IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEAST DIVISION

JORDAN BLAIR                                                                          PLAINTIFF

vs.                                        Case No. 1:02CV88CAS

BOB WILLS, AKA BOBBY RAY WILLS, AKA W. B. WILLS,
BETTY SUE WILLS, SAM GERHARDT,
DEBORAH GERHARDT, BO GERHARDT, JULIE GERHARDT,
DREW PARRISH, ROBERT O'BRIANT, ROBERT KENNEDY,
DBA "MOUNTAIN PARK BOARDING ACADEMY,"
and PALM LANE BAPTIST CHURCH, INC.

                                                                                    DEFENDANTS

**SUBMISSION OF DEPOSITION TESTIMONY IN OPPOSITION TO SUMMARY JUDGMENT**

        Comes now Plaintiff Jordan Blair and states:

        Pursuant to Docket Text ORDER re [101] MOTION for Extension of: Time to File Excerpts

from Depositions of the Blairs, filed by Jordan Blair, Plaintiff was granted an extension of time to file

portions of deposition transcripts.  This pleading is filed, with the deposition and supporting documents,

such as letters produced in response to subpoena duces tecum to the depositions, in opposition to the

motion for summary judgment.

**Ron Blair**

1.        21-32, showing that Ron Blair would not have sent Jordan Blair to Mountain Park Boarding

Academy if he had known or believed that the abuse alleged in the complaint would take place.

1

2.      Page 29 of the Parent-Student Handbook, saying that the medical escrow is to be used to pay medical expenses.

3.      Sam Gerhardt deposition where he says, at line 1028, that the escrow is not to be used for such purposes.

4.      Betty Wills deposition where she says that prescription medicine comes out of the escrow account.

5.      Jordan Blair letter to parents dated November 2, 2001, where he said "I can't have my medicine so don't bother to send that."  (Most probably referring to Zoloft)

6.      Jordan Blair letter to parents dated 12-14-01, in which Jordan asked for Neutrogena face wash and Retin-A, in the margin of which Sam Gerhardt wrote "Call me or email me so I can help you respond to this...Bro. Gerhardt."


**Jannett Blair**


7.      Page 3 to show that Jannett Blair participated in the decision making concerning the care and placement of Jordan Blair.

8.      Page 5 to show that Jannett Blair would not have sent Jordan Blair if she had known or believed that Jordan Blair would be deprived of sleep.

9.      Pages 11-15 to show that Jannett Blair thought that Mountain Park Boarding Academy policy would not allow Jordan Blair to have acne medicine, and to show that she would not have sent him if she had known or believed that bathroom deprivation would take place at Mountain Park Boarding

Academy.

10.     Pages 16-18 to demonstrate that Ron Blair choked Jordan shortly before Jordan was sent to

Mountain Park Boarding Academy.

11.     Page 24 where Jannett Blair said that she would change her mind about Mountain Park

Boarding Academy if Jordan Blair could prove the allegations in his complaint.

**Chris Blair**

12.     Page 7-9, to show that Chris Blair told his father that he would call the police if an incident

similar to the guitar breaking altercation took place, and also that Ron Blair, in choking or at least

placing his hands on Jordan Blair's neck, caused a purple spot on Jordan's neck.

Respectfully submitted,

By:____/s/ Oscar Stilley_____
Oscar Stilley, Attorney at Law
Central Mall Plaza Suite 520
5111 Rogers Avenue
Fort Smith, AR 72903-2041
Attorney for Plaintiff
479 996-4109
501-646-0333 Fax
oscar@oscarstilley.com email

CERTIFICATE OF SERVICE

3

I, Oscar Stilley, by my signature above certify that I have this January 16, 2004 served the defendants with a copy of this pleading electronically by email (CM/ECF being temporarily unavailable) to:  John Oliver, Attorney at law, Oliver, Oliver, & Waltz, PO Box 559, Cape Girardeau, MO, 63702-0559; and John Briggs, Attorney at law, Brown & James, P.C., 1010 Market Street, 20th Floor, St. Louis MO 63101-2000.

4

Ron Blair
December 23, 2003                                                      21

1              MR. OLIVER:  Same objection.

2              MR. BRIGGS:  I'll join.  Also, at this point, I

3          feel a line of questions of a similar nature

4          continuing, and I ask that the objection be

5          continuing through this line of questions.

6              MR. STILLEY:  Certainly.  Your request is

7          granted, your objection is continuing throughout the

8          line.

9              MR. BRIGGS:  Thank you, Judge Stilley.

10  A.   Well, let me answer it this way, Mr. Stilley.  The best

11  way I know how to answer that is that it didn't matter what I

12  thought, to Jordan, because Jordan wouldn't take his medicine

13  when we provided it for him at home.  That was part of the

14  problem.

15  Q.   What kind of medicine are you talking about?

16  A.   His acne medicine.

17  Q.   You're telling -- now you understand you're on oath,

18  correct?

19  A.   Yes, Sir.

20              MR. OLIVER:  You know, Mr. Stilley, you do that

21          again, we're going to quit.  These little sly

22          insinuations by a lawyer who has been disciplined by

23          the Arkansas Supreme Court, and the United States

24          District Court for the Western District are

25          unbecoming to the profession.  He knows he's under

Ron Blair
December 23, 2003                                                        22

1           oath.  You don't need to remind him.  That sly

2           innuendo is an attempt by you to comment on his

3           testimony.  Don't do it again.  This'll be over.

