1                UNITED STATES OF AMERICA
              EASTERN DISTRICT OF MISSOURI

2               SOUTHEASTERN DIVISION

3  JORDAN BLAIR,                )
                          )

4        Plaintiff,       )
                          )

5      vs.                )  No. 1:02-CV-88 CAS
                          )

6  BOB WILLS, ET AL.,       )
                          )

7        Defendants.      )

8

9              TRANSCRIPT OF JURY TRIAL

10      BEFORE THE HONORABLE CHARLES A. SHAW
          UNITED STATES DISTRICT JUDGE

11             April 12, 2004
               Volume I

12

13  APPEARANCES:

14  For Plaintiff:    Mr. Oscar Stilley
                   511 Rogers Avenue

15                 Central Mall Plaza, Suite 520
                 Fort Smith, AR  72903

16

17  For Defendants:   Mr. John L. Oliver, Jr.
                 OLIVER, OLIVER & WALTZ

18                 400 Broadway, P.O. Box 559
                 Cape Girardeau, MO  63702

19                 Mr. John D. Briggs
                 BROWN AND JAMES

20                 1010 Market Street, 20th Floor
                 St. Louis, MO  63101

21

22  REPORTED BY:      SUSAN R. MORAN, RMR
                 Official Court Reporter

23                 111 South 10th Street
                 St. Louis, MO  63102
                 (314) 244-7983

24

25  Proceedings recorded by mechanical stenography, produced by
  computer-aided transcription.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

I N D E X

PRETRIAL CONFERENCE                              3

INITIAL INSTRUCTION BY THE COURT          55

OPENING STATEMENTS

     (By Mr. Stilley)                    62
     (By Mr. Oliver)                     66

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

PLAINTIFF'S WITNESSES

BETTY SUE WILLS

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| (By Mr. Stilley) | 81 | | | |
| (By Mr. Oliver) | | 116 | | |
| (By Mr. Stilley) | | | 130 | |

JORDAN BLAIR
     (By Mr. Stilley)      134

E X H I B I T S

|  | Offered | Received |
|---|---|---|

PLAINTIFF'S EXHIBITS

|  | Offered | Received |
|---|---|---|
| 2 - 7, 9 - 38 | 52 | 52 |
| 41 | 52 | 53 |

```
 1              (The following proceedings were held on April 12,
 2    2004 at 9:13 a.m.:)
 3              THE COURT:  Good morning.
 4              MR. STILLEY:  Good morning.
 5              MR. OLIVER:  Good morning.
 6              THE COURT:  We're here for the trial of Jordan Blair
 7    versus Bob Wills, doing business as Mountain Park Boarding
 8    Academy, et al.  Representing plaintiff Blair is attorney
 9    Oscar Stilley.  Good morning, Mr. Stilley.
10              MR. STILLEY:  Good morning.
11              THE COURT:  And representing the defendants Bob
12    Wills, et al. is John Oliver.
13              MR. OLIVER:  Your Honor.
14              THE COURT:  And this is Russell Watters with you
15    here?
16              MR. BRIGGS:  John Briggs, Your Honor.
17              MR. OLIVER:  Your Honor, may I introduce Mr. Dave
18    Gibbs of the bar of Florida who won't participate in the
19    trial, but with the Court's permission if he could sit in
20    front of the bar and observe, we would appreciate it.
21              THE COURT:  Very well.
22              MR. GIBBS:  May I correct one thing, it's the bar of
23    Ohio.
24              THE COURT:  You're getting closer.  We have a number
25    of issues remaining, pretrial issues.  And part of this whole
```

1    thing, we've only got two claims left, this Fair Labor

2    Standards Act and this civil -- single civil battery claim,

3    the plaintiff against Bo Gerhardt.

4         Now, one of the things, we got all these witnesses

5    that you're trying to belatedly come up with.  It's as simple

6    as this, you know, you cannot hide the basketball and then

7    sneak out on the floor for a slam dunk, it is as simple as

8    that.  This is not Perry Mason.  You got to come on with it.

9    It's like playing cards, everybody got to turn their hands up

10   and see what you got, maybe the game don't even need to be

11   played, you see.  If you got all threes and the other person

12   got all aces, please, then I can make a call and the game is

13   over.  No point in playing that game.  But here you are

14   trying to come up with a bunch of cards that you didn't turn

15   up.  That's the problem.

16        MR. STILLEY:  Your Honor, may I address that?

17        THE COURT:  Go for it.

18        MR. STILLEY:  Here's what the situation was.  I had

19   tried to get information from the defendants about various

20   individuals, about names and contact information on the

21   various individuals.  Was not able to get that.  But now let

22   me explain what the situation is.

23        THE COURT:  You know, when a person has a problem,

24   what do they do?  Do you play golf?

25        MR. STILLEY:  No, I don't.

1          THE COURT:  Well, they call the official and they

2     ask the official for a ruling.  Did you call me and ask me

3     for a ruling?

4          MR. STILLEY:  Your Honor.

5          THE COURT:  No, you didn't do that.  See, now you

6     want to come up with this.  You should have called, said we

7     got a problem, what we going to do, Mr. Official?

8          MR. STILLEY:  Well, I understand that.  But what the

9     rule says is that you have to either identify witnesses

10    either directly in response to discovery or Rule 26 or

11    otherwise identify these individuals in writing, whether it's

12    other litigation going against these individuals.  And rather

13    than try to go through this again to try to get this

14    information, I simply listed all the former students and

15    staff at these facilities.  And one of these gentleman,

16    Mr. Palmer, only got out about eight months ago, so it was

17    long after the litigation was started that we even knew that

18    he existed.

19         THE COURT:  Well, you know, if you take anything to

20    an extreme, suppose you list everybody in the world as a

21    witness.  Please.  You know, there is some degree of

22    specificity that is needed.  I'm going to let Mr. Oliver

23    respond to what you're talking about.  Mr. Oliver.

24         MR. OLIVER:  May it please the Court.  First, Your

25    Honor, this was a subject, albeit briefly, of a discovery

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    conference and ruling between Your Honor, myself, and

2    Mr. Briggs on September the 23rd of 2003 in which the Court

3    made certain rulings, with respect to which we have complied

4    with one exception, which is the subject matter for the

5    further pretrial.

6           Since that time the plaintiff has not under their

7    duty under Rule 26(e)(1) supplemented either their Rule 26(a)

8    disclosures or their answers to interrogatories, particularly

9    my interrogatories for Palm Lane No. 34 and No. 35 and No.

10   36, in which I specifically asked for the name, address, and

11   telephone number of people with certain knowledge.

12          Judge, you're acquainted with this better than I am.

13   Your decision in Patterson versus State Farm was just

14   affirmed by the Eighth Circuit a little while ago in which

15   where the party did not under Rule 26(e)(1) supplement their

16   disclosures until the date that pretrial was due, Your Honor

17   excluded that evidence.  The Eighth Circuit affirmed you.

18          And then most recently -- I understand I'm taking a

19   risk citing -- most recently, Your Honor, the Eighth Circuit

20   cited that opinion affirming you again in a case called

21   Troncanon (phonetic), in which the defendant tried to do what

22   Mr. Stilley did, which was to run in a bunch of witnesses on

23   the pretrial.  And the Eighth Circuit citing to Your Honor's

24   affirmed opinion specifically held that not only -- not only

25   affirmed the trial court but affirmatively stated that the

1    trial court should exclude all witnesses who weren't listed

2    in 26(a) or a timely 26(a) supplement or answers to

3    interrogatories.  With the exception of Lou Blair, which we

4    clearly admit we knew about.  Mr. Stilley offered Lou Blair

5    to us to depose.

6           So with the exception of Lou Blair and the

7    plaintiff, all of these witnesses in this case that he's

8    listed -- except our clients obviously -- are inappropriate

9    and should be stricken.

10          THE COURT:  Very well.  Mr. Stilley, what do you

11    have to say to these thirty people basically, almost 30

12    people here you belatedly listed?  Anything about any of them

13    that you've identified them or supplemented information about

14    them?  You know, part of the reason people may want to take

15    depositions, take these people's statements, see what they

16    have to say.  They have a right to do these things.  That's

17    why we have these rules.  It's not a surprise -- civil cases

18    are not a surprise situation.  It is to explain to lay people

19    that it is simply like you have a hand, they have a hand, and

20    if they ask to see your cards, you just have to turn them up.

21    You turn your cards up and we see what everybody has so we

22    know where we're doing.

23          But when you don't do that, nobody knows what's

24    going on.  It's a surprise situation.  They have a right to

25    take these people's depositions, statements or whatever

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    investigation otherwise they wish to undertake.  But when you

2    belatedly give up that information, then nobody knows.

3    You've taken advantage of our rules.  So it's a problem.  Is

4    there any exception with any of these people?

5            MR. STILLEY:  Your Honor, I know I listed a number

6    of individuals.  The only three that's in dispute is a lady

7    named Melissa Smith, a lady named Angela Collier, and a lady

8    named or a gentleman named Ray Palmer.  That's the only three

9    we're talking about.  Ray Palmer is the one that got out

10   about eight months ago.

11           THE COURT:  Got out of what?

12           MR. STILLEY:  Beg your pardon?

13           THE COURT:  Got out?  What are you saying?

14           MR. STILLEY:  Out of Mountain Park.  The other two

15   have been out for a considerable period of time.  So -- let

16   me put it like this.  If -- and I'd respect the Court's

17   ruling --

18           THE COURT:  Is there some way that you were

19   prevented from knowing who these people were?  What's the

20   problem?

21           MR. STILLEY:  No, I was not.  Well, I knew about --

22   I just dribble these people along.  These people came to my

23   attention from time to time that I just from various sources

24   find out that these people existed.

25           THE COURT:  Well, you remember when we had our

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

```
 1    previous President in a pickle, he said he was going to tell

 2    more rather than less.  See, you're telling less rather than

 3    more.  You say you knew about these people but you didn't

 4    want to tell anybody, see.  So what do you want me to do?

 5            MR. STILLEY:  Judge, let me put it like this.  I can

 6    present all the evidence that I need with Mr. Jordan Blair

 7    and Lou Blair.

 8            THE COURT:  Fine, then these other witnesses are

 9    excluded.  Now, let's see here about Mr. Lou Blair.  There's

10    a motion to exclude him also.

11            MR. OLIVER:  Her, Your Honor.  This is Mrs. Blair.

12    It's the witness's grandmother.

13            THE COURT:  I'm sorry.

14            MR. OLIVER:  And might I suggest it might be

15    appropriate if the witnesses or potential witnesses that are

16    in the room weren't in the room.

17            THE COURT:  Well, it doesn't bother me.

18            MR. OLIVER:  All right.  It doesn't bother me then.

19            THE COURT:  If they are excluded, that's that.  This

20    is just a legal matter.

21            MR. STILLEY:  Your Honor, let me put it like this.

22    I do want to reserve for rebuttal, and I want to make sure I

23    have a clear understanding of that.

24            THE COURT:  Rebuttal is somewhat different.

25            MR. STILLEY:  That is correct.
```

1          THE COURT:  We're talking about witnesses in your

2     case in chief.

3          MR. STILLEY:  Correct.

4          THE COURT:  Rebuttal witnesses are witnesses that

5     you're saying something came up that you need to rebut that

6     was not part of your case but was part of the defendant's

7     case and you are rebutting what they say.  So you don't

8     necessarily know who those might be.  So there's a

9     difference.  What are you saying, Lou Blair then would be a

10    potential rebuttal witness?

11         MR. STILLEY:  No, I'm saying Ms. Smith, Ms. Collier,

12    and Mr. Palmer would be potential rebuttal witnesses.  And

13    Ms. Blair, I'm still contending she's a proper witness to

14    testify.

15         THE COURT:  I'm not going to concern myself with

16    rebuttal witnesses until -- I'm not going to cross that

17    bridge until we get to it.

18         MR. STILLEY:  Okay.

19         THE COURT:  Now, so as far as witnesses in chief are

20    concerned, those witnesses are excluded.  Now let's go to Lou

21    Blair.

22         MR. STILLEY:  Okay.

23         THE COURT:  My understanding is that the defendants

24    have moved to exclude Lou Blair based on the fact that the

25    witness has no relevant testimony other than information

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

```
 1    relative to the plaintiff's juvenile detention.  And that's

 2    not part of this case.

 3              MR. STILLEY:  Your Honor, I understand that that's

 4    not part of this case.  There are some issues involved in

 5    this.  For example, the defendants sent me their copies of

 6    their exhibits on the last day for me to object.  And one of

 7    those exhibits, Exhibit A, it has a statement in it from Ron

 8    Blair talking about Jordan.  And I was not able to talk to my

 9    client before midnight on that date.  Since that time I've

10    talked to him and we'd like to keep that out.  It's Ron

11    Blair's statements about Jordan's situation.

12              THE COURT:  Wait a minute.  I'm talking about apples

13    and you've jumped over on oranges.  I'm not following you.

14    What are you talking about?

15              MR. STILLEY:  Well, Ms. Blair can explain actually

16    what the situation is with Jordan Blair.  And if we don't

17    have these extraneous things, it may not be necessary to call

18    Ms. Blair.

19              THE COURT:  Maybe if you object at the appropriate

20    time they won't come in, you know.

21              MR. STILLEY:  Your Honor.

22              THE COURT:  That's the whole idea of an objection.

23    Just like they file objections to these witnesses, you see.

24              MR. STILLEY:  Your Honor, but once again they waited

25    until the very last day.  I got this material on the very
```

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1    last day.  My client was at work and I could not talk with

2    him about this.  I wanted to see what he had to say.  And so

3    unless I was just going to object without discussing it with

4    him, I didn't have a way to object.

5         THE COURT:  Are you talking about the potential of

6    another rebuttal witness perhaps?  Is that what you're really

7    talking about?

8         MR. STILLEY:  No.  I think that this should be -- I

9    think I should be allowed to present her for my case in chief

10   to let the jury know --

11        THE COURT:  To explain something that he's going to

12   present.

13        MR. STILLEY:  No.

14        THE COURT:  That's what you're telling me.

15        MR. STILLEY:  That may be part of it.  But to

16   explain about -- give a little background on Jordan Blair.

17        THE COURT:  Well, you know, there used to be a

18   television program called This is Your Life.  Now, this is

19   the court case here, this is not This is Your Rife, this is a

20   trial.

21        MR. STILLEY:  I understand.

22        THE COURT:  We don't need all that extraneous

23   information about his background.  What do you want the jury

24   to say, oh, I feel sorry for him?  That's going to be one of

25   my instructions, forget all that sympathy stuff, we've got to

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1    rule on the law.

2              MR. STILLEY:  I understand that.  I certainly do.

3              THE COURT:  Okay.  Well, that witness is excluded

4    also.  I mean, if it's a rebuttal situation, then you just

5    bring that to the Court's attention if there is a need for

6    rebuttal.  So that witness is also excluded.

7              Mr. Oliver filed a lot of motions here.  He's got a

8    motion to preclude collateral attack of this juvenile

9    adjudication.  I assume you're not going to put any

10   information on about the fact that Mr. Blair was adjudicated,

11   juvenile delinquent.  Is that fair to say?

12             MR. STILLEY:  Your Honor, the way this case stands I

13   think that all should be just kept out.  It's irrelevant.  It

14   doesn't --

15             THE COURT:  Fine, okay.  That motion will be then

16   denied as moot.

17             Now, you know, a whole lot of claims that were

18   brought have been ruled on in some fashion or another or

19   excluded.  But in any event, I guess in a display of caution

20   Mr. Oliver has filed motions to preclude irrelevant and

21   immaterial evidence.  And among those -- among the many, that

22   the defendants engaged in a conspiracy to deprive Mr. Blair

23   of his constitutional rights.  Are we going to have any of

24   that, Mr. Stilley?  I'm just going to go down.  It's like 19

25   of these things.

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1          MR. STILLEY:  Your Honor, what I would -- if I was

2    left on my devices what I would do is to allow the witness to

3    testify that he wanted to contact law enforcement and was not

4    allowed to do that.

5          THE COURT:  What has that got to do with anything?

6          MR. STILLEY:  The best --

7          THE COURT:  We got two issues here, you know, the

8    Fair Labor Standards Act violation and this battery.

9          MR. STILLEY:  Well, I think the best that would go

10   to is that he was kept there and kept without ability to

11   communicate and prevented to leave so that he wouldn't have

12   to work there.  If he had been able to --

13         THE COURT:  Mr. Oliver.

14         MR. OLIVER:  That's a false imprisonment claim, Your

15   Honor.  You've already ruled on that.

16         THE COURT:  Yeah, I think you want to keep those

17   claims in that I already ruled on.  You know, when you think

18   about the Fair Labor Standards Act, we're talking about the

19   employer/employee relationship and the hours, kind of work,

20   that kind of thing.  The battery is this as you all

21   various -- this shoving or pushing or whatever, so we got

22   those two things.  That's all we got.  That's all that's left

23   here.  So how does the fact that he -- part of what you're

24   saying, that he wasn't allowed to leave have to do with

25   either one of those?

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1          MR. STILLEY:  That helps prove he didn't volunteer

2    -- it's not just volunteered work.  He was compelled --

3          THE COURT:  This is as Mr. Oliver said, this not a

4    false imprisonment claim.

5          MR. STILLEY:  That's true.  That's true.

6          THE COURT:  Well, you know, there's several things.

7    I heard Charles Barkley say the other day that work is not

8    all it's cracked up to be.  And these people are talking

9    about essential employees.  The graveyard is full of them.

10   So what I'm trying to say there is this is not about forcing

11   somebody to work, this is just whether or not he was an

12   employee.  Not whether or not he was forced to stay there.

13   That's gone.  That claim is gone.

14         MR. STILLEY:  I understand.  I'm trying to --

15         THE COURT:  Fine, we got to move on.  So I'm

16   granting as far as that is concerned.

17         Bounty hunter service, that's granted.  We're not

18   getting into that.

19         Affiliation of the defendants Mountain Park and Palm

20   Lane with facilities outside the United States.  What has

21   that got to do with anything?  That's excluded also.

22         Their lock-down facilities, that's excluded.

23         Contract status.  We may need that.  There is an

24   employer/employee relationship, who was the employer, is it a

25   corporation or is it some individuals?  What about that,

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1   Mr. Stilley?

2           MR. OLIVER:  Your Honor, we agree with you.

3           THE COURT:  Okay, fine.  No problem, that's denied.

4           Did you miss anything to exclude, Mr. Oliver?  They

5   engaged in brainwashing.  Okay, that's granted.

6           Deprived Mr. Blair of access to legal counsel.

7   That's granted.

8           Tell me when you have one that you wish to really

9   challenge, Mr. Stilley.

10          Deprived Mr. Blair of access to appeal regarding his

11  adjudication of delinquency.  That's granted.

12          Deprived Mr. Blair of his due process rights.

13  Granted.

14          Engaged in acts of cruel and unusual punishment.

15  Granted.

16          MR. STILLEY:  Your Honor, now, on that I'd like to

17  address that.

18          THE COURT:  Fine.

19          MR. STILLEY:  I want to let the jury know actually

20  the conditions he worked in.  I think that's only fair.  Does

21  that sound reasonable to you?

22          THE COURT:  No.

23          MR. STILLEY:  Certainly the hours.

24          THE COURT:  This is not about the terms and

25  conditions of his employment in terms of the cleanliness,

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    badness, whatever of that atmosphere.  We're really more in

2    terms of the relationship, the hours, the kind of work that

3    was done, whether or not, you know, the defendants were a

4    commercial enterprise.  So I don't understand what you are

5    talking about.

6         MR. STILLEY:  Well, I mean, the totality of the

7    circumstances is the important issue here.  And what I'm

8    trying to do is to show the jury actually what he was doing

9    and the conditions of that.  Because the defendants are

10   saying, well, we were just trying to do this to help him.

11   And the plaintiff is saying, no, you were doing it to try to

12   make money.

13        THE COURT:  That's what my mother used to tell me

14   people.  You know, in my day, my mother -- when the boys

15   acted bad, she'd put their chair up against the wall, and

16   you'd have to get up under there and she'd take that iron

17   cord and she told me she was doing it for my own good.

18   That's what they said.  Now go ahead.

19        MR. STILLEY:  I think that is fair.  And I'd like

20   the Court to rule on that.  I think the Court should say,

21   yes, you can show the true facts of how he was worked because

22   there's a difference between somebody --

23        THE COURT:  Well, I'll tell you what, in terms of

24   describing the kind of work he did, fine.  But in terms of

25   trying to ask the jury be sympathetic because he was

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

```
 1    mistreated, no.  You understand?
 2              MR. STILLEY:  I understand.
 3              THE COURT:  But don't try to sneak across the line,
 4    you know, because the whistle will be blown.  And you have
 5    been told here.  And this is the way it works with me.  Do
 6    not think I'm going to call you up here to the bench to tell
 7    you that you just didn't understand this when you should have
 8    been inside the line.  I'm going to let you know right there
 9    in front of that jury, okay.
10              MR. STILLEY:  Certainly.
11              THE COURT:  So everybody understands as I told you
12    already, can't waste time here, we got to move this show on.
13              MR. STILLEY:  Certainly.  Since we're on this
14    issue --
15              THE COURT:  So I'm granting this.  In terms of cruel
16    and unusual punishment, that's excluded.  You're not here --
17    we're talking about violation of Fair Labor Standards Act and
18    a battery, not any cruel and unusual punishment.  That's just
19    the sympathy ploy you're playing, you know.  So you got to
20    stay away from that.
21              MR. STILLEY:  Well, there's some related issues
22    here.
23              THE COURT:  I know there are.
24              MR. STILLEY:  Well, I'll let you take up in the
25    order.  And if we still got any left --
```

1          THE COURT:  Fine.  What about references to other

2     students or acts inflicted upon them, students.  Other

3     students by defendants.  What about that?

4          MR. STILLEY:  Your Honor, I think that that would be

5     proper to show intimidation to compel him to continue to

6     work.

7          THE COURT:  Well, you know, this is about the fact,

8     did he work, what did he do when he worked.  Again, you're on

9     this false imprisonment situation.  That's granted.

10          MR. STILLEY:  Now, let me make sure I understand

11     this.  For example, where this other boy was forced to

12     continue to run until he urinated and defecated in his pants,

13     is he prohibited from mentioning anything about that?

14          THE COURT:  Oh, absolutely.  What has that got to do

15     with this?

16          MR. STILLEY:  Well, that's --

17          THE COURT:  That is understandably something that

18     does not clearly appear to be appropriate for it to occur,

19     but that is not what this case is about.  That's the problem.

20     And the problem is this, I let all this stuff in, then the

21     Court of Appeals gets to beating me around for letting all

22     this stuff in that I shouldn't let in.  I'm trying to keep

23     the record clean.  Can't have all this stuff you're trying to

24     throw up against the wall.  See, you need to think about how

25     does this show a violation of the Fair Labor Standards Act or

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

 1    how does it tend to show that this battery occurred.  If it

 2    doesn't tend to show that, it may sound good, it may show

 3    from your perspective that the defendants are bad people, but

 4    that's not this case.  It's simple as that.  That's not this

 5    case.