4                MR. STILLEY:  I believe you've done the same

5           thing in this very case.

6                MR. OLIVER:  This'll be over.  Do it again, and

7           it's over.

8                MR. STILLEY:  Oh, you're just going to

9           unilaterally terminate somebody else's deposition?

10                MR. OLIVER:  Yes.  Yes.  A matter of

11           professional conduct, Mr. Stilley, which we haven't

12           seen any of yet this morning from you.  Now if you'

13           going to ask the questions without the innuendo, as

14           away.

15   Q.   What kind of medicine was Jordan Blair taking when he wa

16   sent to Mountain Park?

17   A.   He wasn't taking any.  That was part of the problem I

18   mentioned.  We provided medicine for him, but he wouldn't tak

19   it.

20   Q.   I thought medicine was prescribed to him.

21   A.   The medicines that were prescribed to him were when he –

22   Remeron, I believe, was one of them.  That was when he come o

23   of Moccasin Bend, and the in-patient care at Willow Crest.  A

24   Zoloft.  Those are the two I remember.

25   Q.   What's Remeron for?

Ron Blair
December 23, 2003                                                    23

1   A.   I really don't know the medical explanation of that.  I

2   know that when he was there, that he would get out of hand, a

3   I was told it would take up to four people to hold him down a

4   administer shots to him.

5        And then they give him the Remeron and stuff when they

6   discharged him, and the Zoloft.  When he come home, he was ve

7   subdued.  He didn't act out.  He did what he was -- should do

8   up until he wouldn't take the medicine, and then he would beg

9   -- you could see the pattern return.  And he would start acti

10  out again.

11  Q.   Okay, Remeron, Zoloft, and what else?

12  A.   Just -- from my recollection, just the acne medicine he

13  took.

14  Q.   What kind of acne medicine?

15  A.   I really don't recall.

16  Q.   Was it a prescription drug?

17  A.   I believe it might have been then.

18  Q.   But you don't remember the name of it?

19  A.   No, I don't.

20  Q.   Did you send any of that prescription medicine with Jord

21  when he was sent to Mountain Park?

22  A.   No, I didn't.

23  Q.   Did you send any Zoloft with Jordan to Mountain Park?

24  A.   No, I didn't.

25  Q.   Did you send any Remeron to Mountain Park?

Ron Blair
December 23, 2003                                                    24

1  A.   No, I didn't.  It's like I told you, he wasn't taking it

2  before he went.

3  Q.   Well, did you not think that he might need some while he

4  was there?

5  A.   I thought he needed some while he was at home, but, like

6  said, he wouldn't take it.

7  A.   Well, -

8  Q.   That's what led his actions to get him where he was at.

9  Q.   Well, were you mad at him?  Is that the reason you

10  wouldn't send any medicine with him?

11  A.   No, Sir.

12  Q.   Why did you not send the Zoloft with him?

13  A.   Well, like I said, he wasn't taking it.

14  Q.   Is that the only reason?

15  A.   As far as I can recall.

16  Q.   How about the Remeron?

17  A.   The same with it.

18  Q.   He just wouldn't take it?

19  A.   He wouldn't take it.

20  Q.   So you didn't send any.

21  A.   No.

22  Q.   Do you think Mountain Park might have the capabilities t

23  make him take stuff like that?

24            MR. BRIGGS:  Objection.  Calls for speculation.

25  A.   I really don't know.

Ron Blair
December 23, 2003                                                    25

1   Q.   What about the acne medicine?

2              MR. BRIGGS:   Same objection.

3   A.   I really don't know.

4   Q.   Did you send him any over-the-counter acne medicine?

5   A.   No.

6   Q.   You knew that Jordan Blair has serious acne problems,

7   didn't you?

8              MR. BRIGGS:   Same objection, Oscar.   That also

9              seeks a medical conclusion.   You haven't laid any

10             foundation that this guy is a doctor.

11             MR. STILLEY:   He's a father.   He knows about

12             his son's acne.

13             MR. BRIGGS:   Well, what qualifies as serious,

14             number one, is vague and ambiguous.   In addition,

15             it's something -- if you think he can qualify it,

16             then ask them to qualify it.   Otherwise, I think th

17             question is improper.   My objection is that.

18  A.   I didn't know.   I wouldn't know whether it was serious o

19  not.   I do know that from his eating habits of binging, and

20  just not eating like he should, and his sleep deprivation tha

21  he had at home, staying up all nights an hour, that had a lot

22  to do with his acne then.   I don't know in the fact, from his

23  teenage years, that all kids go through that.   Now that's the

24  extent of my knowledge of it.

25  Q.   Well, what did you observe concerning his acne?

Ron Blair
December 23, 2003
26

1   A.   Acne.

2   Q.   Was it on his face?

3   A.   Yes.

4   Q.   Any other parts of his body, that you saw?

5   A.   I believe his back.

6   Q.   How bad?

7   A.   Just looked like normal acne to me.

8   Q.   Did he have to put some kind of a cream on it?

9   A.   He did, I believe.  He put something on it.

10  Q.   Did he put that stuff on it while he was staying at home

11  with you?