 6              MR. STILLEY:  Can I make a run at trying to explain

 7    why that is part of this case?

 8              THE COURT:  Go for it.

 9              MR. STILLEY:  Okay.  One of his jobs was a security

10    guard.  He was compelled to act as an unpaid security guard.

11    And the reason that this boy who was running in the woods,

12    the reason that he didn't run in the woods and go to the

13    bathroom is that everybody, including the plaintiff was under

14    strict orders if he gets more than slapping distance away

15    from his personal security guard, you all have to attack him.

16    So that was part of his job duties.  And that's --

17              THE COURT:  So he did that.  He ran after the

18    person?

19              MR. STILLEY:  He didn't have to do that, but that is

20    why the kid -- and he was on duty, then he had to watch to

21    make sure this kid didn't run over the hill.  If he had not

22    had these orders in an ordinary circumstance as he was

23    running on, he'd say go to the bathroom.

24              THE COURT:  You can hear him tell about his duties,

25    then you want to get to what happened to this other person

1    because of some general duties.  Fine.  We're talking about

2    his duties, what he had to do as a job.

3            MR. STILLEY:  Well --

4            THE COURT:  Not what happened to other people.

5            MR. STILLEY:  Well, certainly he should be allowed

6    to say that he was required to act as an unpaid security

7    guard.

8            THE COURT:  He can tell what his job duties were,

9    what he did.

10           MR. STILLEY:  Can he explain how he had to behave

11   with relation to the other kids as part of those job duties?

12           THE COURT:  Is that part of his job?  Was that part

13   of his job duties?

14           MR. STILLEY:  Yes, Your Honor, it was.

15           THE COURT:  Well, we'll see.  Okay.

16           MR. STILLEY:  So are we still open on that?  Can we

17   just take that as it comes in?

18           THE COURT:  Don't go too far with that.  Don't go

19   too far.  You know, when I was a kid, the guys would wrestle

20   in the neighborhood, the big guys would take their knuckle

21   and put it to your head and you'd either have to say mama or

22   I give.  Don't bring us to that, please.  Okay.  You just

23   keep stretching.

24           MR. STILLEY:  Your Honor, I want a fair presentation

25   of the evidence.

1        THE COURT:  We all want a fair presentation.  And I

2    understand your concerns.  But that what you're talking about

3    in a great deal is not a part of this case.  You know, as

4    they say, I feel your pain.  But that isn't part of this

5    case.

6        MR. STILLEY:  His duties as a security guard --

7        THE COURT:  His duties.  What did he have to do as

8    part of his job.

9        MR. STILLEY:  Okay.  And can I ask him then what did

10   this require you to do in relation to specific students?

11       THE COURT:  Well, you want to get to somebody

12   urinating in their pants and defecating in their pants.  I

13   mean, please.  That isn't part of his job to make somebody do

14   that, okay.

15       MR. STILLEY:  Actually it was, Your Honor.

16       THE COURT:  Oh, please.

17       MR. STILLEY:  It was.

18       THE COURT:  To make somebody urinate or defecate in

19   their pants?

20       MR. STILLEY:  Yes.  If he had --

21       THE COURT:  Well, you better present me some

22   evidence that that was part of his duties.  That's a hard job

23   to get done it would seem to me.

24       MR. STILLEY:  Your Honor, that's their rules.

25       THE COURT:  Fine.  Let me tell you something.  You

1    are an officer of this court.  You want me to accept what

2    you're saying is true so that when you do something, I accept

3    what you're saying.

4              MR. STILLEY:  Correct.

5              THE COURT:  You seem to be stretching things, okay.

6              MR. STILLEY:  Your Honor --

7              THE COURT:  I can't see -- I just don't see that,

8    that that's your job duty, to make somebody urinate and

9    defecate in their pants.  I just don't see that as a specific

10   job duty.  Fine.  I don't want to discuss that any further.

11   You just present your testimony about the job duties.

12             Defendants using or retaining people with firearms

13   there at Mountain Park and Palm Lane.  That's excluded.

14             MR. STILLEY:  Your Honor, can I make a statement?

15             THE COURT:  Go ahead.

16             MR. STILLEY:  He was forced to throw the bottles

17   from the shootout.

18             THE COURT:  That was one of his jobs?

19             MR. STILLEY:  Yes.

20             THE COURT:  Well, it seems like you may have to put

21   that in.  But, see, the problem that it seems to me is that

22   you want to continue to emphasize that this was a prison,

23   that the plaintiff was falsely imprisoned.  And I keep

24   telling you that that's not part of this case.  So if part of

25   his duties were throwing bottles for guards or whatever so

1      they could shoot at, then that's his job duty.

2                MR. STILLEY:  Right.

3                THE COURT:  But the part that you seem to want to go

4      to, false imprisonment, is not part of the case.

5                MR. STILLEY:  I understand there's just two claims

6      and that's all I'm trying to present evidence.

7                THE COURT:  If you don't understand, I'm going to

8      help you a little later on.

9                MR. STILLEY:  Certainly.

10               THE COURT:  You know, you hear that story Cool Hand

11     Luke about a failure to communicate?

12               MR. STILLEY:  I don't guess I remember that.  We

13     didn't have TV when I was growing up.

14               THE COURT:  Well, it is one of the famous lines in

15     movies.  And, you know, when the prison warden was explaining

16     about someone's failure to communicate, he had a method of

17     communicating.  I don't intend to employ that method, but

18     there's ways to get one's message across.

19               Other lawsuits.  Other lawsuits, you want to bring

20     up other lawsuits?  Other boarding schools?

21               MR. STILLEY:  I don't anticipate bringing up any

22     lawsuit or other -- well, I don't need to bring up other

23     boarding schools.

24               THE COURT:  Denial of bathroom privileges.

25               MR. STILLEY:  Your Honor, I think that that has to

1      be part of it.

2                    THE COURT:  Why?

3                    MR. STILLEY:  That is part of his --

4                    THE COURT:  That was one of his job duties?

5                    MR. STILLEY:  As I explained to you, one of his job

6      duties was that he was to attack any kid who ran away or got

7      out of line.

8                    THE COURT:  I'm talking about denial of bathroom

9      duties for the plaintiff.  That is what defendants have asked

10     to exclude, any reference to that.

11                   MR. STILLEY:  Well, the jury might think that he got

12     bathroom breaks, and we need to take off time for bathroom

13     breaks.  I think we need to show that he rarely got bathroom

14     breaks and they were very short.

15                   THE COURT:  Fine.  If that's relative to his hours

16     of work, then fine.  But not to show any cruel or unusual

17     punishment, okay.

18                   MR. STILLEY:  I understand.

19                   THE COURT:  Okay.  The hours, the hours of work

20     only.

21                   MR. OLIVER:  Your Honor, may it please the Court.

22     In that regard the law is very clear, 29 CFR 785.22, I mean,

23     assuming you have an employer/employee relationship, which we

24     obviously don't agree to, but the United States Department of

25     Labor and the regulations 29 CFR 785.22325 require that

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1    bathroom breaks be counted as part of the hours worked, so

2    there's no reason to discuss or go into bathroom breaks at

3    all because they are included in the start to stop time,

4    finish.

5          THE COURT:  What about that, Mr. Stilley?  That

6    seems to be the case.

7          MR. STILLEY:  Just the typical day, if I just say

8    Mr. Blair explain to us what's a typical day like.  Tell us

9    what you did when you got up.  That's going to be part of it.

10   I need to show that to show the totality of the issues which

11   you in your order said was proper in a Fair Labor Standards

12   case.

13         THE COURT:  Yeah, in terms of what he did for his

14   day.  But what I was saying was that -- what I initially said

15   was you should show this in terms of hours of work.  And

16   Mr. Oliver is correct in terms of that, you know, that is to

17   be counted, bathroom time is to be counted.  So it's really

18   not a consideration in terms of hours of work.  Because

19   whether you do or not do that, it's not a consideration in

20   terms of your hours of work.  So what would it be for then?

21   What are we putting it in evidence for?  Why is it in

22   evidence?  That's the question.

23         MR. STILLEY:  In order for the jury to understand

24   the totality of the circumstances.

25         THE COURT:  What totality is that?

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1          MR. STILLEY:  Well, is this work for the benefit of

2    Mountain Park and the defendants or is it something that's

3    just to help these kids learn things.  And when you go

4    through the day, unless you just artificially exclude that,

5    you have to show how much time he got for various tasks and

6    how much time he got for his own personal use for various

7    things and what the circumstances were of the work that he

8    did.  Because there's a dispute between the plaintiff and the

9    defendant about what the character of this work is.  They say

10   it's not compensable.  My client said, yes, you were working

11   me for your benefit and you have to pay me for it.

12         THE COURT:  Well, I'm just wondering the degree to

13   which you are or are not allowed rest room privileges, does

14   that make it an employer/employee relationship?  I mean, does

15   it tend to show one or the other?

16         MR. STILLEY:  Certainly it does.  It certainly does

17   because it shows that there's not humanitarian concern for

18   these kids and desire -- it's to teach them how to do things.

19   It's desire to make them work every minute they can possibly

20   get them to work.  And that's what happened, and that's what

21   the evidence is going to show.

22         THE COURT:  Mr. Oliver.

23         MR. OLIVER:  You know, Judge, that's why we have

24   Rule 404(b) to exclude these kind of things and 403, that's

25   why these rules of evidence exist so that we don't have to

1    have all these mini trials throughout this trial over issues

2    that are not probative.  The question here as this court has

3    already ruled is whether or not Blair's activities are part

4    of the school or part of the business enterprise.  And, you

5    know, whether he had 30 or 45 seconds or five hours to go to

6    the bathroom is irrelevant to those decisions.  Justly the

7    confusion Mr. Stilley when he used the word humanitarian in

8    essence admits that he intends a trial on what the Court has

9    drawn a line in the sand about trying to show that this is

10   some inhumane operation.  And that's why we have Rule 403.

11        THE COURT:  Fine, I'm excluding that.  You hit it on

12   the head when you're talking about humanitarian.  This is not

13   about that.  This is about employee/employer relationship

14   here, whether or not that relationship existed.

15        MR. STILLEY:  Your Honor, let me make sure I

16   understand the scope of this ruling then.  Is he prohibited

17   from telling the jury about the typical day in his life?

18        THE COURT:  I didn't say that.  We're talking about

19   the denial of bathroom privileges, okay.

20        MR. STILLEY:  Can he just say the facts of what was

21   done to him?

22        THE COURT:  You just continue to make it appear to

23   me that you want to continue to try to sneak across the line,

24   that's what you keep telling me.  Judge, you give me an

25   opening so I can sneak across the line.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    MR. STILLEY:  Your Honor, I don't want to sneak up

2    to the line, I want to go right up to it and stop.

3    THE COURT:  You may be acting at your peril, okay.

4    I have ruled on this denial of bath room privileges.

5    MR. STILLEY:  Okay.  Well, I want to know the scope

6    of it.

7    THE COURT:  That is the scope of it.

8    MR. STILLEY:  Well, now let me ask you this:  If I

9    just ask him --

10    THE COURT:  When you ask me this, I'm going to tell

11    you that.  Go ahead.

12    MR. STILLEY:  If I just ask him to tell the jury

13    what he did during the typical day, and he goes through this

14    and he says how much time that he got to go to the bathroom,

15    is that going to be a violation of your order?

16    THE COURT:  Yes.

17    MR. STILLEY:  So he has --

18    THE COURT:  That isn't what he did.  That isn't what

19    he did.  That's what he didn't do.  That's what you're

20    telling me, that's what he didn't do.

21    MR. STILLEY:  No, he did go to the bathroom, but he

22    just didn't get very much time.

23    THE COURT:  Fine.  Fine, the time is not relevant.

24    MR. STILLEY:  Well, Judge, you told me that the

25    totality of the circumstances.

```
 1              THE COURT:  See, you're still the Cool Hand Luke,

 2    where somebody is over this, shake the weeds, boss, we got

 3    the string on him when he goes to the bathroom.  Please.

 4    False imprisonment.  You keep going there.  You keep going

 5    there in terms of the violation.  And, you know, as they say,

 6    I feel your pain.  I understand what you're saying.  But this

 7    is not part of that case.  That is out.  You still want to

 8    try the part of the case that has disappeared.

 9              MR. STILLEY:  Well, when I ask him about that, do I

10    just have to explain to him when he talked about --

11              THE COURT:  He's sitting there.  Please.  We will

12    have recesses.  I don't need any further discussion of that.

13    You've been told.

14              Escaping from Palm Lane?

15              MR. STILLEY:  Your Honor, they said that themselves.

16    That's the way they describe it.  They say in their

17    pleadings --

18              THE COURT:  Well, folks say a lot of things.  How is

19    that coming in in terms of the employment or the battery?

20              MR. STILLEY:  Well, that would show when he was

21    terminated.  If they don't want to show he was terminated, if

22    they want to continue to the present I don't guess I have a

23    objection to that.

24              THE COURT:  He ran away at some point in time, and

25    that's when he stopped working.
```

1          MR. STILLEY:  That's right, he escaped, ran away,

2     same thing.

3          THE COURT:  Well, temper that.  Temper that.  He ran

4     away.

5          MR. STILLEY:  Okay.

6          THE COURT:  Okay.  Okay, that's denied.  We'll hear

7     about that as far as his termination of the relationship,

8     whether that was employment or scholastic.

9          This adjudication, the delinquency adjudication.

10    That's granted.  That's out.

11         MR. STILLEY:  I take it that nothing is going to be

12    mentioned by either party, nobody is going to say anything

13    about adjudication, correct?

14         THE COURT:  Not to the substance of it, not to the

15    merits of it.  I mean, I don't know if your client is going

16    to talk about how he got to Mountain Park in the first place,

17    I don't know that.

18         MR. STILLEY:  Well, the issues that we have, I think

19    the whole thing needs to stay out if you can't explain.

20         THE COURT:  Fine, I don't have a problem with that.

21    Is that all right with you, Mr. Oliver?

22         MR. BRIGGS:  I'm sorry, I don't think I understand.

23         THE COURT:  He wants to exclude any mention of

24    juvenile delinquency on the part of Mr. Blair.

25         MR. BRIGGS:  We've comfortable with allowing --

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1    we're comfortable with explaining that the parents enrolled

2    him without making reference to the exact cause.

3            THE COURT:  Okay.  How about that, Mr. Stilley?

4            MR. OLIVER:  I'm sure Mr. Blair will describe his

5    son as troubled.  I think we can leave it at that.  We take

6    trouble children; we don't take normal children.

7            THE COURT:  Fine, I think we have an understanding.

8            MR. STILLEY:  Your Honor, that is satisfactory to

9    me.  We may have to keep out just a little bit of the

10   deposition testimony on that account, but I'll get with

11   opposing counsel on that.

12           THE COURT:  Depravation and denial of sleep.  What

13   about that?

14           MR. STILLEY:  That goes to his hours.  He was forced

15   to work all of his waking hours and only got a limited amount

16   of sleep a night, so I think that would show how many hours

17   he worked.  Many times he would work --

18           THE COURT:  Fine.  You're going to show this is for

19   hours of work, and not for depravation of sleep?

20           MR. STILLEY:  Right.

21           THE COURT:  Correct.

22           MR. STILLEY:  Correct.

23           THE COURT:  Denial of, depravation of medicine?

24           MR. STILLEY:  Your Honor, I think that that is very

25   appropriate because he's out there working, he's asking for

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1    medicine.  And his letters show that he's asking for

2    medicine.  I need some medicine and they won't give it to

3    him.

4              THE COURT:  Okay.

5              MR. STILLEY:  And they are saying --

6              THE COURT:  I understand.  How many times do you

7    want me to say I feel your pain.  What has that got to do

8    with the two questions in this case, employment and battery?

9              MR. STILLEY:  Well, if the defendant --

10             THE COURT:  That's what you got to tell me.  Don't

11   tell me this happened that bad, that bad.  So it's a lot of

12   bad stuff happening in this world.  The devil is busy.  So

13   what.  I can't solve every problem.  I'm trying to deal with

14   Fair Labor Standards Act and battery.  Those are my two

15   problems.

16             MR. STILLEY:  Your Honor, this would go for one

17   thing to the totality of the circumstances.  As long as the

18   defendants want to make out that this is something other than

19   an employment relationship, it's something that they are just

20   teaching the kids how to be good adults, I think we need to

21   show that the facts of what's going on, otherwise the jury

22   gets a misapprehension.

23             THE COURT:  That's granted.  That's out.  You

24   haven't told me anything about employment or battery.

25             Depravation of proper educational materials.  What

1    about that, Mr. Stilley?

2         MR. STILLEY:  Goes to his hours because they didn't

3    let him do any work that was age or grade appropriate.  And

4    the rule on Fair Labor Standards Act say if you're compelled

5    to go to a meeting just on the basis that you're compelled to

6    go to a meeting by your employer is compensable.  What we

7    want to say, he had his high school diploma.  He had

8    completed that.  And despite that, he was sent to Palm Lane

9    on the same day he got this high school diploma and forced to

10   work there.  So his educational background would be

11   appropriate.

12        MR. OLIVER:  It's a lay opinion.

13        THE COURT:  We're talking about depravation of

14   proper educational materials.

15        MR. OLIVER:  That's lay opinion as to what's proper.

16   He's trying to substitute a judgment of -- judgment of

17   Christian educators.  We don't have to go into -- the fact is

18   he had the opportunity to have an education.  Now, what level

19   is totally irrelevant.  And particularly when he offers no

20   expert evidence to indicate that the diagnostic testing that

21   we gave him was improper.

22        Your Honor, if I might, I've just about had enough

23   of Mr. Stilley's statements this morning.  This is going to

24   be a problem throughout this trial, and I apologize in

25   advance.  Mr. Stilley just told the Court that on November

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    the 10th that his client had his diploma, and that's a

2    misstatement of fact.  And it's not unlike the misstatement

3    of fact he made to Judge Dawson in this case when Judge

4    Dawson wrote that although plaintiff and plaintiff's counsel

5    deny the warrant of an outstanding arrest, they made that

6    denial in the filing of Western District of Arkansas December

7    17th, 2003 after they made affidavits before this court a

8    year before that they knew about the warrant.  Mr. Stilley

9    has a habit at least in front of Judge Dawson, your

10   counterpart in Arkansas, of making statements that are

11   demonstrably not true.  This education thing, Your Honor,

12   there was -- the diploma was, in fact, in a file in another

13   school.  That principal told us that Jordan was never

14   eligible for that diploma.  Later he gave that diploma to

15   Mr. Stilley.  We never had the diploma.  And it has nothing

16   to do with what Mountain Park is.  We're going to have to

17   have a mini trial, bring in the principal and find out

18   whether Mr. Stilley and his group threatened principal Womack

19   with a suit if they didn't give the diploma.  You can listen

20   to the tape, Your Honor.  Mr. Stilley gave --

21          THE COURT:  No, it looks like I'm going to have to

22   listen to more than I want to already.

23          MR. OLIVER:  Absolutely.  I didn't want to get

24   there, but enough is enough.  Enough is enough.

25          THE COURT:  Let's bury this and move on.

1           MR. STILLEY:  At this point in time they are asking

2     for an offset for the value of what they provided to him.  I

3     think it is relevant to the value what they provided to him.

4     They did find my client didn't have physical possession of

5     that diploma on the 10th of November, that's correct, because

6     I couldn't go anywhere.  He couldn't communicate with the

7     outside world.

8           THE COURT:  This sounds like something that may be a

9     rebuttal matter.  Is that correct?

10          MR. STILLEY:  Well, I wanted to just present

11    testimony in my case in chief about what his educational

12    background -- I mean, what educational achievements have you

13    made and when did you make those achievements.

14          THE COURT:  I don't see that as problematic, but I'm

15    talking about the initial thing that I was referring to was

16    Mr. Oliver -- the defendants' motion for you to put on

17    evidence of the denial of proper educational materials, you

18    know, books, paper, pencil, whatever.  Educational materials.

19          MR. STILLEY:  What I'd like to do --

20          THE COURT:  That's out.  What?  Tell me about that.

21          MR. STILLEY:  What I want to just do, put on the

22    facts that he was put in fifth grade level work.  Is that

23    fair?

24          MR. OLIVER:  That's not fair because it isn't true.

25          THE COURT:  How is that relevant?

1          MR. STILLEY:  Well, on one hand they are saying we

2     want to offset to your wages for what the value --

3          THE COURT:  I'll tell you what, you know, we've got

4     a situation as to whether or not it's student or employee,

5     so, you know, there is some kind of balance there in terms of

6     what he was doing of an educational nature or was it an

7     employee situation.  But the idea of it being cruel or

8     unusual or punitive in some kind of way is not appropriate.

9     But whatever shows that it's more likely education or more

10    likely employment, those kinds, that's relevant.

11         MR. STILLEY:  That's all I want to put on.

12         THE COURT:  Anything on that, Mr. Oliver?

13         MR. OLIVER:  If you want an education in the school,

14    the philosophy and testing procedures of the School of

15    Tomorrow, I guess not, but you just added about a day of

16    explanation, unnecessary explanation to the trial.  The point

17    is --

18         THE COURT:  No, it wouldn't be a day.  It don't take

19    somebody long to tell what their philosophy, what their

20    educational approach is.  That's that.  I mean, I understand

21    this is an alternative education, but it won't take that long

22    to explain it.

23         MR. OLIVER:  Yes, sir.  The only issue is whether he

24    was in school or at work, not what he was doing.

25         THE COURT:  You know, part of it he's going to be

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    talking about what he's doing is work.  Somebody is going to

2    talk about education.  So we got to talk about what he is

3    doing.

4          MR. OLIVER:  Yes, sir.

5          THE COURT:  So I'm talking about something as simple

6    in that regard.  It's not something for sympathy that he was

7    being mistreated or something of that nature.  So I'm going

8    to grant that motion as far as educational materials is

9    concerned, but allow evidence as to education versus

10   employment activities.

11         Okay.  We already got to this diploma situation.

12   What about that?  You say, Mr. Stilley, that that's just to

13   show what he got because there is a claim on the part of

14   defendants for payment as to his education.  Tell me about

15   that.

16         MR. STILLEY:  Yes, that is one thing.  And the other

17   thing is that mitigates against being a student if he already

18   got a high school diploma.  So the student versus employee

19   dichotomy is the -- I think the key issue that we need to

20   show, he's got a high school diploma.

21         MR. OLIVER:  Your Honor, first of all, he doesn't

22   have any evidence that we had it, because we didn't have it.

23   If we had it, maybe that would be relevant.  The fact that

24   this boy claimed it and we got it in discovery sort of

25   militates against this having any probative value whatsoever.

1    I mean, in the handbook we specifically tell these parents

2    that enroll their students that they are going to continue to

3    get courses including post graduate or post high school

4    courses, and we continue to provide education, whatever

5    level.  There's a minimum one-year requirement.  Whether they

6    are eligible for graduation someplace else within that year

7    or not is irrelevant to us and to the parents that enroll

8    them because we indicate that we'll continue to provide

9    appropriate level courses during that one-year period of

10   time.