12  A.   At times.

13  Q.   When he needed it?

14  A.   Not every time.

15  Q.   Did you have to tell him that he needed to put that

16  medicine on?

17  A.   I believe he had been told, yes.

18  Q.   How many times?

19  A.   I couldn't say.

20  Q.   Is it fair to say that he would ordinarily put on acne

21  medicine when he needed it?

22  A.   No, because a lot of the things he did was very

23  unordinary.

24  Q.   Well, can you tell us about what percentage of the time

25  you had to remind him to take his acne medicine?

Ron Blair
December 23, 2003                                                    27

1    A.    No, I couldn't.

2    Q.    Did he have to take any acne medicine by mouth while he

3    was living with you?

4    A.    Not that I know of.

5    Q.    This prescription acne medicine, do you know if it was a

6    cream, or a pill, or what it was?

7    A.    I think it might have been a cream.

8                    MR. BRIGGS:   And actually, I'm going to object.

9              I think he said that he didn't know whether it was

10              prescription.

11   Q.    Well, do you know if he had a prescription or not?

12   A.    Like I said, I think it was at the time.  I think it was

13   Q.    Do you know what doctor he got that prescription from?

14   A.    A general practitioner in Alma, I believe.

15   Q.    Do you know the doctor's name?

16   A.    Not really, because there was several that we saw at tha

17   clinic.  There was Dr. Sills, Dr. Bishop, Dr. Sasser, and Dr.

18   Schlabach.  Now which one it actually was, I'm not sure.

19   Q.    Okay.  When you sent Jordan Blair to Mountain Park, was

20   part of your motivation to try to deprive Jordan Blair of acn

21   medicine?

22   A.    No.  Like I said, my motivation was to do whatever we

23   could to help him, in spite of hisself.

24   Q.    Was it part of your motivation to try to deprive Jordan

25   Blair of the Zoloft?

Ron Blair
December 23, 2003                                                    28

1   A.    That would be the same answer.

2   Q.    How about Remeron?

3   A.    Be the same answer.

4   Q.    You're sure about that, right?

5              MR. OLIVER:  You know, Mr. Stilley, -

6   A.    Yes, Sir, I am.

7              MR. OLIVER: - you are a jerk.

8   Q.    While Jordan Blair was at Mountain Park, did he ever ask

9   you for any medication, to your knowledge?

10  A.    I'd have to look and see, through the letters.  I can't

11  say for sure that he did.  I know he asked for other things,

12  just personal items and things like that, and clothing, and

13  shoes -- certain brand names of stuff that he wanted.  But -

14  Q.    If he had asked for acne medicine, would you have sent

15  that acne medicine to him?

16  A.    Well, I didn't have to.  I think there was an account se

17  up for his medical needs there at the school, that we had put

18  funds in for those kind of things.

19  Q.    Were you relying on that fund to provide for his acne

20  medicine?

21  A.    Well, whatever medical need he had, that's what it was

22  there for.

23  Q.    Were you told by the people at Mountain Park that acne

24  medicine would be provided for out of that fund?

25  A.    No, not that I know of, I wasn't told that.

Ron Blair
December 23, 2003
29

1  Q.    What were you told about that fund?

2  A.    That it was for his medical needs.

3  Q.    What medical needs?

4  A.    Well, I don't know.  I mean, whatever they would be.

5  Q.    Were you ever told by Mountain Park personnel that you

6  needed to send some acne medicine?

7  A.    I don't recall.

8  Q.    If you have been requested to send acne medicine for

9  Jordan, would you have sent it?

10  A.    If they had requested it, I sure would have.

11  Q.    If Jordan Blair had requested that medicine, would you

12  have sent it?

13  A.    Well, I don't know that I would have done that, because

14  they were the ones administering to his needs at the time.

15  Q.    Did they tell you not to send acne medicine?

16  A.    Not that I recall.

17  Q.    Is it possible that they did?

18           MR. BRIGGS:  Objection, calls for speculation.

19  A.    I really don't think so, but -

20  Q.    Do you have any knowledge of why Jordan Blair didn't get

21  acne medicine for an extended period of time while he was at

22  Mountain Park?

23           MR. OLIVER:  Extended period of time.  Object

24           to it.  Assumes facts not in evidence.  You can

25           hardly claim that he was there an extended period of

Ron Blair
December 23, 2003

30

1        time.

2   A.   I don't know.

3   Q.   Would you have sent Jordan Blair to Mountain Park if you

4   had known that he would be deprived of acne medicine for an

5   extended period of time?

6                MR. OLIVER:  Same objection.

7                MR. BRIGGS:  And the objection I had before.

8   A.   You know, like I answered you earlier, which, I think I'

9   answered this a couple of times already -- we were trying to

10  everything we knew to do for Jordan, in spite of himself.  An

11  that would have to be my answer to it.

12  Q.   That doesn't answer my question.  The question is, would

13  you have sent Jordan Blair to Mountain Park if you had known

14  that he wouldn't get acne medicine?

15               MR. BRIGGS:  Same objection.

16  A.   I don't think so.

17  Q.   You realize that you have a legal and moral duty to

18  provide for your child's health care, correct?

19               MR. OLIVER:  Oh, come on, Oscar.

20  A.   And I was.

21  Q.   It was your intention that he get adequate health care a

22  medication, correct?