11          The fact that some other school at some time after

12   this lawsuit handed him a diploma is irrelevant to what

13   happens at Mountain Park or actually at Palm Lane.  He was

14   only at Mountain Park 17 days.

15          THE COURT:  Mr. Stilley.

16          MR. STILLEY:  Your Honor, I think that I should be

17   allowed to interrogate the witness about this on the stand

18   because it's -- you can't --

19          THE COURT:  That's why we're having this hearing.

20   We're trying to find out this now.  See, you want to put out

21   all this sympathy business for the jury.  And once they've

22   heard it, I can't unring that bell.  That's why I'm trying to

23   see if this dog will hunt right now.  If the dog can't hunt,

24   I got to tell you to keep it up on the porch.  You see?

25          MR. STILLEY:  Sure.

1          THE COURT:  That's what we're here for, to see if

2     your dog hunts.  See which one of these dogs will do

3     something here.

4          MR. STILLEY:  My dog will hunt.

5          THE COURT:  That's what you say, but I'm going to be

6     the judge of that.  Now, let's talk about this a little more.

7          MR. STILLEY:  Okay.

8          THE COURT:  How old was Mr. Blair when he first went

9     to Mountain Park?

10          MR. STILLEY:  He was almost 17.  He was 16 years

11     old.

12          THE COURT:  Okay.  And so he got a diploma from the

13     school from which he left?

14          MR. STILLEY:  Correct.

15          THE COURT:  What grade was he in when he left?

16          MR. STILLEY:  He had already completed all

17     requirements for graduation.  And this was an ACE school,

18     accelerated Christian education school, same as Mountain

19     Park.  So he had completed all requirements for graduation.

20     And let me explain this.  I think it's probably fairly

21     obvious you can't complete all requirements for graduation

22     without knowing that.  And if you go somewhere else, you're

23     going to try to explain to the new school, here's what I

24     completed, I don't need to go back.

25          THE COURT:  Fine.  But you got a situation where his

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    parents sent him here.  So now what does this tend to show,

2    that, in fact, that unless you can tell me otherwise what you

3    are seeming to suggest to me is that Mr. Blair had completed

4    all his requirements to complete high school but did not have

5    a high school diploma, and you find out later on that he did

6    have a high school diploma and so here we are.  So now what

7    does this tend to show in terms of employment status, student

8    status versus student status or battery?  What does it tend

9    to show there?  How does it tend to prove one of those things

10   are more likely one way or the other way?

11           MR. STILLEY:  Well, let's start with what Mountain

12   Park says about their facility.  They say it is an academy.

13   Mountain Park Baptist Boarding Academy, and it is nothing

14   more than the name implies.  And when you have a diploma, you

15   got a demonstration, certification that this person has

16   completed secondary education.  They've completed high

17   school.  There is no need for them to be a student.  So the

18   logical --

19           THE COURT:  Wait a minute, who made the

20   determination for Mr. Blair to be there in the first place?

21           MR. STILLEY:  The parents.

22           THE COURT:  Now, you're trying to put this decision

23   making on the defendants, that they made a determination of

24   him being there.  That wasn't the case.  That's what you're

25   telling me.  So I'm trying to see how is this relevant.  You

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    seem to be suggesting somewhere in this student employee

2    situation that it's relevant, and I'm trying to figure out

3    how is it relevant.  I don't see it yet.

4            MR. STILLEY:  Well, let's look at it in this way.

5    If an individual -- let's say nobody had sent him there, he

6    just showed up there.

7            THE COURT:  Well, he didn't show up there.

8            MR. STILLEY:  Well, I understand that.

9            THE COURT:  That didn't happen.

10           MR. STILLEY:  A person who has a high school diploma

11   is more likely -- when they are forced to do work, it's more

12   like a work situation than educational situation, especially

13   when the facility says we don't do anything but secondary

14   education, 9 through 12.  That's all their business is.  And

15   when that has been completed --

16           THE COURT:  I'm excluding that.  That's that.

17           MR. STILLEY:  Are you excluding evidence that he had

18   a high school diploma?

19           THE COURT:  Yes, I'm excluding that unless it's in

20   rebuttal unless it has something to do relative to what the

21   defendants put on because that has nothing to do with how he

22   got there, and you're telling me it had something to do with

23   the level of work that he could get otherwise.  We got people

24   with Harvard law degrees working as greeters at Wal-Marts in

25   St. Louis, please.

1          MR. STILLEY:  They're still entitled to minimum

2     wage.  They are entitled to a minimum wage.  And that's all

3     he's asking for is minimum wage and overtime.

4          THE COURT:  Fine.  What has this got to do with

5     whether or not he is entitled to minimum wage?

6          MR. STILLEY:  It militates in favor of the employee

7     relationship instead of student relationship.  Suppose the

8     defendants can show he was just in fifth grade level work, he

9     needed to be educated.  That makes it look like he's a

10    student.

11         THE COURT:  We don't want to get into whether or not

12    he just got these social promotions.  I don't know what his

13    educational level is.

14         MR. STILLEY:  Well, it's not about social promotion.

15    It is about whether or not he had a high school diploma,

16    whether or not he had completed requirements of high school

17    education.  And that militates very much against a student

18    status or a status of just the defendants were just trying to

19    teach him things about work.  It's not teaching about work,

20    it's making him work.  It's making him work at their

21    enterprises.  And I think it would be just very unfair not to

22    allow him to show he had completed all requirements of

23    graduation and was awarded a diploma dated November 10th.

24         THE COURT:  It seems to me neither you nor he knew

25    he had been awarded a diploma until some time later.

1          MR. STILLEY:  Your Honor, he certainly knew.

2          THE COURT:  It seems that neither you nor he knew he

3     had a diploma until sometime later.  Is that correct?

4          MR. STILLEY:  No, he knew he had completed the

5     requirements.

6          THE COURT:  I didn't ask you that.  I asked you, did

7     you or he knew he had a diploma at that time?  I didn't ask

8     you about completed requirements.  Don't try to change the

9     song and dance, you know.

10         MR. STILLEY:  That he knew?

11         THE COURT:  A diploma.

12         MR. STILLEY:  On what date?  On the 10th of

13    November?

14         THE COURT:  When he started Mountain Park.

15         MR. STILLEY:  It had not been awarded at that point

16    in time.

17         THE COURT:  It's out.  Excluded.

18         Well, his work as security guard there.  I guess

19    you're going to talk about his work, so that's that.  That's

20    denied.

21         MR. STILLEY:  I beg your pardon?

22         THE COURT:  That will be in.  The motion was to

23    exclude it, so he'll be able to talk about his work, which is

24    part of his work is a security guard as you already

25    mentioned.  That's fine.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    What about all these deposition excerpts?  I mean,

2   well, first of all, we can deal with plaintiff's.  Why do we

3   need to deal with plaintiff's depositions other than in terms

4   of cross-examination or something?

5        MR. OLIVER:  I'm afraid I'm not following Your

6   Honor.  Parts of plaintiff's deposition are admissible.  They

7   are not hearsay, they are admissions under Rule 803(d).

8   Anything he says we can introduce.  I mean, obviously we're

9   not going to use everything that we had because the Court has

10  correctly narrowed the scope of the trial, so we'll be

11  pairing our stuff down tremendously.

12       THE COURT:  You want to file a motion to exclude

13  these references to designated deposition excerpts, and maybe

14  we're going to have to wait until that time, because we're

15  not going to keep going over ground that's been tread.  If

16  it's rebuttal or whatever.

17       MR. STILLEY:  Your Honor, I have no problem with

18  them using it for impeachment.  I think they need to get the

19  testimony from the witness stand.  If they don't like the

20  questions, they can come back in their case and get the

21  questions answered straight from him.  I don't think it's

22  necessary or appropriate.

23       THE COURT:  I don't see repeating the same testimony

24  as to what he said.  What's the point?

25       MR. OLIVER:  There isn't any, and it won't happen.

```
 1              THE COURT:  So anything you're going to put on in

 2       terms of a deposition testimony of Mr. Blair would be

 3       something where he said something different or something

 4       partially different?

 5              MR. OLIVER:  Absolutely, Your Honor.  We won't offer

 6       anything -- we don't need to prove it twice.

 7              THE COURT:  I'm trying to tell you.

 8              MR. OLIVER:  And we do not intend to try to.  We

 9       just listed things out of abundance of caution so nobody is

10       surprised.

11              THE COURT:  Fine.  This will be denied as moot.  We

12       have an understanding here.  Oh, deposition testimony of Ron

13       Blair.  I don't think Mr. Blair -- will there be any

14       testimony in reference to Mr. Blair?

15              MR. STILLEY:  To Ron Blair?

16              THE COURT:  Yes.

17              MR. STILLEY:  I had made an objection to part of

18       that because it was just every question was leading at the

19       deposition.  I know that theory is that they can put this

20       testimony in because he's unavailable, he's more than a

21       hundred miles away, but the testimony that I objected to was

22       just --

23              THE COURT:  Well, I don't think he's testifying.  Is

24       there going to be any testimony from Mr. Blair?

25              MR. OLIVER:  By deposition at least, Your Honor.
```

1          THE COURT:  For what purpose?  I mean, I don't

2     understand why we're going to have testimony at all from

3     Mr. Ron Blair.

4          MR. OLIVER:  Because the question and answer is the

5     opinion that the boy can't be believed, that he's untruthful.

6     It's character attack, Your Honor, no ifs, ands, and buts

7     about it.

8          MR. STILLEY:  Judge, I think on the basis of your

9     rulings, I think that needs to be kept out.  We went through

10     and took out a great number of things that perhaps one side

11     or other would have liked to talk about that is improper.

12     And the good part of this testimony is Mr. Oliver making

13     statements and every once in ail while Mr. Blair says yes.

14          MR. OLIVER:  That's exactly what Rule 611(c) says

15     you do in cross-examination, Your Honor.

16          THE COURT:  I'll tell you what, I'll take this under

17     advisement.  You all get 611(c) and also the character

18     witness testimony so we can look at it in light of those two

19     issues, okay.

20          MR. OLIVER:  It's 608, Your Honor, if my memory

21     serves me correct.

22          THE COURT:  Okay.  We'll look at it in terms of

23     those two things.

24          MR. STILLEY:  Judge, on Jordan's deposition

25     testimony, some of this relates -- refers to prohibited

1    matters such as the adjudication in Crawford County, so we

2    want to take that out.  We're objecting to --

3           MR. OLIVER:  That's correct, Your Honor, before we

4    ever broach Jordan's deposition again, we will have conformed

5    it to the Court's rulings.

6           THE COURT:  Okay.  I'm looking at we got some

7    objections, defendants' objection to the deposition of Sam

8    Gerhardt.  That shouldn't be coming in.

9           Objection to Betty Sue Wills.  I don't see that

10   coming in at all.

11          And then we've got some problems with or at least

12   some objections to the instructions.  I think my law clerk

13   called you all and told you all to take out these --

14          MR. OLIVER:  May I approach, Your Honor?

15          THE COURT:  Put it in the formal names of the

16   various parties as opposed to --

17          MR. OLIVER:  May it please the Court.  In raising

18   the practical problem that Mr. Briggs and I wanted to bring

19   to the Court's attention, before we start to try to avoid

20   problems, our clients, because a lot of them have the same

21   last name, their typical mode of talk or typical address with

22   respect to Mr. Bob Wills is Pastor Wills, that's the way they

23   refer to Bob Wills.  With respect to Sam Gerhardt, it's

24   usually Brother Gerhardt to distinguish him from Bo, his son

25   Bo Gerhardt, who is usually Mr. Gerhardt.  Mrs. Wills, Betty

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    Sue Wills is frequently called Sister Wills.  And I know that

2    the Court has strong feelings about the appropriateness of

3    titles.  And I just wanted to call the Court's attention to

4    the fact that from time to time these people are going to use

5    those titles.

6         THE COURT:  I don't have any problem with the

7    witnesses using it because I know they are going to use what

8    they are familiar with.  I'm just concerned about how it

9    looks, you know, if it's an appellate issue and the Court of

10   Appeals is looking at it in terms of these instructions.  Not

11   me or the jury.  Part of all this record stuff is for any

12   appellate court.

13        MR. OLIVER:  Well, Your Honor, I didn't -- when I

14   was advised, I have no problem removing it.  I just raised --

15   I put it in there because quite frankly, you know, in dealing

16   with them, I've grown accustomed to using their terminology

17   and that's why it's in there.

18        THE COURT:  I think it's appropriate for the trial,

19   but I think you're going to have to make it clear to the jury

20   who we're talking about in terms of any instructions, that

21   you're referring to this as your name is that.  When you do

22   your closing arguments, you can just make it clear.  I was

23   just looking at the appellate situation, that's all.  I don't

24   have a problem with it during trial.

25        MR. OLIVER:  Thank you, Your Honor.

1          MR. STILLEY:  I'm happy, Your Honor.

2          THE COURT:  Okay.  What other problems do we have

3     other than these instructions that I think we can work with

4     later.  Because we got this jury here.  We'll take a recess

5     and then we'll see what's happening with our jury so we can

6     get started.  We had some -- we got any problems with

7     exhibits or the interrogatories or anything left with that?

8          MR. OLIVER:  We do have -- we have problems with --

9     you've effectively excluded several of both side's exhibits.

10    The only exhibit that we have difficulties with is Exhibit

11    39, the plaintiff's exhibits.  It's 39 which is

12    unauthenticated sheet from an unauthenticated medical record.

13    It's actually quite misleading.

14         THE COURT:  I don't know what 39 is offhand.

15         MR. STILLEY:  Your Honor, I got a complete set for

16    you, if I may approach.

17         THE COURT:  Sure.

18         MR. STILLEY:  Your Honor, maybe I can speed things

19    along here.  If we're going to present testimony about the

20    medicine, I'm not sure it would even be relevant to show that

21    he didn't have acne on his back beforehand and he did

22    afterwards.  I mean, I'm just trying to be fair with you, I

23    know what you've already ruled.

24         THE COURT:  You know what, you're trying to be fair.

25    I'll be the judge of that, please.  Be fair.  Listen, you're

1      trying to be fair for your client, and Mr. Oliver tries to be

2      fair for his client.  And those two things are completely

3      different.  Why do you think we've been up here talking for

4      over an hour?  And why do you think they give me this robe,

5      have me sit up here and try to figure out the difference

6      between what you both all are talking about is fair.  Please.

7      Fine, you say since we're excluding -- since the Court is

8      excluding evidence about medicine and so forth, you're not

9      going to use this exhibit; is that correct?

10          MR. STILLEY:  I don't see any way to use it, and I'm

11     willing to withdraw it.

12          THE COURT:  Fine.  Anything else in that regard,

13     Mr. Oliver?

14          MR. OLIVER:  Judge, in view of all your rulings, we

15     don't have any objection to plaintiff's exhibits numbered two

16     through 38, nor 41, which we had previously objected to.  In

17     fact, I would suggest the Court just treat them as admitted.

18          THE COURT:  Fine, I'll do that then, and that will

19     save some time.

20          Now, let's sort of figure this out.  Mr. Stilley, it

21     would seem that you basically got one witness now?

22          MR. STILLEY:  Well, I'm going to call the defendants

23     to get just a little evidence from them.

24          THE COURT:  Fine.  What else do we need to do before

25     we take a recess and see if we got the jury in order here?

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1          MR. STILLEY:  Your Honor, there's a couple things I

2     want to ask you about.  On the exhibits that we've excluded,

3     and we've excluded 39.  Is that all that's excluded?

4          THE COURT:  That's my understanding.  Mr. Oliver

5     said as far as he was concerned two through 38 admitted.

6          MR. OLIVER:  We need to look at eight, Your Honor.

7          THE COURT:  He changed his mind.

8          MR. OLIVER:  No, I'm all for it, but I believe the

9     Court's ruled that eight is out.  That's the --

10          THE COURT:  Why don't you take it out real quick.

11          MR. OLIVER:  That is the Court's order, so I believe

12     the Court's ruling covers that.

13          MR. STILLEY:  I want that out.

14          THE COURT:  Two through seven, nine through 38

15     without disagreement or objection will be admitted.  What

16     else did we need to do before we take a little break here?

17          MR. OLIVER:  Forty and 41.

18          THE COURT:  We're not doing any 40, 41.  They are

19     out as far as I understand.  Unless we can see later.  What

20     else?

21          MR. STILLEY:  We can't have 41?

22          THE COURT:  I don't know.  I don't know if there is

23     an objection to that.

24          MR. OLIVER:  41 is the pictures of some girls

25     playing.  I don't know what it refers to, but it's okay with

1    us.

2          THE COURT:  Okay.  What about 40?

3          MR. OLIVER:  40 was the affidavit was used to get

4    the arrest warrant.

5          THE COURT:  You aren't going to use that, are you,

6    Mr. Stilley?

7          MR. STILLEY:  We're going to take all that out.  And

8    I may have to take a little out of three, but during the

9    break I'll make sure I don't have anything to violate the

10   order.

11          Here's what I want to ask you about.  For the

12   jury -- to advise the jury, can I just move to admit and then

13   recite the numbers, the correct ones?  How do you want to

14   handle that?

15          MR. OLIVER:  As far as I'm concerned they can be

16   just treated as admitted without any further reference.

17          THE COURT:  I don't think I need to rule on it.  I

18   mean, if they ask for something, I'll send them back.  I've

19   admitted them already basically.

20          MR. STILLEY:  I just wanted --

21          THE COURT:  Let me show you what's been admitted as

22   exhibit -- you can do it that way.

23          MR. STILLEY:  Certainly, that works.  One other

24   thing I want to ask you about is since we do have quite a few

25   papers, do you mind if I have Ms. Teri Young help me from

1    time to time at counsel table?

2            MR. OLIVER:  I do mind, she's not a lawyer.  She's

3    not a paralegal.  She is the person who technically under

4    Arkansas law has committed barratry.  She's paying for all or

5    part of this.  She has no place at counsel table.

6            MR. STILLEY:  Judge, I just -- I'm not the best at

7    paper.

8            THE COURT:  Is she an employee in your office?

9            MR. STILLEY:  No.  I must confess, I have employed

10   her in an ad hoc basis from time to time, but she's not an

11   employee in my office.

12           THE COURT:  If she's not a paralegal or lawyer, not

13   employed in your office in this capacity, I don't see any way

14   that I can do this.  Generally other than parties or the

15   lawyers are not allowed inside those swinging gates anyway

16   unless they are going to testify.

17           MR. STILLEY:  I just wanted to check.  I just want

18   to check.

19           MR. OLIVER:  We ask for the rule on witnesses.

20           THE COURT:  You understand that?  So that will go

21   for both sides.  That means that if you are a witness you can

22   only be in here if you are testifying.

23           MR. OLIVER:  Or if you're a party.

24           MR. STILLEY:  I understand that.

25           THE COURT:  Anything else?

1          MR. OLIVER:  Nothing, Your Honor.

2          THE COURT:  Why don't we -- we better give us 15

3     minutes.   20 minutes to 11 we'll get started.

4          (Court in recess from 10:24 a.m. until 10:48 a.m.)

5          (Voir dire conducted.)

6          (Jury seated and sworn.)

7          THE COURT:  Ladies and gentlemen of the jury, I'm

8     going to take a few moments now to give you some initial

9     instructions about this case and about your duties as jurors.

10    At the end of the trial I'll give you further instructions.

11    I may also give you instructions during the trial.  Unless I

12    specifically tell you otherwise, all such instructions, both

13    those that are given now as well as those that are given

14    later are equally binding upon you and must be followed.

15          This is a civil case which I've explained to you

16    brought by Jordan Blair against Bob Wills doing business as

17    Mountain Park Boarding Academy, and all the other defendants

18    who were introduced to you earlier today.

19          Now, there are two claims in this case, one is that

20    Plaintiff Blair asserts that there was a battery committed

21    against him by the Defendant Bo Gerhardt on October 24th, a

22    shoving incident that he claims.  And Mr. Gerhardt denies

23    this.

24          The second claim of the Plaintiff Blair is made

25    against all defendants that under federal law, specifically

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    the Fair Labor Standards Act, that he was an employee of the

2    defendants because he performed these various tasks while as

3    a student at Mountain Park and Palm Lane.  Plaintiff claims

4    that he should have been paid for performing these tasks.

5    All of the defendants deny that Mr. Blair was ever an

6    employee.  So that's what this case is about.

7         From the evidence you will decide what the facts

8    are.  You're entitled to consider that evidence in light of

9    your own observations and experiences in the affairs of life.

10   You will then applies those facts to the law which I give you

11   in these as well as the other instructions and in that way

12   reach your verdict.

13        You are the sole judges of the facts, but you must

14   follow the law as given in the instructions whether you agree

15   with it or not.  In deciding what the facts are, you may have

16   to decide what testimony you believe and what testimony you

17   do not believe.  You may believe all of what a witness has

18   said, only part of it, or none of it.

19        In deciding what testimony to believe, consider the

20   witnesses' intelligence, their opportunity to have seen or

21   heard the things testified about, their memories, any motives

22   they may have for testifying a certain way, their manner

23   while testifying, whether they said something different at an

24   earlier time, the general reasonableness of their testimony,

25   and the extent to which their testimony is consistent with

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    other evidence that you believe. Do not allow sympathy or

2    prejudice to influence you. The law demands of you a just

3    verdict unaffected by anything except the evidence, your

4    common sense, and the law as given in the instructions.

5         You should not take anything that I may say or do

6    during the trial as indicating what I think of the evidence

7    or what I think your verdict should be, that is entirely up

8    to you. Evidence from which you will find the facts will

9    consist of the testimony of witnesses and documents and other

10   things received in the record as exhibits and any facts that

11   the lawyers agree to, that we call that a stipulation or that

12   the Court may instruct you to so find.

13        Certain things, however, are not evidence and I'm

14   going to list those things for you now. Statements,

15   arguments, questions by the lawyers are not evidence.

16   Objections to questions are not evidence. The lawyers have

17   an obligation to their client to make an objection when they

18   believe that evidence that is being offered is improper under

19   the rules of evidence. You should not be influenced by the

20   fact that an objection has been made nor the Court's ruling

21   on an objection. If an objection is sustained, you should

22   ignore the question and not try to guess as to what the

23   answer might have been.

24        If the objection is overruled, you should treat the

25   answer just like any other. If you're instructed that some

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1   item of evidence is being received for a limited purpose,

2   then you must follow that instruction.  Testimony that has

3   been excluded by the Court or that you're told to disregard

4   is not evidence and must not be considered.

5        Anything that you've seen or heard outside the

6   courtroom is not evidence and must be disregarded.  You're to

7   decide this case solely on the evidence presented here in the

8   courtroom.

9        At times during the trial I may sustain objections

10  to questions asked without permitting the witness to answer

11  or where an answer has been given may instruct that it be

12  stricken from the record and that you disregard it and

13  dismiss it from your minds.  You may not draw any inference

14  from an unanswered question nor may you consider testimony

15  which has been stricken in reaching your decision.  The law

16  requires that your decision be made solely upon the competent

17  evidence before you.  Such items that are excluded from your

18  consideration will be excluded because they are not legally

19  admissible.