23  A.   Yes.

24  Q.   Would you have sent Jordan Blair to Mountain Park if you

25  had believed that he would be deprived of the right to go to

Ron Blair
December 23, 2003

31

1    the rest room when he needed to go?

2                        MR. BRIGGS:   Same objection as before.

3                        MR. STILLEY:   You've got a continuing

4            objection.

5    A.   No, I wouldn't.

6    Q.   If you had known that Jordan Blair was being assaulted

7    physically, without provocation, would you have sent Jordan

8    Blair to Mountain Park?

9    A.   No, I wouldn't.

10   Q.   Did you make some complaints, some complaints to the

11   police, against Jordan Blair before he was sent to Mountain

12   Park?

13                       MR. BAKER:   I'm going to object, and instruct

14           Mr. Blair not to answer any questions relative to a

15           of the court proceedings in the juvenile matter in

16           Crawford County.

17                       MR. STILLEY:   I'm not asking him about court

18           proceedings.   I'm asking about complaints to the

19           police.

20                       MR. BAKER:   Go ahead and answer that, Mr.

21           Blair.

22   A.   Yes.

23   Q.   And when were those complaints made?

24   A.   I don't know the exact dates and times.   I'm sure you do

25   But I don't.   I just know it was during the times that we wer

Ron Blair
December 23, 2003                                              32

1   having trouble with him.

2   Q.   What kind of trouble did you have?

3   A.   Well, he cut his wrist, for one thing.  He -

4   Q.   Did you file a police report for the wrist cutting?

5   A.   No.

6   Q.   What else?

7   A.   He stole our credit cards, and charged pornography calls

8   with them, on our phone.  And, after talking to him about it,

9   when we first learned about it, and praying with him, and

10  getting him to acknowledge the problem he was dealing with,

11  he'd just turn around and do it again.  And finally, as a

12  resort of him realizing the consequences of his actions, since

13  he wouldn't do it, we did go and file a complaint, sure did.

14  Q.   How many times did the credit card theft happen?

15  A.   I'm not really sure how many times he used it.  But I

16  believe it was more than once.  And then it was the same thing

17  with his grandparents' credit card.

18  Q.   How many times did you find out about a credit card theft

19  A.   Well, I found out after the fact one time, that I know of

20  All the occurrences had taken place.  And then one time him

21  stealing my mother, Lou Blair's, Social Security card for the

22  same purpose.  And he had made calls from her house, also.

23  Q.   After you confronted him about the theft of your credit

24  card, and the improper use of that credit card, did that happen

25  again?

**INCIDENTAL EXPENSES (Estimated)**

| | |
|---|---|
| Incidental Expense Account (Accrued student expenses per year) | $  300.00 |
| Computer Lab Fees (dictated by cost of specific course) | varies |
| PLAN Test (prep for ACT/ 10th and 11th grades) | $      8.00 |
| A.C.T. College Test (12th grade only) | $    25.00 |
| Additional expenses that may be anticipated for graduating seniors | $1,500.00 |
| (Portraits, class ring, announcements, senior trip, graduation dress, etc.) | |

Applicants are only admitted on the express condition that they shall remain at the school until the end of the written agreement, unless suspended or allowed to withdraw because of sustained illness. The parent or guardian agrees that in the event the student leaves school because of voluntary withdrawal (voluntary withdrawal includes situations where a parent is asked to remove a student because of the parent's unwillingness to support all MPBBA policies) on parent's or guardian's part during the written term or any subsequent academic session, no part of the fee for the school year shall be refunded or remitted and **ANY UNPAID BALANCE ON ACCOUNT OF SUCH FEES FOR THE SCHOOL YEAR SHALL BECOME IMMEDIATELY DUE AND PAYABLE TO THE SCHOOL AS LIQUIDATED DAMAGE.  SCHOOL RECORDS WILL BE WITHHELD UNTIL THIS CONTRACT IS SATISFIED.  THERE ARE NO ALLOWANCES FOR PARTIAL MONTH ENROLLMENT.**

MPBBA does not give money back.  We reserve the right to use the money any way we deem necessary.  An exception in the finance policy for one is NOT meant as an exception in the finance policy for anyone else.

**Damages**

In the event that a student damages property or equipment, while committing a wrongful act as deemed by MPBBA or the law, the parent is expected to bear the financial responsibility for replacement or repair of the damages.

**Medical Escrow**

The $500.00 medical escrow provides preparation against possible medical expenses.  Medical needs will be met from this account (appointments, prescriptions, etc.).  It is expected that this account be maintained at $500.00.  The balance of this account may be returned upon withdrawal as long as **all medical and other obligations** are met.  Allow at least thirty days to pass after withdrawal before requesting the balance.

**Incidental Expense Account**

The Incidental Expense Account  provides for incidental items such as dry cleaning, eye glass repair, fuel expense to doctor visits, etc....  You may check on this account at any time to ensure that sufficient funds are available.  It is important that you do not allow this account to become overdrawn.

**Expenses For Graduating Seniors**

Specific information regarding these expenses will be provided upon request.  See Appendix D.

**GIVING:**

Occasionally the opportunity to give to a ministry will be presented to the students, allowing them to feel a part of helping others in financing God's work.  The normal contribution will not exceed $1.00.  Parents who wish to give financially through the ministry of **MPBC** may contact Pastor Wills.