20       The law does not require, however, that you accept

21  all of the evidence that is admitted, even though it may be

22  competent.  In determining what evidence you will accept, you

23  must make your own evaluation of the testimony given by each

24  of the witnesses and determine the degree or weight you

25  choose to give such testimony.

1          Some of you have heard of the terms direct and

2    circumstantial evidence.  You're instructed that you should

3    not be concerned with those terms since the law makes no

4    distinction between the weight to be given to direct and

5    circumstantial evidence.  In these instructions you're told

6    that your verdict depends on whether you find certain facts

7    have been proved.

8          The burden of proving a fact is upon the party whose

9    claim depends upon that fact.  The party who has the burden

10   of proving a fact must prove it by the preponderance of the

11   evidence or the greater weight of the evidence.  To prove

12   something by the preponderance of the evidence is to prove

13   that it is more likely true than not true.  It is determined

14   by considering all of the evidence and deciding which

15   evidence is more believable.

16          If on any issue in the case the evidence is equally

17   balanced, you cannot find that that issue has been proved.

18   The preponderance of the evidence is not necessarily

19   determined by the greater number of witnesses or exhibits a

20   party has presented.

21          You may have heard of the term proof beyond a

22   reasonable doubt.  That is a stricter standard which applies

23   in criminal cases.  It does not apply in civil cases such as

24   this.  You should, therefore, put it out of your minds.

25          Now, earlier when we took a recess I gave you the

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    admonition.  I'll give it to you here again and ask you to

2    recall it when I ask you to abide by the admonition.

3         During the trial you're not to discuss this case

4    with anyone or permit anyone to discuss it with you.  Until

5    you retire to your jury room at the end of the case to

6    deliberate on your verdict, you are simply not to talk about

7    the case.

8         Secondly, you're not to read or listen to anything

9    touching on the case in any way.  If anyone should try to

10   talk to you about this case, bring it to the Court's

11   attention promptly.  You should not try to do any research or

12   make any investigation on your own about this case.  Do not

13   form any opinion until all the evidence is in.  So keep an

14   open mind until you start your deliberations at the end of

15   the case.

16        At the end of the trial you'll have to make your

17   decision based upon what you recall of the evidence because

18   you will not have a written transcript.  It will be

19   impractical for Sue to read back lengthy transcript

20   testimony, so pay close attention to the testimony as it is

21   given.

22        The trial is ready to begin now.  And it won't be

23   long before we go to lunch, okay.  The trial is ready to

24   begin now, and I understand you all did come in at 9:30, so

25   we'll try to get a little done before we go to lunch.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1          First, each side may make an opening statement.  And

2     an opening statement is neither evidence nor argument.  It is

3     an outline of what that party intends to prove offered to

4     help you in following the evidence.

5          Next, the plaintiff will present his witnesses and

6     the defendant may cross-examine them.  Then the defendant

7     will present their witnesses and plaintiff may cross-examine

8     those witnesses.  After that the attorneys will make their

9     closing arguments to summarize the evidence and interpret the

10    evidence for you.  And you will be given -- then the Court

11    will give you the final instructions of law, and you will

12    then retire to your jury room to deliberate on the case.

13         But we want to see what we can do with getting these

14    opening statements in.

15         MR. OLIVER:  May it please the Court.  Could we be

16    able to use the ELMO in opening?

17         THE COURT:  Yeah.

18         MR. OLIVER:  We need to bring the TV in.  I wonder

19    given that, might we do lunch first.

20         THE COURT:  It will just take a few minutes I've

21    been told.  How about yourself, do you need it?

22         MR. STILLEY:  I don't have any problem at all about

23    going to lunch first and then doing this after lunch, but

24    I'll let the Court make the call on that.

25         THE COURT:  The call has been made, it doesn't take

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    long to get the TV.

2            MR. OLIVER:  Could we help?  I'd be glad to help.  I

3    can't help it I'm hungry.

4            THE COURT:  I understand.  Mr. Stilley.

5            MR. STILLEY:  May it please the Court, counsel,

6    ladies and gentlemen of the jury.  My name is Oscar Stilley.

7    I represent the plaintiff, Jordan Blair, and I'm going to

8    take just a few minutes here to explain to you what this case

9    is about.

10           It is a very simple case.  There's two claims,

11   there's a claim of battery that is directed at only one

12   individual, and that is Bo Gerhardt.  And the judge already

13   told you what that is about.  That is about an incident in

14   which Mr. Blair alleges that he was slammed into a counter

15   immediately after he arrived at Mountain Park.

16           And then we got the second claim, which is a Fair

17   Labor Standards claim for minimum wages and overtime pay for

18   the failure to pay for the work that was compelled of him

19   while he was at Mountain Park.  It is a simple case and I

20   don't want to make it more complicated than it is.

21           Let me tell you first what this case is not.  This

22   case is not a contest between religions.  As a matter of fact

23   these folks are Baptist, I'm Baptist, I went to a Baptist

24   church, my wife is Baptist.  My client is -- has grown up in

25   the faith.  And he by no means is opposed to the faith, so

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1   don't get the idea there is any objection on the part of

2   anybody to Christianity or religion, that is not the case.

3   The case is about a young man.

4        Let me just tell you just a little about the

5   evidence that you're going to hear about his life.  He was a

6   good student by all counts.  He in the earlier part of high

7   school, he was in public school, made As and Bs, was on the

8   football team, well liked, made the paper from time to time

9   for his athletics.  After that he was taken out of the public

10  school and put into a private school where he completed his

11  high school education.

12       And after this point in time is when he was sent to

13  Mountain Park.  Right after that point in time that he was

14  sent to Mountain Park.  And at Mountain Park he was forced to

15  get up in the morning about 5:30 a.m.  And part of the day

16  that would put him in certain kind of educational activities

17  or least they claim they were educational activities, but the

18  great part of the day they had him working doing things like

19  building fences, building or repairing barns, digging ponds.

20  They actually had him to work to dig a pond with a shovel.

21       Mr. Wills has a yacht in Florida.  He was compelled

22  to work on that yacht polishing things, taking care of that

23  vessel and otherwise doing work for the defendants.  He

24  worked on their houses.  He worked on the grounds around

25  their houses.  And not just a small amount of work, but he

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    was worked -- from time to time he was forced to work from

2    this early hour and he got very little time to get around and

3    rest and do other things that you would ordinarily do.

4    Sometimes he was forced to work into the wee hours of the

5    morning and forced to get back up again at 5:30 in the

6    morning and go again and do the same thing.

7          He didn't have an option about this.  He was told to

8    do this.  And the defense has alluded to this is not the kind

9    of school where you just come and go when you want to.  This

10   is the kind of school where you can't leave and you cannot

11   communicate with anybody except the people that the operators

12   of this enterprise want you to communicate with.  So it's not

13   a matter that he can just say, well, I'll find my way

14   somewhere else.  He was forced to do this work under threat

15   of serious damage to himself if he did not do this work.  So

16   that's the situation we have here.

17         Of course the defendants are all denying that they

18   are employers.  So we're going to have to put on some

19   evidence about who this enterprise actually belonged to.

20   Mountain Park Baptist Boarding Academy is not a corporation.

21   There is no formal zoning section.  That's the name that's

22   used by certain individuals.  So I'm going to ask some

23   information, asking questions of some of these individuals to

24   see who is making profits off this so that you'll have a

25   better opportunity to determine who was getting the financial

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    benefit from this young man's labor, on the grounds that the

2    people that are getting the benefit from that labor are the

3    employers.  Whether they admit that or not, that is --

4         MR. OLIVER:  That's an improper standard, Your

5    Honor, I object.  That's not the standard.

6         THE COURT:  Overruled.

7         MR. STILLEY:  At any rate, I will certainly try to

8    keep this as reasonably brief as I can just to show you what

9    the facts were during this period of time, what kind of work

10   that he did by testimony, and that he left.  Actually he was

11   sent to Mountain Park in Missouri because he comes from

12   Arkansas.  He was born and raised in Crawford County,

13   Arkansas.  He was sent to Mountain Park October 24th, 2001.

14   On the 9th or 10th of November of 2001 he was taken to

15   Florida against his will to the Palm Lane Boarding Academy

16   there.

17        MR. OLIVER:  I do object now, Your Honor.  I mean,

18   he's already treaded the line twice.  Objection.

19        THE COURT:  We are not here about, you know, how

20   he's in this school or anything of that nature.

21        MR. STILLEY:  Certainly, Judge, I understand.  Let

22   me see if I can -- let me see if I can --

23        THE COURT:  He didn't have anything to do with the

24   decision as to going to Palm Lane.

25        MR. STILLEY:  Correct.  Thank you, Judge.  At any

1  rate, I believe it was the 15th of March of 2002 that he

2  escaped from Palm Lane, left and went back to Arkansas.  And

3  at that point in time obviously he was no longer performing

4  any work for Palm Lane Academy.

5       So thank you very much for your time and attention.

6  That's the evidence that we anticipate presenting in this

7  case.  Thank you very much.

8       MR. OLIVER:  Give me a second to get my composure,

9  Your Honor.  May it please the Court.

10       THE COURT:  Go ahead, Mr. Oliver.

11       MR. OLIVER:  Mr. Blair, Mr. Stilley, ladies and

12  gentlemen.  My honor to represent Bob and Betty Sue Wills and

13  Sam Gerhardt, who make up the leadership of Mountain Park

14  Baptist Church and its ministry, the Mountain Park Baptist

15  Boarding Academy, and to represent Palm Lane Baptist Church,

16  which is a Florida corporation which has as its primary

17  ministry, the Palm Lane Baptist Boarding Academy.  And also

18  with John to represent the staff.

19       In 1987 the Wills, Pastor Wills and Betty Wills,

20  opened with Sam Gerhardt the Mountain Park Baptist Church out

21  in Patterson, Missouri.  And they began their ministry which

22  is this Palm Lane Baptist Boarding Academy.  Students are

23  enrolled here by their parents with -- this is from

24  Plaintiff's Exhibit No. 9, with the full knowledge that

25  Mountain Park was a boarding academy that has two missions,

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1   one mission is to provide college preparatory academic

2   program, and the other is to provide an environment of faith

3   through nurturing Christian values of biblical self image to

4   try to help these troubled children to accomplish two things,

5   one to walk with God and to develop their own faith while

6   simultaneously and in an integrated program advancing

7   academically.

8       Jordan came in to this well-established program on

9   October the 24th, 2002.  He came in to -- I'm sorry, October

10  the 24th, 2001.  He came in to a well-established program, a

11  program which begins at 5:30 in the morning and throughout

12  the day till nine or 9:30 at night, provided rigid, a rigid

13  environment and a rigid structure for these troubled

14  children, boys on the one hand, girls on the other hand.

15      The structure involves separation between boys and

16  girls, very high standards of conduct and discipline.  At the

17  same time they integrated this concept.  And the concept is

18  very simple, if you live in a life where there is Christian

19  example, and if you have the opportunity to read the bible,

20  to learn the bible and to walk with others who walk with God,

21  then you are going to be or have the opportunity to restore

22  yourself, to gain a new respect for authority, to gain

23  biblical self image, which is the image of the body as a

24  temple, to have respect for yourself, respect for others, to

25  develop a sense of personal responsibility and work ethic at

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    the same time learning how to work with others.  Because

2    these are after all troubled children that come to this

3    school.

4           Now, when they come here they are also introduced to

5    an academic program.  And we don't need to go through the

6    academic program other than you know it's an integrated part

7    of this.  They use a Christian curriculum called the School

8    of Tomorrow curriculum, which involves a system called PACE,

9    which is just a way that you establish where you are.  A lot

10   of this is computer based.  And it's integrated with the

11   Landmark Freedom Baptist curriculum.  So this is an

12   integrated academic program and an integrated religious

13   program is taught together in a very rigid structured system.

14          Who is involved in the system?  Well, in Missouri

15   involved in the system when Jordan was there, the evidence

16   will be Pastor Wills is on top, he makes the decisions.  This

17   is an independent fundamental Baptist church.  He makes the

18   decisions with input from Betty, his wife, whose job title is

19   executive administrator.  And then with Sam Gerhardt who has

20   had a variety of titles but essentially at the time Jordan

21   was there, he was associate pastor.  As all practical though

22   the evidence will be that he ran the day-to-day activities of

23   the operation.

24          Robert O'Brient, who is also a defendant, was the

25   principal or the director as you were of the academic

```
 1    program.  He ran the academic program.  Bo Gerhardt helped

 2    with the male students, sort of dorm supervisor for want of a

 3    better way to describe it.  Julie was there, but she and

 4    Debbie, Mrs. Gerhardt, Sam's wife, are on the other side,

 5    they are on the girl's side.  And they don't have input into

 6    the essential decisions that relate to the boys.

 7          Day to day Sam Gerhardt, Brother Gerhardt, is what

 8    they usually refer to him or Brother Sam, runs it day to day.

 9    Brother O'Brient, or Brother O'Brient runs the school part.

10    Bo helps in the dorm and at the time was involved in the

11    learning center.

12          In Florida at Palm Lane at the time that -- well,

13    I'll just tell you, Palm Lane is a corporation, okay.  Palm

14    Lane, its officers, the two that make the decisions are Bob

15    Wills and Betty Sue Wills.  They have the same titles, pastor

16    and executive administrative assistant.

17          The people that hire, fire, set wages, set policy

18    are Bob Wills, Betty -- Bob Wills, Betty, you all know the

19    wife always participates in decisions.  And Sam has

20    significant input at Mountain Park but not at Palm Lane.

21          Now, the Blair involvement with Mountain Park

22    started on October the 20th of the year 2000 when Ron Blair

23    called Mountain Park and made some preliminary inquiries and

24    was sent a packet of information.  The packet of information

25    includes an application, which you will see, part of it has
```

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1    already been admitted as Plaintiff's Exhibit No. 2.  And part

2    of this package is a parent handbook or a parent/student

3    handbook which has already been admitted which is Exhibit

4    No. 9.  This explains the philosophy of Mountain Park to the

5    parents before they ever come there.

6         Sam didn't hear from the Blairs for about a year.

7    And on October the 2nd, 2001 he got another phone call from

8    Mr. Ron Blair, the father, indicating a renewed interest

9    because of activities at home, a renewed interest in sending

10   Jordan to Mountain Park.  He asked for another information

11   package and he got another information package.  And then

12   Mr. Blair called back on October the 9th and explained in

13   greater detail the problems at home.  And on October the 20th

14   the Blairs arrived, Ron and Jannett Blair, and went through

15   parent orientation.  You know, this is not your basic

16   kindergarten, this is not your basic public school.  And

17   parents are required to go through orientation so they

18   understand the school before they make the commitment.

19         And the Blairs came and went through the orientation

20   process and saw how the school works in great detail and

21   signed the enrollment forms.  They call on October the 24th,

22   2001 and formally enrolled Jordan Blair in Mountain Park

23   knowing that before he turned 17 he would be moved to Palm

24   Lane.

25         So the plan was to stay at Mountain Park until about

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1   Jordan's 17th birthday, and then move him to Palm Lane.

2   Jordan arrived on the evening of October the 24th.  He was

3   met by a young man named Drew Parrish, who as they do with

4   every child is enrolled tries to, you know, engage in small

5   talk, trying to make these kids relax, try to make them

6   understand the environment that they are in.  And they come

7   in to the boy's dorm and you go downstairs and there is a

8   couch down there that is routinely used to discuss the

9   situation with new students.  We're trying to put them at

10  ease.  You know, most of them are not real pleased to be

11  there.  They know they are going in to a strict religious

12  rigid environment.  Well, some don't want to be there.

13  Trying to put them at ease, and at the same time try to

14  conform to our requirements.  You know, we have rules about

15  what you can and cannot have, what you can and cannot bring.

16         So every student is talked to, talked to on the

17  couch about this.  About this time Bo comes.  Bo comes down,

18  has the conversation with Jordan.  One of the things that

19  they do is to inspect everything that's brought to make sure

20  there's no contraband.  You know, no long knives that -- you

21  know, that the clothing that they bring is appropriate.  You

22  know, this is a white T-shirt, high necks, no V-necks for

23  young ladies, no rock band T-shirts.  It's a change for these

24  kids.

25         So there's an inspection to make sure that

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1   everything that the child has brought, young person's brought

2   fits.  While the inspection is going on, all children take a

3   shower.  These young people are taken to the shower and they

4   take a shower.  This is the first thing they want, clean

5   children.  You now take care of your body and have respect

6   for yourselves as the temple of the Lord because your body is

7   a temple.  If you don't have that, you're not going to ever

8   have respect for others.

9        And then the child is integrated into the activities

10  of the school that are ongoing at the time they arrive.  Now,

11  what did not happen on November the 24th is that Bo Gerhardt

12  did not take Jordan Blair and slammed him up against

13  anything.  There is a no touch policy at Mountain Park.

14  Students don't discipline students.  Staff does not use

15  physical discipline on students except swats which are the

16  last resort, and they are never administered to Jordan.

17       This is an invention.  It did not happen.  Bo comes

18  in, meets Jordan, engages in small talk, explains the basic

19  rules, hands him this towel and bar of soap, sends him to the

20  shower while they inspect his goods, make sure that there is

21  nothing inappropriate there, no long knives, no inappropriate

22  clothes, that kind of thing, no inappropriate rock music, no

23  inappropriate books.  Do they have the correct bible, King

24  James version, the correct one.  Because that's the

25  environment that he's changed to.  You don't slam any child

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    in the staff area into any bathroom.  It doesn't happen and

2    it did not happen.

3          Now, then Mr. Blair then was just integrated into

4    the program.  Well, the program that was going on at that

5    particular time would have been to sleep.  So after his

6    shower he would have been shown to the dormitory.  They all

7    sleep in a dorm.  The next day he would have been integrated

8    into the regular Monday through Friday program.  This isn't

9    an absolute, but this is pretty much what the schedule is.

10   It differs on Wednesday night because on Wednesday night you

11   have additional church service.  It differs on Friday night

12   because on Friday night you have movies.  And it differs on

13   Saturday and Sunday.

14         But basically you get up in the morning, you start

15   off with your personal hygiene.  Then there is a period of

16   time for bible reading and personal devotions.  This is an

17   essential part of the way the school functions.  We believe

18   that if shown a chance to know the Lord, if they develop a

19   personal relationship with the Lord and become saved, they

20   will be restored to society.

21         After that they eat and then they come to common

22   area cleaning.  That's one of the -- considered by Mountain

23   Park to be one of the basics.  Every student, every student,

24   for every student the very basics of character development

25   begin with responsibility to maintain their personal and

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1   common areas.  This is how they do it at Mountain Park.  They

2   have teams.  Because teamwork is something that troubled

3   people lack.  And they need to learn to work together to

4   learn self-respect and how to deal with other people.

5           So they are assigned teams and they start off the

6   day then cleaning the common area.  Then at 8:15, from

7   8:15 to noon and then afternoon till about 2:30 they go to

8   school.  School is, as I showed you from the Plaintiff's

9   Exhibit 9, school is the academic program which is the School

10  of Tomorrow curriculum.  A self-based integrated learning

11  program combined with the Freedom Baptist curriculum which is

12  the religious portion.

13          So from 8:15 in the morning to noon and then from

14  one o'clock to 2:30 is the academic program.  After the

15  academic program there is work and there is sports.  This is

16  just Monday through Friday.  Sunday afternoon is -- unless

17  you're on discipline, Sunday afternoon is free time.

18  Saturday afternoon is a variety of different things.  But

19  from 2:30 to roughly five o'clock you do one of two things,

20  you either work or you play sports.  Some days they play

21  sports; soccer, volleyball, baseball, softball, swim.  That's

22  activity some days.  And some days they work.

23          Now, what do they do?  What do they do, in teams a

24  whole lot of things.  What is the point of the work?  Well,

25  I'll tell you what we don't do.  We don't make anything,

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    except to provide an opportunity by Christian example in

2    reference to the bible is the word of God.  The only thing we

3    make is an opportunity for these children, troubled children

4    to find God and by finding God be restored to society.  But

5    we don't make any products.  We don't sell anything.  We

6    don't buy and sell farm equipment.  We don't buy and sell

7    machinery.  We don't repair, buy, and sell farm equipment or

8    machinery.  We don't run cattle farms.  We don't run horse

9    farms.  We have a singular mission ministry, save troubled

10   youth and at the same time educate them.  And this is

11   integrated into it.

12           So children, young people in the afternoon learn

13   work ethic, self-respect, team work, a self accomplishment,

14   relearn a sense of pride by either as groups playing sports

15   or doing things.  What do they do?  They stack firewood.  We

16   have -- a hot water heater is wood fire.  They stack

17   firewood.  Do they do it all the time?  No, the guy that

18   sells the school the firewood stacks it some of the time, but

19   that's an activity that they do.  We leave a part of the

20   grounds unmowed.  Most the grounds are mowed with a bushhog,

21   particularly down in Florida.  We leave a part unmowed so

22   that we can reintroduce young people to manual labor, to hard

23   work, where they go cut weeds or mow grass or pick up limbs.

24   Or down in Florida where it rains and blows a lot, pick up

25   what's blown in.  Or maybe paint fences.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1      So that they accomplish something, something that

2 they've not apparently in their life accomplished it with

3 other people.  We don't sell this product.  We don't put it

4 into the stream of commerce.  We use this opportunity to

5 teach these young people how to work in society with each

6 other.  A self-respect and work ethic just exactly like we

7 tell the parents when they enroll their children that we are

8 going to restore.

9      These children by providing nurturing Christian

10 values of respect for authority, learn how to take direction,

11 a biblical self image and Christian services.  We nurture

12 them at student growth, respectfulness, leadership, and

13 creativity.  And in part, and, in fact, in whole this work or

14 play environment is intended exactly to do that, to teach

15 cooperation, like the sports, to teach cooperation, to teach

16 children respect for authority so they don't end up like me

17 yelling at every basketball official.  I don't think a SEMO

18 official has ever made a good call, but somebody ought to

19 teach them better than I learned.  It's respect for

20 authority, something that most of these children when they

21 come don't have.

22      So, yeah, sure, they have to clean up in the

23 morning.  And, yes, they have to work or play sports in the

24 afternoon.  Because it's part of how we put their lives back

25 together.  Teamwork, self-discipline, accomplishment,

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    service, we integrate this with other students called

2    orientation guides, students that show willingness to

3    minister to others with team leaders, students who show

4    willingness to minister and have leadership responsibility.

5    And we take unacceptable peer pressure and throw it out the

6    window and substitute peer pressure with peer pressure to

7    save children.  And by example these children are restored,

8    hopefully restored to society believing in Christ, saved with

9    strong academic background, an unaccredited but Christian

10   school academic background.  And this is the philosophy of

11   Mountain Park, and it is the background into that philosophy

12   that Jordan came and was moved to Florida where he stayed

13   till he walked away on March the 15th.