*Page 29*

1024         Q    You didn't care what he said about his

prescription medications?

        A    I am responsible to the parent who cares for

him.

1025         Q    You are not responsible to the child, too?

        A    If a child has medicine like acne medicine, and

the parent told us they have got acne medicine, bring it

with you, make sure we have it; and he will get it.

        But every student who calls, am I going to ask

the parent "Is this child on acne medication," no, I don't

ask that question.

1026         Q    He had a $500 retainer for medical expenses; did

he not?

        A    Ask your question again.  I am not for sure I am

understanding exactly what you are asking.

1027         Q    Jordan Blair's parents paid $500 to Mountain

Park to provide for the medical necessities of Jordan

Blair; did they not?

        A    They provided a $500 medical escrow.

1028         Q    That provided enough money to buy acne

medication necessary.  Correct?

        A    No, sir.  That is not what that is for.

1029         Q    What is it for?

        A    It is a medical escrow.

     A   Yes, sir.

212       Q   Will that be reflected in the financial records

of the students?

     A   Yes, sir.

213       Q   Are you sure about that?

     A   Yes, sir.

214       Q   Will there be anything in addition to the $5?

     A   What do you mean by in addition to the $5?

215       Q   Will there be any charges?  Let's say that you

use some kind of drug that costs $50 a month, will that

$50-a-month drug be shown as a charge against that

parents' account?

     A   If we used, if we used that type drug you are

talking about, yes, it would be on there.

216       Q   What does the $5 cover?

     A   It covers cough drops.  It covers Tylenol.  It

covers Aleve.  It covers all kinds of medicine like that.

217       Q   Does it cover the worm medicine?

     A   It covers everything like that.

218       Q   How do I know what is "like that"?

     A   If it is not a prescription medicine, that is

prescribed especially for that person, that comes from a

doctor, then it is charged in the $5.

     If it is a prescription medicine that has that

child's name on it, that says "This is for this child,"

then it comes out of their account.

219   Q Do you have some prescription medicines that are

not --

   A No.

220   Q Wait a minute.  Now, let me ask the whole

question.  Then, you answer.

    Do you have some prescription medications that

you give to a lot of people instead of just the person

that it is prescribed for?

   A No, sir.

221   Q Have you ever to your knowledge had an incident

where a child has been given a prescription medicine

without a prescription from a doctor?

   A Not to my knowledge.

222   Q Would you have knowledge if that had occurred?

   A I would think so.

223   Q What kind of container does this worm medicine

come in?

   A It is just a little bottle, I think, just a

small two or three-ounce bottle.

224   Q Is that a one-dose bottle?

   A No.  I think it has more than one dose in it.

225   Q Do you know how many doses it has?

   A No.  I don't.

226   Q Do you know what flavor it is?

Mom + Dad,                                                NOVEMBER 2, 2001

     I still need all of my toiletries +
stuff. Some shower shoes ... etc. You'll
have to buy the clothes or something b/c
I don't have any dress pants that fit.
I need jeans, too ... my regular ones
are too baggy. Did Chris have a
happy birthday?? Tell him I said
hey! How is Timmy?? Well, I'm
doing fine. I'm still mad at you
guys, but I imagine that you guys
are still mad at me too ... Anyway,
may I please go into the Air National
Guard?? I really want to enlist.
Please, I'm begging you. I will
have the same (more) discipline than
here and I'll be able to go to college
instead of having to go through all
of the red tape here. Mom + Dad
I already have enough credits to
graduate ... Mr. Brian required 26,
+ they require 22 or 23 here?!
All of us have stuff to deal with ...
at least let me try to make something
of myself. All you have to do is send
the recruiters' papers up here + I'll
sign them. Will you please deeply
consider this ... please!

P.S. I can't have my                        Love ya,
medicine (so don't bother
to send that. Will you                      P.S.2 Oh I need a

Dec 18 01 03:24p     Debby Gerhardt          863-993-3037          p.2

Mom & DAD,                                    12-14-01

Hey! These are a few things that I've learned these past weeks: 1) speaking in tongues is false doctrine, 2) the christian music you listen to is wicked (+ stuff he calls it trash), 3) Our church (FBC) is wicked, 4) The music you sing in church is wicked, ⑤ The instruments they use are wicked (drums, electric guitar, etc...) and ⑥ the way they sing is wrong; these are some of the things I'm told about everyday. Do you agree with this? The way you dress is even wrong in their eyes!? Are you Independent Fundamental Baptist? If any of this is true, why does it say so in the Bible? Just read Acts or 1 Corinthians. Why didn't you send me to boot camp or jail if you wanted to punish me? At least there I would be able to graduate on time! Did you know that I'm going to be a high school dropout? Without even a GED?! Why? Especially when I have the opportunity to go into the Air National Guard and start college, and go to a "good" church. Do you even realize what your doing? Did you send me here so you wouldn't have to be responsible for me? Why won't you allow me to go into the Air National Guard? I still need some clothes, white undershirts (large), Q-Tips, soap, Lotion, Big towels, hair gel, 0.00 4 mm razor, Neutrogena face wash, a suit, dress shoes, Pocket Bible, Robin A, Electric Razor, work belt, work boots, book light, + a hairbrush.
                                              Sincerely,
                                              [signature]

Call me or email me so I can help you respond to this... Bro Gerhardt

Jannett Blair
December 23, 2003                                                          3