14         There will be no evidence that we are a business

15   enterprise or that we engage in any commerce.  There is no

16   evidence that any of the defendants except Bob Wills, Sue

17   Wills and Sam have any right to hire, fire, set wages or do

18   anything that people who are employers are.  This isn't

19   employment.  This is education.  It's education with your

20   mind, with your spirit, and with your hands.  So that if you

21   keep your commitment to Mountain Park or you keep your

22   commitment to Palm Lane, after a year you have a realistic

23   chance to be a restored human with a faith in God and an

24   ability to work in society fully educated.  And that's what

25   the evidence will be.

1          There is no employment here.  He wasn't employed by

2     anybody.  Nobody employed him.  Nobody is an employer as

3     relates to Jordan.  This is an integrated part of a system

4     designed by the Wills to save children.  When you hear the

5     evidence you'll know that Bo Gerhardt didn't slam Jordan

6     Blair up against anything.  Violent conduct begets violent

7     conduct.  It's against the rules.  It's against Christian

8     example.  It didn't happen.

9          And neither did we work this boy in employment.  We

10    didn't produce any goods for employment.  Did the boy do

11    work?  Absolutely did chores in the morning, did work in the

12    afternoon to restore himself.  The only tragedy here is he

13    didn't stay long enough for it to take.  Thank you.

14         THE COURT:  Ladies and gentlemen of the jury, we'll

15    take our luncheon recess at this time.  Recall the admonition

16    with regard to no discussion of the case and so forth and so

17    on.  Have a pleasant lunch.  Why don't you look at returning

18    to your jury room at 2:15 p.m.  Have a pleasant lunch.

19         (Court in recess from 12:58 p.m. until 2:13 p.m.)

20         (The following proceedings were held outside the

21    hearing of the jury:)

22         THE COURT:  Good afternoon.  I understand you all

23    had something you wanted to talk to me about?

24         MR. STILLEY:  Yes, Your Honor.  On the defendants'

25    exhibits in light of the rulings this morning, I'm moving to

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    require the defendants to strike anything in their pleadings

2    about Mr. Blair's alleged pornography or impression of credit

3    cards or anything of that nature.  Other than that I don't

4    have any objection to this Exhibit B.  But based on the

5    Court's rulings, I think this information should be kept out

6    for a number of reasons including excessive prejudice.

7              THE COURT:  Mr. Briggs.

8              MR. BRIGGS:  Your Honor, Defendants' Exhibit A I put

9    up on the ELMO.  We're specifically referring to the first

10   page of A.  And what Mr. Stilley is concerned about is about

11   a third of the way down the page, I'll highlight it for the

12   Court.  This is previously prepared, it's a form that

13   defendant sends to the parents who are considering enrolling

14   their children in Mountain Park.  Since the purpose is to

15   minister to troubled youth, one of the things that Mountain

16   Park wants to find out is what the parents are concerned

17   about.  There are several preset things; alcohol, drugs,

18   sexual activity.

19             THE COURT:  Why are we concerned about it though?

20             MR. BRIGGS:  Your Honor, I don't think we're

21   concerned about it at all.  We aren't offering this or we

22   wouldn't offer this to prove the truth of the matter whether

23   Mr. Blair was engaging in pornography, depression of stolen

24   credit card or anything else.  The only reason we might refer

25   to this exhibit would be specifically to identify what was

1    presented to Mountain Park, what Pastor Gerhardt had as an

2    understanding that the parents believed Jordan was troubled.

3    That's the basis, not to prove that he necessarily was or to

4    establish that he necessarily was.  So we aren't offering it

5    to prove --

6           THE COURT:  Fine.  That's excluded.  What else?

7           MR. STILLEY:  Your Honor, I didn't see Drew Parrish

8    here.  Is Drew Parrish here?

9           MR. BRIGGS:  No, he's not here yet.

10          MR. STILLEY:  Your Honor, I'd move for default

11    judgment against Drew Parrish for failure to show up.

12          THE COURT:  Denied.

13          MR. STILLEY:  Okay.  Thank you.

14          THE COURT:  Anything else?

15          MR. STILLEY:  That's all, Judge.  Thank you.

16          MR. OLIVER:  Could I have a minute?  I need to

17    figure out a way to get this redacted.  I'll figure it out.

18          THE COURT:  Fine.  Let's bring the jury on.

19          (The following proceedings continued within the

20    hearing of the jury:)

21          THE COURT:  Good afternoon, ladies and gentlemen of

22    the jury.  Okay.  We ready to proceed?

23          MR. STILLEY:  Yes, Your Honor.

24          THE COURT:  Call your first witness.

25          MR. STILLEY:  Betty Sue Wills.

```
1                          BETTY SUE WILLS,

2     Having been first duly sworn, was examined and testified as

3     follows:

4                          DIRECT EXAMINATION

5     BY MR. STILLEY:

6     Q.    Please state your name.

7     A.    Betty Sue Wills.

8     Q.    Where do you live?

9     A.    Fort Meyers, Florida.

10    Q.    And where do you work?

11    A.    At Palm Lane in Mountain Park.

12    Q.    What is the full legal name of Mountain Park?

13    A.    Mountain Park Baptist Church and Mountain Park Boarding

14    Academy.

15    Q.    Is that a formal organization or that just a doing

16    business as name?

17    A.    It's an organization.

18    Q.    Is it a corporation?

19    A.    No, sir.

20    Q.    Is it a partnership?

21    A.    No, sir.

22    Q.    Is it a sole proprietorship?

23    A.    It's a church and a boarding academy.

24    Q.    Okay.  What is the organizational structure of the --

25    of Mountain Park?
```

1    A.    What is the structure?

2    Q.    Right.  Who owns -- let me put it like this.  Who owns

3    the property that is used by this organization?

4    A.    Mountain Park Baptist Church.

5    Q.    Okay.  Is there a legal entity called Mountain Park

6    Baptist Church?

7    A.    It's a Mountain Park Baptist Church, yes, sir.

8    Q.    But that's not a corporation?

9    A.    No, sir, it's not a corporation.

10   Q.    Whose name -- whose name is on the deed of the property

11   that the operation is on?

12   A.    Mountain Park Baptist Church.

13   Q.    Okay.  So it's not in the name of any particular

14   individual?

15   A.    No, sir.

16   Q.    Okay, all right.  If the operation were to dissolve and

17   cease operations, who would get the --

18         MR. OLIVER:  Objection, Your Honor, where we going?

19   It's a church, not a 501c3 corporation.  He's asking for

20   legal conclusions.

21         THE COURT:  In the earlier ruling we were looking at

22   if there is an employer/employee relationship.  We're trying

23   to -- I gave him some leeway to find out who would be the

24   employer.  That's where we are with this.

25         MR. OLIVER:  Well, for the record, Your Honor, then

 1    I object to inquiring tax status or tax ramifications, which

 2    is all this is.

 3              THE COURT:  Well, maybe you all can reach an

 4    agreement and make everybody happy.

 5              MR. OLIVER:  Your Honor, we offered to stipulate

 6    it's an unincorporated voluntary association organized as an

 7    independent fundamental Baptist church.

 8              THE COURT:  Come on up.

 9              (The following proceedings were held at the bench

10    and outside the hearing of the jury:)

11              THE COURT:  What I'm referring to and so I was

12    talking about earlier is if, in fact, there was a

13    determination that there was an employee/employer

14    relationship, who would be the employer.

15              MR. OLIVER:  And with that regard, Judge, I don't

16    mind Mr. Stilley inquiring into who makes the decisions, who

17    had -- the criteria set out by the courts are clear it's who

18    hires and fires and sets salaries, not who gets the money if

19    the church dissolves.

20              MR. STILLEY:  I want to know who has the assets on

21    that.

22              MR. OLIVER:  The assets -- well, that's premature.

23    There's no judgment.  There are no punitive damages in the

24    FLSA case.

25              THE COURT:  I'm looking at allowing him to have some

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    broad inquiry in terms of who the employer is.  Now, one does

2    not have to admit that one is an employer.  But, I mean, for

3    ownership purposes or whatever else, it could make it very,

4    very simple if you all would reach some kind of agreement.

5    Otherwise we're going to have to go through all this.

6         MR. OLIVER:  I stated in opening statement

7    unequivocally that Pastor Wills, Betty Wills, and Sam

8    Gerhardt were the decision makers.  They are the ones that

9    hire, fire, and set salaries.  And that is the criteria, the

10   sole criteria under the pattern instructions definition of

11   who an employer is, the person who acts in the interest of

12   the employer and that's somebody who has power to fire, hire.

13        THE COURT:  You all need to reach a stipulation to

14   tell this jury so there is no question about this.

15        MR. STILLEY:  I think it would be in everybody's

16   advantage for them to just stipulate that all these

17   individuals are employers.

18        MR. OLIVER:  We aren't.

19        THE COURT:  They are not going to stipulate that --

20        MR. OLIVER:  I don't agree that anybody is an

21   employer.  But the people who had decision making are Pastor

22   Wills, Betty Wills, and Sam Gerhardt, that's pretty

23   straightforward.

24        MR. STILLEY:  I'm going to be looking at who is

25   deriving the benefit from this, who gets the money from it.

1   And I think that's where you have to go down to see who is,

2   in fact, the employer.  Because you don't have a formal

3   organization, you don't have a corporation.  I think we can

4   tell from this witness already they don't have any formal

5   organization at all.  It's just a name that they do business

6   by, and it's the individuals doing the business.  And I want

7   to know which individuals are getting the money and how much.

8   I think that that tells us who the equitable owner of this

9   business is.

10       THE COURT:  Part of my problem is this with any

11  company, people can be making decisions, but that doesn't

12  make them the owners of the company.  Just because somebody

13  at Ralston or Anheuser-Busch, they make decisions, they don't

14  own the company.  So even though we may have some people

15  making decisions, that doesn't mean they are necessarily the

16  employers.  They could be, could not be.

17       So, I mean, there could be a stipulation that you're

18  not admitting, nobody is admitting that they are, in fact you

19  challenge the fact that they are employers.  But if there is

20  anyone to be classified in such a status, it would be these

21  people, then we're through with all this.

22       MR. OLIVER:  It would be these people, Pastor Wills,

23  Sam Gerhardt, and Betty Sue Wills.

24       THE COURT:  What about that?  We have to tell the

25  jury this so we can end this, so we can have that as a fact

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    if they determine by the nature that there's an employer/

2    employee relationship.

3            MR. STILLEY:  I want to establish that the others

4    are too, the rest of them, because they operated as a group

5    making money.  And I think that the testimony is going to

6    show that the money that came into this organization was

7    passed out in the form of de facto dividends to various

8    individuals.

9            THE COURT:  So you don't want a stipulation?

10           MR. STILLEY:  I would take a stipulation if they

11   would stipulate that all the defendants are employers.  I

12   mean, that's satisfactory to me.

13           MR. OLIVER:  Your Honor, his inquiry is the wrong

14   legal test for the definition of employer.  An employer is

15   the organization or someone who acts in the interest of the

16   organization which is clearly defined as the hire, fire

17   people.  And to use your analogy, it's the Anheuser-Busch,

18   it's not the shareholders.  They can't under an FLSA case,

19   you can't get to the shareholders because they get dividends,

20   it's only the decision makers.  And we're willing to -- I

21   mean, the deposition testimony is clear and we're willing to

22   agree as to who the decision makers are.

23           MR. STILLEY:  Well, as you said, Judge, though, the

24   decision makers aren't necessarily liable for any wages.  You

25   can get fired by your boss who has legitimate right to fire

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1   you, but you can't sue him.  It's a different question where

2   you have what amounts to a de facto partnership of various

3   people that came together and began to work in the operation

4   and they divide the money.

5        THE COURT:  You're saying you want all the

6   defendants, Mr. Stilley is saying only several of the

7   individuals.

8        MR. STILLEY:  Right.  And if I can just inquire --

9   maybe just a little more about the ownership structure and

10  then about who gets the money off this, I think that we have

11  a clear picture.

12       MR. OLIVER:  Who gets the money is entirely

13  irrelevant, purely prejudicial.  Who gets the money is --

14       MR. BRIGGS:  It's profit information.  It's outside

15  the scope of this inquiry.

16       MR. STILLEY:  Well, profit information in a

17  partnership setting is very, very appropriate and very

18  relevant to this, to who the employer is.

19       MR. OLIVER:  You haven't pled partnership, it's

20  outside the pleadings.

21       THE COURT:  I'm not getting any clear indication

22  here.  One is talking about decision making, the other is

23  ownership.  I'm going to allow you some leeway.

24       MR. OLIVER:  Will it be continuing then?

25       THE COURT:  Continuing objection.

1          MR. OLIVER:  That it's an improper legal standard so

2     the inquiry is irrelevant.  Thank you.

3          (The following proceedings continued within the

4     hearing of the jury:)

5     BY MR. STILLEY:

6     Q.    Can you tell the jury who would get the assets that are

7     used by Mountain Park if that organization were dissolved?

8     A.    It would go to a like ministry.

9     Q.    Is that written down somewhere?

10    A.    No, sir.

11    Q.    Okay.  And how do you know that?  What's your basis of

12    personal knowledge for that?

13    A.    Just that if the ministry dissolved then the assets go

14    to a like ministry.

15    Q.    Did somebody tell you that?

16    A.    I guess my husband and I discussed it at different

17    times.  We've discussed it with our lawyers.

18    Q.    Okay.  Tell -- can you tell the jury how do you

19    normally refer to the organization at Mountain Park?  Do you

20    just call it Mountain Park?

21    A.    Mountain Park.

22    Q.    Okay.  Does Mountain Park refer to the church as well

23    as the boarding academy?

24    A.    Mountain Park Baptist Church and the boarding academy

25    is a ministry under the church.

1    Q.    Okay.  Is there a distinction between the church and

2    the academy?

3    A.    What do you mean?

4    Q.    Are the books for the church and the academy kept

5    separately?

6    A.    No, sir, everything is under the church.

7    Q.    So there's one set of books?

8    A.    There's one set of books for the bookkeeping.

9    Q.    Now, when -- did you remember when Jordan Blair, the

10   plaintiff in this case, came to be at Mountain Park?

11   A.    Just from the application.  I understand it was October

12   the 24th.

13   Q.    Of what year?

14   A.    2001.

15   Q.    How many other students were there at that time?

16   A.    I have no idea how many students were there back in

17   October 24th, 2001.

18   Q.    Can you get close on it?

19   A.    I would say probably 70, 80.

20   Q.    Was that boys and girls?

21   A.    Yes, boys and girls.

22   Q.    Were all these paid students or were there any there

23   without tuition from the parents?

24   A.    We would have a few that come and could not pay the

25   full amount and we would let the parent pay just part of

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    tuition.  And then we would let some parents that had one of

2    the students there would help out sometimes with tuition.

3    Q.     Okay.  Using the same time frame, how many students

4    were at Palm Lane Baptist Church in Florida?

5    A.     Probably about 20 girls.

6    Q.     Was it girls only?

7    A.     At that time, October 24th, yes, they were girls only.

8    Q.     When did it change to girls and boys?

9    A.     When we brought Jordan and some other boys down to the

10   ministry, we had some boys and girls there.

11   Q.     So Jordan Blair was one of the first boys there?

12   A.     No, sir, we had had boys there before and we took them

13   and sent them back to Mountain Park.  And then we brought

14   them back down to Palm Lane.

15   Q.     Now, let's find out a little bit about the formal

16   organizational structure of Palm Lane.  Do you call that Palm

17   Lane?

18   A.     Palm Lane Baptist Church.

19   Q.     Is that a corporation?

20   A.     Yes, that's a corporation.

21   Q.     What is the formal corporate name?

22   A.     Palm Lane Baptist Church.

23   Q.     Incorporated?

24   A.     Yes, sir.

25   Q.     And how long has this corporation been operating?

```
 1    A.    We started it in 1997.

 2    Q.    Okay.

 3    A.    I think we bought the property in November 1997.

 4    Q.    Are these students -- how is Palm Lane and Mountain

 5    Park affiliated?

 6    A.    They are two different ministries.

 7    Q.    I believe you told us that there were students sent

 8    back and forth?

 9    A.    The reason we sent them back because we were a little

10    short of workers, so we informed the workers that the boys

11    would be going back to Mountain Park so we would have enough

12    workers to take care of them.

13    Q.    Who makes the decisions with regard to Palm Lane?

14    A.    Brother Wills and I.

15    Q.    And anybody else?

16    A.    No, sir.

17    Q.    Who makes the decisions with respect to Mountain Park?

18    A.    Brother Wills and I and Brother Sam Gerhardt.

19    Q.    Anybody else?

20    A.    No, sir.

21    Q.    Who manages the finances at Palm Lane?

22    A.    The bookkeeping is all done at Mountain Park.

23    Q.    Are all the books then kept together for Palm Lane and

24    Mountain Park?

25    A.    No, sir, the banking is done in Florida.
```

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1   Q.    But I'm not asking about the banking, but about the

2   books.

3   A.    Yes, sir, the books are at Mountain Park.

4   Q.    Okay.  And they are all kept together; is that correct?

5   A.    No, they are not together, they are separate.

6   Q.    Okay.  So there's two sets of books at the facility at

7   Mountain Park, correct?

8   A.    Yes, sir, one for Mountain Park and one for Palm Lane.

9   Q.    And who keeps those books?

10  A.    Mrs. Gerhardt.

11  Q.    Does she keep both sets?

12  A.    Yes, sir.

13  Q.    Okay.  Can you tell the jury the physical location of

14  each of these facilities?

15  A.    Mountain Park Baptist Church is located in Patterson,

16  Missouri.  Palm Lane Baptist Church is located in Arcadia,

17  Florida.

18  Q.    And would it be fair to say then that at the time that

19  Jordan Blair arrived at Mountain Park that there were about

20  100 total students in the two schools?

21  A.    I said I wasn't sure, there could have been 100.  I

22  said between 70 to 80.

23  Q.    Okay.  Now, but you also said that there were about 20

24  students at Palm Lane?

25  A.    Yes, sir.

1    Q.    So it would be fair to say there were 90 to 100

2    students altogether?

3    A.    How many?

4    Q.    Ninety to 100 students?

5    A.    Yes, sir.

6    Q.    And what's the rate of tuition at these places?

7    A.    1,200 a month.

8    Q.    Both places?

9    A.    Yes, sir.

10   Q.    Has that changed in the past three years?

11   A.    I don't believe so, no, sir.

12   Q.    So can you tell the jury what your approximate average

13   annual revenue from these two schools is?

14   A.    No, sir, I don't keep up with that.

15   Q.    Well, if there were a hundred students, it would be

16   1,200 times 100, correct?

17   A.    Yes, sir.

18   Q.    And can you tell the jury how much that is?

19   A.    Not right off my head, no, sir.

20   Q.    Would that be 120,000?

21   A.    It could be yes, sir.

22   Q.    Times 12 months?

23   A.    Well, 12 months.

24   Q.    Well, 12 months in a year, correct?

25   A.    12 months, yes.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    Q.    And the parents typically send the kids there all year

2    round, correct?

3    A.    Most of them do.  Some of them do not, but most of them

4    do.

5    Q.    So is it fair to say that the revenue in 2001 was about

6    close to one and a half million dollars per year?

7    A.    It could be.

8    Q.    And is it true that the revenue -- is the revenue about

9    the same at this point in time?

10   A.    I'm sorry?

11   Q.    Is the revenue of the two schools about the same at

12   this point in time?

13   A.    The same amount of money for both schools.

14   Q.    Is it about the same at this point in time?

15   A.    They -- each family was charged 1,200 but now Palm Lane

16   only had 20 students where Mountain Park would have 80 to 90

17   students.

18   Q.    But are the student numbers still the same at both

19   facilities?

20   A.    Right now?

21   Q.    Correct.

22   A.    No, it isn't.

23   Q.    And how have they changed?

24   A.    We just haven't had the call for students.

25   Q.    About how many students are at Mountain Park right now?

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

```
 1    A.    About 40 something.

 2    Q.    And how about Palm Lane?

 3    A.    Palm Lane has 19.

 4    Q.    Who owns the land that Palm Lane sits on?

 5    A.    The land is in my name.

 6    Q.    Who obtains the -- of this $1.5 million, can you tell

 7    us where this money goes?

 8    A.    Oh, yes, sir, it goes to pay bills and build buildings,

 9    pay salaries.

10    Q.    Salaries?

11    A.    Yes, sir.

12    Q.    Who is on salary?

13    A.    All of our staff.

14    Q.    Can you tell us who they are?

15    A.    There's myself and Brother Wills, Brother and

16    Mrs. Gerhardt, Brother Bo and Julie Gerhardt, Ms. Goodman,

17    Brother O'Brient and Ms. O'Brient, Brother Kennedy and

18    Mrs. Kennedy, Andrea Hill, Monica McCombs.  Let me think a

19    minute.  Sandra Herman, Robin Baldwin.  Have several outside

20    staff that work just on the buildings.  Mitchell, I'm not

21    sure what his last name is.  Billy Fox.  We have several

22    cooks that come in every day, Sue Harmon, Barbara -- I can't

23    think of her name right now.  Amber "Stoflus".  We have

24    Meagan O'Brient is called a junior staff.

25    Q.    What is a junior staff?
```

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1    A.    Junior staff is one that is still in school but wants

2    to be a worker, so we give her some duties and pay her a

3    little bit of money.

4    Q.    Okay.  How much does a junior staff worker typically

5    get?

6              MR. BRIGGS:  Objection, Your Honor, may we approach?

7              (The following proceedings were held at the bench

8    and outside the hearing of the jury:)

9              THE COURT:  I'll sustain the objection.  You're

10   going way beyond who would be the employer.  Let's stay on

11   this.  You know, how much a junior person makes, please.

12             MR. STILLEY:  Well, let me explain myself lest you

13   think I didn't have any reason to go there.  Last I heard,

14   they were paying $300 a month, which would indicate that they

15   don't think they are required to comply with Fair Labor

16   Standards.  And I'm going to ask to see if they consider

17   themselves, that they are required to pay minimum wage.

18             MR. BRIGGS:  May I respond, Your Honor?

19             MR. STILLEY:  If he wants to object and then the

20   Court wants to rule on that.

21             THE COURT:  Wait a minute.  You want to ask who --

22             MR. STILLEY:  Want to ask her if they consider

23   themselves subject to the Fair Labor Standards.

24             MR. BRIGGS:  Your Honor, my response is this.

25   No. 1, you ruled on this last September 23rd when we had the

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    hearing on discovery.  You ruled that he was not entitled to

2    inquire about employee's salaries.  Second, Your Honor, he's

3    basing his supposition on the last he heard through the

4    grapevine how much people are making.  Third, he has -- if

5    he's going to inquire, I think he has to cover the entire

6    territory as far as room and board, any other expenses that

7    are covered under the plan.  And in addition to that, whether

8    these people would waive any exemption rights under the Fair

9    Labor Standards Act.

10          It is our position to come back on that.  If he's

11   making an affirmative position on that, I think he has to

12   present evidence on it.  And he hasn't offered anything in

13   this lawsuit so far.  I don't know where he's going to get it

14   here.  I think it's improper for him to inquire about

15   confidential information.  He hasn't demonstrated how that

16   junior -- what junior staff members would do would constitute

17   the employer/employee relationship.