1       JANNETT LEE BLAIR, being duly sworn, testified upon her

2   oath as follows:

3                        DIRECT EXAMINATION

4   BY MR. STILLEY:

5   Q.   Please state your name.

6   A.   Jannett Lee Blair.

7   Q.   And who are you married to?

8   A.   Ronald Gene Blair.

9   Q.   And what's your children's names?

10  A.   Jeffrey, Jordan, Christopher, and Timothy.

11  Q.   Do you recall sending Jordan Blair to Mountain Park?

12  A.   Yes.

13  Q.   Did you play any role in the decision to send him to

14  Mountain Park?

15  A.   Of course.

16  Q.   And what was that role?

17  A.   To be in agreement.

18  Q.   With your husband?

19  A.   Uh-huh.

20  Q.   You know what the reasons were for sending him to Mounta

21  Park?

22  A.   Yes.

23  Q.   What were they?

24  A.   He was unmanageable at home.

25  Q.   Did you ever go to Missouri and meet Sam Gerhardt?

Jannett Blair                                                                    5
December 23, 2003

1              objection going as on a continuous basis throughout

2              the remainder of the deposition.

3                      MR. BAKER:  Go ahead and answer the question.

4     A.   What was it again?

5                      MR. STILLEY:  Okay, you've got a continuing

6              objection left.

7                      MR. BRIGGS:  Yes.

8                      MR. STILLEY:  I just want to understand that.

9     Q.   If you had believed that Mountain Park was going to

10    deprive Jordan Blair of sleep, as is alleged in the Complaint

11    would you have sent him there anyway?

12    A.   Of sleep?

13    Q.   Right.

14    A.   No.

15    Q.   Okay.  Now do you know what medication that Jordan was o

16    when he was sent to Mountain Park?

17    A.   He was on no medication.

18    Q.   No medication at all?

19    A.   Huh-uh.

20    Q.   He had no prescriptions?

21    A.   He left Sparks Hospital.  He ran away from Sparks

22    Hospital, discontinuing all his medications on his own.

23    Q.   How long was he gone from Sparks Hospital?

24    A.   Oh, I don't know exactly.  Maybe two months that we

25    couldn't find him.

Jannett Blair
December 23, 2003                                                            11

1   A.   Yes.  He asked in letters.

2   Q.   Okay.  And what did you do?

3   A.   We told him he couldn't have it.

4   Q.   And why did you not want him to have it?

5   A.   Well, the school does not dispense medication like

6   antidepressants.

7   Q.   Okay.  Well, I'm not talking about the antidepressants

8   right now.  I'm talking about the tetracycline, Retin-A, and

9   the cream.  Was it your understanding that the school had a

10  policy against dispensing those medications?

11  A.   Yes.

12  Q.   Is that why you didn't send them?

13  A.   Partly.

14  Q.   Did any personnel at either Mountain Park or Palm Lane

15  tell you not to send tetracycline, Retin-A, or cream?

16  A.   No.

17  Q.   How did you come to the conclusion that the school did n

18  permit the use of these drugs?

19  A.   I believe it was in the handbook.

20  Q.   Did you ever ask any questions about the handbook to mak

21  sure?

22  A.   Not about the medication, no.

23  Q.   When Jordan sent you the letter and asked for the

24  tetracycline, Retin-A, and cream, did you do anything at all

25  response to that?

Jannett Blair                                                    12
December 23, 2003

1    A.   We told him that he couldn't have it.  We wrote him back

2    Q.   Why did you get him started on the tetracycline, Retin-A

3    and cream to begin with?

4    A.   Well, the Retin-A is a cream.

5    Q.   Okay.

6    A.   It's not two things.

7    Q.   Do you know how to spell Retin-A?

8    A.   Yes.

9    Q.   Can you spell it for us?

10   A.   R-e-t-i-n dash, capital A.

11   Q.   Okay, so there were two things that he had.  It was the

12   Retin-A, and the tetracycline?

13   A.   For acne.

14   Q.   Did you tell Jordan that he was not going to be able to

15   get any of those drugs?

16   A.   I believe so.

17   Q.   How did he respond?

18   A.   Well, he would ask for something else.

19   Q.   What else did he ask for?

20   A.   Boots.  A flashlight.

21   Q.   Did he ask for any over-the-counter acne medicine?

22   A.   Not that I remember.

23   Q.   Do you remember -- when did Jordan start on the acne

24   medicine?

25   A.   Oh, gosh.  Let me think.  Probably -- I'm just blank.  I

Jannett Blair
December 23, 2003                                          13

1   can't remember.  It was down here with Dr. Schlabach or Bisho

2   Probably when he was fifteen.

3   Q.   So is it fair to say that he'd been on this medication f

4   perhaps a year before he went to Mountain Park?

5   A.   On the acne medication?  Yeah, maybe a year.

6   Q.   It would seem that in order to get a prescription for ac

7   medication of this type that the acne would have to be pretty

8   bad.  Is that true?

9                   MR. BRIGGS:  Objection.  Calls for speculation

10            and a medical conclusion.