18          THE COURT:  Well, he's saying he's going toward

19   whether or not they are subject to the Fair Labor Standards

20   Act.  Every employer is subject to that.  I mean, but you're

21   really getting to whether or not your client, Mr. Blair, is

22   an employee.  So I think you're going a little bit too far

23   afield.  And we're going way too far afield with how much

24   people are making and whether or not they are subject in

25   terms of those employees.  We're not talking about those

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    employees.  I thought you were making -- I thought you were

2    making an inquiry to see who the employers, if there is such

3    a thing, who they are.

4          MR. STILLEY:  I can get back to the --

5          THE COURT:  Let's stay there.

6          MR. BRIGGS:  Your Honor, actually while we're here

7    then I still, I want to make this preemptorily.  Then I still

8    would object to his inquiry into example how much Mr. and

9    Mrs. Wills make or how much Pastor and Mrs. Gerhardt make.  I

10   think that is inappropriate inquiry to determine whether or

11   not they would constitute employers in this case.

12         THE COURT:  I don't know what's going to constitute

13   who.  But it seems to me that unless there is some other

14   information there, this isn't part of the information there

15   in terms of these people.  The defendant is claiming that all

16   of them are the employer.  So I'm going to allow that.

17   There's a simple solution, you all don't want to go there, so

18   forget it.  Here it is.

19         MR. BRIGGS:  Thank you, Judge

20         (The following proceedings continued within the

21   hearing of the jury:)

22   BY MR. STILLEY:

23   Q.    How much compensation did you receive from Mountain

24   Park and/or Palm Lane in 2001?

25   A.    How much pay did I receive?

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

```
1    Q.    Correct.

2    A.    I'm not sure because I don't receive a salary every

3    month.

4    Q.    Okay.  Where can we get that information?

5    A.    I'd have to look on my income tax.

6    Q.    Who is the bookkeeper?

7    A.    Mrs. Gerhardt.

8    Q.    Okay.  Would she have that information?

9    A.    She would have it at Mountain Park, yes.

10   Q.    Is that Debbie Gerhardt?

11   A.    Yes, it is.

12   Q.    You said something about having that information at

13   Mountain Park.  Are you saying that -- what do you mean by

14   that?

15   A.    On the computer at Mountain Park where she keeps our

16   bookkeeping.

17   Q.    Okay.  You don't think she would know that, have

18   personal knowledge of that information?

19   A.    I don't think she would know that, sir.

20   Q.    Okay.  Are you telling us you don't know how much

21   compensation you got in 2001?

22   A.    No, sir.  Like I said, I don't receive a salary every

23   month.

24   Q.    Is there any year you could tell us how much

25   compensation you received from these two entities?
```

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    A.    I think this last year I received 54,000.

2    Q.    I beg your pardon?

3    A.    54,000 this past year.

4    Q.    Okay.  Would that be 2003?

5    A.    Yes.

6    Q.    Okay.  Would that be commensurate with other years or

7    do you know if that would be roughly similar to other years?

8    A.    I may have received a bit more other years.

9    Q.    All right.  Do you have personal knowledge about how

10   much compensation your husband received from Mountain Park

11   and Palm Lane?

12   A.    I think this past year he got 40 something.

13   Q.    Do you know about any other years?

14   A.    No, sir, not right off I don't.

15   Q.    Okay.  Now, is that just cash compensation?

16   A.    A check.

17   Q.    Okay.  But does that include -- do you get any housing

18   or other things of value through these two organizations?

19   A.    I'm buying my own home in Florida.

20   Q.    Okay.  And does that come out of the compensation that

21   you receive from --

22   A.    Yes, it does.

23   Q.    And that comes out of the compensation that you receive

24   from those two organizations, correct?

25   A.    I don't receive anything from Palm Lane, I just get

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    money from Mountain Park.

2    Q.    Okay.  Do you have personal knowledge about the

3    compensation received by any of the other individuals that

4    are parties to this lawsuit?

5    A.    I know about how much salary they get, yes, sir.

6    Q.    Okay.  How about Mr. Gerhardt, Mr. Sam Gerhardt, do you

7    know how much he gets?

8    A.    Let's see, 24,000.

9    Q.    That's cash?

10   A.    Paycheck, yes, sir.

11   Q.    Does he also get a house to live in?

12   A.    Yes, sir, he has a home to live in.

13   Q.    Do you know if he gets any labor to keep up that house?

14   A.    Does he get any labor to keep up the house?

15   Q.    Right.  Is there any labor included in his

16   compensation?

17   A.    No, sir.  The men that work come in from outside that

18   work for us.  Our carpenters do all the labor work on the

19   houses.

20   Q.    Okay.  Do the students at Mountain Park ever do work?

21   A.    Yes, sir.

22   Q.    They do work on Sam Gerhardt's house?

23   A.    No, sir.

24   Q.    Never?

25   A.    Work on his house?

1    Q.    House or grounds.

2    A.    They may sweep around the house.  They may pick up

3    limbs.  But work on the house, no, sir.

4    Q.    Okay.  So is it fair to say then they keep the grounds

5    clean?

6    A.    Yes, sir.

7    Q.    Is it fair to say they keep the inside of the house

8    cleaned?

9    A.    Oh, no, sir.  The boys?

10   Q.    Right.

11   A.    You talking about the boys?

12   Q.    No, the girls.

13   A.    Sometimes the girls may go up there and wash some

14   windows and do things like that, yes, sir.

15   Q.    Is that work that they are required to do or is that

16   just voluntary?

17   A.    No, sir, that's volunteer.

18   Q.    Is there any penalty for not volunteering?

19   A.    No, sir.

20   Q.    How about -- now, who is Debbie Gerhardt?

21   A.    My daughter.

22   Q.    Do you know how much her salary is?

23   A.    A thousand a month.

24   Q.    From both organizations?

25   A.    From Mountain Park only.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    Q.    Okay.  How much does she get from Palm Lane?

2    A.    She doesn't get anything from Palm Lane.

3    Q.    Do you know of any nonemployee compensation, noncash

4    compensation that she gets?

5    A.    No, sir.

6    Q.    Do you know how much compensation Bo Gerhardt gets from

7    these two organizations?

8    A.    Mountain Park pays him 1,300 a month.

9    Q.    And Julie Gerhardt?

10   A.    Their salary is together.

11   Q.    Oh, do they only draw one salary between them?

12   A.    Together.

13   Q.    And can you tell, what is your relationship to Bo and

14   Julie Gerhardt?

15   A.    Bo is my grandson.

16   Q.    And who is Julie?

17   A.    Julie is his wife.

18   Q.    Do you know what compensation Drew Parrish received in

19   2001, if any, from these two organizations?

20   A.    He got some from Palm Lane and some from Mountain Park.

21   I couldn't tell you exactly what his was.

22   Q.    Okay.  Do you know how much -- well, let me go through

23   these names and you just tell me.  I'm asking you about what

24   compensation they received from either or both of these

25   organizations to see if you have any knowledge about that.

1    Do you have any knowledge concerning Bill Cavitt -- wait,

2    strike that -- Robert O'Brient?

3    A.    Yes, sir, he received money from Palm Lane.  He

4    receives 1,500 a month.

5    Q.    And how about Robert Kennedy?

6    A.    Brother Kennedy gets his salary from Palm Lane, and his

7    is 1,300 a month.

8    Q.    Is there any profit derived from these -- either of

9    these two organizations, any cash profit at the end of the

10   year?

11   A.    Derived?

12   Q.    Right.  Do these businesses turn a profit?

13        MR. OLIVER:  Object to the characterization.

14        THE COURT:  Overruled.

15   A.    No, sir.  You talking about a profit from some

16   business?

17   Q.    Well, I'm just asking if there is a profit.  After all

18   the expenses have been paid, is there none left over?

19   A.    There may be a little bit.

20   Q.    Okay.  Let's take 2001, do you know about how much was

21   left over for that year?

22   A.    No, sir, I do not.

23   Q.    Do you know who would know?

24   A.    Mrs. Gerhardt.

25   Q.    Do you have any personal knowledge about why Jordan

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1  Blair was sent from Mountain Park to Palm Lane shortly after

2  he arrived at Mountain Park?

3  A.    Yes, sir, I do.

4  Q.    Okay.  What's your understanding of those reasons?

5  A.    In the State of Missouri at 17 a child is considered

6  legal age.  In Florida they have to be 18.  And Jordan Blair

7  would've been with us only a few months when he turned 17, so

8  that's why we took him to Florida.  We told his parents he

9  would have to go to Florida if we took the child.

10  Q.    What would have been wrong with leaving him at Mountain

11  Park?  Would he been able to leave the facility within just a

12  few months?

13          MR. OLIVER:  Objection, this is outside the scope.

14          THE COURT:  Where we going?  Sustained.

15  BY MR. STILLEY:

16  Q.    Do you have any personal knowledge as to whether there

17  were any signed documents from Jordan Blair's parents

18  authorizing that he be transferred to Palm Lane?

19          THE COURT:  Sustained.  We're going to focus on the

20  two claims; battery, employer/employee, okay.

21          MR. STILLEY:  Certainly, Judge.  Certainly.

22          THE COURT:  Fine.

23  Q.    Do you have any personal knowledge as to whether there

24  are any time records kept on students who perform work at

25  either of these facilities?

1    A.    No, sir, these are just chores that the students

2    perform, there is no time record.

3    Q.    What about you talked about junior staff?

4    A.    Yes, sir.

5    Q.    Are time records kept on junior staff?

6    A.    No, sir.

7    Q.    Is there a particular reason for that?

8    A.    We just don't have a time record on none of the

9    employees except the outside that come in.

10   Q.    Can you define or explain to the jury what the -- what

11   the principle function of Mountain Park Boarding Academy is?

12   A.    The principle function?

13   Q.    Correct.

14   A.    Is to take a child that is having problems and tell

15   them about Jesus and get him an education and try to get his

16   life turned around so he can walk into society and live and

17   work among others without trouble.

18   Q.    Isn't it true that Mountain Park in its own literature

19   says -- Mountain Park Baptist Boarding Academy says that it

20   is nothing more than the name implies?

21   A.    A boarding academy?

22   Q.    Correct.

23   A.    It's a boarding academy, yes, sir.

24   Q.    Is the academy then providing education for students?

25   A.    Yes, sir.

1    Q.    Is this academic education?

2    A.    Yes, sir.

3    Q.    And for what grade levels?

4    A.    All grade levels.  We take them from -- we start 12, 13

5    years old and take them up to 17 in Missouri and then 18 in

6    Florida.

7    Q.    Where do the majority of your students come from as to

8    what state?

9    A.    All over.

10   Q.    About what percentage of your students come from the

11   state in which the academy is located?

12   A.    Not very many.

13   Q.    Okay.  How does the personnel of Mountain Park and Palm

14   Lane communicate with the parents that are outside their

15   state?

16           MR. OLIVER:  Your Honor, does this have something to

17   do with this case?  Objection, irrelevant.

18           MR. STILLEY:  Your Honor, interstate commerce.  Can

19   we approach on this?

20           THE COURT:  I'm sustaining that objection.

21           MR. STILLEY:  Your Honor, may I approach anyway?  I

22   want to make sure.  I have some other things I want to

23   approach on.

24           (The following proceedings were held at the bench

25   and outside the hearing of the jury:)

1          MR. STILLEY:  Your Honor, I think this is an

2   appropriate time to see if maybe we can streamline this a

3   little bit.

4          THE COURT:  I'm telling you.

5          MR. STILLEY:  I'm trying to -- I'm taking a belt and

6   suspenders approach because I've learned that sometimes it's

7   a good idea to do.  Let me explain what I'm trying to do.

8   I'm trying to prove the interstate commerce tag to hold them

9   liable under Fair Labor Standards.  There is also a provision

10  of the law that says that all schools, all schools, primary

11  and secondary education schools, are covered by Fair Labor

12  Standards Act.  Now, if they would either agree with that or

13  I could have a ruling that they are covered, and I can bring

14  you the law and let you take a look at it, and then I would

15  not feel obliged to try to establish this alternate route.

16         THE COURT:  What do you have to say about this,

17  Mr. Briggs?

18         MR. BRIGGS:  Well --

19         THE COURT:  You need some help?

20         MR. BRIGGS:  No.  Actually, Your Honor, under the

21  Act it has been found that certain educational institutions

22  will qualify.  My recollection is that the Act does not say

23  every single educational institution qualifies as an employer

24  under the Act.  I wouldn't -- I think it's inappropriate that

25  at this point we wouldn't stipulate to that, but moreover

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1    taking this back road approach, or bootstrapping approach to

2    try to prove interstate commerce is inappropriate in this

3    case.  Where the students came from to be enrolled in

4    Mountain Park doesn't create interstate commerce in itself.

5            THE COURT:  His questions were talking about

6    communicating with each other and the parents.  That's what

7    he was inquiring about.

8            MR. OLIVER:  Obviously they communicated in

9    interstate commerce if they are from out of state.  If he's

10   going where you -- I objected because he's going where you

11   barred him from going just like he has been during this

12   entire examination.  I don't care where the students come

13   from.  I'd be glad to stipulate that they write letters, put

14   them in the mail that go in interstate commerce.

15           THE COURT:  Fine.  Make the stipulation, then you

16   all move on.  You got that?

17           MR. STILLEY:  I don't have a problem with it.  What

18   I want to do is establish not only do that, they take the

19   kids, and I think we can stipulate to this too, that they

20   take these kids from Missouri to Florida which crosses a

21   state line.

22           MR. OLIVER:  I think she already testified to that.

23           THE COURT:  What are you trying to do?

24           MR. STILLEY:  I'm trying to cover all the bases,

25   that I make sure --

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1        THE COURT:  He said he's going to stipulate to

2    interstate commerce.  What more do you need?

3        MR. STILLEY:  If he stipulates to interstate

4    commerce on this association, I'm happy.

5        MR. OLIVER:  No, no, no.  I'm not trying to be at

6    odds with the Court, but I'm willing to stipulate and she's

7    already testified that students were moved from Mountain Park

8    to Palm Lane.  We agree that was in interstate commerce.  We

9    agree that parents communicate from other states in to

10   Missouri and from Missouri and that children communicate from

11   Missouri to other states.  We agree that children communicate

12   from Palm Lane to other states and that parents communicate

13   with children from other states to Palm Lane in Florida.

14   This isn't a dispute in this case.  The letters prove that

15   that are already in evidence.

16       THE COURT:  So what mode are you on?

17       MR. STILLEY:  If they want to stipulate that they

18   are involved in interstate commerce, what I want to do is go

19   the next route to find out where they get the goods.  They

20   transport goods across the state line to their facility.

21       MR. OLIVER:  Mr. Stilley has a perverted view of

22   what the law is in this case.  The question is whether or not

23   they produce goods in interstate or are an enterprise that

24   produces goods in interstate commerce, that's the exact

25   question in this case.

```
 1              MR. STILLEY:  No, there is two things, there is
 2   interstate and there is production of goods for interstate
 3   commerce.  And they are vastly different concepts.  And I
 4   know that they don't produce goods in the sense of a factory
 5   that produces goods in interstate commerce.  That's fine.
 6   The question that I am trying to prove here or the
 7   proposition is that they engage in interstate commerce.  But,
 8   like I said, if we could just get a stipulation that they are
 9   a school as defined by the code section, and if we need to
10   get it, I can get it and show it to you.
11              MR. OLIVER:  We don't agree they are that.
12              MR. STILLEY:  Well, that leaves all these things in
13   evidence.  And I think that I should be allowed to --
14              THE COURT:  Well, if you all do have some partial
15   stipulation, let's put that on.  And otherwise I'm going with
16   the evidence on interstate commerce.  I'm going to let you do
17   it, okay.
18              MR. STILLEY:  Do you want us to take a little bit of
19   time to work on that?
20              MR. OLIVER:  Could I give this to Mrs. Wills?
21              MR. STILLEY:  You want us to take a break and work
22   on that?
23              THE COURT:  No.  He don't need a break.  He said it
24   all up here.  He could get up here and say it.  Since you
25   don't play golf, you don't understand.  Mr. Briggs plays a
```

1    little golf, don't you, Mr. Briggs?

2         MR. BRIGGS:  Yes, sir.

3         THE COURT:  He understands what Lee Trevino said.

4    You know what Lee Trevino told the amateur, have you heard

5    this before?

6         MR. BRIGGS:  I haven't, Judge.

7         THE COURT:  This amateur golfer, you know, an

8    amateur is not like a professional, he's playing with Lee.

9    And he asks Lee, "How should I hit this ball?"  And Lee said,

10   "Miss it quick."  You see what I'm saying, that's what I'm

11   talking about, so miss it quick.  I haven't got all day.

12        MR. BRIGGS:  Thank you, Judge.

13        (The following proceedings continued within the

14   hearing of the jury:)

15        MR. OLIVER:  Your Honor, if it saves any time, the

16   defense is willing to stipulate and agree that from time to

17   time children from states other than Missouri registered and

18   enrolled in Mountain Park and come to Missouri from other

19   states.  And from time to time as testified to by Mrs. Wills

20   those students, males have been moved with the permission of

21   their parents to Florida, to Palm Lane.  And from time to

22   time students at Palm Lane with the permission of their

23   parents, which is in Florida, have been moved to Missouri.

24   That in both schools parents communicate from states other

25   than Missouri and Florida with the students and as shown by

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    the evidence that we've already agreed to the 19 or 28

2    letters, that the students communicate with their parents in

3    states other than Missouri.  In Florida, for instance, Jordan

4    Blair writes letters to his parents.  There are 28 of them in

5    evidence.  Patients write letters to Jordan Blair both at

6    Palm Lane and Mountain Park as the case may be.

7              THE COURT:  Very well.

8              MR. STILLEY:  Thank you, Judge.

9    BY MR. STILLEY:

10   Q.    Do you have any personal knowledge as to whether

11   Mountain Park purchases goods that have been transported in

12   interstate commerce?

13   A.    No, sir.

14   Q.    You have no personal knowledge one way or the other?

15   A.    No, sir.

16   Q.    How about Palm Lane?

17   A.    No, sir.

18             MR. STILLEY:  Your Honor, could I have a moment with

19   my client?

20             THE COURT:  Sure.

21             MR. STILLEY:  Thank you.

22   Q.    Does Mountain Park have official tax exempt status?

23             MR. OLIVER:  Objection, Your Honor, churches aren't

24   required to have tax exempt status under IRS 506c.

25             THE COURT:  Overruled.  You may inquire.

```
 1    BY MR. STILLEY:

 2    Q.    Do you recall the question?

 3    A.    Say it again, please.

 4    Q.    Okay.  Does Mountain Park have official tax exempt

 5    status from the IRS?

 6    A.    Mountain Park Baptist Church has a tax exempt.

 7    Q.    And when did the IRS award that status?

 8    A.    When did it what?

 9    Q.    When was this status approved by the IRS?

10    A.    Probably in the year '88 or '89.

11    Q.    Do you have personal knowledge of that?

12    A.    No, sir -- well, I'm talking about a tax exempt letter

13    stating the church is tax exempt.

14    Q.    Right.

15    A.    Uh-huh.

16    Q.    Is that what you're talking about?

17    A.    Yes.

18    Q.    You did get that letter?

19    A.    Yes.

20    Q.    How about Palm Lane Academy, does it have the same

21    status?

22    A.    Tax exempt, yes, sir.

23    Q.    Do you remember when that status was achieved?

24    A.    Probably about two years ago.

25    Q.    Do you know why it took -- that Palm Lane was started
```

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

```
 1    in '97; is that correct?

 2    A.    We bought the property in '97, yes.   The students we

 3    didn't start taking until 2000.

 4    Q.    Do you know the reason that the exemption letter wasn't

 5    gotten until a couple years ago?

 6    A.    Probably because my husband had had a heart attack and

 7    he was just kind of slow in getting it going after his heart

 8    attack.

 9    Q.    Do each of these organizations file tax returns as tax

10    exempt organizations?

11          MR. OLIVER:  Your Honor, I object.  He's asking

12    questions he knows the law doesn't require them to do.

13    You've already ruled this on September 23rd, 1993 (sic).

14          MR. STILLEY:  I'm just trying to find out -- she

15    testified they had tax exempt status.  I'm wanting to see if

16    they got that as a church.

17          THE COURT:  Why?  Curiosity sake.

18          MR. STILLEY:  I think it goes to some of the issues

19    in this case about their claims of simply being -- trying to

20    help kids as opposed to being a profit enterprise.

21          THE COURT:  I'm sustaining that.

22    BY MR. STILLEY:

23    Q.    Do either of these organizations engage in any

24    political activities or support any political candidates?

25          MR. OLIVER:  Objection.
```

 1           THE COURT:  Sustained.  You've got to focus on these

 2      two issues here; battery and employer/employee relationship.

 3      If something goes to show someone was an employer or not an

 4      employer under the Fair Labor Standards, then that's fair

 5      game.  Or, you know, the kinds of activity that go on in

 6      terms of work, whatever else.  But please.

 7           MR. STILLEY:  As a matter of fact, I'm ready to pass

 8      this witness.

 9           MR. OLIVER:  May it please the Court.

10                          CROSS-EXAMINATION

11      BY MR. OLIVER:

12      Q.    Mrs. Wills, when was Mountain Park established?

13      A.    1987.

14      Q.    And let me show you from what's been marked for

15      identification as Defendant's Exhibit 9 a statement of the

16      purpose.  Is that accurate?  Tell the ladies and gentlemen of

17      the jury whether that fairly and accurately sets forth the

18      purpose of Mountain Park?

19      A.    Yes, it does.

20      Q.    Now, from that day forward has the purpose of Mountain

21      Park changed?

22      A.    No, it hasn't.

23      Q.    And when did you and Pastor Wills establish Palm Lane?

24      A.    In 1997.

25      Q.    From 1987 to 1997 who ran Palm Lane?

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    A.    Brother Wills and I did.

2    Q.    Okay.  And how did Brother Gerhardt get involved?

3    A.    In the year 1993 Brother and Mrs. Gerhardt came to work

4    with us.

5    Q.    And who told Brother Sam what to do?

6    A.    Brother Wills.

7    Q.    Who tells Brother Sam what to do now?

8    A.    Brother Wills.

9    Q.    And occasionally maybe Mrs. Wills?

10    A.    Yes, sir.

11    Q.    Who are the decision makers or who were the decision

12    makers in 2001 at Mountain Park?  Who made the decisions?

13    Start with policy decisions.

14    A.    Brothers Wills.

15    Q.    Who was involved in the hiring and the firing?

16    A.    Brother Wills.

17    Q.    All right.  Who had input into that?

18    A.    Brother Sam and I.

19    Q.    Who controlled the manner by which your staff behaved

20    themselves and set policy for staff behavior?

21    A.    Brother Wills.

22    Q.    And who had input into that?

23    A.    Brother Sam and I.

24    Q.    Anybody else?

25    A.    No, sir.

1   Q.    Now, from time to time I assume that employees -- when

2   I say staff wages were set, correct?

3   A.    Yes, sir.

4   Q.    And who set those wages?

5   A.    Brother Wills.

6   Q.    And who had input into that?

7   A.    I did.

8   Q.    All right.  What about Brother Gerhardt, did Sam have

9   input?