11                   MR. BAKER:  Go ahead and answer.

12  A.   Well, it's not as bad as Timmy's is.

13  Q.   Does Timmy take prescription medication?

14  A.   He just started, and he didn't even ask for it.

15  Q.   But he was having problems, so you provided that?

16  A.   Yes, just like we did Jordan.

17  Q.   Okay.  Well, did you know in advance of sending Jordan t

18  Mountain Park that he wouldn't be able to get the acne

19  medicine?

20  A.   Yes.

21  Q.   And so I take it that was okay with you, to send him

22  anyway?

23  A.   Yes.  Yes.  These were the choices he made.

24  Q.   Well, would you consider it a punishment that he wouldn'

25  get his acne medication?

Jannett Blair                                                                    14
December 23, 2003

1   A.    No.  It was a choice he made.

2   Q.    That would be an adverse consequence, would it not?

3   A.    It's -

4              MR. BRIGGS:   Objection.   Argumentative.

5   A.    It's called a consequence of your actions.

6   Q.    Do you believe that you, as a parent, have a duty to

7   provide the medical necessities of your children?

8   A.    Yes.

9   Q.    Did you not consider the acne medication to be a medical

10  necessity?

11  A.    No.

12  Q.    If you had known in advance about the bathroom deprivati

13  and had believed that that would occur, would you have sent

14  Jordan Blair to Mountain Park anyway?

15  A.    No.

16  Q.    And did you read in the Complaint about the assaults tha

17  Jordan is alleging to have happened to him?

18  A.    I don't remember -- I remember him saying that other kid

19  were assaulted.

20  Q.    You don't remember him saying that he was assaulted?

21  A.    No, not really.  No.

22  Q.    Do you ever remember having a problem with Jordan Blair

23  having improperly used credit cards to buy things he shouldn'

24  buy?

25  A.    Yeah.

Jannett Blair                                                    15
December 23, 2003

1   Q.    Do you remember how much he charged up on those credit

2   cards?

3   A.    No.

4   Q.    Do you know if he ever paid those amounts back in full?

5   A.    Well, how can I know that, if I don't know how much he

6   charged, for certain?

7   Q.    Did you never figure out how much he charged?

8   A.    I think my husband did.

9   Q.    Okay.  Did you have any knowledge about how much had bee

10  charged on the family credit cards?

11  A.    I might have at that time, but I don't remember now.

12  Q.    Okay.  Do you remember if the amounts that were charged

13  the family credit cards were repaid in full?

14  A.    No, I don't.

15  Q.    You don't know one way or another?

16  A.    No.

17  Q.    Okay.  When you sent Jordan away, did you have any

18  intention that he would be prevented from having access to

19  legal counsel?

20  A.    No.  I didn't know he needed any.

21  Q.    So I take it from your answer, then, that if he wanted t

22  appeal from an adverse decision at general court that you

23  wouldn't have had any objection to him taking that appeal?

24  A.    Yes, I would have objected to it.

25  Q.    Would you have -- did you do anything knowingly to try t

Jannett Blair                                                    16
December 23, 2003

1   prevent Jordan Blair from taking an appeal from that decision

2   A.   No.

3   Q.   If you had known that sending Jordan Blair to Mountain

4   Park would result in him being deprived of the ability to

5   appeal that decision, would you have sent him to Mountain Par

6   anyway?

7   A.   I don't know.  That's hard to say.  I mean, I didn't kno

8   all of this was going to happen.

9   Q.   Were you witness to an incident in which there was a

10  guitar broken, and there was a scuffle between Mr. Blair and

11  Jordan Blair?

12  A.   Uh-huh.  Yes.

13  Q.   Do you remember anybody -- well, can you give us just yo

14  description of what happened?

15  A.   Ronnie was working second shift, as usual.  And Jordan

16  acted up pretty good that night.  He was walking across the

17  furniture, he was laying under the couch and picking it up in

18  the air, and just acting like a caged animal.  And those are

19  the things I remember most vividly.

20       But anyway, I had called Ronnie, and I think he -- I don

21  remember if he talked to him or not, but when he got home, I

22  told him everything that Jordan had done, and then I started

23  crying, because I had been very upset over the things he was

24  doing, because I didn't understand him.  I didn't know who he

25  was, I didn't know what was going on with him, and it had bee

Jannett Blair
December 23, 2003

17

1  night, after night, after night of this.

2       And Ronnie went in there and talked to Jordan.  When he

3  came back in the bedroom were I was, I was crying, and I said

4  "Oh good, I'm glad you're going to spank him."  And he said,

5  "Oh, you want me to?"  And I said, "Yes, I believe he needs a

6  good spanking."

7       And I know he was too big, and whatever, but he went in

8  the bedroom and told him to bend over, and Jordan said no.  S

9  that's when the scuffle began.  He wouldn't bend over.  And h

10 never did.

11 Q.   Okay.  Well, tell us about the actual scuffle, itself.

12 What did you see?

13 A.   A lot of testosterone.

14 Q.   Well, can you describe it a little bit more discreetly?

15 A.   Pushing and shoving, and yelling, and breaking things.

16 And Jordan put his fists up to his dad, at one point, and

17 Ronnie said, "You don't want to do that, Jordan."  So he put

18 his -- took his stance down a little, and they wrestled arou

19 in the closet, on the floor, just everywhere.