10  A.    Mostly Brother Wills and I.

11  Q.    Now, when I say staff, we're talking about everybody

12  that's been sued, right?  You have inside staff, correct?

13  A.    Yes, sir.

14  Q.    And then tell the jury what this outside staff is that

15  you've referred to.

16  A.    These are hourly wage people that come in and do

17  outside work; building, cooking, things like that.

18  Q.    All right.  Those people that -- you have cooks, people

19  that cook?

20  A.    Yes, sir.

21  Q.    Do you have people that work in yards?

22  A.    Yes, sir.

23  Q.    People that do mechanic work and things like that?

24  A.    Yes, sir.

25  Q.    Who hires and fires those people at Mountain Park?

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

```
 1    A.    Brother Wills and I.

 2    Q.    Okay.  And who sets their wages and hours of

 3    employment?

 4    A.    Brother Wills.

 5    Q.    All right.  And who sets the job requirements?

 6    A.    Brother Wills.

 7    Q.    Okay.  Now, in Mountain -- at Mountain Park are

 8    financial records kept?

 9    A.    Yes, sir.

10    Q.    And who keeps those records?

11    A.    Mrs. Gerhardt.

12    Q.    And where does Mountain Park bank, what state?

13    A.    Missouri.

14    Q.    And does it have its own set of books?

15    A.    Yes, sir.

16    Q.    Now, you made reference to a tax exempt letter,

17    correct?

18    A.    Yes, sir.

19    Q.    And that's a letter you received from the State of

20    Missouri that says you don't have to pay sales tax, correct?

21    A.    Yes, sir.

22    Q.    That letter has been issued to you by the State, right?

23    A.    Yes, sir.

24    Q.    Now, at Mountain Park, are the operations of Mountain

25    Park kept separate from the operations of Palm Lane?
```

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

```
1    A.    Yes, sir.

2    Q.    All right.  Now, there is a newsletter, correct?

3    A.    Yes, sir.

4    Q.    What's the name of the newsletter?

5    A.    Mountain Park Update.

6    Q.    And is Palm Lane news published in that newsletter?

7    A.    Yes, sir.

8    Q.    Why?

9    A.    Because Palm Lane can't afford its own newsletter.

10   Q.    Does Mountain Park when they graduate have a

11   graduation?

12   A.    Yes, sir.

13   Q.    And do you publish some kind of yearbook?

14   A.    Yes, sir.

15   Q.    And are Palm Lane students in that yearbook?

16   A.    Yes, sir.

17   Q.    And why is that?

18   A.    Because they can't afford their own yearbook.

19   Q.    Now, when you say that, who are you talking about?

20   A.    The students at Palm Lane.

21   Q.    Now, let's talk about Palm Lane.  Palm Lane was

22   established in what year?

23   A.    1997.

24   Q.    It's a corporation, correct?

25   A.    Yes, sir.
```

```
1   Q.    And it's located where, in Arcadia, Florida?

2   A.    Yes, sir.

3   Q.    Has about 19 or 20 girls?

4   A.    Has 19.

5   Q.    Currently the maximum number of girls down there is how

6   many?

7   A.    Currently it's about 40.

8   Q.    That would be the maximum you could take?

9   A.    Yes, sir.

10  Q.    How many boys?

11  A.    We don't have any boys right now.

12  Q.    All right.  Now, in 1997 why did you and Pastor Wills

13  start Palm Lane?

14  A.    Because we felt like that there was some teenagers that

15  when they turned 17 they still needed help.  And in Missouri

16  at 17 if they wanted to leave they could leave.  And we were

17  wanting to help them more so we went down to Florida and

18  opened up Palm Lane.

19  Q.    And this would give you --

20  A.    -- another year with them.

21  Q.    When you say teenagers or troubled teenagers, tell the

22  ladies and gentlemen of the jury what kind of audience your

23  ministry is aimed at Mountain Park's ministry?

24  A.    Young people that are in trouble, rebellious, runaways.

25  Q.    What do you mean by trouble?  Trouble is a cop-out.
```

1    What is trouble?

2    A.    They don't want to obey their parents.  They don't want

3    to go to school, they want to do drugs, sex, everything that

4    goes along with rebellious teenager.

5    Q.    And is that your audience, the parents of those

6    children?  Is that who these ministries are directed to?

7    A.    Yes, sir.

8    Q.    Mountain Park has a church, correct?

9    A.    Yes, sir.

10   Q.    And what -- how is the boarding academy related to that

11   church?

12   A.    It's a ministry of the church.

13   Q.    And that ministry is to do what?

14   A.    Help young people, give them an education, tell them

15   about Jesus.  Have them go into the world and live a normal

16   life among other people.  Not cause trouble.  Get a good

17   education.  Many of them go to college, are married to

18   preachers or become preachers.  Just a wonderful life they

19   have after they accept Jesus.  And we want to turn their

20   lives around.

21   Q.    How rigid or structured is Mountain Park?

22   A.    Very structured.

23   Q.    How rigid or structured is Palm Lane?

24   A.    Very structured.

25         MR. OLIVER:  Mr. Stilley, if you give me your

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

```
 1    Exhibits 40 and 41, please.
 2    Q.    Here -- these are some pictures taken off a web site.
 3    What are these pictures showing?
 4    A.    Girls playing.
 5    Q.    That's at Palm Lane, right?
 6    A.    Yes, sir.
 7    Q.    There's a fence there.  What's the purpose of the
 8    fence?
 9    A.    To keep the girls from running away.
10    Q.    What does it do in terms of their safety from things
11    from the outside?
12    A.    It keeps them safe.
13    Q.    There's another picture.  Is that the same kind of
14    thing?
15    A.    Yes, sir.
16    Q.    At Palm Lane you see this fence.  Where are the boys
17    located?
18    A.    On the other side of the dorm.
19    Q.    On the other side --
20    A.    Of the house where the school is and where the dining
21    hall is, the boys are located on the other side of the fence.
22    Q.    On the other side of the fence?
23    A.    Right.
24    Q.    The fence keeps the boys out too?
25    A.    Yes, sir.
```

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1  Q.    Now, at Palm Lane, do you have specific rules of

2  conduct and discipline?

3  A.    Yes, sir.

4  Q.    Okay.  Let me show you from -- see if I'm bright enough

5  to put this right side up.  In your literature you list

6  specific kinds of rules that are expected, correct?

7  A.    Yes, sir.

8  Q.    Are those rules -- describe those rules or characterize

9  them.  Are they relaxed?

10  A.    No, sir.

11  Q.    Is it fair to say they are rigid?

12  A.    Yes, sir.

13  Q.    Are they strict?

14  A.    Yes, sir.

15  Q.    Are they strictly -- or do you try to strictly comply

16  with them or ask students to strictly comply with them?

17  A.    Yes, sir.

18  Q.    What do your rules say about violent conduct?  If you

19  look.

20  A.    Well, will not be permitted.

21  Q.    Disorderly conduct, is that permitted?

22  A.    No, sir.

23  Q.    All right.  Is there literally a rule, literally a rule

24  for most everything?

25  A.    Yes, sir.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

```
1    Q.     In Exhibit 9, which is the yearbook that Mr. Stilley

2    chose, look at page 19.  Does the personal attitude statement

3    pretty well express the philosophy of Mountain Park about how

4    these students are to behave?

5    A.     Yes, sir.

6    Q.     Do you have a discipline policy at Mountain Park?

7    A.     Yes, sir.

8    Q.     It says the discipline policy has the goal of giving

9    each student maximum opportunity for self-discipline.  How do

10   you do that?

11   A.     Peer pressure.

12   Q.     Do they have opportunities for correction?

13   A.     Yes, sir.

14   Q.     Okay.  And do they have a list of infractions that end

15   up being sort of the rules of the road?

16   A.     Yes, sir.

17   Q.     And how do students get to know these rules?

18   A.     They are told these rules for school; no cheating, no

19   lying, no --

20   Q.     And at the same time that you're enforcing those rules,

21   what's Mountain Park and Palm Lane's position about their

22   personal maintenance and maintenance of the areas in which

23   they live?

24   A.     Must be clean.

25   Q.     You have this policy, if you look at page 31 of that
```

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    handbook, every student, for every student the basic, very

2    basic of Christian character development begin with the

3    responsibility to maintain their personal and common areas.

4    Is that part of the philosophy?

5    A.    Yes, sir.

6    Q.    And how do the students do that?  Do they have to work

7    to do that?

8    A.    Yes, sir.

9    Q.    And what do they do?

10   A.    They have to clean the toilets.  They have to clean

11   their laundry.  They have to clean their sinks.  They have to

12   clean around their bed.  They have to make their own bed.

13   They have to wash their own sheets.

14   Q.    Now, explain to the jury what form this cleaning takes.

15   One person doesn't go wash just his sheets, do they?

16   A.    Oh, no, sir.  They have -- every two weeks we change

17   their duties.  There will be a group that does the laundry, a

18   group that does the cleaning of the bathrooms, a group that

19   does the vacuuming, a group that does the different chores

20   that we have.

21   Q.    Are those called teams?

22   A.    Yes, sir.

23   Q.    And who are the team -- are there team leaders?

24   A.    Yes, sir.

25   Q.    And where do those team leaders come from?

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    A.    They are students that have been with us for awhile and

2    they show there's been a change in their life and they want

3    to do what's right and they want to help others.

4    Q.    Now, as the students develop, do they also go to

5    school?

6    A.    Yes, sir.

7    Q.    And at both schools, do you -- what kind of academics

8    do you use?

9    A.    School of Tomorrow.

10   Q.    That's a Christian school, correct?

11   A.    Yes, sir.

12   Q.    Now, in the handbook you also in addition to explaining

13   how that works, you make reference to Landmark Freedom

14   Baptist curriculum.  What's that?

15   A.    It's a bible curriculum.

16   Q.    And why is that taught?

17   A.    To teach them the bible.

18   Q.    And is that integrated with the academic program?

19   A.    Yes, sir.

20   Q.    And then it says BEKA curriculum.  It says this

21   material is prepared, distributed through Pensacola Christian

22   College?

23   A.    Video classes.

24   Q.    And is that for that advanced education?

25   A.    No, sir, it's like Spanish, stuff like that that high

1    school students have to have.

2    Q.    So it allows you to have a complete curriculum in

3    Florida and Missouri?

4    A.    Yes, sir.

5    Q.    Now, Mr. Stilley's asked you a lot of things about who

6    got what and things of that nature.  You and Pastor Wills

7    take any salary from Palm Lane?

8    A.    No, sir.

9    Q.    Do you take salary from Mountain Park?

10   A.    Yes, sir.

11   Q.    When do you take salary from Mountain Park?

12   A.    When they have the money.

13   Q.    That's not all the time, is it?

14   A.    No, sir.

15   Q.    And the other staff members, inside staff are paid, are

16   they not?

17   A.    Yes, sir.

18   Q.    And some of them, are their houses on Mountain Park?

19   A.    Yes, sir.

20   Q.    Some of them have houses to live in, correct?

21   A.    Yes, sir.

22   Q.    Now, Mountain Park own those houses or those people?

23   A.    Mountain Park.

24   Q.    Now, you indicated that from time to time in addition

25   to cleaning that we've discussed, students are obligated to

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    do other chores.  How does that work?

2    A.    Sometimes when -- like at my house I have a house at

3    Mountain Park when I'm up there.  And the girls will beg me

4    to let them come over and wash my windows or sweep my porches

5    off or things like this.  They can do chores like that, it's

6    only voluntary like that.

7    Q.    And in the afternoon, let's take the boys, in the

8    afternoon do the boys have a work or play period?

9    A.    Sometimes they work and sometimes they play.

10   Q.    What makes the difference?

11   A.    It's according to how much work has to be done.

12   Q.    What's the purpose of the work?

13   A.    To teach them to work.

14   Q.    Is that part of your philosophy of restoring basic life

15   skills so they can reintegrate in the community?

16   A.    Yes, sir.

17   Q.    Part of the educational process?

18   A.    Yes, sir.

19   Q.    Now, does anybody derive any money benefit from that?

20   A.    No, sir.

21   Q.    I mean, these kids, you don't run them around town and

22   have them stack firewood for other people, right?

23   A.    No, sir.

24   Q.    Does Mountain Park or Palm Lane make anything for sale?

25   A.    No, sir.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    Q.    You buy and repair equipment or anything like that for

2    resale?

3    A.    No, sir.

4    Q.    Do you make anything that you sell?

5    A.    No, sir.

6    Q.    You run any cows or horses or anything like that at

7    Mountain Park?

8    A.    No, sir.

9    Q.    What about at Palm Lane?

10   A.    No, sir.

11   Q.    You engaged in any business other than saving of the

12   souls?

13   A.    No, sir.

14   Q.    Any business other than trying to bring these troubled

15   youth to the Lord?

16   A.    No, sir.

17             MR. OLIVER:  No further questions, Your Honor.

18             THE COURT:  Any redirect?

19             MR. STILLEY:  Yes, Your Honor, briefly.

20                       REDIRECT EXAMINATION

21   BY MR. STILLEY:

22   Q.    Is there a particular reason on this barbed wire fence

23   that there's barbs sticking out both directions?

24   A.    I said it was for the safety to keep the girls in.

25   Q.    Is it to keep -- but if the barbs were going both

1    directions, you're trying to keep people from either coming

2    in or going out; isn't that correct?

3    A.    Yes, sir.

4    Q.    How tall is that fence?

5    A.    I'd say eight feet I guess.  I wouldn't know exactly.

6    It's probably more than that.  I don't know.

7    Q.    Do the kids ever get out of that fence?

8    A.    Have they every gotten out?

9    Q.    Yes.

10   A.    Mountain Park they have, yes, sir.

11   Q.    How about Palm Lane?

12   A.    No, sir.

13   Q.    You said something about peer pressure?

14   A.    Uh-huh.

15   Q.    What do you mean when you say peer pressure?

16   A.    You have good peer pressure and you have bad peer

17   pressure.  You put kids with kids that want to do good and

18   you're going to do good.  You put kids with people that want

19   to do bad and they are going to do bad.

20   Q.    Is that what you mean by peer pressure?

21   A.    That's peer pressure.

22   Q.    Now, you talked about a written set of rules; isn't

23   that correct?

24   A.    In our handbook, yes, sir.

25   Q.    Correct.  But the kids don't get a copy of that, do

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1   they?

2   A.    No, sir, but their parents do.

3   Q.    Now, you said that the kids sometimes came and did work

4   for you but they begged to come and work for you; is that

5   correct?

6   A.    Yes, sir.

7   Q.    Have they ever come and worked for you when they

8   weren't begging or asking you to do that?

9   A.    No, sir, they are asked do they want to do that.

10   Q.    Are there any negative consequences for not wanting to

11   do that?

12   A.    Oh, no, sir.

13   Q.    How about cows at Palm Lane, do you have any cows at

14   Palm Lane?

15   A.    There are cows at Palm Lane, but they don't belong to

16   us, they belong to Mr. -- I can't think of his name right

17   now, the man that is using our land to produce cows on.

18   Q.    Do you lease your land, your pasture land to this

19   gentleman?

20   A.    No, sir.

21   Q.    What is the arrangement that you have between Palm Lane

22   and the gentleman that has the cows?

23   A.    Verbal.

24   Q.    Okay.  What's the terms?

25   A.    He can just use our property.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1   Q.    No charge?

2   A.    No charge.

3   Q.    Do you do any upkeep on the pastures?

4   A.    No, sir.

5   Q.    Do the kids have to do any upkeep on the pastures?

6   A.    No, sir.

7   Q.    You positive about that?

8   A.    Yes, sir.

9          MR. STILLEY:  Pass the witness.

10         MR. OLIVER:  Nothing further, Your Honor.  May she

11  step down?

12         THE COURT:  Very well.  Thank you, Ms. Wills.  You

13  may step down.

14         THE WITNESS:   Thank you.

15         THE COURT:  Ladies and gentlemen of the jury, we'll

16  take our afternoon recess at this time.  Recall the

17  admonition.  Be prepared to return to the courtroom at ten

18  minutes of four.  We'll be out of here by five.  Recall the

19  admonition.

20         (Court in recess from 3:28 p.m. until 3:55 p.m.)

21         THE COURT:  Good afternoon again, ladies and

22  gentlemen of the jury.  Shall we continue, Mr. Stilley.  Go

23  ahead.  Call your next witness.

24         MR. STILLEY:  Call plaintiff, Jordan Blair.

25         THE COURT:  Very well.

```
 1                        JORDAN BLAIR,

 2    Having been first duly sworn, was examined and testified as

 3    follows:

 4                     DIRECT EXAMINATION

 5    BY MR. STILLEY:

 6    Q.    Please state your name.

 7    A.    Jordan Michael Blair.

 8    Q.    And you come from Arkansas; is that correct?

 9    A.    Yes, sir.

10    Q.    Where were you born?

11    A.    In Fort Smith, Arkansas.

12    Q.    And where were you raised?

13    A.    In Crawford County, Alma, Arkansas.

14    Q.    Okay.  And where did you go to school in the early

15    years, first through sixth?

16    A.    First through sixth, Alma public schools.

17    Q.    Okay.  Where did you go -- when you got on into high

18    school, where did you go to high school at?

19    A.    I attended Miami public schools in Oklahoma.  I

20    attended Alma public schools.  And I also attended

21    International Academy of Christian Education.

22    Q.    Okay.  Can you tell us the dates for each of those?

23    A.    Yes, sir.  Let's see, the year 2000 was the year I went

24    to -- no, 1999 was the year I finished my ninth grade year.

25    The year 2000 I went to Miami public schools.  And then in
```

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1 the end of 2000 towards the start of 2001 I attended

2 International Academy of Christian Education.

3 Q. Okay.  When you were going to Alma public schools, did

4 you have some sort of sports or hobbies that you engaged in?

5 A. Yes, sir.

6 Q. And what were they?

7 A. I was a member of the band.  I was a member of the

8 football team.  I ran track.  And that was about it.

9 Q. Did you enjoy the football?

10 A. Excuse me?

11 Q. Did you enjoy playing football?

12 A. Absolutely.

13 Q. How long did you play football?

14 A. I started playing football since fourth grade.

15 Q. What positions did you play?

16 A. Tailback on offense, and on defense I played

17 linebacker.

18 Q. What kind of grades did you have while you were playing

19 football?

20 A. 3.5, 3 point.

21 Q. Okay.  And when you were at the Christian school, tell

22 us about that experience.  Tell us where you started in the

23 Christian school.  Let's start with that.

24 A. Well, my brother had gotten into some trouble and the

25 public schools wouldn't allow him to continue on in their

1    school system.  So as an alternative my parents went ahead

2    and enrolled all of us, all of my brothers into a Christian

3    school.  I then started there and finished the end of my

4    sophomore year and junior and senior year of high school.

5    Q.    Did you complete the courses of education for that

6    program?

7    A.    Yes, sir.

8    Q.    And when did you complete that?

9    A.    In 2001.

10   Q.    About what time?

11   A.    October.

12   Q.    Okay.  Now, we're going to skip forward to this a

13   little bit later, but did -- when you came to Mountain Park,

14   did Mountain Park realize that you had completed the

15   requirements for high school?

16            MR. BRIGGS:  Objection, Your Honor.

17            THE COURT:  What's the purpose?

18            MR. STILLEY:  I just asked if they were aware that

19   he had completed the requirements.

20            THE COURT:  If who?  Sustained.

21   BY MR. STILLEY:

22   Q.    Okay.  And had you had any paid employment prior to

23   October of 2001?

24   A.    Yes, sir.

25   Q.    And can you tell us about that?

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

```
 1    A.    I worked construction for Rick Parker Construction.
 2    When I was -- I started doing that when I was 15.  I did that
 3    for a little over a month.  And I've also worked for the
 4    school that I attended, the IAC, which is the abbreviation
 5    for the International Academy of Christian Education.  I got
 6    paid $6 an hour for the job that I had at IAC.  And I was
 7    paid $8 an hour for the construction work.
 8    Q.    Okay.  Did you leave those jobs on good terms?
 9    A.    Yes, sir.
10    Q.    Now, you've told us about band and football.  Were --
11    both of those were school sports, correct?
12    A.    School activities.
13    Q.    School activities, beg your pardon.  Were you
14    engaged -- involved in any other sports outside of school?
15    A.    Just playing around with my brothers or church
16    activities, that sort of thing.
17    Q.    Did you have some church activities that were exercise
18    related?
19    A.    Yes, sir.
20    Q.    And what was that?
21    A.    Volleyball, we played baseball, things of that nature.
22    Q.    Anything else?
23    A.    That's all I can think of as of now.
24    Q.    What is your religious background?
25    A.    I grew up in a nondenominational home, Christian home.
```

1    We went to a nondenominational church.  And that's basically

2    what I grew up in.

3    Q.    Were you comfortable with that?

4    A.    Yes, sir, at the time.

5    Q.    Did you have friends at church that you did activities

6    with?

7    A.    Yes, sir.

8    Q.    Now, what was the date that you were taken to Mountain

9    Park?

10   A.    October 24th, 2001.

11   Q.    Okay.  Can you tell us what happened?  Who did you

12   first meet when you got there?

13   A.    Drew Parrish and Matt Elmore.

14   Q.    Did you know what to expect when you arrived there?

15   A.    No, sir.

16   Q.    What did they do with you at that point in time?

17   A.    Well, first I had to have the handcuffs taken off of

18   me, so that was done.  Then Drew Parrish led me into the

19   boys' dorm.  Well, actually I had said hi to him or something

20   like that and I didn't call him or I didn't say yes, sir to

21   him, so he corrected me for that.  Then he -- I was taken to

22   the boys' dorm.  And the door was sealed tight behind me and

23   a bed moved in front of it.  So then I was being pushed into

24   the hallway through the boys' dorm where I encountered three

25   or four other individuals, Matt Elmore was one of those,

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    Jason Lowe, Drew Parrish, and I think that was it at that

2    time.

3    Q.    Okay.  Did these individuals take you somewhere?

4    A.    I was -- well, I met them in the bathroom sink

5    through -- the staff had a little room right adjacent from

6    the bathroom facilities.  So it was right in there, in that

7    hallway.

8    Q.    Okay.  What happened -- did they ask you to do

9    something at that point in time?

10   A.    I was told to remove all my clothing and to -- well,

11   first what I had said to them was I had wanted to file a

12   defense petition, a family in need of services petition.  I

13   was being abused --

14             MR. BRIGGS:  I'll object at this point.

15             THE COURT:  Where are we going?

16             MR. STILLEY:  Your Honor, I was just trying to take

17   him through the chain of events when he first got there.

18             THE COURT:  Well, some chains of events you may need

19   to skip.

20             MR. BRIGGS:  Your Honor, I'll ask you to instruct

21   the jury to disregard the testimony.

22             MR. STILLEY:  Your Honor, can we approach on this?

23             THE COURT:  No, the jury will disregard his last

24   statement.