20 Q.   Did you see any choking going on?

21 A.   Uh-huh.

22 Q.   Who choked who?

23 A.   Ronnie choked Jordan.

24 Q.   How much did he choke him?

25 A.   Just enough for him to be still.

Jannett Blair
December 23, 2003                                                          18

1    Q.    Could you tell whether he had gone unconscious or not?

2    A.    Yeah.

3    Q.    Did he go unconscious?

4    A.    No.

5    Q.    He didn't go unconscious?

6    A.    No.

7    Q.    Did you see any marks on Jordan's neck?

8    A.    No.

9    Q.    Did you look at his neck after the altercation?

10   A.    No.

11   Q.    Did anybody try to make a telephone call?

12   A.    No.  I took the two boys out, when that happened.

13   Q.    When what happened?

14   A.    When they were on the floor, choking.

15   Q.    Okay.  Did either of the boys try to make a telephone

16   call?

17   A.    No.  Nobody did.

18   Q.    Did you at some point in time find out that Jordan had

19   been sent to Palm Lane Academy?

20   A.    Uh-huh.

21   Q.    When did you find out?

22   A.    I think it was the day it happened, or the day after.  I

23   can't remember.

24   Q.    Well, do you remember -- what day he would that be?

25   A.    I don't know.

Jannett Blair                                                        24
December 23, 2003

1    Q.   If the military was able to help him, and help him to

2    respect authority, would that have satisfied your concerns?

3    A.   How would I know they could do that?

4    Q.   Well, we don't, but I'm just asking.

5    A.   In my belief, Mountain Park had a much better chance of

6    doing that than the military.

7    Q.   Do you still to this day have faith in Mountain Park's

8    abilities?

9    A.   Yeah, I do.  Until all this stuff is proven to be true,

10   then it's not true to me.

11   Q.   Okay.  And if this stuff was proven to be true that's in

12   Jordan's Complaint, would that change your mind?

13   A.   If it's proven?

14   Q.   Yes.

15   A.   Yeah.

16                  MR. STILLEY:  Pass the witness.

17                  MR. BRIGGS:  No questions.

18                  MR. STILLEY:  We're all done.

19                  MR. BAKER:  Thank you, Ma'am.

20                  [WITNESS EXCUSED - 2:10 p.m.]

Chris Blair
December 23, 2003                                                              7

1   A.    Oh, I was going to think.  I can't remember.  Just that

2   like if I don't have to answer it like they'll say so or

3   something, or he will.

4   Q.    Okay.

5   A.    Just normal stuff.

6   Q.    Did they talk to anything about the facts that you might

7   be questioned about?

8   A.    Just about you asking me about my dad choking him.

9   Q.    Did they talk about that?

10  A.    They just -- they said they doubt you'll ask me about

11  that.   That's all.

12  Q.    Did they say anything more about that incident?

13  A.    Huh-uh.   No.

14  Q.    Do you remember anybody trying to make a phone call after

15  this incident with your dad and Jordan?

16  A.    Yes.

17  Q.    Who tried to make the phone call?

18  A.    Me.

19  Q.    And what happened then?

20  A.    They just stopped wrestling, and Jordan finally took his

21  whipping.

22  Q.    Okay.  Did you make the phone call?

23  A.    No.  I told them next time they did, though, they did

24  wrestle, I was going to call the cops.

25  Q.    Did your dad tell you not to make the phone call?

Chris Blair
December 23, 2003                                                                8

1   A.    No.  He didn't say anything.

2   Q.    Did he take the phone away from you?

3   A.    No.

4   Q.    Did you dial the number?

5   A.    Huh-uh.  No.

6   Q.    Did you just start to dial the number?

7   A.    No, I picked up the phone.  That's all I did.

8   Q.    Okay, and why did you put the phone back down?

9   A.    Because they finished.  They didn't do any more.

10  Q.    Did you say you told your dad that you were going to cal

11  them next time, if the same thing happened?

12  A.    Yeah.  That's what I said, yes.

13  Q.    Okay.  Do you remember an incident in which a knife was

14  placed at your throat by Chris?

15  A.    I'm Chris.

16  Q.    I mean Tim.

17  A.    Yes.

18  Q.    Okay, how did that come about?

19  A.    We were just at my grandma's.  I can't remember what we

20  were doing.  I think he was just messing with me, though.

21  Q.    Okay.  Did that make you scared of him?

22  A.    Kind of.

23  Q.    Do you know whatever came of that?

24  A.    Huh?

25  Q.    Do you know if there was any punishment ever dealt out

Chris Blair
December 23, 2003
9

1  over that?

2  A.   I can't remember.  I know he was punished, but I can't

3  remember what it was.

4  Q.   After this incident in which the guitar got broke, do yo

5  remember seeing any marks on Jordan's throat or neck?

6  A.   Yes.

7  Q.   And where were they at?

8  A.   Just like right here, just a little purple spot where my

9  dad's thumb was, where he was just holding him down, is all h

10  was doing.

11  Q.   Okay.  How long did that stay that color?

12  A.   Just that night.  The next morning it was gone.

13  Q.   Okay.

14          MR. OLIVER:  And this is admissible in this

15        case because?  Come on, Mr. Stilley.  Have some

16        decency.

17          MR. STILLEY:  Pass the witness.

18          MR. BRIGGS:  We have no questions.

19          MR. STILLEY:  Thank you.

20          MR. BAKER:  Thanks, Chris.

21          [WITNESS EXCUSED 1:34 P.M.]