25   BY MR. STILLEY:

```
 1   Q.   Well, don't say anything -- can you tell us what
 2   happened after that?
 3   A.   Bo Gerhardt then came from the downstairs area.
 4   Q.   Is that the first time that you had seen Bo Gerhardt?
 5   A.   Yes, sir.
 6   Q.   And what happened then?
 7   A.   I had proceeded to ask him some things that I felt
 8   needed to be addressed immediately, legal needs that I had.
 9   Then I was told that I was to not talk about those things,
10   that those things wouldn't be done.  I had asked to speak to
11   an attorney.  And I was not going to be allowed to speak to
12   an attorney.
13          MR. BRIGGS:  I would object to his testimony.  We've
14   been through this.
15          MR. STILLEY:  Your Honor, I'm just trying to --
16          THE COURT:  Move on.  Just move on.
17   BY MR. STILLEY:
18   Q.   Okay.  And what happened after that?
19   A.   Well, as a reprimand I was shoved into the wall, the
20   sink counter.  And then I was -- I froze.  I mean, I couldn't
21   do anything.  I was just scared.  I had four or five other
22   guys around me.  I mean, I felt like fighting back but I
23   couldn't do anything about it.  And then I was told to go
24   take all my clothes off and go take a shower.  And then he
25   proceeded to follow me into the shower.  And Matt Elmore came
```

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

 1    along with us, with him.

 2    Q.    Okay.  Who followed you into the shower?

 3    A.    Matt Elmore and Bo Gerhardt.

 4    Q.    Did they watch you take a shower?

 5    A.    Yes, sir.

 6    Q.    Who was it that slammed you up against the wall?

 7    A.    Bo Gerhardt.

 8    Q.    How hard?

 9    A.    Very hard.

10    Q.    Did it hurt?

11    A.    Absolutely.

12    Q.    Did it leave any marks?

13    A.    I'm not aware of it.

14    Q.    How long did it hurt?

15    A.    That whole night.

16    Q.    Did that cause any -- did that cause you any fright or

17    fear later on?

18    A.    Absolutely.

19    Q.    And can you describe that for the jury?

20    A.    Yes, sir.  There was no way of -- in a normal situation

21    you have -- you're able to make decisions on your own.  And

22    you know what you believe and you go and you try to -- if

23    something is -- I saw things that happened at Mountain Park

24    and things that happened to me that --

25         MR. BRIGGS:  Your Honor, may we approach?

```
 1              THE COURT:   Reask your question.   This answer is
 2      nonresponsive.
 3      BY MR. STILLEY:
 4      Q.     Okay.   What was the psychological impact of you on
 5      being slammed up against the wall?
 6      A.     I was absolutely frightened.
 7              MR. BRIGGS:   I object.   That requires expert
 8      testimony.
 9              THE COURT:   Rephrase your question.
10      Q.     Okay.   Can you tell the jury what long lasting impact
11      that you suffered as a result of being slammed up against the
12      counter?
13      A.     Well, I was scared all the time.   Any time anybody
14      raised their hands around me, I was scared.   I kept my mouth
15      shut.   I did what I was told.   I wasn't allowed to look at
16      other people.   I didn't even -- there was no responsiveness
17      from me, it was like I became a zombie.
18      Q.     And how long did these feelings last?
19      A.     The entire time I stayed there.
20      Q.     Did they stop immediately after you got out?
21      A.     Oh, no.
22      Q.     How long did they last after that?
23      A.     Months.
24      Q.     Now, playing football you took some pretty hard knocks,
25      did you not?
```

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1    A.     Absolutely.

2    Q.     What would be the difference between getting knocked

3    down in football and getting slammed up against the wall?

4    A.     There's rules and regulations.  There's an official

5    sitting who is watching the game.  If it's something that is

6    considered a foul --

7              MR. BRIGGS:  Your Honor, I object.  May we approach?

8              THE COURT:  No.  Sustained.

9              MR. BRIGGS:  I'll ask the Court to instruct the jury

10   to disregard the testimony.

11             THE COURT:  Rephrase your question.  Overruled.  No.

12   BY MR. STILLEY:

13   Q.     Can you explain to the jury the difference between the

14   getting slammed up against the wall by Bo Gerhardt and being

15   struck in football by an opposing player?

16             MR. BRIGGS:  I'll object, Your Honor.

17             THE COURT:  Sustained.

18   Q.     Why did you -- why did you suffer these ill feelings

19   for many months as a result of being battered by Bo Gerhardt?

20   A.     I was scared.

21   Q.     And why were you scared?

22   A.     Because if that's the kind of behavior that is going to

23   happen, or that's the kind of action that's going to happen

24   just from me simply asking a question, then I can't do any --

25   I can't be responsive to anything throughout the next -- you

1    know, eight months or five months that I stayed.

2    Q.    Well, now were you ever told about a no-touch policy

3    while you were at Mountain Park?

4    A.    No, sir.

5    Q.    Did you ever see any indication that there was a

6    no-touch policy?

7    A.    No, sir.

8    Q.    Did you ever see any indication that there was not a

9    no-touch policy?

10   A.    Yes, sir.

11   Q.    And what's the basis for your understanding of that?

12   A.    Well, during orientation it has to be within slapping

13   distance of an orientation guide.

14           MR. BRIGGS:  Objection, Your Honor.  Move to strike.

15           MR. STILLEY:  Your Honor, I'm just trying to show

16   the nature of the circumstances that he was in.  Give the

17   jury some idea --

18           THE COURT:  Hold on.  You're talking about some

19   policy.  Do you have some written statement?

20           MR. STILLEY:  No.  Apparently there isn't a written

21   statement, no-touch statement.

22           THE COURT:  Fine.  I'm not clearly understanding

23   what's being testified to.

24           MR. STILLEY:  Okay.  There's been previous testimony

25   about a no-touch policy.  I'm asking him about his personal

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    knowledge about whether, in fact, there was a no-touch policy

2    enforced.

3              MR. BRIGGS:  Your Honor --

4              THE COURT:  Well, I mean, he has to -- what's the

5    basis of that?

6              MR. STILLEY:  I'm trying to get his personal

7    knowledge.

8              THE COURT:  You act like he is the administrator of

9    the school.

10             MR. STILLEY:  No.

11             THE COURT:  Then why don't you ask him the basis of

12   his knowledge.

13             MR. STILLEY:  I'll be glad to.  Certainly.

14             THE COURT:  Overruled.

15   BY MR. STILLEY:

16   Q.    Mr. Blair, what's the basis of your knowledge

17   concerning the actual operation of a no-touch policy at

18   Mountain Park and Palm Lane?

19   A.    That there is none.

20   Q.    And why do you -- what is your basis of personal

21   knowledge for saying that to the jury?

22   A.    Well, I've seen Sam Gerhardt himself as I was walking

23   out of the boys' dorm grab --

24             MR. BRIGGS:  Objection, Your Honor.  Move to strike.

25             THE COURT:  Sustained.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1          MR. STILLEY:  Can I approach on that?

2          THE COURT:  No.  You were given these opportunities

3     to ask this question and it's just totally nonresponsive --

4          MR. STILLEY:  I don't want to tread across the line.

5          THE COURT:  -- about some other incident.

6          MR. STILLEY:  I don't want to tread across the line.

7     I think I can shorten this for you if I can approach on this.

8          THE COURT:  You try.  Let's move on.

9          MR. BRIGGS:  Your Honor, may I ask the Court to

10    instruct the jury to disregard.

11         THE COURT:  No.  We're moving on.  We're moving on.

12    BY MR. STILLEY:

13    Q.    Okay.  What was the name of the student you just told

14    us about?

15         THE COURT:  Hold on.  I said we are moving on.

16         MR. STILLEY:  I'm trying to move on.

17         THE COURT:  Well, you got to try harder.  Because

18    now you've told about another incident.  I did not ask the

19    jury to disregard.  You know, we weren't supposed to be there

20    no kind of way.  You have crossed the line there.  So let it

21    go and move on.  I'm letting it go.  Let's move on.

22         MR. STILLEY:  I'm going to use another way to make

23    sure I don't step on that line.

24         THE COURT:  Well, the way you're using it is not

25    working.  You need to move to another subject.

 1           MR. STILLEY:  Okay.

 2     BY MR. STILLEY:

 3     Q.    Disregarding anything that you previously talked about,

 4     did you see anything that would give you personal knowledge

 5     about whether or not there was, in fact, a no-touch policy in

 6     effect at Mountain Park.

 7           THE COURT:  Okay.  We're moving on from this.  We

 8     are moving on from this.

 9           MR. STILLEY:  Is he not going to be allowed to give

10     any other evidence concerning whether there was, in fact, a

11     no-touch policy?  None at all?

12           THE COURT:  We have tried this.  You tried it

13     several times and then he wants to tell us about some other

14     incident.

15           MR. STILLEY:  Your Honor, there was testimony

16     concerning a policy.  What I'm trying to do --

17           THE COURT:  Fine.  Then he couldn't tell us.  He

18     told us about something different, about something that

19     happened.

20           MR. STILLEY:  What I'm trying to do is put forth

21     testimony that there is no such policy.  De facto, the policy

22     is the exact opposite of what they said.

23           THE COURT:  I never heard anybody say anything about

24     any policy other than you.

25           MR. STILLEY:  It was Betty Wills.

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1          THE COURT:  Try this one more time.  That's it.

2     Either -- you know, it's either you saw this in writing or

3     you were told, it is as simple as that.  It is as simple as

4     that, by someone in authority, okay.  Your witness.

5          MR. STILLEY:  I don't understand what you're saying

6     though, Judge.  I really don't understand.

7          THE COURT:  When you asked him did he have any

8     knowledge about any such policy, he wants to talk about

9     something happened that was contrary to some policy rather

10    than policy.  You asked him what his knowledge of a policy

11    was.  Either he saw it in writing or was told by someone in

12    authority, okay.  It is as simple as that.

13         MR. STILLEY:  Well, what I'm trying to do --

14         THE COURT:  Fine.  Ask the question one more time.

15    BY MR. STILLEY:

16    Q.   Do you have personal knowledge as to the -- strike

17    that.  Do you know what I mean when I say de facto?

18         THE COURT:  Oh, please.  A whole lot of people don't

19    know what you mean when you say that.  Come on.

20    Q.   Let me put it like this.  Do you understand what I mean

21    when I ask what the actual policy is?

22         THE COURT:  Why don't you ask him this, did he see

23    something in writing or did somebody in authority tell him

24    that was the rule or the policy.

25         MR. STILLEY:  I'm not concerned about that.  I don't

1    have any interest in putting in any evidence about that.

2          THE COURT:  Well, then where is the knowledge going

3    to come from?

4          MR. STILLEY:  The knowledge is going to come from

5    actual observation, physical witness of this.

6          THE COURT:  Overruled.  Let's move on to the next

7    then.  We're through with that.  Let's go to the next

8    subject.

9          MR. STILLEY:  Am I prohibited --

10          THE COURT:  You are not permitted because you say

11    you have no evidence.  Let's move on.  You are prohibited

12    because you just told me you got no evidence.

13          MR. STILLEY:  Wait a minute.  What am I prohibited

14    from doing?  I'm not trying to be hard.

15          THE COURT:  From this whole situation about a

16    policy.  You just told me that from observation.  I mean, you

17    have to -- he has to have been told or seen it someplace or

18    where else is he going to get it from?  What did he observe?

19    What he told us he observed was just the opposite.  That's

20    what he told us he observed.  Is that the policy?  That's

21    what he observed.  Now, you're going down the same road we've

22    been down.  And I've sustained an objection to that.  Okay.

23    So you can't go back down that road.

24          MR. STILLEY:  Okay.  I'm not trying to be difficult.

25          THE COURT:  Yes, you are.  Fine.  Then go to another

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    subject matter.

2          MR. STILLEY:  Okay.  But I need to know exactly what

3    you mean when you say another subject matter.

4          THE COURT:  Whatever else you want to put on,

5    because you've exhausted this one.

6          MR. STILLEY:  Okay.  What I'd like to do is to ask

7    about -- just what you asked me to ask, did somebody tell you

8    anything relating to the no-touch policy.

9          THE COURT:  We're not talking about somebody walking

10   down the street or something, we're talking about somebody

11   who has a basis of authority or something in writing.  You

12   asked him the policy.  And then he wants to tell about

13   somebody slamming somebody else.  Please.  That's showing

14   that the policy is slamming.  That's not showing the policy

15   is not about no touching.  I mean, come on.  That's not

16   responsive.

17         MR. STILLEY:  Okay.  If it doesn't violate the

18   Court's order, what I want to do is ask him whether he has

19   personal knowledge based on what you said, somebody telling

20   him, not doing but telling him or something in writing about

21   a policy related to --

22         THE COURT:  Fine, then do that.

23         MR. STILLEY:  Okay.

24   BY MR. STILLEY:

25   Q.   Mr. Blair, do you have anything either in writing or

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    that was spoken to you by someone in authority of some sort

2    at Mountain Park concerning a no-touch policy or the policy

3    of Mountain Park and/or Palm Lane concerning touching other

4    students?

5    A.    No, sir.

6    Q.    Nothing either spoken or in writing?

7    A.    No, sir.

8          THE COURT:  You just asked that question.  It took

9    all this time for us to get to that.  I told you, move on

10   now.

11   Q.    Now, when you got to Mountain Park, were you assigned

12   an orientation guide?

13   A.    Yes, sir.

14   Q.    Can you explain to the jury what an orientation guide

15   is?

16   A.    The orientation guide is given in orientation to a

17   student which is basically they are the babysitter and they

18   watch the student.  The student can't get out of arms length

19   or what they call slapping distance.  They will be in the

20   bathroom with them at all times or that distance is kept at

21   all times throughout the day, whether it be in the shower or

22   school or whatever.

23   Q.    And can you tell us what orientation means?

24   A.    Well, there is different levels of freedom at Mountain

25   Park.  On orientation you're basically stuck with that

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1    orientation guide for, I believe I was told about two months.

2    Then you become a student, which would just be a single

3    student who can be in certain rooms by himself without having

4    an orientation guide as long as the orientation guide is

5    around.  There are -- then there's the other level of

6    orientation guide and which is above the student level.  And

7    they -- the only difference is they have orientation student.

8    Q.    Okay.  And when you first got there were you an

9    orientation student?

10   A.    Yes, sir.

11   Q.    Did you ever get off orientation?

12   A.    No, sir.

13   Q.    How long were you there?

14   A.    Five months.

15   Q.    And can you tell the jury what is meant by the term

16   staff worker?

17   A.    Any of the defendants.

18   Q.    Can you tell the jury what a junior staff worker is?

19   A.    It's one of the students who works for the staff.

20   Q.    Now, while you were at Mountain Park did you ever get a

21   copy of the rules?

22   A.    No, sir.

23   Q.    Did you ever ask for a copy of the rules?

24   A.    Yes, sir.

25   Q.    And what response did you get?

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1    A.    I wasn't able to have them.

2    Q.    How did you find out what the rules were?

3    A.    I didn't until after I left and ran away from Palm Lane

4    and filed a lawsuit.

5    Q.    Did you kind of learn about rules just as you broke

6    them or as you did something they didn't like?

7    A.    My orientation guide would tell me things and then

8    other things I did have to find out after them doing stuff to

9    me, punishing me.

10   Q.    Okay.  Were you allowed to have money while you were a

11   student there?

12   A.    No, sir.

13         MR. BRIGGS:  Objection, Your Honor.  May we

14   approach?  This is irrelevant.  It's outside the scope of the

15   two claims.

16         THE COURT:  Fine.  Sustained.  Let's move to

17   something relevant.

18   BY MR. STILLEY:

19   Q.    Now, were you allowed to have contact with the outside

20   world while you were a student at Mountain Park?

21   A.    No, sir.

22         THE COURT:  Mr. Stilley, am I going to have go over

23   your notes, your script?  You know, I mean, what does that

24   have to do with the two things I keep telling you?

25         MR. STILLEY:  I'm just trying --

```
 1            THE COURT:  The battery and the employer/employee

 2     stuff.  What does that have to do with that, were you allowed

 3     to have contact with the outside world, with other people?

 4            MR. STILLEY:  I'm just trying to paint a picture.

 5            THE COURT:  I know you're trying to paint a picture,

 6     but that's not the picture we're here to see.  We didn't come

 7     to see that picture.  See, that's what I'm talking about.

 8     You got a picture you're just trying to show, and that is not

 9     the one we came to see.  That's what I keep trying to tell

10     you.  I'm trying to keep from previewing your movie because

11     it's not the one we came to see, but you keep trying to show

12     it.

13            MR. STILLEY:  I certainly don't mean to do anything

14     that I shouldn't do.  I was just trying to --

15            THE COURT:  Yeah, you're a nice fellow, but that's

16     not got nothing to do with it.  I mean, please.  I'm not here

17     about that.  What I'm trying to say is you keep trying to

18     paint a picture that we didn't come to see.  It might be the

19     picture you see, the picture you like, but it's not the

20     picture we're here to see.  It's as simple as that.

21            MR. STILLEY:  Well, I'm doing my best to put on

22     evidence that is proper to put before the jury.  I beg your

23     pardon, Your Honor, I'll need just a little time to try to

24     sort through some of these things to try to limit the

25     questions that I shouldn't ask.
```

1      THE COURT:  I'll tell you what, ladies and gentlemen

2  of the jury, we're going to have a pleasant evening.  We're

3  going to adjourn early today.

4      I gave you that admonition earlier.  It particularly

5  goes into effect now because you're going home or someplace

6  from here.  Now, all that admonition is good, but let me boil

7  this down to its essence.  Your friends and family will know

8  you've been down here on jury service.  So when you get

9  wherever you're going, they are going to ask, "Did you get

10 selected to serve on a case?"  The answer to that is, "Yes."

11 Then the next question is, "Well, what kind of case is it?"

12 The answer to that is, "The judge told me not to discuss that

13 with you."  Because if you tell them that, then they are

14 going to tell you what they think, what they know.  You see,

15 admonition gone.

16      So keep that in mind.  You can discuss this case as

17 fully and freely when it's completed.  They told me, they

18 said Wednesday, but in any event you can discuss it as fully

19 and freely with anyone you choose when it's over.  Why don't

20 you return to your jury rooms tomorrow morning at 9 a.m.

21 Have a pleasant evening.

22      (The following proceedings were held outside the

23 hearing of the jury:)

24      THE COURT:  Mr. Stilley, you know, it's like we

25 are -- maybe we're here to see Spartacus or something and you

```
 1   keep trying to show us The Passion.  You want The Passion.

 2   Please.  You know, this is not that case.  I understand.  I

 3   keep telling you, I feel your pain.  Just like The Passion.

 4   But this is not that play, okay.  We didn't come here to see

 5   that.  I told you what we came here to see.

 6          MR. STILLEY:  Certainly, Judge, and --

 7          THE COURT:  I know, but you got to do better.  Sorry

 8   sounds good, but you got to show me something.  You keep,

 9   could you do this, could you do that.  Talk to me about what

10   he did do in terms of work or school, his responsibilities.

11   Maybe you finished with the battery situation.  So you got to

12   deal with his responsibilities, you know, at the institution

13   now, what you are characterizing as work and the

14   employer/employee relationship, not his contact with outside

15   people and any of those kinds of things.  You're still trying

16   to paint the picture of the institution as a group of bad

17   people.

18          MR. STILLEY:  Your Honor, I'm just trying --

19          THE COURT:  Yes, you are.  That's what you're trying

20   to do.  And that is not what this case is about.  And I

21   understand The Passion, but that is not this case.  It's as

22   simple as that.

23          MR. STILLEY:  Maybe I'm going at it the wrong order.

24          THE COURT:  The wrong order?

25          MR. STILLEY:  This is part of the case.  And let
```

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1    me --

2            THE COURT:  You are out of order completely.

3            MR. STILLEY:  Well, let's stop and think about this.

4    We've already had a ruling that he's entitled to put on

5    evidence as duties as a security guard.  What's the duties of

6    the security guard.

7            THE COURT:  You didn't ask that.  You asked about

8    could he see other people.  You want to paint all these

9    pictures like he's in prison, false imprisonment.  That's the

10   picture you're painting.  And you know the rules are if

11   something is more prejudicial than probative.  And when you

12   paint this picture of someone false imprisoning someone, it

13   becomes more prejudicial than probative of what the issues

14   you're trying to paint.  And those claims are gone.  They are

15   not here.

16            You know, it's like a guy said one time, you know,

17   one year Casey Stengel, you know he was the manager of the

18   Mets.  So he figured out he was going to have his pitching

19   rotation for the whole year.  And he had it all set up.  The

20   first game rained out, messed up his whole year.  That's you.

21            MR. STILLEY:  Your Honor, I'm sorry.

22            THE COURT:  Your issues that you wanted are no

23   longer in the case, but, you know, you got your pitching

24   rotation set up for all that.  They are not there anymore.

25   You know, things have changed.  You have to change your

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    questions you're asking.  That's all I'm saying.

2          MR. STILLEY:  Okay.  Well, I think that -- I think

3    it's order, not substance for this reason.  If I could lay

4    the foundation, that's what I was trying to do.

5          THE COURT:  That he couldn't see people, that he

6    wasn't seeing anybody else?  Tell me what that has to do with

7    any of the issues, the battery or the employment.  I assume

8    you're saying that has to do with the employment.  What does

9    that have to do with the employment?

10          MR. STILLEY:  One of his job duties as an employee

11    was to prevent other people from making contact with the

12    outside world, going anywhere, doing anything of that nature.

13          THE COURT:  That doesn't have anything to do with

14    him, whether he could see somebody or not.  Was that his job,

15    seeing that he couldn't see nobody, policing himself?  Is

16    that the job?  Please.

17          MR. STILLEY:  Let's --

18          THE COURT:  No, you were off base there.  You were

19    off base there.

20          MR. STILLEY:  Let's just try this again.

21          THE COURT:  You need to go over your questions and

22    sincerely ask yourself these questions.  And remember me

23    Casey Stengel story.  You see what I'm saying?  I tell stuff

24    in stories.  You could say it was LaRussa or whoever, but

25    older folks remember Casey.  I'll see you all tomorrow

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    morning.

2              MR. STILLEY:  Thank you, Judge.

3              THE COURT:  Okay.

4              (Court in recess at 4:33 p.m.)

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

```
 1                    C E R T I F I C A T E

 2            I, Susan R. Moran, Registered Merit Reporter, in

 3     and for the United States District Court for the Eastern

 4     District of Missouri, do hereby certify that I was present

 5     at and reported in machine shorthand the proceedings in the

 6     above-mentioned court; and that the foregoing transcript is

 7     a true, correct, and complete transcript of my stenographic

 8     notes.

 9            I further certify that I am not attorney for, nor

10     employed by, nor related to any of the parties or attorneys

11     in this action, nor financially interested in the action.

12            I further certify that this transcript contains

13     pages 1 - 160 and that this reporter takes no responsibility

14     for missing or damaged pages of this transcript when same

15     transcript is copied by any party other than this reporter.

16            IN WITNESS WHEREOF, I have hereunto set my hand

17     at St. Louis, Missouri, this _____ day of

18     _____, 2004.

19

20                          _____

21                          /s/ Susan R. Moran
                            Registered Merit Reporter
22

23

24

25
```