```
 1                    UNITED STATES OF AMERICA
                   EASTERN DISTRICT OF MISSOURI
 2                     SOUTHEASTERN DIVISION

 3     JORDAN BLAIR,                    )
                                        )
 4              Plaintiff,              )
                                        )
 5         vs.                          )  No. 1:02-CV-88 CAS
                                        )
 6     BOB WILLS, ET AL.,               )
                                        )
 7              Defendants.             )


 8                     TRANSCRIPT OF JURY TRIAL

 9
               BEFORE THE HONORABLE CHARLES A. SHAW
10                  UNITED STATES DISTRICT JUDGE

11                        April 13, 2004
                            Volume II
12


13     APPEARANCES:

14     For Plaintiff:      Mr. Oscar Stilley
                           511 Rogers Avenue
15                         Central Mall Plaza, Suite 520
                           Fort Smith, AR  72903
16
       For Defendants:     Mr. John L. Oliver, Jr.
17                         OLIVER, OLIVER & WALTZ
                           400 Broadway, P.O. Box 559
18                         Cape Girardeau, MO  63702

19                         Mr. John D. Briggs
                           BROWN AND JAMES
20                         1010 Market Street, 20th Floor
                           St. Louis, MO  63101
21
       REPORTED BY:        SUSAN R. MORAN, RMR
22                         Official Court Reporter
                           111 South 10th Street
23                         St. Louis, MO  63102
                           (314) 244-7983
24
       Proceedings recorded by mechanical stenography, produced by
25     computer-aided transcription.
```

```
1                              I N D E X

2                         Direct   Cross   Redirect   Recross

3   PLAINTIFF'S WITNESSES

4   JORDAN BLAIR
         (By Mr. Stilley)       3 (Cont'd)
5        (By Mr. Briggs)                 32
         (By Mr. Stilley)                            54
6
    RAY PALMER
7        (By Mr. Stilley)     188
         (By Mr. Oliver)                201
8

9   DEFENDANTS' WITNESSES

10  BO GERHARDT
         (By Mr. Briggs)      78
11       (By Mr. Stilley)              96

12  ROBERT O'BRIENT
         (By Mr. Oliver)     126
13       (By Mr. Stilley)             139
         (By Mr. Oliver)                             149
14       (By Mr. Stilley)                                      150

15  SAM GERHARDT
         (By Mr. Briggs)     154
16       (By Mr. Stilley)             170

17  DREW PARRISH
         (By Mr. Briggs)     207
18       (By Mr. Stilley)             211

19
    INSTRUCTION CONFERENCE            219
20

21                          E X H I B I T S

22                          Offered      Received

23  DEFENDANTS' EXHIBITS

24      C, D                  149          149

25      A                     207          207
```

1              (The following proceedings were held outside the

2      hearing of the jury on April 13, 2004 at 9:12 a.m.:)

3              THE COURT:  Good morning.  Anything before we bring

4      the jury out?

5              MR. OLIVER:  Yes, sir, if I could.  We agreed by

6      redaction to change parts of Defendants' Exhibit A.  And I

7      made an extra copy of the first three pages for the Court.

8      I've given Mr. Stilley his copy.  It's my understanding he

9      approves the redactions.

10             MR. STILLEY:  That is correct, Your Honor, we're

11     satisfied with that.

12             THE COURT:  Okay, thank you.  Let's bring the jury

13     on.  Mr. Blair, you want to resume the stand.

14             THE WITNESS:  Yes, sir.

15             (The following proceedings continued within the

16     hearing of the jury:)

17             THE COURT:  Good morning, ladies and gentlemen of

18     the jury.  Shall we resume, Mr. Stilley.

19             MR. STILLEY:  Thank you, Judge.

20                     DIRECT EXAMINATION (Cont'd)

21     BY MR. STILLEY:

22     Q.    Mr. Blair, can you tell us when your 17th birthday was?

23     A.    November 17th, 2001.

24     Q.    And you told us about the battery yesterday.  Who were

25     the witnesses to that battery?

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    A.    Matt Elmore, Jason Lowe, and Andrew Parrish.

2    Q.    Okay.

3    A.    And Bill Cavitt.

4    Q.    Are any of those individuals -- any of those

5    individuals defendants in this lawsuit?

6    A.    Yes, sir.

7    Q.    And who would that be?

8    A.    Bill Cavitt and Andrew Parrish.

9          MR. BRIGGS:  Objection, Your Honor.  Mr. Cavitt is

10   not a party to this lawsuit.

11          MR. STILLEY:  That is correct, Your Honor.  I'm

12   sorry.  I think he's probably just forgotten that.

13   BY MR. STILLEY:

14   Q.    Do you see Andrew Parrish in this courtroom today?

15   A.    No, sir.

16   Q.    Now, I asked you yesterday about what sports that you

17   were involved in before you went to Mountain Park.  Did you

18   forget one of those?

19   A.    Yes, sir, Tai Quon Do.

20   Q.    And where is it you do the Tai Quon Do?

21   A.    At church.

22   Q.    And who did you do it with?

23   A.    The other church members.

24   Q.    When you were at Mountain Park, what punishments were

25   you told about for misbehavior?

1           MR. BRIGGS:  Objection, Your Honor, this stuff is

2     irrelevant unless he was told by a staff member.  I think

3     that it's also vague.  Mr. Stilley would have to narrow his

4     question.

5           MR. STILLEY:  Judge, let me withdraw that question.

6     I'm not trying to go I think where they think.  I'm trying to

7     go -- I think I can make it easier.  Just withdraw that

8     question and ask another one.

9     BY MR. STILLEY:

10    Q.   Mr. Blair, were you punished with disciplinary

11    punishments such as swats or having to write lines while you

12    were at Mountain Park?

13          MR. BRIGGS:  Objection, Your Honor, relevance.  It

14    doesn't relate to the battery claim or the Fair Labor

15    Standards Act.

16          MR. STILLEY:  I'm just trying to demonstrate that he

17    was not -- he didn't create problems while he was there.

18          MR. BRIGGS:  Your Honor, I'm still not sure if

19    that's relevant.

20          THE COURT:  You need to try your question again.

21          MR. STILLEY:  Okay.  I'll just go to another line of

22    questions.  Thank you.

23    BY MR. STILLEY:

24    Q.   While you were at Mountain Park, were you provided any

25    age appropriate classes?

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

```
 1   A.    No, sir.

 2   Q.    Did you get credit for any course work that you did?

 3   A.    No, sir.

 4   Q.    Did you actually learn anything in classes?

 5   A.    No, sir.

 6   Q.    Did you ever see a written schedule for the students?

 7   A.    No, sir.

 8   Q.    What was the actual schedule of your activities?  Can

 9   you just explain to the jury what you would do on a typical

10   weekday?

11   A.    It pretty much varied from day to day.  The schedule

12   that Mr. Oliver presented earlier in his opening statement.

13         MR. OLIVER:  Your Honor, I'd object to the witness

14   commenting on the opening statement.  I mean, we're already

15   three violations of your court order.

16         THE COURT:  All right, fine.  Why don't you just

17   answer the question as opposed to referring to Mr. Oliver.

18         THE WITNESS:  Yes, sir.

19   A.    Mr. Stilley, could I see a copy of the defendants'

20   exhibits, please.

21   Q.    Actually we're not trying to get you to comment on

22   anything else, we just want to know what you did based on

23   your personal recollection of what you actually did.

24   A.    Yes, sir.  I would wake up around 5:30 in the morning,

25   be woken up around 5:30 in the morning.  Would then have to
```

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1   have a prayer session.  And then I would have to do chores

2   which lasted about 45 minutes to an hour.  I then have to --

3   we'd go have breakfast.  Then I'd come back and we'd have

4   more indoctrination meetings.  And then I would go to school

5   doing fifth grade work even after I graduated.  I would have

6   to --

7            MR. BRIGGS:  Objection, Your Honor, it's outside the

8   scope.  It's irrelevant.

9            THE COURT:  Fine.  Overruled.  Go ahead.

10  A.   Then -- and that would last from about nine o'clock

11  till noon.  And after lunch, which would be around there, we

12  would -- sometimes we would go to an afternoon class or

13  something like that or on some days we wouldn't even go to

14  school.  I mean, we would just go and this would be through

15  the week on a school day, and we would be taken to Brother

16  Wills' house where we would wax his boat, do lawn

17  maintenance, wash their cars, wax their cars.

18           On -- I've done anything from changing the oil in

19  their cars, rotate tires.  I performed maintenance on

20  backhoes.  I've installed water pipe, repaired water piping.

21  Installed toiletry -- toilets.  And this would take place on

22  throughout the day.

23           Now, the only thing that was pretty much on a steady

24  pace would have been the indoctrination meetings which went,

25  which, you know, I willingly went to and voluntarily which

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

```
1    took place on a Wednesday night, on Sunday mornings, and then

2    at least for an hour on every week night.  So that's

3    basically how the week went.

4    Q.    Now, you told us about some chores, correct?

5    A.    Yes, sir.

6    Q.    Tell us what you mean when you say chores.

7    A.    Well, with the chores I look at something of a personal

8    responsibility.  I mean, I understand -- my understanding is

9    that you would have to make your bed, clean up around the

10   dorm, the dorm area that you lived in.  Clean the bathrooms,

11   that sort of thing.  And that's my understanding of chores.

12   Q.    Okay.  Are you asking this jury to assess monetary

13   damages for you having to do chores?

14   A.    No, not at all.

15   Q.    Now, you tell us a little bit about the schedule.  But

16   what did you do at the end of the day?  The evening, what was

17   your typical schedule in the evening?

18   A.    What exact time?

19   Q.    Well, after say five o'clock.

20   A.    After five o'clock.  Five o'clock we'd usually shower

21   and then have dinner.  Then I would -- we would -- I would be

22   forced to attend the indoctrination meetings.

23   Q.    And how long did those meetings last?

24   A.    From -- anywhere from an hour and a half to two hours.

25   Q.    Per day?
```

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1    A.    Yes, sir.

2    Q.    Was that every weekday?

3    A.    Yes, sir.

4    Q.    How -- what was the difference between weekdays and

5    Saturdays and Sundays?

6    A.    On Saturdays we would get up at 6:30 a.m.  Then there

7    would be no school.  We would work all day doing various

8    tasks that I've just told the jury about.  And we would have

9    lunch and then we'd work some more until five o'clock, which

10   we would shower then for dinner.

11   Q.    Okay.  What did you do after dinner?

12   A.    We would have -- well, on Saturday we'd have the same

13   meetings.  Then on Sunday we would have -- we wouldn't work

14   in the morning, we'd have -- I'd be forced to go to

15   indoctrination meetings, have lunch, and then we would just

16   have a little -- I would be -- I'd have another

17   indoctrination meeting with an orientation guide, that sort

18   of thing.  And then we'd have dinner and that would be the

19   day.

20   Q.    What was the latest that you ever had to do work?

21   A.    On the tasks that I had previously mentioned, till

22   about five o'clock.  Now, as far as being a security guard,

23   that was 24/7.

24   Q.    Okay.  What about -- were you ever required to have

25   somebody move?

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

```
 1    A.    Oh, yes, sir.  Yes, sir.  Sorry about that.  When Aaron

 2    Smith was moving out from Palm Lane we were required to stay

 3    up late moving all of his belongings out into a moving van.

 4    And that lasted about a week.  We moved O'Brient back in and

 5    we were forced to stay and move all the things in for them.

 6    Q.    And how late did you work on that?

 7    A.    Till about midnight or one.

 8    Q.    What time did you have to get up the next morning?

 9    A.    At 5:30.

10    Q.    Did you volunteer for that duty?

11    A.    No, sir, nobody did.

12    Q.    Did you complain about that duty?

13    A.    No, sir.

14    Q.    Why not?

15    A.    I wasn't allowed to.

16    Q.    Okay.  You told us about some of the jobs that you did.

17    Did you ever see -- while you were at Palm Lane did you ever

18    see any cattle?

19    A.    Yes, sir.

20    Q.    Did you have any jobs with respect to the cattle?

21    A.    Yes, sir, for the longest time at Palm Lane we repaired

22    all the cattle's fences and stuff like that.  We were -- it

23    was kind of a metal fencing all the way around on some areas

24    where the cattle stayed, and we had to sand all the fences

25    out, prime it and then paint it.  And this lasted basically
```

1    pretty much my whole stay at Palm Lane, which was a total of

2    four months.  Then also occasionally the cattle would get out

3    from a hole in the barbed wire fence and we'd have to go

4    chase them out, repair the barbed wire, heard the cattle back

5    in.

6            We'd also had to use weed hooks to chop down.  I

7    know Ms. Wills earlier stated in her testimony that --

8            MR. BRIGGS:  Objection, Your Honor, move to strike.

9            MR. STILLEY:  There's no necessity for that.

10           THE COURT:  Fine.  The Court will strike that.

11           MR. BRIGGS:  Instruct the jury to disregard, Your

12   Honor.

13           THE COURT:  The jury will disregard.

14           MR. STILLEY:  Thank you, Judge.

15   BY MR. STILLEY:

16   Q.    Okay.  Just go ahead and testify your personal

17   knowledge what was actually done.

18   A.    We had to cut weeds down along the fences for the

19   cattle.  We'd spend a whole day.  That would have been like a

20   Saturday job where we'd spend a whole day working on that.  I

21   would wear gloves and still have blisters on my hands from

22   doing that all day in the hot sun.

23   Q.    Did you have any pasture maintenance duties besides

24   using the weed hook?

25   A.    Not any more than I've already mentioned.

1   Q.    Did you have any job duties relating to watering the

2   cattle or providing for a source of water for the cattle?

3   A.    Oh, yes, sir.  We were being forced to dig a pond for

4   the cattle by shovel.  And that was a whole week job.  I had

5   left pretty much after we started that.

6   Q.    Okay.  So you left while the pond digging project was

7   underway?

8   A.    Yes, sir.

9   Q.    And did you have wheelbarrows that you used?  How did

10  you get the dirt out of the pond?

11  A.    We just had to shovel it off the side at a time.

12  Q.    Was it just shovels you used to dig this pond?

13  A.    Yes, sir.  Well, the staff member Robert Kennedy was

14  using a small bulldozer, just a smaller size one.

15  Q.    Okay.  So then were you just doing the dressing around

16  the edges then with the shovels?

17  A.    Yes, sir.  We also after he had -- after Robert Kennedy

18  had dug out somewhat, about eight feet deep, we were down

19  there having to clean that out.

20  Q.    Did you dig in the bottom of the pond?

21  A.    Yes, sir.

22  Q.    How many students were involved in this project?

23  A.    It was all the boy students at Palm Lane.  I would say

24  between 11 and 15 students.

25  Q.    Did you work -- when this project was underway, did you

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    work each day all day or did you go to these classes that you

2    previously told us about for part of the day?

3    A.    I would go to the classes for part of the day, mainly

4    for the morning.  But sometimes we wouldn't even go to

5    afternoon, we'd just go work.  That was basically how that

6    went towards the pond digging.

7    Q.    Were you also required to provide services in the

8    nature of security services?

9    A.    Yes, sir.

10   Q.    And can you -- how did you find out that you had to

11   provide these services?

12   A.    I was told by Robert Kennedy.  I was told by

13   orientation guides and other staff.

14   Q.    What did they tell you that your job duties as a

15   security guard were generally?

16   A.    I was to make sure that nobody got away, no one ran

17   away.  I was to tackle them if anyone started to run away.  I

18   was to without question back up any person in authority so to

19   speak, whether it was orientation guides or a single student

20   or a staff member.  If a student at whatever ranking had

21   provoked or was being displeasant towards the staff member,

22   we were to restrain him.

23        MR. BRIGGS:  Your Honor, this is irrelevant.  This

24   is outside the scope.  You ruled on this yesterday.

25        THE COURT:  Go ahead.

```
 1   A.    At nighttime we were to always be awake.  We would try

 2   to sleep, but if anybody got up, we were to be awake.  We

 3   were also always if someone gotten up, make sure there were

 4   more than one person with them, that we were watching their

 5   every move.  We had to put bunk beds in front the doors so

 6   all the doors were blockaded.  We also had security alarms

 7   that we were to have turned on at night, make sure we turn

 8   them off during the day.  If they went off at night, we were

 9   supposed to be up and, you know, ready to restrain any

10   individual that wasn't supposed to be up.

11   Q.    Were there any kind of security devices that you were

12   made aware of that you were supposed to listen for?

13   A.    Yes, sir.

14              MR. BRIGGS:  Objection, Your Honor, may we approach?

15              THE COURT:  Come on.

16              (The following proceedings were held at the bench

17   and outside the hearing of the jury:)

18              MR. BRIGGS:  Your Honor, yesterday during pretrial

19   you specifically ruled that references to Palm Lane and

20   Mountain Park that made it sound like a prison or a lockdown

21   facility were inappropriate and outside the scope.  Whether

22   there were security devices does not relate to the battery.

23   It doesn't relate to the Fair Labor Standards Act claim

24   either.

25              THE COURT:  Well, it's describing -- I see this,
```

1   there's a line there.  But he's talking about what he had to

2   do as part of his job.  As long as he's talking about what

3   Mr. Blair had to do as part of what he claimed is a job,

4   employment, then I'm going to allow it.

5          MR. OLIVER:  Well, Judge, he shouldn't be allowed to

6   use obviously rehearsed pejorative answers like restrain

7   other students.

8          THE COURT:  You all can cross-examine him about

9   that.  He says that's what he was supposed to do.

10         MR. OLIVER:  Well, Your Honor, by my count he's

11  violated your direct orders from yesterday four times today

12  and nine times yesterday.  I mean, it seems it's time to -- I

13  would ask the Court to ask Mr. Stilley to conform to the

14  Court's orders.

15         THE COURT:  He's doing better than he did yesterday.

16         MR. OLIVER:  Well, that's true.  But now all he's

17  done is spend all night coaching Jordan Blair to come up

18  with these -- slip in these snippets like what I said or what

19  Ms. Wills said.

20         MR. STILLEY:  I didn't.  And we'll be done here very

21  shortly.

22         MR. OLIVER:  Judge, let me tell you that that's a

23  prevarication.  He did spend the night just like he spent

24  every recess after coaching these witnesses he's got outside

25  in violation of the rules.

 1          MR. STILLEY:  Your Honor, I did not coach any

 2   witnesses.

 3          THE COURT:  Fine.  Let's hurry up with this witness.

 4          (The following proceedings continued within the

 5   hearing of the jury:)

 6   BY MR. STILLEY:

 7   Q.    Did you have any security devices that was part of your

 8   job to listen for?

 9   A.    Yes, sir.

10   Q.    And what were those or what were those?

11   A.    I don't know exactly what type they were.  I know that

12   the two at Palm Lane were bought at Radio Shack.  Basically

13   it was a very high pitched screeching noise that you would

14   hear.  So you would definitely know if someone -- well, they

15   were motion detectors is what they were.  And they were put

16   over entryways.  And those were basically what they were.

17   Q.    And did anybody explain to you as part of your job

18   duties what would typically cause these devices to sound?

19   A.    I didn't need any explanation for it.  I mean, you

20   stuck your hand in there, it was a motion detector and it

21   would go off.

22   Q.    Where was this located in relation to where you slept?

23   A.    At Mountain Park it was located downstairs.  All the

24   exits upstairs were blockaded.  I believe there was only one

25   exit upstairs.  That was blockaded totally, and a staff

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    member slept there, so there wasn't any way of leaving there.

2    There might have been one on there, but I can't be sure about

3    that.

4    Q.    You sure about that?

5    A.    However, there was one downstairs that was in front of

6    the stairwell so you could not go down the stairs without

7    setting that motion detector off.

8    Q.    Did this motion detector ever go off while you were

9    there?

10   A.    Yes, sir.

11   Q.    And why did it go off?

12   A.    Someone was going downstairs to use the bathroom I

13   believe.  At least that's what they said.

14   Q.    Was it possible they used the bathroom without going

15   downstairs?

16   A.    No, sir, unless you went in your pants or something

17   like that.

18         MR. OLIVER:  What does this have to do with the job?

19         MR. BRIGGS:  Objection.

20         THE COURT:  Fine.  Move on from this.

21         MR. STILLEY:  Certainly, Judge.

22         THE COURT:  We're talking about his job, not what

23   somebody else was doing.  Please.  His job.

24         MR. STILLEY:  Certainly.

25         MR. OLIVER:  This is just what I raised at the

1   bench.  This is purposeful.

2            THE COURT:  Fine.

3   BY MR. STILLEY:

4   Q.    Okay.  Getting to your duties with respect to security,

5   about how much sleep did you get each night?

6   A.    Four hours of sleep.

7            MR. BRIGGS:  Objection, this is outside the scope.

8            MR. OLIVER:  Already ruled.

9            THE COURT:  One at a time now.  We're not going to

10  tag team over there.

11           MR. STILLEY:  Judge, I'm just --

12           THE COURT:  No, you know, it's like is the glass

13  half empty or is it half full?  Now he talked about -- if

14  you're claiming hours he's worked, how many hours he worked,

15  see.  What I'm saying, do you understand that?  Do you

16  understand that?

17           MR. STILLEY:  Yes, I do.

18           THE COURT:  Fine.  Then take it that way, not how

19  many he slept, how many hours he worked.

20           MR. STILLEY:  Certainly.

21           THE COURT:  Fine.  You get it?

22           MR. STILLEY:  Certainly.

23           THE COURT:  Fine.

24  BY MR. STILLEY:

25  Q.    How many hours did you work as a security guard?

```
 1    A.    As I said earlier, it was a 24/7 job.  I guess you

 2    could say between 9 p.m. and 5:30 a.m. sort of on call.

 3          MR. STILLEY:  You know, can we approach about

 4    something?  And I hate to do this, but it's a legal issue

 5    that needs to be raised and I can explain it to you.  I'm

 6    just trying not to raise anything that I shouldn't.

 7          THE COURT:  I know you will explain it to me.  Come

 8    on.

 9          (The following proceedings were held at the bench

10    and outside the hearing of the jury:)

11          MR. BRIGGS:  Just for the record, Your Honor, before

12    he starts, the on call comment that his client so aptly threw

13    in there is outside the scope of this claim.  There's been no

14    allegation that he had to be on call for anything.  That's a

15    specific section of the Act.

16          THE COURT:  I'm sure you will cross-examine him

17    about that and say this was never mentioned before.

18          See, you are still on your lineup.  See, if you come

19    with how many hours you working, then it's the sleeping is

20    obvious.  You got to stay on working, on the job.

21          MR. STILLEY:  Right.

22          THE COURT:  You want to open the door and wait to

23    let, you know, your client say anything he wants to say.  You

24    know, hoping that he can say something.  You know, and you

25    need to stop that.  Let's get on with the show.
```

```
1          MR. STILLEY:  The reason I came over here is, where

2    I want to go, but I don't want to do it if the Court does not

3    want me to do that, I don't want to do anything the Court

4    feels is inappropriate, but I want you to understand why I

5    think it is appropriate.

6          THE COURT:  What are you talking about?

7          MR. STILLEY:  There is a case that says if you get

8    less than five hours of sleep per night that you're entitled

9    to full pay all night for your duties.

10          THE COURT:  Well, hold on.  You're a nice fella.

11          MR. STILLEY:  Right.

12          THE COURT:  But some people are insomniacs.  So they

13    are supposed to be paid because they are insomniacs, huh?

14    It's not about how much sleep, it's about how much work.  You

15    got it?

16          MR. STILLEY:  Well, I want to preserve the record.

17          THE COURT:  The record is preserved.  You need to

18    talk about how much work.  Now, you said he was on call all

19    night, fine.  Case closed.

20          MR. STILLEY:  Well, if he was allowed to testify, he

21    would testify that he got less than five hours of sleep a

22    night.

23          THE COURT:  Well, that -- you know, some people get

24    no sleep because they are insomniacs, you see, so I'm not

25    going there.  What you're talking about is that he worked so
```

```
1     many hours that there were only five hours left.  So that's

2     what you need to be focusing on.  Okay.  It's how many hours

3     worked.  Now, if he's on call all night, you're saying he

4     worked all night.  Fine, that's what you say.  Okay.

5              MR. STILLEY:  Does that mean then that I wouldn't be

6     allowed to ask him how many hours of restful sleep that he

7     was able to get each night?

8              THE COURT:  No, you will not be able to ask that.

9              MR. STILLEY:  Okay.  I just can't understand --

10             THE COURT:  Because we are not getting into whether

11    or not he had some medical problem sleeping or anything of

12    that nature.  You talked about he was on call all night.

13             MR. STILLEY:  Okay.

14             THE COURT:  So you basically said he worked 24/7.

15    That's what you just said, you said he worked 24/7.

16             MR. STILLEY:  That is exactly what I said.

17             THE COURT:  Fine.  What more do you want?  Is there

18    any more time?  You know, it's like talking about this guy

19    that had three jobs, three full-time jobs, and he got

20    overtime on all of them.  Please.

21             MR. STILLEY:  I know some lawyers like that.

22             THE COURT:  I know.  I know.  But you've already

23    said he's working 24/7, that he was on call all night.  How

24    much more time is it?

25             MR. STILLEY:  I think I preserved the record on
```

1   that.  I just wanted to establish what I was trying to get

2   the point.

3          THE COURT:  I understand.

4          MR. OLIVER:  Your Honor, again, with due respect to

5   the Court and Mr. Stilley, I would beg the Court to require

6   Mr. Stilley to control his client.  His client is

7   intentionally -- there can be no doubt about it now that his

8   client is intentionally going over the lines the Court set in

9   the pretrial.

10          THE COURT:  I think what happens to some degree is

11   that while the client has a real emotional stake in this

12   thing, and he's a young person, so I would expect Mr. Stilley

13   to exercise some control by asking questions and not waiting,

14   you know, just opening the door and whatever comes out comes

15   out.  You got to go and ask questions.  You seem to want to

16   let your client say anything he wants to say.  But you have

17   to take control of this.

18          MR. STILLEY:  Certainly, Judge.

19          THE COURT:  And you know what, when you take

20   control, the people you're selling to will respect you more.

21   You know who you're selling to?

22          MR. STILLEY:  I'm selling to eight people sitting in

23   the box.

24          THE COURT:  That's right, so take control.

25          MR. STILLEY:  Certainly.

 1          THE COURT:  Because otherwise you're not going to

 2    sell it, okay.  You better take control.

 3          MR. STILLEY:  I certainly understand that.

 4          THE COURT:  Because it's like you're letting it fly

 5    anyplace.  It's like you don't necessarily believe in it

 6    yourself.  You're just whatever the client says.  It's like

 7    the client selling the case.  You have to take control.

 8          MR. STILLEY:  Judge, I intend to take control.

 9          THE COURT:  Because he is but 19 years old.  I think

10    all these people are over 40.

11          MR. OLIVER:  He's 19 years old and he's given the

12    answers Mr. Stilley has told him to give.  It's plain and

13    apparent.

14          THE COURT:  Take control.  Take control.

15          MR. STILLEY:  Let me say this and save some trouble

16    and go ahead and ask the Court, and I want to preserve the

17    record on this and I want to get the ruling on this.  The

18    next question I want to ask is about his security guard

19    duties with respect to toileting.  And I would anticipate

20    that he would say he was slammed up against the wall, yanked

21    off the toilet, and it's his job to keep them from causing

22    any problem for the people that just did that to them.  I

23    want to preserve the record.  I want to preserve that

24    testimony.

25          THE COURT:  You already said it's more prejudicial

1    than probative.  You've already said that he was supposed to

2    back up any actions of any people in authority or other

3    students who were in authority.  So please.

4         MR. STILLEY:  Well, I want a ruling on that.  If you

5    rule me not to do --

6         THE COURT:  Yeah, I just told you, I'm excluding

7    that.

8         MR. STILLEY:  Fine.

9         THE COURT:  You just said he's supposed to back up

10   anybody.  See, you keep wanting to show these very bad kinds

11   of things.  You want to show other alleged batteries and so

12   forth.  That's what you want to do.  And so when you're

13   trying to prove a case of battery, I mean, that is not part

14   of, you know, this case.

15        MR. OLIVER:  It's a violation of Rule 403 and

16   404(c).

17        MR. STILLEY:  I'm trying to --

18        THE COURT:  I'm not allowing that.

19        MR. STILLEY:  I'm not trying to bring anything

20   before the jury that I shouldn't, but I do want to protect

21   the record.

22        THE COURT:  Since when?

23        MR. OLIVER:  He spent two days --

24        THE COURT:  When did you change?

25        MR. STILLEY:  Judge, I'm trying to walk this line

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

```
1    and vigorously represent my client and I have 100 percent

2    respect for the Court.  But I just got -- I just got two

3    more.  And I just asked you about also --

4             THE COURT:  You still got the same script.

5             MR. STILLEY:  No, this is a different script.  And

6    everything it says, what were your duties.

7             THE COURT:  You're just singing in a different

8    pitch, but it seems like it's the same song.

9             MR. STILLEY:  Judge, if I can get a ruling on this,

10   if you give a ruling, I'll respect it.

11            THE COURT:  What is it?

12            MR. STILLEY:  What were your duties as a security

13   guard relating to physical altercations?

14            MR. OLIVER:  Asked and answered.

15            MR. BRIGGS:  Asked and answered.

16            THE COURT:  You asked that about if there was any

17   kind of action going on by people in authority, what was he

18   supposed to do, he was supposed to back them up without

19   question.

20            MR. STILLEY:  And what were your duties as a

21   security guard relating to runaways?

22            MR. OLIVER:  Asked and answered, volunteered

23   answers.

24            THE COURT:  He was supposed to restrain people.

25   We've already got that.
```

1          MR. STILLEY:  Okay.  I just wanted to -- you're

2     ruling that neither of those can come in, correct?

3          THE COURT:  Asked and answered, that's my ruling.

4     They've objected to it on the basis it's been asked and

5     answered, and I'm agreeing with that.

6          MR. STILLEY:  Thank you very much.  That's not a

7     problem.  Thank you.  I mean, I reserve my objection.

8          THE COURT:  Fine.

9          MR. STILLEY:  But I want to get it on the record.

10         THE COURT:  Fine.

11         MR. STILLEY:  Thank you, Judge.

12         (The following proceedings continued within the

13    hearing of the jury:)

14    BY MR. STILLEY:

15    Q.    You talked about various jobs, doing things like

16    digging ponds.  Can you explain to the jury how that you've

17    calculated your weekly hours on those particular duties?

18    A.    Well, see, it was so varied, there was such a variation

19    between our daily activities, so I had a breakdown of about

20    how long it took for us to do a job and how long it took for

21    me -- the labor that I performed on that job.  Basically

22    pretty much if I remember, I just kind of pieced together how

23    much -- how many hours I worked on any specific job.

24    Q.    So what's a fair estimate of hours per week?

25         MR. OLIVER:  Objection, estimate.

```
1              THE COURT:  Overruled.

2    A.    Anywhere between 15 to 27 hours.

3    Q.    Okay.  And how did you calculate that?

4    A.    Well, see, if it stayed where we didn't leave the camp,

5    the property, it was pretty much between 15 and 20 hours.

6    Now, if we had taken -- and we didn't go to school at all

7    during the week -- during a school day and say we went to Bob

8    Wills' house or -- yeah, Bob Wills' house, then that would

9    add on extra hours for that week.

10   Q.    Did you get to play sports while you were at Mountain

11   Park or Palm Lane?

12   A.    Yes, sir.

13   Q.    And what sports did you get to play?

14   A.    We played baseball, basketball, volleyball.

15   Q.    And how many times did you get to play baseball?

16   A.    Played baseball once at Mountain Park and about twice

17   at Palm Lane.

18   Q.    How about basketball?

19   A.    Once at Mountain Park and about three or four times at

20   Palm Lane.

21   Q.    And how about volleyball?

22   A.    None at Mountain Park, about eight or nine times at

23   Palm Lane.

24   Q.    Did you ever get to go swimming?

25   A.    Yes, sir.
```

```
 1    Q.    How many times?

 2    A.    I believe twice at Bob Wills' house.

 3    Q.    I want to draw your attention to Plaintiff's

 4    Exhibit 10.  Can you tell the jury why you think this

 5    letter -- well, first of all, tell the jury what this is.

 6    A.    This is a letter written from me to my parents on

 7    October 9, 2001.  I would have been at Mountain Park.

 8    Q.    And is all the writing on this letter yours?

 9    A.    No, sir.

10    Q.    And where is the other writing?

11    A.    It seemed to either been on the back of the page --

12          MR. BRIGGS:  Your Honor, objection.  May we

13    approach?

14          MR. OLIVER:  He's going to censorship.  That

15    doesn't --

16          THE COURT:  Well, I don't know where you all are

17    going.  Where are we?

18          MR. BRIGGS:  It's irrelevant.  This isn't relating

19    to the battery or the Fair Labor Standards Act claims.

20          MR. STILLEY:  Your Honor, I'm trying to identify

21    which of the words in the letter were --

22          THE COURT:  What does this have to do with

23    employment, Fair Labor Standards Act, or the battery?  What

24    does it have to do with one of those?

25          MR. STILLEY:  Well, he was asking for work boots in
```

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1    this letter.  However, the entire letter is admitted.  And on

2    a number of these letters including this one there were

3    matters that were written in by one of the Gerhardts.  I

4    believe this one is by Sam Gerhardt.

5              THE COURT:  So.

6              MR. STILLEY:  I'm just trying to establish --

7              THE COURT:  What does it have to do with either of

8    those two issues, battery or Fair Labor standards?

9              MR. STILLEY:  Well, I'm just trying to establish

10   that it was not all his words.

11             THE COURT:  So.

12             MR. OLIVER:  Your Honor, we agree that his words are

13   his words, that his words are in evidence.

14             MR. BRIGGS:  We don't dispute that.  Moreover --

15             THE COURT:  Well, you know, what does the letter

16   have to do with this case?  That's what I'm talking about.

17             MR. STILLEY:  What it has to do with this case is he

18   was asking for work boots.  And the reason that --

19             THE COURT:  Fine.  Then you can ask him did he write

20   a letter asking for work boots and is this the letter.

21             MR. BRIGGS:  Your Honor, I'd object to the extent

22   that it calls for hearsay.

23             THE COURT:  Overruled.  I'll allow you to ask that.

24             MR. STILLEY:  Okay.  But not anything about anybody

25   else's writing?

1          THE COURT:  Please.  I keep telling you, if it

2     doesn't have to do with the battery or Fair Labor Standards

3     then forget it.  We don't want to hear it.

4          MR. STILLEY:  Okay.  Thank you, Judge.

5          THE COURT:  We want to finish this case within our

6     lifetimes, you know.

7          MR. STILLEY:  Okay, Judge.

8          THE COURT:  We got to hear everybody in the world,

9     we'll be here forever.

10    BY MR. STILLEY:

11    Q.    Did you wear different clothes when you were doing your

12    work as opposed to when you were doing other things?

13    A.    Yes, sir.

14    Q.    And what kind of -- say, when you went to these

15    meetings or classes, what kind of clothes did you wear?

16    A.    In indoctrination meetings we wore a suit.  During

17    classes we were required to wear khaki slacks, a button down

18    dress shirt.

19    Q.    And what did you wear when you were doing work?

20    A.    We wore -- I was required to wear a uniform of yellow

21    T-shirt, work belt, jeans, and steel toe work boots.

22    Q.    Okay.  In this Exhibit 10, what were you asking for in

23    that letter?

24    A.    The work boots.

25    Q.    How about No. 12, Exhibit No. 12, can you take a look

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

```
 1    at that.

 2              MR. OLIVER:  What's the date, Mr. Stilley?

 3              MR. STILLEY:  It's 10/16/01.

 4    Q.    Do you see anything in that letter related -- that was

 5    related to your work?

 6    A.    Did you say this one was dated 10/16/01?

 7    Q.    I think it's ten -- maybe it's 10/26?

 8    A.    10/26.

 9    Q.    Look down about line 5.

10    A.    Yes, sir.

11    Q.    And do you see anything there that related to your work

12    duties?

13    A.    Yes, sir.  I was in need of work jeans and work shirt

14    and work boots.

15    Q.    Take a look at Exhibit No. 14.  On the second line do

16    you see anything in this letter that relates to the work that

17    you did at Mountain Park or Palm Lane?

18    A.    Yes, sir, I was still asking for work boots and work

19    shirts, yellow T-shirts.

20    Q.    And why did you ask again?

21    A.    Because as I say, earlier with the -- I was required --

22    with the classes I was required to wear khaki slacks and a

23    button down dress shirt where I performed my chores in those

24    clothes.  Now, the task I said before as far as digging the

25    ponds, repairing the cattle fence, that nature I was required
```

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

 1    to wear the work uniform.

 2    Q.    Okay.  But it sounds from these letters, it sounds like

 3    you asked for these items more than once; is that correct?

 4    A.    Yes, sir.  Yes, sir.

 5    Q.    And why did you have to ask more than once?

 6    A.    Because I was told that I had to have them.  I was

 7    having other students were having to provide them for me.

 8    Q.    And I don't want to go through all these letters one by

 9    one, it would take just a whole lot of time, but do these

10    other letters contain similar items?

11    A.    Yes, sir.

12              MR. STILLEY:  Pass the witness.

13              THE COURT:  Cross-examination.

14              MR. BRIGGS:  Thank you, Your Honor.

15                              CROSS-EXAMINATION

16    BY MR. BRIGGS:

17    Q.    Good morning, Mr. Blair.

18    A.    Good morning, sir.

19    Q.    Mr. Blair, did you understand that your -- strike that.

20    You understood that your parents wanted to send you to

21    Mountain Park; is that correct?

22    A.    No, sir.

23    Q.    Do you remember having your deposition taken, sir?

24    A.    Yes, sir.

25              MR. BRIGGS:  May I approach the witness, Your Honor?

```
 1              THE COURT:  Go ahead.

 2      Q.   Mr. Blair, you had your deposition taken on June 4,

 3      2003; is that correct?

 4      A.   Yes, sir.

 5              MR. BRIGGS:  My apologies, Your Honor.  May I have a

 6      moment?

 7              THE COURT:  Ladies and gentlemen of the jury, why

 8      don't we just take a morning recess at this time.  Recall the

 9      admonition.  Be prepared to return to the courtroom at --

10      return to your jury room at 10:15, okay.

11              (Court in recess from 9:54 a.m. until 10:22 a.m.)

12      BY MR. BRIGGS:

13      Q.   Mr. Blair, prior to the break I handed you a copy of

14      your deposition from June 4, 2003.  Do you have that still in

15      front of you?

16      A.   Yes, sir.

17      Q.   Okay.  And the question I'd asked you was whether you

18      understood that your father wanted to send you to Mountain

19      Park; is that correct?

20      A.   Yes, sir.

21      Q.   And your answer was no, right?

22      A.   Yes, sir.

23      Q.   Turning to your deposition page 20.  Page 20, line 22.

24      I'll go ahead and read it for you.

25              "QUESTION:  Do you know if your father, Ron Blair,
```

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

```
 1    asked that you be sent to Mountain Park?

 2              "ANSWER:  Yes, sir.

 3              "QUESTION:  And was it his wish that you go to

 4    Mountain Park?

 5              "ANSWER:  Yes, sir."

 6              That was continuing on to page 21.  Did I read that

 7    correctly, Mr. Blair?

 8    A.    I'm not sure where you're at here.

 9    Q.    Okay.  On page 20, line 22.  So toward the bottom.

10    A.    Yes, sir.

11    Q.    Okay.  I'll read it once again.

12              "QUESTION:  Do you know if your father, Ron Blair,

13    asked that you be sent to Mountain Park?

14              "ANSWER:  Yes, sir.

15              "QUESTION:  And was it his wish that you go to

16    Mountain Park?"  That's continuing on to the next page.

17              "ANSWER:  Yes, sir."

18              Do you see that?

19    A.    Yes.

20    Q.    Did I read it correctly?

21    A.    Yes, sir.

22    Q.    Okay.  Does that refresh your recollection then,

23    Mr. Blair, did your father indeed wish you go to Mountain

24    Park?

25    A.    When I answered those questions, that was before his
```

1    deposition testimony was taken.  And I believe that --

2    Q.    Actually, well, Mr. Blair, did you understand that he

3    be sent to Mountain Park.  Or excuse me?

4    A.    That he be sent?

5    Q.    Strike that.  Did you understand he wish that you be

6    sent to Mountain Park?

7    A.    No, sir, not at this time.

8    Q.    And you're saying because of his deposition testimony

9    that that changes your opinion?

10   A.    Yes, sir.  For reasons that because of the Court's

11   order, the judge's order I can't go into.

12   Q.    Do you know is his deposition is in evidence in this

13   case?

14   A.    Not that I know of, sir.

15   Q.    Okay.  Very well.  At the time your deposition was

16   taken, did you have that understanding?

17   A.    Yes, sir.

18   Q.    Okay.  Very good.  Mr. Blair, I believe it was your

19   testimony that you arrived at Mountain Park on October 24,

20   2001?

21   A.    Yes, sir.

22   Q.    When Mr. Stilley was asking you some questions

23   yesterday, you said you arrived in Mountain Park in

24   handcuffs; is that correct?

25   A.    Yes, sir.

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

```
 1    Q.    Did Mountain Park put you in handcuffs?

 2    A.    No, sir.

 3    Q.    Did Mountain Park bring you to the campus?

 4    A.    No, sir.

 5    Q.    So your parents, were they the ones that put you in

 6    handcuffs?

 7    A.    No, sir.

 8    Q.    Did your parents bring you to Mountain Park campus?

 9    A.    No, sir.

10    Q.    Very good.  Continuing on with that testimony,

11    Mr. Blair, do you recall with respect to this alleged

12    battery, going to that claim, that Mr. Gerhardt, Bo Gerhardt,

13    shoved you into a sink.  Yesterday you told us that it didn't

14    leave a mark on your body, correct?

15    A.    Yes, sir, that I recall.

16    Q.    Okay.  And indeed it didn't draw blood either; is that

17    correct?

18    A.    Yes, sir.

19    Q.    This morning on direct Mr. Stilley had also asked you

20    with respect to where you were placed as far as your

21    educational training at Mountain Park and Palm Lane.  And I

22    believe your response was that you were put into fifth grade

23    work; is that correct?

24    A.    Yes, sir.

25    Q.    When you first got to Mountain Park, did you take a
```

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1    diagnostic test?

2    A.    Yes, sir.

3    Q.    Okay.  And after that you began doing work in the

4    curriculum that Mountain Park uses and Palm Lane uses,

5    correct?

6    A.    Yes, sir.

7    Q.    Referring you to Plaintiff's Exhibit 10, Mr. Blair.

8    While you were at Mountain Park and Palm Lane, you wrote and

9    sent letters to your parents; is that correct?

10   A.    Yes, sir.

11   Q.    In fact, you've offered 28 letters that you wrote to

12   your parents while you were enrolled at Palm Lane and

13   Mountain Park in this trial; is that correct?

14   A.    I'm not exactly sure on the number 28, but I have

15   offered some.

16   Q.    Okay.  Is it more than 20?

17   A.    I'm not sure.

18   Q.    Why don't you take a moment and count for us then.  The

19   first one is Exhibit 10 if that helps you.  And the last one

20   is your Exhibit 38.

21   A.    Yes, sir.

22   Q.    So it's correct there are about 28 letters?

23   A.    Yes, sir.

24   Q.    The first letter, Plaintiff's Exhibit 10 taking a look

25   at, isn't it correct that you wrote this letter to your

1    parents?

2    A.    Yes, sir.

3    Q.    Okay.  And if I can find it.  Referring to what I've

4    just highlighted on the screen, Mr. Blair, and now I'll read

5    that.  "I'm having to redo my junior and senior year."  Do

6    you see that there?

7    A.    Yes, sir.

8    Q.    Did I read that accurately?

9    A.    Yes, sir.

10   Q.    Okay.  So isn't the truth of the matter that while you

11   were at Mountain Park and Palm Lane, in fact, you were

12   redoing your junior and senior year, you told your parents

13   that, correct?

14   A.    Yes, sir.

15   Q.    Okay.  And junior/senior year in high school is not

16   fifth grade work, correct?

17   A.    Well, it depends on what system of learning you're

18   using.  See, they had an age based program which you can tell

19   by the pace that I was using it was 10/56 which the 56 would

20   indicate fifth grade level work.

21   Q.    All right.  But respect to this, you were placed

22   basically in your junior year, that's what you told your

23   parents, correct?

24   A.    Yes, sir.

25   Q.    Mr. Blair, taking a look at Plaintiff's Exhibit 10,

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1    this letter.  If you want you can take a moment and read it.

2    Why don't we start off with the date in the upper right-hand

3    side.  And it appears to say 10/9/01; is that correct?

4    A.    Yes, sir.

5    Q.    Mr. Blair, in fact, did you write this letter on

6    10/9/01?

7    A.    Yes, sir.

8    Q.    Were you enrolled at Mountain Park or Palm Lane at the

9    time you wrote this letter?

10   A.    No, sir.

11   Q.    Okay.

12   A.    So that must have been 11/9/01.  I might have gotten

13   the months mixed up.

14   Q.    So this letter was likely written on November 9, 2001?

15   A.    I can only guess.

16   Q.    When did you leave Mountain Park and go to Palm Lane?

17   Was that around November 9th?

18   A.    Yes, sir.

19   Q.    Why don't we refer you then to the second sentence of

20   the letter at the top.  And I'll read it.  "So I'm leaving

21   for Florida tomorrow morning.  How are Timmy and Chris?"

22   A.    Yes, sir.

23   Q.    Did I read that accurately?

24   A.    Yes, sir.

25   Q.    Okay.  Based upon the statement that you made to your

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    parents that you were leaving for Florida tomorrow, would it

2    be fair to say that this letter was written on or about

3    November 9, 2001?

4    A.    Yes, sir.

5    Q.    All right.  Taking a look at this letter, Mr. Blair, do

6    you make any reference in there to Bo Gerhardt committing a

7    battery against you or slamming you or shoving you against a

8    bathroom sink or wall?

9    A.    No, sir.

10   Q.    Okay.  Actually in taking a look at Plaintiff's

11   Exhibit 10 as well, Mr. Blair, isn't it true that in this

12   letter you don't make any reference to your parents of having

13   to do work at Mountain Park?

14   A.    Absolutely not.

15   Q.    Moving on to Plaintiff's Exhibit 11, Mr. Blair.  Now,

16   the date at the letter on the top says 10/9/01.  Mr. Blair,

17   did you write this letter while you were enrolled at Mountain

18   Park or Palm Lane?

19   A.    Yes, sir.  But, again, the date must be wrong.  The

20   month may be wrong.  11/9 probably.

21   Q.    So it's your understanding that this -- that, in fact,

22   you wrote this letter on November 19th, 2001?

23   A.    Yes, sir.

24   Q.    Where were you at that time, in Palm Lane or Mountain

25   Park?

```
1    A.      Palm Lane.

2    Q.    Mr. Blair, taking a look at this letter, isn't it the

3    truth that in this letter to your parents that you didn't

4    mention anything about Bo Gerhardt shoving you into a sink or

5    wall?

6    A.      Absolutely.

7    Q.      And isn't it also true that in this letter you don't

8    make any reference to work to your parents?

9    A.      Absolutely.

10   Q.      Going on to the next letter, Plaintiff's Exhibit 12.

11   Once again the date on this letter, it says 10/26/01.  And,

12   Mr. Blair, taking a look at this letter, did you write this

13   while you were enrolled at Palm Lane?

14   A.      Give me a second to read through this to make sure.  I

15   don't see any indication that it would indicate that was

16   written on November.  It could have been written on October

17   like it was dated.

18   Q.      Okay, fair enough.  Mr. Blair, isn't it the truth that

19   in this letter that you wrote to your parents that you didn't

20   make any mention of Bo Gerhardt shoving you into a sink or a

21   wall?

22   A.      Absolutely not.

23   Q.      Okay.  In fact, Mr. Blair, we could go through every

24   other letter that you have offered into evidence in this

25   trial, over 20 letters.  In every single one of those letters
```

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    that you included, isn't it true you didn't make any

2    reference of Bo Gerhardt shoving you into a wall?

3    A.    I would never make a reference with these letters being

4    monitored and risk the punishment.

5          MR. BRIGGS:  Your Honor, I'd instruct the witness

6    not to -- I'd instruct the Court to instruct the jury to

7    disregard the answer and move to strike the remaining portion

8    of the answer.

9          THE COURT:  The jury is so instructed.

10   BY MR. BRIGGS:

11   Q.    Now, if we could turn to Exhibit 26, Mr. Blair.

12         THE COURT:  Is that Exhibit 26?

13         MR. BRIGGS:  Yes, Your Honor.

14   Q.    Mr. Blair, did you write this letter?

15   A.    Yes, sir.

16   Q.    And what's the date on it?

17   A.    January 18th, 2002.

18   Q.    Okay.  At that point in time you were down at Palm

19   Lane?

20   A.    Yes, sir.

21   Q.    Okay.  In the letter once again, and I'll read it, you

22   state to your parents, "I'm having to take my junior year

23   over again."  Is that correct?

24   A.    Yes, sir.

25   Q.    All right.  Very good.  You didn't make any reference

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    to doing fifth grade work to your parents in any letter that

2    you wrote; isn't that correct, Mr. Blair?

3    A.    Yes, sir.

4    Q.    Now, turning to Exhibit 30.  Mr. Blair, was this

5    written in or around February 2002?

6    A.    Yes, sir.

7    Q.    And I've highlighted some text in the middle of the

8    letter and I'll go ahead and read it.  I've learned to weld,

9    to fix a toilet completely, use a belt sander.  Do you see

10   that there?

11   A.    Yes, sir.

12   Q.    Did I read the handwriting correctly?

13   A.    Yes, sir.

14   Q.    Now, learning these vocational skills, learning to

15   weld, learning to fix a toilet, are those some of the work

16   chores or -- strike that.  Were some of the work things that

17   you did while you were at Palm Lane?

18   A.    Yes, sir.

19   Q.    Okay.  And you're asking this jury to pay you for

20   learning these skills, correct?

21   A.    Absolutely.

22   Q.    Okay.  And Exhibit 31.  Mr. Blair, on direct you said

23   that it took about a week to dig the pond.  And then you said

24   that it wasn't completed when you left Palm Lane, correct?

25   A.    Yes, sir.

1    Q.    Okay.  Looking at this exhibit, it is dated February 8,

2    2002.  And the second sentence or third sentence says, "Well,

3    right now we're working on digging a pond."  Do you see that

4    there?

5    A.    Yes, sir.

6    Q.    Okay.  You said the pond took about a week.  And yet it

7    wasn't finished when you left.  And I thought it was your

8    testimony that you left Palm Lane in March 15, 2002.  Isn't

9    that right?

10   A.    Yes, sir.

11   Q.    Okay.  Mr. Blair, well, then if it only took a week, it

12   should have been finished, correct?

13   A.    Well, we were in Florida and it rains a lot so

14   you're -- we're not going to dig out in the mud when it's

15   raining, so we would postpone.  But it was about a week's

16   worth of work that I had labored on the pond.

17   Q.    You said it was raining a lot but that you were working

18   outside in the sun every day, and that that's the basis for

19   your Fair Labor Standards Act claim, correct?

20   A.    When I worked on the pastures.

21   Q.    Okay.  And otherwise when you worked outside, did you

22   only work outside when it was nice out?

23   A.    Not all the time.  We would be -- there's an overhang

24   at Palm Lane where we'd work underneath when it was raining.

25   But the pond was located out in the pasture, so -- and also

 1    it was in Florida so you really can't -- I mean, it will rain

 2    wherever, so.

 3    Q.    Okay.  And this was in the winter time in Florida,

 4    right?

 5    A.    Yes, sir.

 6    Q.    All right.  Going on spring.  You never worked in

 7    Florida in the summertime?

 8    A.    Right.

 9    Q.    Now, in calculating the hours that you said you worked

10    while you were at Mountain Park and Palm Lane, I just want to

11    get this correct.  You said that there is no way to give

12    specific dates and times that you actually were doing

13    specific tasks or actually working; is that right?

14    A.    Right.

15    Q.    Okay.  So you can't tell us exactly what hours you were

16    working on a particular day?

17    A.    Well, I can tell you for sure as far as the tasks I

18    performed, the labor I performed as far as like I previously

19    stated on the jobs like digging the pond and things of that

20    nature, that would be at least two and a half, three hours

21    per day, that's for sure, I can know for sure.

22    Q.    Well, that really wasn't an answer to my question.  I

23    said that you really can't tell us the specific hours you

24    worked on specific days.  And that's what I asked.

25    A.    Yes, sir, that's correct, I can't.

1    Q.    Okay.

2    A.    There were no records that we kept or anything like

3    that.

4    Q.    You said in a typical day at Mountain Park or Palm Lane

5    that you got up and then you said a prayer; is that right?

6    A.    Yes, sir, I was forced to do that.

7    Q.    Okay.  Do you understand, Mr. Blair, that when your

8    father enrolled you at Mountain Park that he understood

9    Mountain Park had a religious -- religion based curriculum?

10   A.    I believe so.

11   Q.    Okay.  After you said your prayers, you said that you

12   did chores, correct?

13   A.    Yes, sir.

14   Q.    And you did chores in and around the dorm area cleaning

15   up the common areas so to speak?

16   A.    Yes, sir, laundry, things of that nature.

17   Q.    That would be making your bed, correct?

18   A.    Yes, sir.

19   Q.    Sweeping the floor?

20   A.    Yes, sir.

21   Q.    You said just then doing laundry?

22   A.    Yes, sir.

23   Q.    And you're not asking this jury to pay you for those

24   tasks?

25   A.    Absolutely not.

```
 1    Q.    Mr. Blair, these indoctrination sessions that you

 2    testified about, you studied bible scripture during those

 3    indoctrination sessions, correct?

 4    A.    Their version of the bible, yes, sir.

 5    Q.    And their version of the bible is the King James

 6    version of the bible?

 7    A.    Yes, sir.

 8    Q.    Okay.  Did you talk about the scripture that you read?

 9    A.    Yes, sir.  Excuse me, what was your exact question?

10    Q.    Did you talk about the scripture that you read?

11    A.    As in me personally?

12    Q.    As in somebody within the group.

13    A.    Someone in the group spoke on their interpretation of

14    it.

15    Q.    Thank you.  While you were at Mountain Park you said

16    that after lunch you would do chores, correct, you'd get put

17    into your work clothes and you'd go out and do work in the

18    yard?

19    A.    Yes, sir.

20    Q.    Would that include mowing the yard?

21    A.    No, sir, I was -- we weren't mowing the yards at the

22    time, it was winter.

23    Q.    Okay.  Would you be raking leaves?

24    A.    Yes, sir.

25    Q.    Did you haul firewood?
```

1    A.    Yes, sir.

2    Q.    Did you clear brush?

3    A.    Yes, sir.

4    Q.    Were there -- strike that.  On some afternoons during

5    the week you would play games or sports; is that correct?

6    A.    Just once at Mountain Park anyway.

7    Q.    Would that happen on occasion at Palm Lane?

8    A.    Yes, sir.

9    Q.    So you weren't doing these outdoor work activities

10   every day, correct?

11   A.    Correct.

12   Q.    These outdoor activities that you did including the

13   hauling of firewood, raking leaves, clearing brush, were

14   those done in teams?

15   A.    At Mountain Park they were.

16   Q.    Now, at Palm Lane did you also do afternoon tasks, job

17   tasks or work tasks?

18   A.    Yes, sir.

19   Q.    Okay.  But there were some afternoons when you would

20   play games?

21   A.    Yes, sir.

22   Q.    On days when you happened to be doing the outdoor

23   tasks, would that include taking out the trash?

24   A.    Yes, sir.

25   Q.    And cleaning cars?

1    A.    The -- yes, sir.

2    Q.    And just so we make it clear, those are the cars that

3    were on campus at Palm Lane, with the possible exception of

4    doing Mr. and Mrs. Wills' car?

5    A.    With the other employees' staff vehicles also.

6    Q.    Would you mow the lawn?

7    A.    Yes, sir.

8    Q.    And would you clear brush?

9    A.    Yes, sir.

10   Q.    You said that you also painted some fences; is that

11   right?

12   A.    Yes, sir.

13   Q.    And you're asking the jury to pay you for those outdoor

14   tasks that you performed?

15   A.    Yes, sir.

16   Q.    Now, you said something about there being cattle at

17   Palm Lane.  As you sit here today you don't know whether Palm

18   Lane owned any cattle, correct?

19   A.    In Ms. Wills' other testimony she stated that they do

20   not own the cattle, so no.

21   Q.    So they don't own the cattle.  If cattle got sick, who

22   would take care of the cattle?

23   A.    We would immediately.  Then they would call the owner.

24   Q.    Okay.  And who is the owner?

25   A.    I only knew the individual as a man named Tousiaant.

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

```
1    Q.    Now, going back to this pond that you said that you

2    dug.  You said that actually one of the staff members was

3    using a small bulldozer or front end loader, correct?

4    A.    Yes, sir.

5    Q.    Okay.  And you among the other students, male students

6    were dressing the edges of the pond?

7    A.    Yes, sir.

8    Q.    And you said that you did that for a week?

9    A.    Yes, sir.

10   Q.    With respect to the pond, were you told by the staff

11   member why it was being dug?

12   A.    For the cows.

13   Q.    Who told you that?

14   A.    Robert Kennedy.

15   Q.    Now, Mr. Blair, are you making a claim for on call work

16   in connection with this lawsuit?

17   A.    Yes, sir.

18   Q.    You are.  Did you plead that?

19   A.    No, sir.

20   Q.    Okay.  Do you know if your lawyer pled that on your

21   behalf?

22        MR. STILLEY:  Objection on the grounds this witness

23   doesn't have knowledge of that, of technical legal matters.

24        MR. BRIGGS:  Well, actually if he has knowledge,

25   i.e., he verified the petition, Your Honor.
```

```
1              MR. STILLEY:  He verified the facts.

2              MR. BRIGGS:  Well, that would be a fact.

3              THE COURT:  Fine.  Go ahead.

4    BY MR. BRIGGS:

5    Q.    Do you know if he did?  Do you know if your lawyer pled

6    that on your behalf?

7    A.    I don't have that knowledge.

8    Q.    Mr. Blair, were you on orientation the entire time you

9    were at Mountain Park and Palm Lane?

10   A.    Yes, sir.

11   Q.    You understood orientation was for new students,

12   correct?

13   A.    Yes, sir.

14   Q.    And a more senior or not necessarily an aged senior but

15   a more experienced student would act as an orientation guide

16   and be within arms length distance of a new student, correct?

17   A.    The way I understood it, the way they pick and choose.

18   Q.    So whoever was chosen to act as an orientation guide?

19   A.    Yes, sir.

20   Q.    Typically that was a more senior student?

21   A.    No, sir, my orientation guide was 14 years old.

22   Q.    Well, when I said more senior, someone who had more

23   experience at Mountain Park or Palm Lane?

24   A.    By a month.

25   Q.    Do you understand that student would not come off
```

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1  orientation until they had demonstrated they could be

2  trusted?

3  A.    Yes, sir.

4  Q.    Since you did not come off orientation the entire time

5  that you were at Mountain Park and Palm Lane, then it would

6  be fair to say that Mountain Park and Palm Lane staff didn't

7  feel that you could be trusted?

8  A.    No, sir.

9  Q.    Why isn't that a fair statement based upon what you

10  just testified to?

11  A.    Because, well, me and the other students also raised

12  the question with Andrew Parrish.  I felt I should come off

13  orientation, and that's about as far as that went.

14  Q.    And a more senior staff wouldn't permit that to happen?

15  A.    I don't have knowledge of any of that.

16  Q.    Mr. Blair, with respect to the security guard issue,

17  you said you had to watch out for students to make sure they

18  didn't escape, correct?

19  A.    Yes, sir.

20  Q.    With respect to your claim that you were a security

21  guard 24 hours a day, if you were on orientation with a more

22  senior student watching you, then how could you be watching

23  for other students?

24  A.    It would be -- no student is allowed in the room by

25  himself.  See, there's always going to be other students

1   around you.

2   Q.    Well, of course.  So the mere fact that no students are

3   permitted to be in a room by themselves, that therefore

4   renders you a security guard, that's what you're claiming?

5   A.    Yes, sir.

6   Q.    Okay.  So the mere fact that you couldn't be in a room

7   by yourself is your basis for claiming that you're a security

8   guard, that's what you just testified to?

9   A.    What if my orientation guide decided he was going to

10  run off.  I was to report any --

11  Q.    So you were to report if another student ran off?

12  A.    No, you didn't let me finish my answer.  I was to

13  report if he discussed any --

14  Q.    Well, that's what you had just said.  So --

15          MR. STILLEY:  Objection.  I request the witness be

16  allowed to answer the question completely before the next

17  question be asked.

18          THE COURT:  Reask your question.

19  BY MR. BRIGGS:

20  Q.    Mr. Blair, the entire time you were at Mountain Park

21  and Palm Lane you were always in the presence of an

22  orientation guide or staff member?

23  A.    No, sir.

24  Q.    When were you not?

25  A.    The day that I ran away on March 15th, 2002.

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1    Q.    So the first opportunity that you had not to be under

2    the eye of an orientation guide or staff member you ran away?

3    A.    Yes, sir.

4    Q.    It's kind of ironic then that somebody who is supposed

5    to be a security guard would run away the first chance they

6    had, isn't it?

7    A.    I was an involuntary security guard, sir.

8    Q.    Mr. Blair, while you were at Mountain Park did you ever

9    do the outdoor tasks, the clearing brush, raking leaves for

10   somebody in the town of Patterson other than the people

11   living at Mountain Park?

12   A.    No, sir.

13   Q.    Mr. Blair, while you were at Mountain Park and Palm

14   Lane did you ever make any goods that were sold by Mountain

15   Park or Palm Lane?

16   A.    No, sir.

17         MR. BRIGGS:  A moment while I may confer, Your

18   Honor?

19         THE COURT:  Go right ahead.

20         MR. BRIGGS:  Thank you.  That's all I have at this

21   time, Your Honor.  May I approach the witness to remove the

22   deposition?

23         THE COURT:  Absolutely.  Mr. Stilley.

24                    REDIRECT EXAMINATION

25   BY MR. STILLEY:

```
 1    Q.    Mr. Blair, were your letters read by other persons

 2    before they were mailed to your parents?

 3    A.    Yes, sir.

 4              MR. BRIGGS:  Objection, Your Honor, move to strike.

 5              THE COURT:  Overruled.

 6    BY MR. STILLEY:

 7    Q.    And do you know who read those letters?

 8    A.    The dorm supervisor for sure.  Also some of the letters

 9    I see that Sam Gerhardt has read those and written in

10    portions.

11    Q.    Did you have any reason not to say certain things in

12    those letters?

13    A.    Absolutely.

14    Q.    And how did you come to have knowledge that there were

15    certain things you shouldn't say?

16    A.    I had been punished before for even the things I had

17    already written as far as my beliefs and my parents' beliefs.

18    Q.    Why didn't you say in those letters that the treatment

19    you were getting at Mountain Park and Palm Lane would cause

20    you to have to repeat your junior and senior years?

21    A.    Excuse me, could you ask that?

22    Q.    Why did you say in those letters that you have to

23    repeat your junior and senior years?

24    A.    Because they -- Mountain Park and Palm Lane didn't know

25    where to place me so they just basically picked whatever they
```

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

```
 1    thought was easy for them.  They didn't want to get records

 2    from my previous school, the one I graduated from.  They

 3    didn't try to do any of that.

 4    Q.    What location were you at when you left the supervision

 5    of Palm Lane?

 6    A.    At a Home Depot in Port Charlotte, Florida, I believe.

 7    It may have been Arcadia, Florida, but around that region.

 8    Q.    Okay.  Moving on to a different issue here.  You didn't

 9    keep a log of your hours that you worked, did you?

10    A.    No, sir.

11    Q.    Why not?

12    A.    I wasn't allowed to.

13    Q.    What's your basis of personal knowledge about that?

14    A.    You're not allowed to write things that they don't want

15    you to write down.

16    Q.    But you didn't have a copy of the written rules,

17    though, did you?

18    A.    No, sir.

19    Q.    How did you find out that that was a rule?

20    A.    Drew Parrish told me.

21    Q.    And why did he come to have occasion to tell you?

22    A.    Because I had marked in my bible days that I had

23    written down for memory verses, stuff like that.  They

24    were -- there were only little marks so it couldn't be

25    distinguished as.  However, I guess it could have been used
```

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    for whatever and he did not like that, so.

2    Q.    How did he find out that you made marks in your bible?

3    A.    He just inspected my bible.  They inspect all the

4    bibles.

5    Q.    How frequently?

6    A.    Just wherever they feel like it.

7    Q.    Now, on cross-examination you said something about King

8    James bible.  Was just any King James bible okay?

9    A.    No, sir.

10         MR. BRIGGS:  Objection, Your Honor, how is this

11   relevant?

12         MR. STILLEY:  Your Honor, he asked --

13         THE COURT:  Well, we've gone enough into that.

14         MR. STILLEY:  Can I have one more question?

15         THE COURT:  No.

16         MR. STILLEY:  Thank you, Judge.  Pass the witness.

17         THE COURT:  Anything else, Mr. Briggs?

18         MR. BRIGGS:  Nothing further, Your Honor.

19         THE COURT:  Very well.  Mr. Blair, you may step

20   down.  Call your next witness.

21         MR. STILLEY:  Your Honor, can I have just about one

22   minute to talk to them or less?

23         THE COURT:  One minute.

24         MR. STILLEY:  Just a very little bit to talk to my

25   client?

1            THE COURT:  Fine.

2            MR. STILLEY:  Thank you, Judge.  Plaintiff rests.

3            THE COURT:  Come on up.

4            (The following proceedings were held at the bench

5     and outside the hearing of the jury:)

6            MR. OLIVER:  I need to get it retyped.

7            THE COURT:  No.  Go ahead.

8            MR. OLIVER:  Well, Palm Lane and Mountain Park and

9     Betty Wills and Bob Wills and Sam Gerhardt on the one hand

10    and Drew Parrish, Robert Kennedy, and Bo, Julie, and Robert

11    O'Brient as individuals move for directed verdict on the Fair

12    Labor Standards Act case for -- there are a lot of reasons.

13           THE COURT:  Well, we're going to -- I think this may

14    take a little time.

15           MR. OLIVER:  I agree with you.

16           THE COURT:  Why don't I let the jury go out.

17           MR. OLIVER:  Fine.

18           (The following proceedings continued within the

19    hearing of the jury:)

20           THE COURT:  It's become clear this is going to take

21    a little time, so why should you sit here.  Why don't you all

22    take a break.  You see what I'm saying.

23           Ladies and gentlemen of the jury, we're going to

24    take a recess as far as you are concerned.  Why don't you be

25    prepared to return to your jury room at 20 after 11.  Recall

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    the admonition.

2              (The following proceedings were held outside the

3    hearing of the jury:)

4              THE COURT:  Okay.  Defendants have a motion for a

5    directed verdict at the close of all -- at the close of

6    rather the plaintiff's case.  Go ahead, Mr. Oliver.

7              MR. OLIVER:  Thank you, Your Honor.  First, Your

8    Honor, on behalf of the individual defendants Drew Parrish,

9    Robert Kennedy, Robert O'Brient, Julie Gerhardt, Bo Gerhardt,

10   and Deborah Gerhardt, the simplest answer or the simplest

11   reason that these defendants are entitled to a directed

12   verdict on the Fair Labor Standards Act is that under no

13   circumstances are they shown to be employers.  There's no

14   evidence that any of those individuals had any decision

15   making capacity at all.  In fact, there's absolutely no

16   evidence that Drew Parrish, Robert Kennedy, Robert O'Brient,

17   Julie Gerhardt, Bo Gerhardt, or Deborah Gerhardt ever made a

18   decision at all in this case.  There's a total absence of

19   evidence.

20              Now, to be an employer you have to suffer or permit

21   somebody to work in traditional terms.  And the test of

22   whether or not an individual is an employer is a test which

23   specifically in the Eighth Circuit under Wirts and other

24   cases require the Court to look at whether or not the

25   individual has the ability to hire, fire, and dictate the

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    manner -- set salaries and dictate the manner and method of

2    work.  So as to these individuals, there's a total absence of

3    that.  They are not be employers under the Act.

4         The second, Your Honor, with respect to those

5    defendants and to the defendants Palm Lane, Mountain Park,

6    Bob Wills, Betty Wills, and Sam Gerhardt, the other

7    defendants, the reality is that the evidence in this case so

8    far demonstrates as a matter of law that the activities that

9    the plaintiff complains of are activities which are part of

10   the integrated process or the integrated system into which

11   his parents voluntarily and as we know in fact sent him

12   voluntarily as the alternative to him going to juvenile

13   detention center, which is what we know in fact although not

14   in the evidence.

15        This court said in its memorandum opinion that the

16   issue was whether or not the plaintiff was engaged in school

17   in which the work was part of the school or on the other hand

18   whether the plaintiff was engaged in work which was in

19   furtherance of, quote, business enterprises.

20        It is clear and there's no evidence to the contrary

21   that this individual is not an employee in the sense of the

22   Fair Labor Standards Act.  An employee under the Fair Labor

23   Standards Act is a person whose economic livelihood depends

24   upon the economic viability of the, quote, employer's, closed

25   quote, business.  Which is to say you have to depend -- your

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    livelihood, your economic livelihood depends on the work

2    given to you by this corporation that's known as your

3    employer.

4          That work has to further a business enterprise.  It

5    either has to produce goods in commerce or be involved in

6    something that produces goods in commerce or is involved in

7    communication in commerce.  And this boy was sent

8    involuntarily to a school which includes three or four hours

9    of work or sports every afternoon as a part of its regimen, a

10   strict regimen, integrated regimen.  And 100 percent of the

11   evidence is then that he is not dependent economically on the

12   success or failure of Palm Lane, he is not an employee within

13   the meaning of the Act.  Neither are the defendants employers

14   within the meaning of the Act as they relate to -- as they

15   relate to Jordan Blair.

16         They are employers as to other staff members, both

17   in and out staff, but they are not employers of the students

18   because the students' work is a part of the training that

19   they are getting as troubled youth as a part of their effort

20   to restore these children, young people to a meaningful life.

21         There are other sufficient reasons to sustain the

22   motion for directed verdict on the Fair Labor Standards Act.

23   I mean, they have a burden of proving a work week, week by

24   week basis, the exact number of hours.  That's part of the

25   plaintiff's burden of proof.  They haven't even tried to do

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    that.  They admitted that they can't.  So, I mean, they don't

2    qualify that way.

3         They haven't established that anything Jordan Blair

4    did had an impact on interstate commerce.  The opening

5    criteria for application is that the labor had a significant

6    impact.  This is just like the cases that Your Honor cited in

7    his memoranda where people go to school, they are at that

8    school.  It's like the College of the Ozarks.  I mean, it's

9    just exactly what's over here at Point Ozark.  Part of the

10   plan, part of your education is to work.  And why do you

11   work?  You work to learn discipline.  You work to learn --

12   you work to learn discipline.  You work to learn

13   self-respect.  And you get vocational skills.  The key in

14   this case in terms of that may be what Jordan Blair says,

15   that he wants to be paid for learning how to weld and how to

16   use a belt sander.

17        Judge, every public school in the United States is

18   required to teach that to boys or that kind of thing to boys

19   in shop.  I mean, you don't get paid for learning vocational

20   skills.

21        This is simply not a Fair Labor Standards Act case.

22   We don't have an employer and we don't have any employee.

23   And the defendants are all entitled to a directed verdict,

24   most particularly or most clearly the individuals as to whom

25   there is absolutely no testimony.  Thank you.

1          THE COURT:  Mr. Stilley, I am inclined to agree with

2     all of what Mr. Oliver has said.  Now, you ready to change my

3     mind?

4          MR. STILLEY:  Yes, Judge, I'm ready to change your

5     mind.

6          THE COURT:  Okay.  Go for it, change my mind.

7          MR. STILLEY:  Okay.  Let's start with the first one.

8     The testimony shows that everyone, part of their duties was

9     to force everyone else to comply.

10         THE COURT:  Say that again.

11         MR. STILLEY:  Part of their duties was everyone had

12    the duty to force everyone else to comply.  If anyone was to

13    cause any trouble for any staff member, they had to basically

14    attack that person.

15         THE COURT:  Well, you know, see, that's kind of

16    stretching making somebody say they are a security guard.

17    You know, that's kind of stretching it.  You said he worked

18    as a security guard, and the testimony came out that's

19    because he had to tell on everybody if they tried to leave

20    the premises, they had to restrain them or if they were

21    breaking the rules tell.

22         MR. STILLEY:  Well, he also had to do physical

23    things.  He also had to physically restrain or catch --

24         THE COURT:  He said restrain.  He basically had to

25    restrain anyone that was leaving the premises or I guess he

1       implied there that if there was an altercation with staff

2       people or someone else of authority, and he had to report any

3       violation of rules.  Okay.  That made him a security guard as

4       far as you're concerned?

5              MR. STILLEY:  That makes him a security guard.

6       Ms. Wills herself testified nobody runs away.

7              THE COURT:  Well, he got away.

8              MR. STILLEY:  From Lowe's.

9              THE COURT:  You have anything else to say about that

10      issue?

11             MR. STILLEY:  Yes.  Well, now, let's not forget

12      there's two sides to this.  I think we just need the jury

13      take and let the jury sort it out.

14             THE COURT:  It's basically a legal issue for me,

15      really.  It's a legal issue.

16             MR. STILLEY:  On what amounts to compensable work?

17             THE COURT:  Whether or not someone is an employer or

18      an employee under the Fair Labor Standards Act, that's my

19      call.  Now, I maybe would perhaps allow the jury to deal with

20      some things.  But right now I don't see that you've made

21      anything, made a case enough for me to submit to the jury.

22      And I want you to tell me what have you shown for me to

23      submit anything to the jury at all?

24             MR. STILLEY:  Well, we've shown that they are a

25      school or at least purport to be a school.  And the law and

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    Fair Labor Standards Act there is a specific section that

2    says that a school is a covered entity.  They have to pay.

3    As I told you earlier, it is a belt and suspenders approach.

4    That is the only reason that --

5         THE COURT:  It is a belt -- tell me that, it is a

6    beltless suspender?

7         MR. STILLEY:  Belt and suspenders approach.  In

8    other words, I'm taking two routes to make sure that one

9    succeeds.  I'm showing the interstate commerce only as

10   redundant to the fact that this is a school.  This is a

11   school, and the schools are required to pay.

12        THE COURT:  Well, I'm not disputing or I don't have

13   a problem, I don't think anyone has a problem that the school

14   is an employer in general.  But is it an employer relative to

15   Mr. Blair, and is he an employee?  I'm saying specifically

16   him.

17        MR. STILLEY:  Right.  And we all can see that there

18   is enough evidence that a reasonable jury could find that

19   Mr. Blair was compelled, compelled to do things like digging

20   ponds, painting fences and various other jobs like that

21   outside of chores.  I would just very respectfully --

22        THE COURT:  That's part of this whole thing about

23   this compelled stuff.  His parents sent him there.  It was an

24   alternative to where else he was going to go.  And he was

25   going to be compelled if he went someplace else.  So, I mean,

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    I see this as part of the training and education curriculum

2    of this type of institution.

3            MR. STILLEY:  Judge, if that is the case then a

4    person could take an individual in and just simply put him to

5    work because that helps that child learn.

6            THE COURT:  We're not looking at that kind -- we're

7    looking at this case here, not some hypothetical case.  We're

8    looking at this one.

9            MR. STILLEY:  We are looking at this case right

10   here.  But we are looking at a case of a kid who was required

11   to do work on the premises and to do work off the premises.

12   And you -- the Fair Labor Standards Act rules and regulations

13   say that you can't even force somebody to attend a meeting

14   without paying them for it.  The defendants have advocated

15   the claim that he was kept there pursuant to court order.

16   They can't do that.  Ms. Wills herself admitted why do we

17   send him to Florida, because he was going to be able to walk

18   out of there in a week.  We know his birthday and we know

19   when he left, it was exactly a week.

20           THE COURT:  We have not -- you know, you want to

21   refresh my recollection as to what the court order from

22   Arkansas said in terms of this being an alternative to him

23   being incarcerated by the state?

24           MR. STILLEY:  Your Honor, here's -- my position on

25   that is, my position is that the defendants claimed ignorance

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    of it, though they didn't have ignorance, it was fact.

2           THE COURT:  You're talking about the fact that he

3    went to Florida.  Was there a term?  I don't know what term

4    he might have gotten otherwise or what the judge indicated in

5    terms of this being an alternative to him being incarcerated.

6           MR. STILLEY:  Here's what the court order said, and

7    we do have a copy of the court order if you want to see it.

8    He said he was sent to Baptist Boys Academy in Missouri to

9    complete inpatient residential treatment.  Well, let's stop

10   and think about that.  Baptist Boys Academy in Missouri is

11   not Palm Lane.  There is no inpatient residential treatment.

12   They themselves in their own book, the testimony from the

13   stand says --

14          THE COURT:  Maybe that was a mistake with the court

15   system.  But that's kind of indefinite.  And how long was he

16   at Mountain Park anyway?

17          MR. STILLEY:  He was there from the 24th of October

18   to --

19          THE COURT:  How long?  Give me a time.  30 days?

20          MR. STILLEY:  Three weeks.

21          THE COURT:  That's not very long in terms of even

22   what the court order said.  How did you describe it,

23   inpatient --

24          MR. STILLEY:  Residential treatment.

25          THE COURT:  Residential treatment.

1          MR. STILLEY:  Correct.  It doesn't say that he has

2     to --

3          THE COURT:  Every time I send somebody down to

4     Springfield in a criminal case, that takes at least 90 days

5     to get a study.  Please.

6          MR. STILLEY:  Here's what --

7          THE COURT:  I'm saying that you know the three weeks

8     in terms of the court order, that just doesn't wash in terms

9     of the court order, okay.  So we're not there.  You're

10    talking about them sending him down to Florida because of the

11    age.  He's got the competing situation with the parents

12    having enrolled him there.

13         MR. STILLEY:  Well, let me make sure the record is

14    very clear on that, the parents did not enroll him in Palm

15    Lane.  He was taken to Palm Lane.  Allegedly on an oral

16    statement from the parents he was taken to Palm Lane.  There

17    were no documents and the court did not order him.

18         THE COURT:  The witness indicated that.  But now

19    he's somewhat backing off of that in terms of his deposition

20    because of a subsequent deposition he claims of his father.

21    But the testimony that he gave was that his father agreed for

22    him to be there, that was the testimony.

23         MR. STILLEY:  Well, the question was about Mountain

24    Park.

25         THE COURT:  There is no testimony to the contrary.

1          MR. STILLEY:  The question was Mountain Park.  Did

2     your father want you to be sent to Mountain Park?

3          THE COURT:  Well, we don't have any testimony to the

4     contrary relative to Palm Lane.

5          MR. STILLEY:  Well, I mean, they are -- if they want

6     to put on in defense, fine, let them put it on in the

7     defense.

8          THE COURT:  I'm tired of beating around the bush

9     with you.  What else do you have relative to this that

10    defendants are employers and that he was -- that Mr. Blair is

11    an employee?

12         MR. STILLEY:  Okay.  Let me just hit the highlights

13    here.  The defendants themselves including Ms. Wills did not

14    believe that they had a right to detain him because Ms. Wills

15    herself said we sent him to Florida.

16         THE COURT:  Are you talking about false imprisonment

17    or are you talking about employee/employer relationship?

18         MR. STILLEY:  I'm trying to talk about wages, but we

19    got a problem here when I try to explain the work, you say,

20    well, he was supposed to work.  And then I say, well, he was

21    held there without legal authority and without anything in

22    writing from his parents.  And then we say is that a false

23    imprisonment claim?  No, it's not a false imprisonment claim,

24    that's something that's already -- we've already been down

25    that road and we've already lost that claim.  That claim is

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    out.

2          But what I'm establishing, that he was in Palm Lane

3    for a number of months and forced to work with no legal

4    authority whatever.  And under state law you can't just take

5    somebody's kid just because they allegedly orally tell you to

6    take that kid, and you just have --

7          THE COURT:  That doesn't seem to go to the issue of

8    employer/employee relationship.  And you know from the

9    letters that you have here in evidence from him to his

10   parents, it didn't seem like -- that there was any protest

11   other than on his part in the letters talking about I'm going

12   to be a good person, I changed and this stuff.  There's no

13   indication that his parents were opposed to this.  And so,

14   you know, that is part of that false imprisonment claim.

15   We're trying to get to employee/employer relationship.

16         MR. STILLEY:  His letters were read.  He could be

17   punished.

18         THE COURT:  Well, please.  Employer/employee

19   relationship.  Forget the letters.

20         MR. STILLEY:  Okay.  When we get to the employer/

21   employee relationship question, what we've got, and all we

22   have to show is that he worked for this person, even if --

23         THE COURT:  The question is really was it part of

24   the educational curriculum or was it, you know, was it a work

25   situation as opposed to a curriculum student situation?

1          MR. STILLEY:  Well, we've got enough facts that it's

2    a submissible case to the jury that you could just say direct

3    a verdict to the jury.  See, he had to put on work clothes

4    totally different from the uniform that he had for his

5    indoctrination meetings and his so-called classes.

6          THE COURT:  Let's face it, this is an alternative

7    school.

8          MR. STILLEY:  Well, then we're assuming this is a

9    bad kid that actually needed to be there.

10         THE COURT:  Assuming?

11         MR. STILLEY:  That's what we're doing.

12         THE COURT:  You're the one that had him talk about

13   being brought there in handcuffs.  You thought that that

14   would show that somebody else was bad.  That was telling

15   something on him.

16         MR. STILLEY:  Well, I didn't know that was going to

17   happen.

18         THE COURT:  Right.  Right.  You should have taken

19   control.

20         MR. STILLEY:  I can't reach out and grab him, you

21   have it do extemporaneously.

22         THE COURT:  He said certain people kept him -- what

23   kind of distance was it?

24         MR. STILLEY:  Slapping distance, that's the facts.

25   That is the facts.  And that's what I've been trying to

1    present.  This whole case is the facts.

2              THE COURT:  Oh, really?

3              MR. STILLEY:  Yes.

4              THE COURT:  Oh, okay.

5              MR. STILLEY:  Just the facts.  But we have to create

6    a picture enough so that the jury has enough information to

7    make a fair decision.

8              THE COURT:  I'm well aware of the picture you were

9    trying to paint.

10             MR. STILLEY:  Well, it was not me that created the

11   picture.  It was somebody else who created a picture and I'm

12   just trying to make an accurate painting.

13             THE COURT:  Well, sometimes they asked was it the

14   chicken first or was it the egg first.  They didn't take him

15   to the juvenile court, did they?

16             MR. STILLEY:  Well, wait a minute, let me -- since

17   we're going to go there, I think that they did.  We don't

18   have testimony from any witness here because -- and I'm

19   satisfied you kept that if I say anything about it, but it's

20   my understanding from information and belief that they told

21   Mr. Blair that that was a good way to get him to the place.

22   And the exhibit --

23             THE COURT:  But the judge made that decision, that's

24   what you're telling me.

25             MR. STILLEY:  Well, the judge made that decision.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1          THE COURT:  So that's -- you know, that's there.

2          MR. STILLEY:  Well, let me explain why that's not

3   there.  He was not allowed --

4          THE COURT:  Well, forget all that.  You just go off

5   on these tangents because you're still on this false

6   imprisonment, this is a bad thing to do.  The whole religious

7   thing, that's a bad situation and so forth.  They got some

8   other version of the bible.  I mean, please.  Let's get to

9   the employer/employee relationship, okay.

10          MR. STILLEY:  Certainly, Judge.  And in order to

11   do -- let's just assume that he was -- there was no order

12   whatsoever.  Can we do that?

13          THE COURT:  Assume there was no order?  No.  It's

14   not -- I don't even know it's relevant.  So that's what I'm

15   saying, we start talking about these things and it is not

16   really relevant.  Talk about the employer/employee

17   relationship.

18          MR. STILLEY:  Okay.  Here's what --

19          THE COURT:  Now, I give you this, now there is some

20   approximation of some hours, but it seems very, very

21   uncertain about.  But there was some approximation, and, you

22   know, so there is something there in terms of hours that

23   Mr. Blair claims, 15 to 20 something hours he said.  What did

24   he say, 15 to 27 hours a week.  I mean, there is no actual

25   records.  I mean, I understand in such a situation perhaps

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1   there would not be records kept.  But he had that.  He had

2   some hours that he claims that he was working.  But the

3   question becomes is this part of the curriculum or is this,

4   you know, a real employment job situation as opposed to

5   student activity, part of the curriculum.

6        MR. STILLEY:  The jury would have to decide the

7   hours on that.  But before we get too far afield here on the

8   lack of records, we know why there's no records, and that is

9   because the defendants said to not keep records, and we check

10  your stuff and if we find you're keeping any notes, journals

11  or anything like that, we stop it.  He couldn't keep it and

12  they wouldn't --

13       THE COURT:  Fine.  I'm giving you a concession

14  there.  You're just beating something that's not about

15  anything.  So let's move to the other aspect of it.  I'm not

16  concerned and I don't have a big problem with the hours,

17  keeping of hours.

18       MR. STILLEY:  Based on my research of the law on

19  Fair Labor Standards --

20       THE COURT:  How would you distinguish what Mr. Blair

21  says he did from student activities of a curriculum of an

22  alternative religious institution?  That's where we have to

23  go.  That's the key.  Right there, that's it.

24       MR. STILLEY:  Okay.  Let me distinguish this.

25  There's a lot of things you can do to distinguish this.  But

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    in an alternative school, the student goes in, the student

2    goes in to class, and they study and they get credit for the

3    study that they did.  In this case, no credit.  No age

4    appropriate instruction whatever.  In the ordinary

5    alternative school that you're talking about, you go in and

6    you are not -- you are compelled to do your work and mind

7    your business.  You're not compelled to go to do other

8    things.  And if you do have a class such as shop where you

9    learn how to weld or use a belt sander or other things like

10   that, you get credit.  And the rules say, the Fair Labor

11   Standards Act rules say in order for that to be considered

12   instruction rather than work, you have to get credit.  That's

13   one thing that takes it completely out of the realm of

14   educational type situation.

15        THE COURT:  Fine.  Let me take this under

16   consideration.  I'm going to rule on this in a little while.

17   Why don't we take a little break and start back.  Why don't

18   we let the jury know that we're going to start back at ten

19   minutes to 12, and then we'll go to 12:30.  And then I'll

20   make a ruling on this issue.  And then if we've only got

21   whichever way that is, we'll just continue on.  If we've just

22   got the battery issue left, we'll deal with that.  If we have

23   both, we'll continue on.

24        MR. STILLEY:  Thank you, Judge.

25        (Court in recess from 11:35 a.m. until 11:57 a.m.)

1          THE COURT:  Counsel, for the time being the Court is

2     going to deny the motion for directed verdict on the Fair

3     Labor Standards Act claim.  The Court believes that it needs

4     a little bit greater basis if it's going to grant this in

5     terms of curriculum versus job situation in terms of the

6     items Mr. Blair mentioned that he performed at the school in

7     terms of whether or not this is part of the curriculum.

8     We've heard Mr. Blair's version that this was work.  The

9     Court believes that even though in terms of an alternative

10    school, it may very well be that this is the curriculum based

11    situation.  But the Court believes it needs testimony on that

12    if it's going to make a ruling in that regard.  So the Court

13    will just hear further evidence on that and we'll entertain

14    that motion at a later time.  Okay.

15          MR. OLIVER:  May it please the Court.  Two problems

16    then as we move forward that I want to bring to the Court's

17    attention.  One is that if the Court is going forward, both

18    Mr. Parrish and Mr. Blair are on their way.  The odds of them

19    getting here today are zero.  So in the course of the

20    evidence we want the Court to know that Mr. Parrish and

21    Mr. Ron Blair based on the calls have left to be here and

22    they probably will not be here before close.

23          THE COURT:  Are they going to give testimony about

24    the curriculum versus employment?

25          MR. OLIVER:  No, just the battery.  I mean, Mr. Drew

 1   Parrish is a supposed witness to the battery.  I assume if

 2   you're going to --

 3           THE COURT:  Well, the battery wasn't gone anyway

 4   regardless.

 5           MR. OLIVER:  I was going to move to dismiss that on

 6   the pending jurisdiction basis.  But we still have a

 7   logistical problem.

 8           THE COURT:  We've gone this far in the case, I will

 9   not be inclined to --

10           MR. OLIVER:  Then I want you to know we have a

11   logistical problem.

12           THE COURT:  Where are they coming from?

13           MR. OLIVER:  Knoxville, Tennessee and Alma,

14   Arkansas, and they are both on their way.

15           THE COURT:  They ought to get here soon then.

16           MR. OLIVER:  We're trying.

17           THE COURT:  Better call them.

18           MR. OLIVER:  Already done that, Judge.

19           THE COURT:  Call them again.

20           MR. OLIVER:  I'll try that too.

21           THE COURT:  Maybe we ought to perhaps finish this

22   testimony today.

23           MR. OLIVER:  We'll try.

24           THE COURT:  Okay.  Let's bring the jury on.  The

25   defendants can start their case.

1      MR. OLIVER:  I'd also like to complain to the Court

2 the intention of Mr. Stilley, and maybe the Court doesn't

3 want to hear it, but Mr. Stilley intentionally left out when

4 he was talking to the Court about the order that Judge

5 Cottrell's order, the concept of that order and the fact that

6 it says Baptist Boys Academy in Missouri or like facility.

7 Mr. Stilley -- that was in my opinion an intentional omission

8 intended to mislead the Court in the course of argument.

9 We've been through this with him before, and I object to it

10 and want to call it to the Court's attention.

11      THE COURT:  Very well.  Mr. Stilley, be mindful, you

12 are an officer of the court.

13      MR. STILLEY:  Yes, Your Honor, I certainly did not

14 intend to mislead you.

15      THE COURT:  Right.  Bring the jury on.

16      (The following proceedings continued within the

17 hearing of the jury:)

18      THE COURT:  Good morning yet, ladies and gentlemen

19 of the jury.  Okay.  We ready to proceed?

20      MR. BRIGGS:  Your Honor.  Yes, Your Honor.

21 Defendants call Bo Gerhardt to the stand.

22      THE COURT:  Very well.

23                BO GERHARDT,

24 Having been first duly sworn, was examined and testified as

25 follows:

```
 1                    DIRECT EXAMINATION

 2   BY MR. BRIGGS:

 3   Q.     Mr. Gerhardt -- would you please state your full name

 4   for the record.

 5   A.     My name is Sammy Gerhardt, G-e-r-h-a-r-d-t.

 6   Q.     And, Mr. Gerhardt, do you have a nickname that you go

 7   by?

 8   A.     Yes, sir.

 9   Q.     And what is that?

10   A.     Bo.

11   Q.     Bo.  For how long have you gone by that nickname?

12   A.     Since my birth date when I was born.

13   Q.     Mr. Gerhardt, do you work at Mountain Park Baptist

14   Church and Boarding Academy?

15   A.     Yes, sir.

16   Q.     What's your job title there?

17   A.     Dean of men.

18   Q.     Did you work at Mountain Park back in October of 2001?

19   A.     Yes, sir.

20   Q.     And were you also the dean of men back then?

21   A.     No, sir.

22   Q.     What were you?  What was your job title back then?

23   A.     I don't know if I really had a job title.  My

24   description of my duties were a boys learning center

25   supervisor.  And I just worked with the boys supervising in
```

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1   and out of school.

2   Q.    So you supervise the learning center and then you also

3   worked and supervised the boys outside of the learning

4   center?

5   A.    Yes, sir.

6   Q.    How old a man are you?

7   A.    I'm 25.

8   Q.    When was your birthday?

9   A.    February 11th, 1979.

10  Q.    Okay.  So back in October 2001 you would have been 22?

11  A.    Yes, sir.

12  Q.    Sir, are you married?

13  A.    Yes, sir, I am.

14  Q.    What's your wife's name?

15  A.    Julie Ann Gerhardt.

16  Q.    And is Julie also employed with Mountain Park?

17  A.    Yes, sir.

18  Q.    Your title back in 2001, you said you worked with the

19  learning center.  Did that make you a staff member back then

20  in Mountain Park?

21  A.    Yes, sir.

22  Q.    And your wife Julie, was she also working at Mountain

23  Park in 2001?

24  A.    Yes, sir.

25  Q.    And was she also a staff member?

1    A.     Yes, sir.

2    Q.     Back in 2001 to whom did you report at Mountain Park?

3    A.     Brother Gerhardt, Sam Gerhardt, my father.

4    Q.     Can you describe your duties as a learning center

5    supervisor back in 2001?

6    A.     Yes, sir, as the duties of a supervisor you make sure

7    the day gets started off right by handing out tests, helping

8    the students set their goals.  You help students if they have

9    problems with academic questions, they need help in math, or

10   algebra, whatever subject they're working in, you're there to

11   assist and make sure their homework is turned in.  You may

12   assign homework.  You check their goals and make sure they

13   did the work they were supposed to do that day.  You do those

14   sort of responsibilities of education in the learning center.

15   Q.     Okay.  And this is part of that integrated educational

16   program that Mrs. Wills testified about yesterday?

17   A.     That is correct.

18   Q.     Okay.  Back in 2001 did your duties include hiring any

19   staff?

20   A.     No, sir, they did not.

21   Q.     No.  Did you have authority to hire or fire staff?

22   A.     No, sir, I did not.

23   Q.     Did you have authority to set salaries for any staff at

24   Mountain Park?

25   A.     No, sir, I did not.

1    Q.    Did you ever work at Palm Lane?

2    A.    No, sir, I have not.

3    Q.    Sir, did you graduate from high school?

4    A.    Yes, sir, I did.

5    Q.    Where did you graduate from high school?

6    A.    Mountain Park Baptist Boarding Academy.

7    Q.    So you actually attended the school you work at now; is

8    that right?

9    A.    Yes, sir, I did.

10   Q.    Okay.  When did you graduate?

11   A.    In May of 1997.

12   Q.    And after you graduated from Mountain Park, did you go

13   to college?

14   A.    Yes, sir, I did.

15   Q.    And where did you go to college?

16   A.    I went to Crown College in Powell, Tennessee just

17   outside of Knoxville, Tennessee.

18   Q.    And is Crown College a Baptist college?

19   A.    Yes, sir, it is.

20   Q.    Now, in this case we've heard an awful lot about having

21   to do various tasks both in and outdoors that students

22   participate in while they are at Mountain Park and Palm Lane.

23   Sir, when you were a student at Mountain Park, where did you

24   live?

25   A.    When I was a student at Mountain Park I lived in the

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1    boys' dorm with the boys.

2    Q.    And just so we can kind of get a picture for it, the

3    boys, they live in a single dormitory at Mountain Park; is

4    that right?

5    A.    Yes, sir, that is correct.

6    Q.    Okay.  How many stories or how many floors did the

7    dormitory have back in 2001?

8    A.    It had and still does have two floors.

9    Q.    Okay.  And what's done on each floor, if you will?

10   A.    The layout of it is downstairs you walk in and it's

11   kind of a mud room, is what we call it.  You kick your boots

12   off so you don't track through the dorm.  To the left you'll

13   see a laundry room where we have commercial washers and

14   dryers.  You continue to walk down a hall.  There's a

15   toiletries on the left.  On the right you have showers.  You

16   walk on in a little farther you have what we call the sink

17   room where we have sinks and mirrors, a water fountain,

18   lockers.  And also downstairs is also another side room

19   that's connected that's also full of lockers for students.

20          If you go up the stairs to the left it will be just

21   bunks where we just have bunk beds and a fireplace and a big

22   screen TV for movies.

23   Q.    Okay.  So the dorm space is one big common area where

24   there are bunk beds and chairs and a television and such?

25   A.    That's correct.

1    Q.    While you were a student at Mountain Park,

2    Mr. Gerhardt, did you also participate in various tasks that

3    the other male students performed?

4    A.    Yes, sir, if the boys worked mowing lawns, I was right

5    beside them.  I was no different.  Whatever duties, work

6    details, whatever it was, I was one just like them.

7    Q.    Okay.  Having been a graduate at Mountain Park and also

8    having worked there now, can you tell the jury what the

9    mission or purpose of Mountain Park is?

10    A.    First and foremost the mission of Mountain Park is to

11    help young people have a walk with God to provide an

12    atmosphere that nurtures biblical self image, respect for

13    authority.  And our other mission also is provide a college

14    preparatory academic program.

15    Q.    Okay.  And I'll show you page 2 of what's already been

16    marked and offered as Plaintiff's Exhibit 9.  And are those

17    twin missions, are those within Plaintiff's Exhibit 9 the

18    Mountain Park student/parent handbook?

19    A.    Yes, sir, they are.

20    Q.    Okay.  Mr. Blair -- or sorry, pardon me, Mr. Gerhardt,

21    what I'd like to do is go through a typical day at Mountain

22    Park.  If you could walk us through it.  And I'll show you

23    what's been marked as Plaintiff's Exhibit -- or, excuse me,

24    Defendants' Exhibit C.  And pointing to what's described as a

25    Monday, sir, taking a look at that for just a moment, can you

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1   tell us if that accurately reflects what a typical Monday

2   would be like at Mountain Park?

3   A.    Yes, sir, that's an accurate description of it.

4   Q.    Okay.  And what is Defendants' Exhibit C?  Is that for

5   the male students?

6   A.    Yes, sir, it is.

7   Q.    Okay.  Do the young ladies, the women, do they maintain

8   a different schedule than the boys?

9   A.    I don't know exactly their schedule because I deal with

10  just the boys on a daily basis.  I can give you my opinion.

11  I believe, I'm not positive, but I believe it is somewhat

12  different.

13  Q.    Okay.  So would it be fair to say then that boys and

14  girls don't mix at Mountain Park?

15  A.    That is very fair to say.

16  Q.    Now, taking a look at the typical Monday, if you could

17  walk us through it.  Starting with rise and shine and

18  personal hygiene, can you explain for the jury what's meant

19  by personal hygiene?

20  A.    Personal hygiene is the daily care of your body, brush

21  your teeth, comb your hair, washing your face.

22  Q.    Why is that important, Mr. Gerhardt?

23  A.    There's several reasons why it's important.  No. 1 in

24  my mind is that a Christian ought to make sure their body is

25  kept nice and clean because it is the temple of God.  And

1    that, you know, you smell good, you look good, you look

2    sharp.  I think Christian people need to look good and keep

3    their body clean so we can use it for a long time.

4    Q.     And when you say that in your faith that the body is a

5    temple of God, does that kind of relate to this biblical self

6    image that you testified about a few minutes ago that's a

7    mission of Mountain Park?

8    A.     I think that's hand in hand, yes, sir.

9    Q.     Now, bible reading and personal devotions, can you

10   describe that briefly for the jury?

11   A.     Yes, sir, in the morning we all go upstairs and we read

12   the bible from Genesis through Revelation.  And January 1st

13   we begin reading Genesis 1, and we'll read about 15, 20

14   minutes.  And everybody is in the dorm, sat down kind of a

15   semi-circle, and each person reads a versus until we read for

16   the 15 or 20 minutes.

17        After that the student has personal time to

18   themselves.  They can go back to their bunk.  They can then

19   choose to have a personal devotion, reading their bible, just

20   their personal time, not as a dorm.  Or they can take that

21   time and kneel by their bunk and pray, but just kind of quiet

22   time with them and God, not as a whole group.

23   Q.     After that we eat breakfast.  And common area cleaning,

24   can you describe for the jury what common area cleaning is?

25   A.     Yes, sir.  We have a job list that rotates every two

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    weeks.  And on that job list there will be multiple chores.

2    No. 1 may be laundry, and there also may be cleaning, mopping

3    downstairs, cleaning, mopping upstairs.  Dusting, dorm trash,

4    sinks and mirrors, and showers and toilet area.  And each

5    student has their name besides a certain duty.  Or their team

6    is besides a certain duty that must be done that morning.

7    And so during that time the student has to get the right

8    chemicals and the right things and clean the toilets or

9    clean, sweep and mop, just whatever needs to be done that day

10   for that particular team.

11   Q.   Okay.  So the boys, they work in teams when they do the

12   common area cleaning?

13   A.   Yes, sir, they do.  One team will be upstairs, one team

14   will be downstairs, one team will be in the laundry.  So they

15   stay together as a team as they perform these common area

16   cleaning.

17   Q.   Okay.  Now, this team, is team work important to the

18   missions of Mountain Park?

19   A.   I know it's very important to the mission at Mountain

20   Park.

21   Q.   And does it also relate to the positive peer pressure

22   that Mountain Park is trying to instill in its students?

23   A.   Yes, sir, it does.  It does definitely do that.

24   Q.   Okay.  Now, after common area cleaning it looks like we

25   get ready for school and academic training.  Is that the

1   dual, both bible and academic curriculum, integrated

2   curriculum that we've talked about already?

3   A.   Preparation for school means that a student, the

4   student would at that time get their homework together, their

5   PACE, make sure their pencils are sharp and they got the

6   right pens, whatever they need for that school day.  It's

7   just preparation time so they can walk into the learning

8   center ready to go.

9   Q.   Okay.  And for about how long are they in the learning

10  center then?

11  A.   They are in the learning center from nine o'clock.  We

12  have one break up till noon or ten till noon.  We eat at

13  noon.  We're out for an hour lunch break and then we resume

14  classes at one o'clock and go till two o'clock.

15  Q.   Okay.  Now, after two o'clock what happens next?

16  A.   From two to 2:30 the students then were dressed more in

17  preppier clothes, khakis and like a button down T-shirt,

18  dress shirt.  Then we change clothes to blue jeans and

19  T-shirts, put your work boots on to get ready to go to work

20  during that 30 minutes time that we prepare for work details.

21  Q.   Okay.  Now, do you do work detail every afternoon?

22  A.   No, sir, we don't.  I'll tell them, I'll tell the boys

23  beforehand, for instance, if it's a beautiful day and I know

24  the fish are biting this time of year, we'll tell them to go

25  get their fishing clothes on, we'll go fishing.  Or if we

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

```
 1   want to play basketball, I'll tell them to put their

 2   basketball shoes on.  It just depends what the weather is

 3   like.

 4   Q.    Okay.  We're -- back in 2001 were you also involved in

 5   deciding what the activity would be in the afternoon?

 6   A.    Yes, sir, I was very much involved with deciding the

 7   activity of the afternoons.

 8   Q.    Okay.  And that was done under the direction of Pastor

 9   Gerhardt?

10   A.    Yes, sir.

11   Q.    On occasions back in 2001, maybe early 2002 when you

12   were at Mountain Park when the kids were going to go out and

13   play games, say basketball, would you also play along with

14   them?

15   A.    Yes, sir, I would.  We would -- I'd be right there

16   beside them, the best that I could at that time.

17   Q.    Okay.  Why do you say the best that you could at that

18   time?

19   A.    I had just went through a serious knee surgery where

20   they went in and put several bolts through my knee.  So it

21   limited me in some of the activities of running up and down

22   the court.  Limited me in running around bases, those kind of

23   things.  So the best of my -- I would either coach or pitch

24   the softball.  I would do what I could that wouldn't

25   interfere with my knee.
```

1    Q.    Okay.  Now, you talked about some of the work detail.

2    Are these -- are these tasks that are also done in teams by

3    the students?

4    A.    Yes, sir, they are also done in teams by the students.

5    Q.    Okay.  And if you can tell the jury, what are some of

6    those work detail tasks that are done at Mountain Park?

7    A.    A lot of it is seasonal.  In the summertime the grass

8    grows terribly fast.  And so we'll get out and we'll mow if

9    it needs to be mowed.  If the concrete is dirty, we'll sweep

10   it off.  If we have something that -- a tree that's fallen

11   down, we'll pick up the brush around, haul it around, pick up

12   limbs, pick up trash.  We live down a dirt road so we wash

13   vehicles and make sure the vans, the vans, the vehicles on

14   the property, all the vehicles on the property are well

15   maintained and are washed and look good.

16           Those are the -- and we haul firewood.  We have wood

17   burning stoves where we get our heat and hot water.  So in

18   the wintertime that keeps us pretty busy hauling wood to the

19   stoves so we can maintain heat and hot water.  So those are

20   some of the activities we would do in a typical work

21   afternoon.

22   Q.    Okay.  Now, are some areas of Mountain Park's campus

23   actually as far as the lawns and stuff, are they actually

24   maintained by somebody other than the students?

25   A.    Yes, sir, they are.  We have on staff during the summer

1    months, the grass growing months, the gentleman that his job

2    is to drive a John Deere tractor and mow most of the

3    property.  There's just a little bit he leaves for us to do.

4    Q.    Okay.  Now, why don't you have them do the whole

5    property?  I mean, why do you have to have some of the

6    students do some of the property?  Why do you do that?

7    A.    Well, to teach a work ethic, a good work ethic.  I

8    think a lot of teenagers today don't know how to work and the

9    meaning of work.  And it was good for me when I was younger

10   to push a lawn mower and it taught me a lot of things.  So we

11   can use that same pushing a lawn mower or pushing a weed

12   eater to help our young people we have in school with us.

13   Q.    Are most of the students who come to Mountain Park, did

14   they have some sort of troubled past?

15   A.    Yes, sir, most of them do.

16   Q.    Okay.  Does the work detail help in addressing the past

17   of these youths in trying to remedy their -- remedy

18   themselves to be more productive citizens?

19   A.    I think so.  I know so.  You know, religion, you can't

20   make anybody accept it.  And I tell parents that.  You can't

21   make a boy trust Christ as his personal savior.  But you can

22   teach him a good work ethic.  He can step right back out in

23   society, fulfill a job and be a good citizen.  And he can put

24   food on the table for his family.  And I think work ethic and

25   incorporate that to our ministry has definitely helped a lot

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    of young people.  Because a lot of young people, they may not

2    trust Christ.  And if we can teach them how to work, I think

3    we have accomplished something.

4    Q.    So it goes back to the mission of trying to nurture

5    that Christian values and Christian development?

6    A.    Yes, sir.

7    Q.    Okay.  And also looking at the missions, does it also

8    help to develop respectfulness and discipline and leadership?

9    A.    I know it does.  Keeping the property nice, lawns

10   mowed, vehicles washed, I think that's a good -- I think

11   that's a good basis for the Christian service.  A Christian

12   should have those kind of things, so I certainly believe so.

13   Q.    Now, in a typical afternoon for how long do the boys do

14   this work detail if they are working and not doing sports?

15   A.    We'll start at 2:30 and we will typically quit between

16   4:30 and five o'clock.  So you're not looking at any more

17   than two to two and a half hours.  Most of the time we do

18   stop, though, at around 4:30.

19   Q.    Okay.  Sir, that work detail schedule, does that change

20   a little bit on Saturdays and Sundays?

21   A.    Yes, sir.  On Saturdays the students, we get up a

22   little later, get up at seven.  Breakfast at 7:30.  Then we

23   have our common area cleaning and bible reading, those kind

24   of things.  So we actually don't start work until a little

25   later in the morning.  So we may start work at nine, 9:30.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    And we'll stop at about 11:30.  And most of the time on

2    Saturdays I make a point that Saturday afternoon we go

3    fishing or we play ball just about every Saturday.  It's very

4    rare a Saturday in the afternoon that we do work.  It's very

5    rare.

6    Q.    Okay.  Very good.  On Sundays do the boys do this

7    outdoor work detail?

8    A.    No, sir, Sundays we do no work detail.  The only thing

9    we do is common area cleaning.  Cleaning the dorm as our --

10   as an everyday chore, but we do not do any work outside

11   cleaning the dorm.

12   Q.    Is that because it kind of goes against your Christian

13   values and beliefs?

14   A.    Yes, sir.

15   Q.    Mr. Gerhardt, do the boys actually do any of the --

16   students at Mountain Park, do they make any products that

17   Mountain Park sells?

18   A.    No, sir, they do not.

19   Q.    Okay.  Are any horses or cattle or anything maintained

20   on Mountain Park?

21   A.    Brother Gerhardt owns some horses himself, but that's

22   it.  But Mountain Park does not maintain any horses.

23   Q.    And is Mountain Park in the business of buying or

24   selling or raising horses?

25   A.    No, sir, they are not.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1 Q. Is Pastor Gerhardt in that business?

2 A. No, sir, he is not.

3 Q. Will the students do chores into the night ever?

4 A. No, sir, not that I can recall.  We don't work into the

5 night.

6 Q. Okay.  Are chores ever assigned as a corrective

7 measure?

8 A. Yes, sir, they are.

9 Q. Why are chores assigned as a corrective measure?

10 A. Chores are assigned as a corrective measure if a

11 student is not willing to cooperate or not willing to do the

12 things that are required by them.  And during the time all

13 the other boys may be fishing or playing ball, basketball,

14 volleyball, whatever it may be, that student may be needing

15 to stack wood or that student may be needing to sweep

16 concrete.  So that would be the times that a student would be

17 working as a discipline.

18 Q. Okay.  And doing chores as corrective measure, so it's

19 kind of done to get the student to recognize what they've

20 done and that they haven't done something properly or they've

21 acted improperly and it's to correct the behavior?

22 A. Yes, sir, it's one of the last measures.

23 Q. Mr. Blair, do you recall -- my apologies.

24 A. No offense.

25 Q. Mr. Gerhardt, do you recall Jordan Blair being at

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    Mountain Park?

2    A.    I recall him being there, yes, sir, I do.

3    Q.    Okay.  Do you recall when you met him?

4    A.    No, sir, I don't recall when I actually shook his hand

5    for the first time.

6    Q.    Do you typically greet most of the male students who

7    arrive at Mountain Park?

8    A.    Yes, sir.  I'm the one who greets almost every male

9    student at Mountain Park.

10   Q.    And when you do greet new students, do you greet them

11   alone or is there somebody else with you?

12   A.    I don't recall ever greeting a student alone.  There's

13   always someone with me.

14   Q.    So you can't -- strike that.  Do you recall what date

15   that Mr. Blair arrived in Mountain Park?

16   A.    Just through this court session here, but off the top

17   of my head, I would not know.  I hear it's October 24th,

18   2001.

19   Q.    Now, Mr. Gerhardt, you heard Mr. Blair's testimony

20   during this trial that he claims that you slammed him up

21   against a counter sink and a wall.  Now, and he claims that

22   you did that on the first day that he was at Mountain Park.

23   Mr. Gerhardt, did that, in fact, happen?

24   A.    No, sir, that never did happen.

25   Q.    Okay.  Does Mountain Park maintain a no-touch policy

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    for staff?

2    A.    Yes, sir, it does strictly maintain a no-touch policy

3    for staff.

4    Q.    Would you have even been alone with Mr. Blair in the

5    sink area to permit you to do that?

6    A.    No, sir, I would have not been alone with him.

7         MR. BRIGGS:  May I confer just a moment, Judge?

8    Thank you.  That's all I have at this time, Your Honor.

9         THE COURT:  Very well.  We'll have our luncheon

10   recess at this time.  Recall the admonition, ladies and

11   gentlemen of the jury.  Return to your jury rooms at 1:30 and

12   we'll continue at that time.

13        (Court in recess from 12:28 p.m. until 1:43 p.m.)

14        THE COURT:  Good afternoon, ladies and gentlemen of

15   the jury.  Shall we continue.  Cross-examination of

16   Mr. Gerhardt.

17                   CROSS-EXAMINATION

18   BY MR. STILLEY:

19   Q.    Mr. Gerhardt, can you tell us about your time frame of

20   reference with respect to Mountain Park?  And in order to do

21   that can you tell us when you first started in school at

22   Mountain Park?

23   A.    I started high school in June of 1993.

24   Q.    When you started, did you have a substantial idea of

25   the operations of that school?

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    A.     Please restate the question.

2    Q.     Certainly.  Let me rephrase it a little bit.  How

3    long -- let me strike that question and ask another.  How

4    long did it take before you obtained some position of

5    authority at Mountain Park?

6    A.     A long time.  When I was a student and I lived in the

7    boys' dorm, I would have been no different than a new

8    student, you know, who was just enrolled.  I had an

9    orientation period where I was strictly watched.  There was

10   also a period where I was by myself.  And after that length

11   of time there was a period where I became an orientation

12   guide myself.  So I started from the very bottom and through

13   just the impression of the ministry, the Lord, I was just

14   able to move right up, so to speak, the ladder.

15   Q.     Okay.  Would it be fair then to say that you were

16   familiar with the operations of Mountain Park since at least

17   about 1994?

18   A.     Familiar with the operations, yes, I was familiar with

19   the operation.

20   Q.     Has that operation been roughly the same from 1994 to

21   2004?

22   A.     Yes, it has.

23   Q.     Okay.  When did you first get a paid position?

24   A.     I don't recall the date when I became a paid position.

25   Q.     Do you recall the year?

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    A.    I can't even honestly recall the year when I became one

2    for a paid position.

3    Q.    It that before you got out of high school?

4    A.    Yes, it was.  I was -- through the Lord's grace I was

5    able to get to junior staff position, which means I was still

6    a student, still in high school, but was in a position that I

7    had a small paycheck every month.

8    Q.    Okay.  And do you know how long that you had that

9    paycheck while you were in school?

10   A.    Probably, I'm going to roughly guess about maybe two

11   years.

12   Q.    Did any other students in the school who were actually

13   enrolled in the school get paid jobs?

14   A.    At that time I remember at least two other junior staff

15   that were males at that time that were also junior staff

16   position.

17   Q.    Okay.  Do you have any personal knowledge of the

18   criteria that was used to select persons or that is used to

19   select persons for paid positions?

20   A.    That question would have to be directed to Brother

21   Wills or Brother Gerhardt.  They have their own criteria.  I

22   don't know what it is.

23   Q.    Okay.  So you don't have personal knowledge, correct?

24   A.    No, sir.  They have their own criteria that they

25   choose.

1  Q.    Now, some of the students are taught things like

2  welding; is that correct?

3  A.    Yes, sir.

4  Q.    That's not a certified program, is it?

5  A.    I don't know.

6  Q.    And you don't have any certified instructors on that

7  program, do you?

8  A.    I don't know that either.

9  Q.    Who would have that knowledge?

10  A.    I don't know who would have that knowledge.

11  Q.    Nobody gets any credit for the learning of things such

12  as welding, do they?

13  A.    I do not know.

14  Q.    Did you ever learn anything other than a strictly

15  academic subject while you were in high school in Mountain

16  Park?

17  A.    Certainly.

18  Q.    And what did you learn?

19  A.    Practical things of life that I learned while a student

20  at Mountain Park, daily practical shoe leather things.

21  Q.    Did you get any credit for having learned those things?

22  A.    No, I did not get credit for learning those things.

23  Q.    Isn't it true that there are any subjects at Mountain

24  Park for which students get credit except academic?

25  A.    Please restate the question.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    Q.    Isn't it true there is no subject at Mountain Park that

2    students get credit except academic subjects such as math and

3    English?

4    A.    That is not true.

5    Q.    What are subjects that are not academic subjects but

6    they are such that the student gets credit for that subject?

7    A.    We have bible study credit.  For instance, you get an

8    elective credit for attending bible studies and churches.  So

9    we do give a bible study, bible elective credit.  You also

10   get credit for PE.  We get credit, the PE, even though we may

11   not play basketball every day for an hour, but combined with

12   the work and the PE that we do in the afternoons, it is

13   granted an academic or PE credit.

14   Q.    But you're not telling this jury that hauling wood is

15   PE, are you?

16   A.    I'm saying that we get credit for the things that we do

17   in the afternoons.  That would be physical things.

18   Q.    But you're not telling this jury that wood hauling is

19   physical education, are you?

20          MR. BRIGGS:  Objection, asked and answered.

21          MR. STILLEY:  Your Honor, it's not been answered.

22          THE COURT:  You may answer.

23   A.    I will answer it the same way I just previously

24   answered the question.  We get credit for or we give credit

25   for the activities that we do in the afternoons, whether it

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

be playing ball, whatever physical activities it may be.
Q. That's not formal -- there's no formal program of that, is there?
A. I guess I don't understand your question.
Q. There's no formal program whereby the person gets credit for having hauled wood or fixed fences or other things of that nature, correct?
A. I still don't understand your question. I'm just ignorant to the phrasing. I don't understand.
Q. Now, when you graduated, you got transcripts, correct?
A. I did.
Q. And on that transcript it says things like math and English, correct?
A. Yes, it does.
Q. And you got credit for that, correct?
A. Yes, I did.
Q. There's nothing on your transcript or anybody else's transcript that says welding or plumbing or anything of that nature, correct?
A. On my transcript it does not. I cannot speak for anybody else's transcript.
Q. You have no personal knowledge of that?
A. I can only speak for my transcript. Not on my transcript. I cannot speak for anybody else's transcript.
Q. You've been on paid staff for about eight years or at

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

```
 1    least eight years, correct?

 2    A.    I got on -- I was on paid staff as a junior staff

 3    worker before I went to college.  After I graduated from

 4    college with my degree in education, I came back and was on

 5    married staff, and now have been on married staff for almost

 6    four years.

 7    Q.    So you've got a lot of experience at this school,

 8    correct?

 9    A.    Yes, sir.

10    Q.    If there was a formal program of welding education or

11    plumbing education or some other such program, you would have

12    knowledge of it, wouldn't you?

13    A.    I guess I don't know the criteria of having a formal

14    program.  I don't know the criteria for having a formal

15    program of it.

16    Q.    You don't know the difference between a formal program

17    and just something that you do in afternoons?

18    A.    I guess I do not.

19    Q.    Okay.  Well, you do know what shows up on transcripts,

20    don't you?

21    A.    I know what's on my transcript, yes, I do.

22    Q.    Well, you have access to other students' transcripts,

23    don't you?

24    A.    I guess I don't typically look at other students'

25    transcripts.
```

1    Q.    That's not the question.

2    A.    I guess I suppose if I wanted to get access, yes, I

3    could.

4    Q.    You routinely get access to transcripts, don't you?

5    A.    Not routinely, no.

6    Q.    Whenever you want to, do you not?

7    A.    Like I already answered, if I wanted it, I could.

8    Q.    Have you ever seen a transcript from Mountain Park that

9    said anything about welding or plumbing or other courses such

10   as welding or plumbing?

11   A.    No, sir, I have not seen that on any transcript.

12   Q.    And you've looked at lots of transcripts, have you not?

13   A.    A lot, that's pretty subjective.  That's very relative.

14   A lot for some may be five.  A lot for some may be 100.

15   Q.    Can you tell the jury about how many of these

16   transcripts you've seen?

17   A.    I haven't seen a whole lot of transcripts.  I would say

18   maybe a dozen.

19   Q.    Did you -- now, you told us you had learned some

20   general things while you were in high school; is that

21   correct?

22   A.    Yes, that is correct.

23   Q.    Did you actually -- whether or not you got credit for

24   it, did you learn anything about welding while you were in

25   high school?

1    A.    Yes, I did.

2    Q.    Did you learn anything about plumbing while you were in

3    high school?

4    A.    No, sir, I don't know much about plumbing.

5    Q.    But that education was not gained through any formal

6    course of instruction, correct?

7    A.    The things that I learned such as welding was taught by

8    someone I know had background and training in welding, and he

9    did teach it in a very formal way with teaching us how to get

10   started, how to mix the acetylene with the oxygen.  It was

11   very formal.  It wasn't just a fly-by-night thing.  We had to

12   wear our goggles and our gloves and he went through the

13   procedures of how to do things.  So in a way, yes, it was

14   formal in his instructions to teaching us how to do it.

15   Q.    What's this gentleman's name?

16   A.    His name was Matthew McFadden.

17   Q.    Matthew McFadden, he's not a certified instructor for

18   welding, is he?

19   A.    You'd have to ask Matthew McFadden.  I do not know his

20   educational background.

21   Q.    Mountain Park has no formal program or certified

22   program for welding, correct?

23   A.    Again, like I said, I don't know.

24   Q.    What about Palm Lane, do you have personal knowledge

25   about the operations of Palm Lane?

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    A.    Personal knowledge, to a very slight degree.

2    Q.    Well, how many times have you been there?

3    A.    I don't know how many times I've been on the property.

4    Q.    Can you come close?

5    A.    I'd say once again maybe 20 times.

6    Q.    Have you helped to haul students there?

7    A.    No, I have not.

8    Q.    Have you ever rode to Palm Lane with a load of

9    students?

10   A.    No, sir, I have not.

11   Q.    Have you ever rode to Palm Lane with as many as one

12   student?

13   A.    No, sir, I have not.

14   Q.    Have you ever come from Palm Lane back to Mountain Park

15   with any students, one or more students?

16   A.    Yes, sir, I have.

17   Q.    And how often has that happened?

18   A.    It has happened one time.

19   Q.    You told us that you had been down there about 20

20   times.  About how long do you spend each time?

21   A.    Most of the time when I go to Palm Lane, I've been down

22   visiting my grandparents, Brother and Mrs. Wills on a

23   vacation.  And we'll drive back and forth for church.  And

24   that's about the extent of the times I've been there, back

25   and forth to church.

1    Q.    Now, but when you go for a trip, how many days do you

2    typically stay?

3    A.    Stay on my vacation?

4    Q.    Right.

5    A.    I guess it depends how much time I have allotted.  I've

6    stayed for as many as three days, and I've stayed as many as

7    ten days.

8    Q.    Is ten days the most that you've spent at Palm Lane?

9          MR. BRIGGS:  Your Honor, I'm going to object at this

10   point.  This is totally outside the scope of direct under

11   Rule 613(b).  Moreover, Your Honor, I don't think where he is

12   leading has any relevance to the two remaining claims in this

13   lawsuit.

14         MR. STILLEY:  Your Honor, I'm just trying to

15   establish a basis of the knowledge about the operation of

16   Palm Lane, whether he has any knowledge or not.

17         THE COURT:  Why don't you ask him about that and

18   stop asking him about his vacation.  Sustained.

19   BY MR. STILLEY:

20   Q.    Do you have any personal knowledge about the operations

21   of Palm Lane Academy?

22   A.    I'll answer the question like I previously answered.  I

23   have slight information about Palm Lane Academy.

24   Q.    Have you ever worked on campus there?

25   A.    No, I have not ever worked on the campus of Palm Lane.

```
 1    Q.    Okay.  You told us where your degree was from.  Can you

 2    tell us again?

 3    A.    I didn't understand the question.

 4    Q.    Where is your degree from?

 5    A.    My degree is from Crown Bible College in Powell,

 6    Tennessee, right outside Knoxville, Tennessee.

 7    Q.    What was your major?

 8    A.    My major is secondary education, the field of physics.

 9    Q.    How long did you spend at Crown Bible College to get

10    your degree?

11    A.    I was able to by God's grace get a four-year degree in

12    three years.

13    Q.    And did you spend that time at Crown College?

14    A.    Yes, sir, I spent the entire time at Crown College.  I

15    took winter interims and summer interims.  I was only home at

16    Mountain Park for a short period of time for Christmas and

17    short period of time in the summers.  I have a minor in bible

18    also from Crown College.

19    Q.    Now, I believe you testified on direct that you have

20    three different things that you're trying to instill in these

21    students:  No. 1, biblical self image; No. 2, team work; and

22    No. 3, Christian values.  Is that correct?

23    A.    Yes, sir, those are three things we definitely try to

24    instill in our students.

25    Q.    Are you trying to provide these students with life
```

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1  skills so they'll be able to successfully integrate into

2  society?

3  A.    Yes, sir, we are.

4  Q.    Are these students given any training on how to handle

5  money?

6  A.    Yes, sir, they are.

7  Q.    Are they allowed to have any money in their possession?

8        MR. BRIGGS:  Objection, Your Honor, we went through

9  this yesterday.

10        MR. STILLEY:  I'm asking about --

11        THE COURT:  Hold on.

12        MR. STILLEY:  I'm asking about the nature of the

13  training program that they have.  It's in response to the

14  testimony on direct.

15        THE COURT:  What testimony on direct about money?

16        MR. STILLEY:  About what kind of things that they

17  are trying to instill in these students.  They are saying

18  they are trying to teach life skills.

19        THE COURT:  I'm sustaining that.

20  BY MR. STILLEY:

21  Q.    And I believe you also testified that Mountain Park is

22  a college preparatory school?

23  A.    We strive to provide a college preparatory diploma.

24  That is what we like to see our students once they graduate,

25  that's what we like to see them reach that goal in high

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    school education.  We certainly have diplomas that provide or

2    they can obtain if they do the work college preparatory as

3    well as honors diplomas.

4    Q.    Do you keep statistics on how many students graduate

5    from Mountain Park and go on to college?

6    A.    If there are, I don't have personal knowledge of it.

7    Q.    Now, we saw a schedule.  I'll get that back out here.

8    Now, you talked about the Mountain Park Baptist Boarding

9    Academy schedule, correct?

10   A.    Yes, sir, I did.

11   Q.    But you don't have any personal knowledge about the

12   Palm Lane -- the schedule at Palm Lane Academy, correct?

13   A.    That is correct.

14   Q.    When is the first time that you saw a document of this

15   nature, saw a schedule such as this sample daily schedule?

16   A.    Oh, I can't give a date.

17   Q.    Do you know when this document was created?

18   A.    We've had it for a long time.  I don't remember the

19   exact date that it was put in pen and paper.

20   Q.    Did you play a part in the creation of this schedule?

21   A.    No, sir, Brother Gerhardt -- I don't know who did it.

22   I would assume Brother Gerhardt probably created the

23   schedule.

24   Q.    Okay.  And when did you first see it?

25   A.    I've already stated I don't remember the first time I

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    laid eyes upon this particular schedule.

2    Q.    Has it been less than a year?

3    A.    This particular schedule probably has been less than a

4    year.  We used to wake up at six o'clock and not 5:30.

5    Q.    Less than six months?

6    A.    No, sir, not less than six months.

7    Q.    Now, the first thing here, let's look at the Monday

8    schedule.  The first thing appears to indicate that a student

9    would be allowed 45 minutes for personal hygiene.  Is that

10   true?

11   A.    Yes, sir, that's very true.

12   Q.    And what are they allowed to do during this period of

13   time?

14   A.    I stated on direct that, and I'll restate once again

15   for the jury, this time is for a young man to brush his

16   teeth, shave his face, iron his clothes, do what every

17   individual in this room had to do this morning before they

18   got in their vehicle.  The typical morning chores that just

19   about every person does in the morning time.

20   Q.    Is it your testimony that the student is allowed to

21   allocate this time as the student sees fit?

22         MR. BRIGGS:  Objection, Your Honor, I'm going to

23   object to the relevance grounds.

24         THE COURT:  Sustained.  Counsel, come up.

25         (The following proceedings were held at the bench

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

```
 1    and outside the hearing of the jury:)

 2           THE COURT:  One has to look at this procedure as a

 3    play.

 4           MR. STILLEY:  Certainly.

 5           THE COURT:  And like plays and poems, there are

 6    themes.

 7           MR. STILLEY:  Right.

 8           THE COURT:  You don't seem to have one when you're

 9    dealing with someone, and you start asking them questions and

10    you just go down some road, and if something pops up, that's

11    all good.  You must have a theme.  I mean, please.  We must

12    finish this within our lifetimes.  You know, and when they

13    start asking about did they have discretion about when to

14    brush their teeth.  I mean, come on.  Only thing you could

15    even show with that even if you could, what does that have to

16    do with employment or battery?  Nothing.  You best get a

17    theme going with what you're doing.  You have to have a theme

18    in mind as a producer of a play.  See, you're trying to

19    produce a play and show it to them.  And you got no theme, so

20    you got no play.

21           Where are you going with this?  What about the teeth

22    brushing?  So think about that.  We're talking about it in

23    this little situation here about the personal hygiene time.

24    But you need to think about it overall in terms of what

25    you're doing so we can finish this rather than you just
```

1    asking something.

2         MR. STILLEY:  Basically what they are testifying

3    through this document, they are testifying that a student has

4    45 minutes to go to the bathroom, to shower, to shave, brush

5    their teeth, all the things that they need to do.  I just

6    want him to say that the students have this opportunity to

7    use this time as they need and see fit to use it.

8         THE COURT:  Please.  No, no, no.  We're not going

9    there, please.  We're not going there.  You're wasting my

10   time.

11        MR. STILLEY:  I would be done if I just got that one

12   answer.

13        THE COURT:  I'm not worrying about you being done

14   with this little answer.  I'm worrying about you being done

15   with the whole case, because you all told me three days.  You

16   see what I'm saying.  And I told this jury.  You're worried

17   about something little.  I'm worried about the big picture.

18   You're worried about pennies, I'm worried about dollars.  You

19   got it?

20        MR. STILLEY:  Well --

21        THE COURT:  Well, then get with it.  Bye.

22        (The following proceedings continued within the

23   hearing of the jury:)

24   BY MR. STILLEY:

25   Q.   Now, you told about times that the kids would get to go

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Case: 1:02-cv-00088-CAS  Doc. #: 180  Filed: 07/09/04  Page: 113 of 227 PageID #: 1235

1  fish; is that correct?

2  A.    Yes, sir.  I'm the fish addict, and when bass start

3  striking, it just -- we go out and catch fish.

4  Q.    And how often do the students get to do this?

5  A.    About twice a week.

6  Q.    Twice a week.  And what's the season for that?

7  A.    Right now we're catching them quite a bit.  Every time

8  we go out, we catch about 15 or 20.

9  Q.    Would that be about February to November?

10  A.    You know, Missouri weather changes from day to day, so

11  whenever we have a beautiful sunny day and the wind is not

12  blowing, we get out and try to catch some fish.

13  Q.    How many fishing poles does Mountain Park have for the

14  students?

15  A.    Boy, most the times students provide their own fishing

16  poles.  But I think we have at least 40 fishing poles, rods

17  and reels.  Mountain Park, myself with my own personal money

18  has went out and bought lures and things for the boys so they

19  can use to have things to fish with.  They have a good time

20  going and digging up worms.  That's one of their favorite

21  things to do in the afternoon before it rains.  It seems like

22  the worms just know when they come, and the boys just love

23  digging them up.  So we have a lot of fishing poles, a lot of

24  lures, a lot of worms.

25  Q.    Let's move on to sports.  About how often do the

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    students get to participate in sports?

2    A.    Once a week.  If we're not fishing, we're playing

3    sports.  If it's an activity day that we're going to play day

4    so to speak, if we don't fish, we'll go and play basketball,

5    softball.  And we built a nice sand volleyball pit, and we

6    play sand volleyball.

7    Q.    So a couple times a week?

8    A.    Yes, a couple times a week.

9    Q.    An hour or two each time?

10   A.    Well, it would be the same as if you look on the

11   schedule, you see from 2:30 it's very well and very plain.

12   And we've seen it the whole time, from 2:30 till five o'clock

13   it says work or sports.  And if we're not working, we take

14   from 2:30 to five o'clock to play the sports.

15   Q.    Now, isn't it true that the students are not allowed to

16   keep journals?

17   A.    No, sir, that is not true.

18   Q.    Students are allowed to keep journals?

19   A.    Yes, sir, they do have journals.

20   Q.    Are they allowed to keep a journal at the time they

21   spent at various activities?

22   A.    I guess I don't understand exactly your question.

23   Q.    Well, if a student wishes to keep a log that records

24   how much time they spend at work activities as opposed to,

25   say, sports or fishing, are they allowed to do that and keep

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    that record?

2    A.    I suppose that question would need to be directed to

3    Brother Gerhardt.  He would be the one that would ultimately

4    decide.

5    Q.    You have personal knowledge of the answer to that, do

6    you not?

7    A.    Personal knowledge of the answer?  I gave you my

8    answer.  I don't understand.

9    Q.    Isn't it true that you yourself had punished students

10   for keeping a journal?

11            MR. BRIGGS:  Objection, Your Honor, this is outside

12   the scope of direct.  It's also collateral source.

13            MR. STILLEY:  Your Honor, they are the ones that are

14   complaining about lack of sufficient record of time spent on

15   work.

16            THE COURT:  Don't overdo it.

17            MR. STILLEY:  Certainly, Judge.

18            THE COURT:  I understand.  Overruled.  You may

19   answer.

20   A.    Would you please restate the question one more time for

21   me?

22   Q.    Isn't it true you yourself have disciplined students

23   for having kept a journal or a log of things and activities

24   they have been involved in?

25   A.    No, sir, that is not correct.  Absolutely not correct.

1  Q.    And you're positive of that, correct?

2  A.    I am absolutely positive that is not true.

3  Q.    Now, when it's time to do work, do you teach efficiency

4  at work?

5  A.    Certainly.  I think efficiency is very important.  If

6  it's worth doing, it's worth doing right is our opinion.

7  There's no point in having to rewash a vehicle because you

8  didn't wash it right the first time.  And so efficiency,

9  110 percent, boy, that's very important in doing a job.

10  Q.    So when you have the students haul wood, you have those

11  students haul it in the most efficient manner that is

12  reasonably possible, correct?

13          MR. BRIGGS:  Your Honor, I'm going to object at this

14  point.  This is outside the scope of direct.

15          THE COURT:  Sustained.

16  BY MR. STILLEY:

17  Q.    You also said that some people were given work for

18  corrective reasons, correct?

19  A.    Yes, sir, that is correct.

20  Q.    And what kind of reason might be -- strike that.  What

21  might cause a student to be assigned corrective work?

22  A.    That is something that's -- if you'll allow me to say

23  very difficult to answer, for the fact that it's not

24  something you do one thing the first time and you

25  automatically get put on maybe a work detail.  It may become

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    after warning after warning after warning after previous

2    corrections may have been made, and it's one of the last

3    things.  So I can't say you do this, this is what happens.

4    Q.    Okay.  How long can the corrective work assignment be?

5    A.    Very subjective question.  I mean, it's depending on

6    the individual.

7    Q.    Can it be a month?

8    A.    Again, it's very subjective.

9    Q.    Six months?

10   A.    Once again, it can be very subjective.

11   Q.    So it's possible that some of these students that are

12   put on work for corrective purposes for a whole six months?

13   A.    No, sir, I would say that's not possible.

14   Q.    Are you sure that's not possible?

15   A.    Yes, sir, I'm very positive that's not possible.

16   Q.    Now, did I understand you correctly when you were

17   testifying on direct to say that you simply present the

18   gospel to the students and let them decide to accept or

19   reject it?

20   A.    You can't make anybody trust Christ.

21        MR. BRIGGS:  Your Honor.

22        THE COURT:  He may answer that.  He's answered it.

23   A.    You can't make -- it's not like a flip top, you just

24   flip the head open and pour it in.  It's a personal decision.

25   You can't force anybody to trust the Lord as their personal

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    savior.  It's impossible.  It's completely impossible.

2    Q.    Do you ever take away King James version bibles because

3    the Mountain Park disagrees with the content of that bible?

4          MR. BRIGGS:  Objection, Your Honor, this is outside

5    the scope of direct.

6          THE COURT:  Sustained.

7          MR. STILLEY:  Your Honor, may we approach?  I've got

8    another question.  Okay.

9    BY MR. STILLEY:

10   Q.    From time to time you have students who are not of the

11   Christian faith, correct?

12   A.    Yes, sir, that is very correct.

13   Q.    Are they compelled to participate in Christian

14   religious activities?

15         MR. BRIGGS:  Objection, Your Honor, it's 404(b)

16   objection.

17         THE COURT:  Sustained.

18   Q.    I noticed in the handbook, did I not, on your direct

19   examination that there is a clause in the handbook that

20   Mountain Park has a policy of racial nondiscrimination; is

21   that correct?

22   A.    I don't know if you notice that or not.

23   Q.    Do you recall if that document -- do you know if that

24   policy is in Mountain Park's handbook?

25   A.    Non -- I'm sorry, restate it for me, please.

1    Q.    Racial nondiscrimination.

2    A.    Yes, sir, that is correct, that is our policy.

3    Q.    Okay.  Do you know what that policy calls for?

4          MR. BRIGGS:  Objection, Your Honor, relevance.

5          THE COURT:  Sustained.

6          MR. STILLEY:  Your Honor, can I approach on this?

7          THE COURT:  You need to ask yourself.  You know,

8    it's like I'm getting tired, tired, tired, tired.  Does it

9    have anything to do with battery?  Does it have anything to

10   do with the Fair Labor Standards Act in terms of employer/

11   employee?  And now we've sort of gone into curriculum as to

12   whether or not something is work or curriculum, okay.  So

13   that's it.  When you start asking all these questions about

14   religion, race, please, you step across the line.  I've

15   talked to you enough about it.  I'm getting tired, real

16   tired.

17   BY MR. STILLEY:

18   Q.    Now, you talked about trying to instill in these

19   students cleanliness; is that correct?

20   A.    Yes, sir, very important is cleanliness.

21   Q.    And you say that is because the human body is the

22   temple of God?

23   A.    Yes, it is.

24   Q.    Does Mountain Park or its employees ever force students

25   to eat foul food?

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1          MR. BRIGGS:  Objection, Your Honor, Rule 16 --

2     613(b).

3          THE COURT:  Sustained.  Are you finished?  I'm going

4     to cut your examination off.

5          MR. STILLEY:  Judge, I'm --

6          THE COURT:  You will learn the easy way and a hard

7     way, you know.  I keep telling you does that have anything to

8     do with this battery situation that's claimed, the pushing or

9     shoving?  Does it have anything to do with this education or

10    are you trying to do something for sympathy or prejudice?

11    See.  Sooner or later when you keep crying wolf, please.  You

12    know, as they say, if you got something, come on with it.

13    BY MR. STILLEY:

14    Q.    Didn't you testify on direct examination that you did

15    not slam the plaintiff into any counter?

16    A.    Yes, sir, I never slammed the plaintiff against a

17    counter.

18    Q.    And didn't you also testify that you don't slam any of

19    the students against counters or against other solid objects?

20    A.    Yes, sir, that is correct.

21    Q.    And you don't push them into other hard objects, do

22    you?

23    A.    No, sir, I do not.

24    Q.    And you've never seen your father do that, have you?

25         MR. OLIVER:  Oh, come on, Judge.

 1          MR. BRIGGS:  Your Honor.

 2          THE COURT:  Sustained.

 3          MR. OLIVER:  I apologize, Your Honor, but that

 4    pushed me beyond.  I object.  This is just --

 5          THE COURT:  I understand.  Are you finished with

 6    this witness?

 7          MR. STILLEY:  No, Judge.  I'm almost finished.

 8          THE COURT:  You better come on with some questions

 9    because I'm going to cut you off.  You keep stepping outside

10    the line.  Sooner or later there is a penalty, you know.

11    They keep blowing the whistle and once you get so many fouls,

12    they just take you out of the game.  You see what I'm saying?

13    I'm tired of telling you.

14          MR. STILLEY:  Judge, I'm just simply trying to

15    cross-examine on the matters that were testified on direct.

16          THE COURT:  Matters that you're interested in.

17          MR. STILLEY:  Well, if they don't want things

18    testified --

19          THE COURT:  I'm telling you what we're here for, and

20    I'm tired of telling you what we're here for.

21    BY MR. STILLEY:

22    Q.    Mr. Gerhardt, have you ever forced any of the students

23    to work late into the night?

24    A.    No, sir, I've never forced anyone to work late into the

25    night.

1    Q.    Have you ever forced any student to work when the

2    student said they were too tired and could no longer work?

3    A.    I probably have encouraged someone to -- who did not

4    want to work to keep on working, yes, I probably have.

5    Q.    Did that include touching or pushing that student?

6    A.    Probably helping them off -- helping them get up the

7    hill with a wheelbarrow, helping them carry a log by getting

8    in front of them, and helping them hold it up with their

9    hands.  I probably, yes, have touched a student before in

10   assisting them to get the job done.

11   Q.    Okay.  In pushing -- in those touchings, have you ever

12   caused that student to have a serious injury?

13   A.    No, sir, I never have.

14   Q.    Have you ever seen that happen?

15   A.    No, sir, I never have seen that happen.

16   Q.    When you first started working for Mountain Park, did

17   you keep time records?

18   A.    No, sir, I have never kept a time record.

19   Q.    Do you know anybody at Mountain Park who has ever kept

20   a time record?

21   A.    As it was stated previous in the courtroom, the only

22   ones who have time records are the driving staff.  There's a

23   clock.  As soon as you walk in the door, they clock in and

24   they clock out.  Those are the only ones that have time

25   records.

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1    Q.    And what kind of staff is that?  Oh, the driving staff?

2    A.    Yes, sir.

3    Q.    That means people who drive in, who live nearby but

4    drive in to Mountain Park?

5    A.    Yes, sir, that is correct.

6    Q.    Have you ever taken someone off of a work detail

7    because there were insufficient orientation guides to watch

8    over that person?

9    A.    I don't understand your hypothetical situation.  I

10   don't understand.

11   Q.    Say you got a student who is working.  Say they are

12   hauling wood.  And have you ever taken a student off of a

13   wood hauling job and put them somewhere else because you

14   didn't have enough orientation guides to oversee this person

15   hauling the wood?

16          MR. BRIGGS:  Your Honor, may we approach for a

17   moment?

18          THE COURT:  Yeah, come on.

19          (The following proceedings were held at the bench

20   and outside the hearing of the jury:)

21          THE COURT:  Go ahead.

22          MR. BRIGGS:  Your Honor, at this point I want to

23   interpose an objection.  This is inappropriate.  It was not

24   asked on direct.  The fact that he's trying to inquire

25   whether randomly at some point in time he may have taken a

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

```
 1    student off work detail because somebody wasn't in a position

 2    to watch him doesn't relate to Mr. Blair's claim of a Fair

 3    Labor Standards Act violation.

 4            THE COURT:  I agree.  You have not seemed to have

 5    gotten my message.  I think I'm going to have to take some

 6    severe measures.  You keep asking questions beyond the scope.

 7    You keep asking questions about things that are just too far

 8    prejudiced or sympathy or, you know, did you -- did his

 9    father ever push somebody.  I mean, please, you know.  Did

10    they ever take the King James version of the bible because

11    they disagreed.

12            I'll tell you what you do, maybe this evening you're

13    going to have to submit your questions to someone.  I told

14    you yesterday about the pitching rotation.  But I'm ending

15    your examination right now because you cannot abide by this

16    court's ruling.  I'm ending your examination of this witness.

17    You understand.  And if you have any more questions of this

18    witness, you submit them in writing to me and I'll approve of

19    them first.  Because you didn't get the idea when I told you

20    about the pitching rotation.  And you keep violating my

21    rulings about what the issues are in this case.  You don't

22    seem to get the message.

23            MR. STILLEY:  Can I make a record about the reason

24    that I wanted to present this testimony?

25            THE COURT:  No.  We are not making any further
```

1    record.  I have talked to you about this.  I'm tired of you

2    coming up here.  You sit down and we'll go -- do you have any

3    redirect of this witness?

4           MR. BRIGGS:  No, Your Honor.

5           THE COURT:  Fine.  You sit down.  If you have any

6    more questions of this witness, you write them down and I'll

7    approve them first.  Call your next witness.

8           MR. STILLEY:  I believe the Eighth Circuit says that

9    you're entitled to make a record of the reasons.  I'd like to

10   make a record of reasons.

11          THE COURT:  I'll tell you what, as far as I'm

12   concerned there is no good reason about asking about his

13   father pushing somebody.  There is no good reason about

14   taking the King James version bible because they disagree

15   with it.  So forget it.  Forget it.  I don't need a reason.

16          MR. STILLEY:  Can I make a record?

17          THE COURT:  No, not on that.  No.

18          (The following proceedings continued within the

19   hearing of the jury:)

20          THE COURT:  Nothing further of this witness?

21          MR. BRIGGS:  We have nothing further, Your Honor.

22          THE COURT:  Very well.  Mr. Gerhardt, you may be

23   seated.  Call your next witness.

24          MR. BRIGGS:  Your Honor, we'll call Robert O'Brient

25   to the stand.

1                        ROBERT O'BRIENT,

2    Having been first duly sworn, was examined and testified as

3    follows:

4                        DIRECT EXAMINATION

5    BY MR. OLIVER:

6    Q.    Would you please state your name to the ladies and

7    gentlemen of the jury.

8    A.    My name is Robert Joe O'Brient.

9    Q.    And what's your professor or occupation, sir?

10   A.    I'm associate pastor at Palm Lane Baptist Church.

11   Q.    And how long have you had that job?

12   A.    Two years.

13   Q.    Before that what did you do, Mr. O'Brient?

14   A.    I was the principal of the Academy at Mountain Park

15   Baptist Boarding Academy.

16   Q.    Now, what is the principal, what does the principal do?

17   A.    Mainly what I did is I supervised the various learning

18   centers.  At that time I believe we had five different

19   learning centers.  And kept up with school records.

20   Q.    I'm not going to spend much time on this, but what is a

21   learning center?  That's been mentioned a couple of times.

22   It's in effect where students do their work?

23   A.    It's actually a room where the students do their work.

24   We call it a learning center instead of a classroom.

25   Q.    You were in charge of that?

1    A.    Yes, sir.

2    Q.    At Mountain Park?

3    A.    Yes, sir.

4    Q.    When did you go to Palm Lane?

5    A.    We went to Palm Lane, my wife and I, we went to Palm

6    Lane in January 2002.

7    Q.    Now, at Mountain Park as a part of your job did you

8    supervise the academic education of the students?

9    A.    Yes, sir.

10   Q.    And what types of education did Mountain Park make

11   available to the students?

12   A.    As far as subjects, just the basic math, English,

13   social studies, science, bible electives, things of that

14   nature.

15   Q.    And what kind of -- let me show you from Plaintiff's

16   Exhibit 9.   What kinds of diplomas were available?

17   A.    There were actually four levels of diploma that we

18   offered; vocational preparatory, general diploma, the college

19   prep, and the honors diploma.

20   Q.    And then what's Category B?

21   A.    Vocational prep.   This is where students who -- a

22   student has to work up at least until the ninth grade level

23   in each of the subjects and accumulate the required state

24   requirements for credit in order to graduate from high

25   school.

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1    Q.    And did you teach outside the classroom?

2    A.    Yes, sir.

3    Q.    And did you teach life skills outside the classroom?

4    A.    Yes, sir.

5    Q.    Well, how does that happen?  How did that happen at

6    Mountain Park?

7    A.    As far as life skills, in teaching the students as

8    we've talked about before in cleaning up their area, keeping

9    themselves neat and clean, and then also in their work in the

10   afternoons when they would go out, we would do everything we

11   could to teach them just a good solid work ethic.

12   Q.    Why do you do that?

13   A.    Because that's something that they can carry with them

14   the rest of their lives.  If, you know, thank the Lord for

15   our good country, and if you work hard you can at least eat,

16   support your family.  And if you're working most of the time,

17   you're staying out of trouble.

18   Q.    And now when these children come to you, are these

19   skills that you teach out of the classroom skills that these

20   young, troubled young people have?

21   A.    Very rarely.  Now, I have seen some students come in

22   who have, you know, they may not have known a particular

23   thing that we were trying to do, but they had learned to

24   work.  But that's very rare.  Most of the time -- I'm not

25   saying that anyone's never tried, but they just not picked up

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    on the good solid work habits.

2    Q.    Now, you went to from Mountain Park to Palm Lane,

3    correct?

4    A.    Yes, sir.

5    Q.    What was the mission of Palm Lane?

6    A.    The mission at Palm Lane is, first of all, to see that

7    a student come -- to do everything we can to encourage a

8    student to come to a right relationship with God through

9    Christ.  And then our secondary goal is to provide a good

10   academic education for the students.

11   Q.    And in the carrying out of that mission, just tell the

12   ladies and gentlemen of the jury how you accomplish those

13   missions.

14   A.    Well, when the students first come in they are placed

15   with an orientation guide which is a student who has shown a

16   desire to help someone as they've been helped.  Normally

17   someone who has been there at least six months and would be

18   able to help the students.  So that when they first come in

19   they have someone who has, you know, recently gone through

20   some similar -- some similar circumstances, you know, coming

21   in to a new place, definitely someone who feels for them or,

22   you know, would know what they are feeling to help them get

23   acclimated to what's going on.

24         And then also to, you know, when they first come in

25   as far as educational, that we give the student a diagnostic

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

```
 1    test which determines their performance levels of curriculum
 2    or perhaps any remedial work that they may have to do.  It
 3    identifies that.
 4    Q.    So you start off with an orientation guide to show by
 5    example; is that right?
 6    A.    Yes.
 7    Q.    And do you work as groups?  Other than in the classroom
 8    do you work as groups, teams?
 9    A.    Yes, sir, we do.
10    Q.    And why do you do that?
11    A.    Well, in order to teach teamwork.
12    Q.    What else does a group allow, if anything?  Is that the
13    primary thing?  Any leadership skills arise out of that?
14    A.    Well, certainly there are leadership skills that arise
15    out of that because those who work harder are showing the
16    others who are not perhaps putting as much effort into it as
17    they could, you know, that it won't kill them to do some
18    work.
19    Q.    Okay.  Now, we've shown -- the jury has seen
20    Defendants' Exhibit C, which is a sample schedule from
21    Mountain Park.  Is the schedule -- let me show you Exhibit D.
22    Is the schedule at Palm Lane essentially the same?
23    A.    Yes.
24    Q.    You typed this schedule up for me, did you not, or had
25    it typed for me, sent it to me in a letter?
```

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

```
 1    A.    It's possible, yes.

 2    Q.    And is this fairly representative of what the students

 3    do?  I'm not saying every day, but day in day out on a

 4    Monday?

 5    A.    Yes.

 6    Q.    The differences are Wednesday night, right, because

 7    they go to church, correct?

 8    A.    Yes, sir.

 9    Q.    Second difference is Friday night?

10    A.    Yes, sir.

11    Q.    And on Friday night there are movies, correct?

12    A.    Yes, we get an old movie out, yes.

13    Q.    And then Saturdays are different?

14    A.    Yes, sir.

15    Q.    And then Sundays are different, correct?

16    A.    Yes.

17    Q.    There are no work or --

18    A.    Not on Sunday.

19    Q.    -- academic programs on Sunday?

20    A.    Not normally.

21    Q.    And is the same thing true of Saturday at Palm Lane,

22    normally not any work activities?

23    A.    You mean not any school work activities?

24    Q.    There's no school work, correct?

25    A.    Yes, sir.
```

1    Q.    But is there work or other activities?

2    A.    Yes, work or play.

3    Q.    Every afternoon are there either work or sports roughly

4    in the 2:30 to five o'clock range?

5    A.    Yes.

6    Q.    Now, Palm Lane, I guess, is that period pretty regular

7    or does the weather ever interfere?

8    A.    Well, in the afternoons in the summertime certainly we

9    get a good shower.

10   Q.    Now, of what importance to Palm Lane in the performance

11   of its ministry is this roughly 2:30 to five o'clock, and

12   what you do on Saturday afternoon?  How do the tasks, the

13   fixing, the painting the fence, that's true, isn't it?

14   A.    Yes, sir.

15   Q.    Painting the fence, how do those tasks and job fit in

16   the performance of the ministry of Palm Lane?

17   A.    Well, speaking from personal experience, and many years

18   ago working with Brother Wills, Brother Wills had an academy

19   in Mississippi I was a part of.  And he taught me many things

20   just watching him work and him being sure that I did.  And

21   then, you know, just having the opportunity to carry that

22   same type of thing on to the students.  It's very important

23   for them to see us work and for us to be working there with

24   them.  And for us to show, you know, enough concern that

25   we're not only just going to give them a task and let them

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

```
 1   work around it, but continually come back to them and say,

 2   you know, okay, this is how you do this, you know how to do

 3   this, and help them.  You know, closely supervise work,

 4   that's important.

 5   Q.    You heard Jordan Blair say that among other things,

 6   writing lines, that one of the things he learned is how to

 7   weld and use a sander, right?

 8   A.    Yes, sir.

 9   Q.    Are those the kinds of skills that kids pick up as a

10   part of this work play time?

11   A.    Yes, sir, that's true.

12   Q.    We don't give them or pretend to give them a vocational

13   certificate in welding?

14   A.    No, sir.

15   Q.    Or belt sanding or anything else?

16   A.    No, sir.

17   Q.    But they do get credit for that, do they not, by

18   getting credits for physical education?

19   A.    Yes, sir.

20   Q.    If you look on the screen from page 65 of the Palm Lane

21   handbook, they get two hours worth of credit for physical

22   education; is that correct?

23   A.    Yes, sir.

24   Q.    Does that credit include all these things that are done

25   in the afternoon or on Saturday?
```

1    A.    Yes, sir.

2    Q.    Now, let's just talk about a couple of these.  There

3    are some kind of fences down at Palm Lane, right?

4    A.    Yes, sir.

5    Q.    And they need to be painted from time to time?

6    A.    Yes, sir.

7    Q.    Do the students do that?

8    A.    Yes, sir, they do.

9    Q.    Do the staff do that along with them?

10   A.    Yes, sir.

11   Q.    Does that fence -- do you sell any of that fence or put

12   it in interstate commerce or anything?

13   A.    No, actually the fence that was painted was a metal

14   pipe fence that was there when we came on the property.  And

15   the property needed some work when we came.  And we just

16   improved the looks of the place.  Instead of having a rusty

17   fence, we wire brushed it and primed it and painted it with

18   white Rustoleum paint just to improve the looks of the place.

19   And it's not finished yet by the way.

20   Q.    Do kids -- in addition to this work when children don't

21   follow the rules, is there a plan, a program of protective

22   activities undertaken?

23   A.    Nothing written.  When you say a plan, nothing written

24   in stone.  Nothing -- we try to work with the students as

25   individuals.

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

```
1    Q.     How do you correct it?

2    A.     Let's get up and do this.

3    Q.     So verbals first?

4    A.     Yes, sir.  Yes, sir.  If they were to refuse to work,

5    which I don't recall personally myself, I don't recall any

6    student ever just throwing his tools down and refusing to

7    work with me or with anyone else.  As long as they were, you

8    know, as long as everybody was in there doing it.

9    Q.     Well, does work sometimes become corrective?

10   A.     Yes, sir.

11   Q.     All right.  First verbal correction and encouragement,

12   correct?

13   A.     Yes, sir.

14   Q.     What's writing lines?

15   A.     Writing lines, most of the time, you know, we try to

16   make a subject of the line match whatever trouble they've

17   been having.

18   Q.     So if there is difficulty -- explain to the jury what

19   happens when you have to write a line.  Somebody messes up.

20   A.     Let's say they are having, you know, a continual

21   problem keeping their area clean and we're having to

22   constantly work with them about keeping their area clean.

23   You know, we may give them a line saying something, you know,

24   while at Palm Lane I will do my utmost to keep my personal

25   area clean.  And, you know, something like that maybe 250
```

1    times.  And we give them three days to do that.  If they

2    don't have that done in three days, the lines are doubled.

3          And what this does, it infringes on their free time.

4    So while others are being able to enjoy play time and free

5    time, you know, they are not able to do that.  And, you

6    know --

7    Q.    Brother O'Brient, do these children understand that

8    every action has an equal and opposite reaction?

9    A.    We do everything we can to help them understand that,

10   yes.

11   Q.    Then do you try to teach them that actions have

12   consequences?

13   A.    Yes, sir.

14   Q.    And is that both good and bad consequences?

15   A.    Right, yes, sir, both merit and demerits.

16   Q.    And does work sometimes assigned as evidence of the

17   need for corrective action give people the opportunity to

18   think about what they've done?

19   A.    Yes.

20   Q.    Now, sir, does Palm Lane have any product other than

21   the young people that it tries to lead to Christ and restore

22   to society?

23   A.    No, sir, we don't produce anything.

24   Q.    You buy and sell cattle?

25   A.    No, sir.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    Q.    You buy and sell horses?

2    A.    No, sir.

3    Q.    Provide irrigation?

4    A.    No, sir.

5    Q.    Did you ever dig a pond?

6    A.    Personally, no, sir.

7    Q.    Did you ever have a pond dug down in Palm Lane?

8    A.    I never gave the direction to dig a pond.  The boys

9    were out close to their campground, which is --

10   Q.    Explain the campground.

11   A.    The campground is a place where they put up a tent and

12   sometimes on the weekend when the weather was right we let

13   them go out and sleep over night in a tent and, you know,

14   build them a fire and have, you know, a weanie roast and

15   sleep out.  And my understanding of it, of course, this is

16   hearsay, but my understanding is --

17   Q.    If it's hearsay, don't tell it.

18   A.    Okay.  But the pond was being dug more for the

19   entertainment of the boys than is it for anything else.

20        MR. STILLEY:  Objection, I move to strike on the

21   grounds no personal knowledge.

22   A.    I knew that the pond was being dug.  I'm sorry.

23        THE COURT:  Overruled.

24   BY MR. OLIVER:

25   Q.    Now, sir, just real briefly, Mr. O'Brient, in the

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1    absence of the work in the afternoon, could Palm Lane

2    adequately perform its mission as you've described to save

3    these children?

4    A.    Not on a consistent basis, no, sir.

5    Q.    Is the work as much a part of the mission as the

6    education?

7    A.    Yes.

8    Q.    Is it as much a part of the overall mission of trying

9    to lead these children to Christ through example and exposure

10   to the Holy Spirit?

11   A.    To show them as far as the spiritual part of it,

12   whether they believe, trying for whatsoever you do is all for

13   the glory of God, that's a Christian lifestyle.  And to show

14   them an example of a Christian lifestyle, which is a

15   desirable thing, but certainly having Jesus Christ as your

16   savior, giving your life to God, that is something they

17   should desire.

18   Q.    And if they don't accept Christ, what value does the

19   morning education and the afternoon education have to them?

20   A.    They have, you know, if they don't accept Christ, the

21   second part of our mission does come in.  And they do have a

22   good opportunity for college credit diploma.  And if they are

23   able to attain that, a good solid foundational education, and

24   hopefully at least knowing how to work and when to work.

25   Q.    Are these skills these kids have when you get them?

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

```
 1    A.    Very rarely.  We have had a few, but very rarely.  They

 2    would be the exception, not the rule.

 3    Q.    Are these the skills you're trying to impart --

 4    A.    Most definitely.

 5    Q.    -- when they go back into real life?

 6    A.    Most definitely.

 7            MR. OLIVER:  Thank you.  You may inquire.

 8                         CROSS-EXAMINATION

 9    BY MR. STILLEY:

10    Q.    So you're the person that typed up the schedule for

11    Palm Lane, correct?

12    A.    Would you show me that schedule again, please.

13    Q.    Certainly.

14    A.    No, sir, I did not type this.  I did not.

15    Q.    You had it typed up, correct?

16    A.    No, sir, I did not have it typed up.

17    Q.    How did you come in possession of this schedule?

18    A.    I really don't believe I possessed a copy of this

19    schedule.

20    Q.    Did you not testify that you sent a copy to your

21    attorney?

22    A.    No, sir.

23    Q.    You didn't?

24    A.    I did not testify that I sent this -- a copy of this

25    particular schedule to the attorney, no, sir.
```

```
 1    Q.    Did you send a copy of some schedule?

 2    A.    Yes, sir, I did.

 3    Q.    And is that schedule different than this schedule?

 4    A.    Not in any substantial way, no, sir.

 5    Q.    Okay.  Now, this other schedule that you did send, did

 6    you type it up?

 7    A.    Yes, sir, I did.

 8    Q.    And when did you do that?

 9    A.    It's been about a year ago.

10    Q.    And you did it specifically for this litigation,

11    correct?

12    A.    As far as I can remember, yes, sir.

13    Q.    And you had worked for Mountain Park or Palm Lane for

14    how long?

15    A.    We began working with Mountain Park -- the first time

16    that we worked with Mountain Park, my wife and I, 1987 to

17    1990.  And then from 1996 to either 2001.  We went to Palm

18    Lane in the year 2002 and we've been there since.

19    Q.    Did you say something on direct examination about a

20    life program?

21    A.    Life program?

22    Q.    Maybe I misunderstood you.  A life skills program or

23    not?

24    A.    No, sir, I did not use those words.

25    Q.    What words did you use?
```

1   A.    About what, sir?

2   Q.    About teaching life skills to students.

3   A.    That we felt it was important that they had good life

4   skills.  I believe I said that, I don't know but I'll say

5   that now.

6   Q.    You have no formal program for that teaching, do you?

7   A.    It is part of our mission and part of our program to

8   teach our students good life skills which include teaching

9   themselves clean and a good work ethic.  Yes, sir, that's

10   part of our program.

11   Q.    But it's not a formal part of your program, is it?

12   A.    Yes, sir, it is a formal part of our program.

13   Q.    Do the students get credit for that?

14   A.    Not school credit, not academic credit.

15   Q.    And you don't have any certified instructors.

16   A.    Instructors in what, sir?

17   Q.    In life skills.  What do you call it?  You tell the

18   jury, what do you call this program that you're talking

19   about?

20   A.    Our overall program is both an academic and life skills

21   program I suppose you could say.  I hold a teacher's

22   certification if you're talking about certifications.

23   Q.    Well, that's not for the academic in this life skills.

24   Do you have any separate --

25           MR. OLIVER:  Your Honor, I object.

```
 1            THE COURT:  Let's not argue with the witness.

 2            MR. STILLEY:  What?

 3            THE COURT:  Let's not argue.  Go ahead.  Just ask

 4    your question.

 5            MR. STILLEY:  Certainly.

 6    BY MR. STILLEY:

 7    Q.    You don't have any certified instructors who are

 8    certified in a program of life instruction or substantially

 9    the same as life instruction, correct?

10    A.    Sir, I don't know what you mean by life instruction.

11    Q.    And you don't have a certified program of training for

12    life skills or life instruction, correct?

13    A.    What do you mean by certified, sir?

14    Q.    Well, certified as in an approved program or approved

15    by some educational regulatory body as being a satisfactory

16    program for providing an education of that sort.

17    A.    Are you asking us -- are you asking me about

18    accreditation, sir?

19    Q.    I'm asking you if there's any certification on the

20    program concerning the teaching of a life skills.

21    A.    I don't understand the question, I'm sorry.

22    Q.    But you can't testify that you do have any such

23    certification, correct?

24    A.    Not understanding what you're talking about, sir, I'm

25    just not comfortable in answering yes or no.  I don't
```

1    understand what you're talking about.

2    Q.    Are your students taught things like welding or sanding

3    or plumbing at Palm Lane?

4    A.    They are taught how to do those things, yes, sir.

5    Q.    But you don't have any certified instructors, do you?

6    A.    To teach those particular things?

7    Q.    Correct.

8    A.    Not to my knowledge, no, sir.

9    Q.    And you have no certified program in any of those

10   courses of instruction, do you?

11   A.    Once again, sir, I do not understand what you mean by

12   certified.

13   Q.    If you don't understand the question, just say I don't

14   understand the question.

15   A.    I don't understand the question.

16   Q.    And Palm Lane gets no credit for anyone in the courses

17   of welding or plumbing or similar courses, correct?

18   A.    That is correct.

19   Q.    And I take it that Palm Lane keeps no records of the

20   time that is spent on work as opposed to the time that is

21   spent in sports, correct?

22   A.    Correct.

23   Q.    Do you have any personal knowledge as to who formulated

24   a policy of not keeping those records?

25   A.    A policy of not doing something?

```
 1    Q.     Correct.

 2    A.     There is no policy that I know of.

 3    Q.     So just -- there's just no policy?

 4    A.     There's no policy saying that we don't keep records.

 5    Q.     Okay.  Is there any rule at Palm Lane that prohibits

 6    any student from keeping a log or a journal?

 7           MR. OLIVER:  It's outside the scope of direct.

 8           THE COURT:  I'll allow the question.

 9    A.     Restate the question, please.

10    Q.     Is there any rule at Palm Lane that prohibits a student

11    or limits a student from keeping a log or journal of

12    activities?

13    A.     No, sir, there is not.  This is not a rule.

14    Q.     Are you positive of that?

15    A.     As I said, there's not a rule.

16    Q.     Okay.  Have the students ever been punished for keeping

17    a log or a journal at Palm Lane?

18    A.     Not to my knowledge.

19    Q.     And if such punishment had taken place, would you have

20    personal knowledge of it?

21           MR. OLIVER:  Objection, Your Honor, it's outside the

22    scope.  It's other acts.

23           THE COURT:  Fine.  I'll sustain.

24    BY MR. STILLEY:

25    Q.     Now, when the boys went out and painted this fence,
```

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    that improved the value of that property, correct?

2    A.    It improved the looks of it, I don't know about the

3    value.

4    Q.    You don't know if that improved the value of the

5    property?

6    A.    I'm not an appraiser, sir, I don't know.

7    Q.    Okay.  Do you have personal knowledge as to who owns

8    the property that this fence is on?

9    A.    No, sir, I do not.

10   Q.    If you don't mind waiting until I get completed with

11   the question before you answer.

12   A.    I'm sorry.

13   Q.    The court reporter would appreciate that if you do

14   that.  Do you have any personal knowledge of the boys, any of

15   the boys or girls being taken over to Bob or Betty Wills'

16   residence to do work there?

17   A.    Yes.

18   Q.    Do you know who was benefited by that work?  Isn't it

19   fair to say Bob and Betty Wills were benefited by that work?

20   A.    Along with the students who volunteered to go, yes.

21   Q.    And that work included things like lawn maintenance and

22   polishing the boat and work on or in the house, correct?

23   A.    Correct.

24   Q.    And is it fair to say all that work benefited Bob and

25   Betty Wills?

1    A.    And also training the students, yes, sir.

2    Q.    Did you ever get any personal benefit out of work that

3    was performed by the students?

4    A.    Other than the satisfaction of seeing them accomplish a

5    job well done, no, sir.

6    Q.    They never polished your car?

7    A.    No, sir.

8    Q.    Never worked at your house?

9    A.    No, sir.

10   Q.    Do you live on campus?

11   A.    Yes, sir.

12   Q.    Is your housing provided to you as part of your

13   compensation?

14   A.    Yes, sir.

15   Q.    Do the students ever come to your house to do lawn

16   maintenance or to clean your house?

17   A.    No, sir.

18   Q.    Never?

19   A.    Never.

20   Q.    Oh, on the welding or the plumbing or similar items, is

21   there any formal lesson plan for those matters of

22   instruction?

23   A.    Not that I'm aware of.

24   Q.    Do you have any personal knowledge as to the source of

25   goods that are procured by Palm Lane?

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    A.     What goods are those, sir?

2    Q.     Such as food, other items that are used by Palm Lane?

3    A.     Yes.

4    Q.     Okay.  Do you know where they come from as a general

5    rule?

6    A.     We get our food from, most of our food comes from Sysco

7    Corporation, they deliver our food.  Most of the

8    miscellaneous items that we get for the students comes from

9    Sam's Club, Wal-Mart, Sam's Club, things of that nature.

10   Q.     Now, you testified on direct about your disciplinary

11   policy not written in stone, correct?

12   A.     Yes, sir.

13   Q.     It's not actually written in paper either, is it?

14   A.     About most things it's written in the handbook.

15   Q.     About most things?

16   A.     Yes, sir.

17   Q.     But the students are not allowed to have a copy of the

18   handbook?

19   A.     Their parents.

20   Q.     But not the student?

21   A.     No, sir.

22   Q.     Isn't it true that Palm Lane makes a choice to do it,

23   that Palm Lane only implement programs with certified

24   programs and certified instructors and formal lesson plans

25   for welding or plumbing?

1    A.    Would you restate that, please.

2    Q.    Isn't it possible if Palm Lane Academy was so inclined

3    that Palm Lane Academy could institute formal programs with

4    certified instructors, certified programs and formal lesson

5    plans for subjects such as welding or plumbing?  Do you

6    understand the question?

7    A.    I suppose we could, yes, sir.

8    Q.    Now, you said something about the pond digging.  And

9    did I understand correctly you said it was for the boys'

10   benefit that the pond was dug?

11   A.    That was my understanding, yes.

12   Q.    What's the basis of your personal knowledge concerning

13   that?

14   A.    My 10-year-old son and my 12-year-old son coming back

15   to the house every day covered with mud was probably one

16   reason I thought it was fun for them.

17   Q.    That pond did actually improve the value of that

18   property, correct?

19   A.    No, sir, I don't think so.  Digging a hole in the

20   ground would not improve the value.  Of course, once again,

21   I'm not an appraiser.

22   Q.    It didn't reduce the value of the property, did it?

23   A.    I don't know.

24          MR. STILLEY:  Judge, could I have a moment with my

25   client?  Pass the witness.

1          MR. OLIVER:  Your Honor, we offer C and D at this

2   time.

3          THE COURT:  Any objection?

4          MR. STILLEY:  No objection.

5          THE COURT:  It's received.

6          MR. OLIVER:  We'll briefly -- I tried to zoom

7   something, Judge, and messed up.  I was trying to do this too

8   fast, I'm sorry.

9                    REDIRECT EXAMINATION

10  BY MR. OLIVER:

11  Q.    The word accreditation was mentioned.  I call your

12  attention to Exhibit 9 down at the bottom.  To your knowledge

13  is Mountain Park accredited, and if so, how?

14  A.    Mountain Park is accredited through the Association of

15  Christian Children's Ministries International and Missouri

16  Association of Christian Childcare Agencies and the School of

17  Tomorrow.

18  Q.    Okay.  Now, it's the same, little bit different down at

19  Palm Lane, is it not?

20  A.    Palm Lane is accredited.  It's registered with the

21  State of Florida as a Type 2 facility, childcare facility, in

22  accordance with the Florida Statute 409.176.  And it is

23  accredited by the Florida Association of Christian Childcare

24  Agency.

25          MR. OLIVER:  Thank you very much, Your Honor.

```
1            THE COURT:  Anything else?

2            MR. OLIVER:  Not of this witness, Your Honor.

3    Excuse me.

4                      RECROSS-EXAMINATION

5    BY MR. STILLEY:

6    Q.    Your accreditation only relates to academics, correct?

7    A.    No, sir.

8    Q.    What does it relate to?

9    A.    Palm Lane is accredited a Type 2 childcare facility

10   under statute 409.176 of the Florida constitution.

11   Q.    Okay.  But that's not an academic matter, is it?

12   A.    No, sir.

13   Q.    When you told the jury that the program was accredited,

14   what were you trying to tell the jury that was accredited?

15   A.    Sir, I did not tell them they were accredited.

16   Q.    What did you say?

17   A.    About what?

18   Q.    About accreditation.

19   A.    I don't recall saying anything particularly.  I asked

20   you if you were asking me about accreditation.

21   Q.    Did you not -- did you not just testify on redirect

22   that Palm Lane had some sort of accreditation?

23   A.    I read what was written on the things that were given

24   here.

25   Q.    But did you have personal knowledge about what you were
```

1    reading?

2    A.    Yes, sir.

3    Q.    All right.  Is Palm Lane accredited by -- for academic

4    subjects?

5    A.    You're talking about Palm Lane?

6    Q.    Correct.

7    A.    No, sir.

8    Q.    What's -- now, you said something about Florida

9    association -- tell me what specific association you're

10   talking about.

11   A.    The Florida Association of Christian Childcare

12   Agencies.

13   Q.    Do you know who the principles are in this

14   organization?

15   A.    No, sir, I do not.

16   Q.    Do you know how that -- now, what does this go by when

17   you just speak in ordinary talking, do you say FACCA or do

18   you say the whole term?  You say FACCA?

19   A.    Yes, sir.

20   Q.    FACCA.  How did you come to know that Palm Lane was

21   accredited or had some affiliation with FACCA?

22   A.    Well, through our handbook and through discussions with

23   my superiors.

24   Q.    What superiors?

25   A.    Brother and Mrs. Wills.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1   Q.    Did they ever tell you what FACCA is?

2   A.    No, sir, I don't think they ever felt the need to.

3   Q.    And you don't know who is involved with FACCA?

4   A.    I know that the president, I suppose that's his title,

5   the head man, his name is Dr. Ed McClellan.

6   Q.    Isn't it true that the Wills have had positions on this

7   board?

8   A.    I do not know.

9   Q.    You don't have knowledge of that?

10  A.    No, sir.

11  Q.    Isn't it true that the Wills were involved in creating

12  FACCA?

13  A.    I do not think so.  I'm almost positive that they did

14  not.  FACCA has been existence for many years before the

15  Wills went to Florida.

16          MR. STILLEY:  Pass the witness.

17          MR. OLIVER:  Nothing further, Your Honor.

18          THE COURT:  That's it.  Two times around.  That's

19  it.

20          THE WITNESS:  Thank you.

21          THE COURT:  Ladies and gentlemen of the jury, we'll

22  take our afternoon recess at this time.  Recall the

23  admonition.  Be prepared to return -- well, return to your

24  jury rooms at 25 after.

25          (The following proceedings were held outside the

1    hearing of the jury:)

2         THE COURT:  Counsel, let's see what else there is to

3    direct toward this Fair Labor Standards Act situation in

4    terms of witnesses or see if you have anything in response to

5    say.

6         And I don't want to get to you having to write down

7    every question you have to write of every witness,

8    Mr. Stilley, and have to have you bring it in for me to

9    review it, you know.  And I don't think I would let the jury

10   see me taking my questions to a 19-year-old and see if he

11   approved of them, you know.  Fine.  Do what you want to do.

12   Make yourself happy.  I'm just saying, I don't know.  I don't

13   know.

14        But I'm just saying, don't get to the point where

15   you have -- you know, I told you about Mr. Gerhardt, that

16   ended that.  If you have any more, you know what you got to

17   do.  So let's not get to that with other people.  Okay.

18        MR. STILLEY:  Yes, sir.

19        THE COURT:  I'm trying to be nice, you know.  Tried

20   to warn you.  You didn't get the message.  So let's get to

21   this part about the Fair Labor Standards Act once I come

22   back.  Any witnesses?  The defendant, you got some rebuttal

23   on that, let's deal with that to see where we are there,

24   okay.

25        MR. STILLEY:  Certainly, Judge.  Thank you.

```
 1              THE COURT:  Okay.

 2              (Court in recess from 3:05 p.m. until 3:33 p.m.)

 3              (The following proceedings continued within the

 4     hearing of the jury:)

 5              THE COURT:  Good afternoon, ladies and gentlemen of

 6     the jury.  Mr. Briggs.

 7              MR. BRIGGS:  Your Honor, we'd call Sam Gerhardt to

 8     the stand.

 9              THE COURT:  Very well.

10                        SAM GERHARDT,

11     Having been first duly sworn, was examined and testified as

12     follows:

13                     DIRECT EXAMINATION

14     BY MR. BRIGGS:

15     Q.    Good afternoon.  Would you please state your full name

16     for the record.

17     A.    My name is Sammy Lee Gerhardt.

18     Q.    What's the name that you typically go by, sir?

19     A.    Sam.

20     Q.    Sir, do you currently work at Mountain Park Baptist

21     Church Boarding Academy?

22     A.    Yes, I do.

23     Q.    What is your position there?

24     A.    I'm pastor there.

25     Q.    How long have you been pastor there?
```

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

```
 1    A.    For a couple years.

 2    Q.    For a couple years now?

 3    A.    Yes, sir.

 4    Q.    Prior to that, let's see, when did you become a pastor?

 5    A.    I've been there so long, just transitions take place, I

 6    have to stop and think for a few minutes.  It's been, I guess

 7    it was probably 2002, yes, sir.

 8    Q.    Okay.  Who is the pastor prior -- before you?

 9    A.    Brother Wills, Pastor Bob Wills.

10    Q.    What's his title now?

11    A.    He is senior pastor.

12    Q.    And prior to becoming pastor, what was your title?

13    A.    Associate pastor, same place.

14    Q.    Pastor Gerhardt, how long did you go or how far did you

15    go in school?

16    A.    I have a master's in Christian education.

17    Q.    Where did you get that degree?

18    A.    From Caroline University of Theology.

19    Q.    And I take it you also have a bachelor's degree?

20    A.    Yes, sir.

21    Q.    And from what college or university?

22    A.    From the same university, Caroline University.

23    Q.    Pastor Gerhardt, what is the ministry of Mountain Park?

24    A.    To reach young people through Christ.  That's first and

25    foremost.  That's why we're there.
```

```
1    Q.    Okay.  And to achieve that ministry does Mountain Park

2    have a mission or missions?

3    A.    Yes, sir, we have a dual mission, to provide a quality

4    academic opportunity as well as to develop within them that

5    sense of character and responsibility to be productive

6    citizens and to nurture them toward a real genuine faith in

7    Christ.

8    Q.    Hopefully everybody can see that okay.  Pastor

9    Gerhardt, I'll show you what has been marked as Plaintiff's

10   Exhibit 9.  Page 2.  And I'll highlight a portion of the

11   page.  What I've highlighted sir, first off, does this page 2

12   come from the Mountain Park parent/student handbook?

13   A.    Yes, sir, it does.

14   Q.    Were you involved in the preparation of that handbook,

15   sir?

16   A.    Yes, sir, I was.

17   Q.    So you are relatively familiar with the handbook?

18   A.    Yes, sir, I am.

19   Q.    And referring to page 2, those twin missions, have I

20   highlighted twin missions, highlighted in the handbook?

21   A.    Yes, sir, you have.

22   Q.    And is this handbook provided to all the parents that

23   enroll students at Mountain Park?

24   A.    Yes, sir.

25   Q.    As part of the twin missions, what are the basic or
```

```
 1    fundamental parts of Mountain Park's practice and curriculum

 2    that arise out of these missions?

 3    A.    Everything we do.

 4    Q.    Okay.  So would that include the academics?

 5    A.    Yes, sir, it would.

 6    Q.    Okay.  And it also includes, you know, teaching the

 7    students to maintain a clean presence as well?

 8    A.    Yes, sir, all of those things.

 9    Q.    Okay.  Maintain a clean environment?

10    A.    Yes, sir.

11    Q.    And is also learning a good work ethic as well?

12    A.    Very important, yes, sir.

13    Q.    Okay.  So work is a fundamental and integral part of

14    Mountain Park's mission.

15    A.    We could not operate and do what the parents ask us to

16    do without any and all of those.  You must have all of those

17    parts.

18    Q.    Okay.  And how is that work important?  What does it do

19    for the students?

20    A.    Again, it provides the students with a sense of

21    accomplishment, a sense of responsibility and accountability.

22    A young person who can learn that mowing the yard and doing a

23    good job at mowing the yard, and somebody walking up and

24    saying, boy, the yard looks nice.  I know Brother Wills is

25    faithful when he comes to visit to make a comment that, boy,
```

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1   the grounds are looking good, appreciate you fellows keeping

2   the grounds up.  And so it gives them a sense of

3   responsibility and then the accountability with that, which

4   in the same sense applies to their spiritual life.  We were

5   created by God Almighty and we have a responsibility and an

6   accountability toward him.  So you take the simple things and

7   apply them to the spiritual things.

8   Q.    And these simple things, do you hope to develop these

9   within the students so they'll carry on the simple things in

10  the way of life once they leave Mountain Park?

11  A.    Oh, yes, sir, most definitely.  And it's just eating

12  that apple one bite at a time, a day by day process to try to

13  instill those principles of just solid character.

14  Q.    Sir, prior to working at Mountain Park and going to

15  college, did you have any background that involved strict

16  regimented environment you were involved in?

17  A.    Yes, sir.  I worked with -- just the time frame there a

18  little bit, I worked with the ministries from the time I was

19  young, 21 years old.  I went to work with my mother and

20  father-in-law.

21  Q.    Did you also go in the service?

22  A.    Yes, I worked with them until '84, '85 until I joined

23  the military.

24  Q.    What branch of the service?

25  A.    The Army.

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

```
 1    Q.    Sir, are you married?

 2    A.    Yes, sir, I am.

 3    Q.    And who is your wife?

 4    A.    My wife is Mrs. Wills' daughter, Debbie Gerhardt.

 5    Q.    And Debbie is also a defendant in this lawsuit?

 6    A.    I'm afraid so.

 7    Q.    And does she work at Mountain Park?

 8    A.    Yes, sir, she does.

 9    Q.    And what does she do?

10    A.    She takes care of the bookkeeping and helps supervise

11    the young ladies.

12    Q.    With -- who sets the policies at Mountain Park?

13    A.    Pastor and Ms. Wills with input from me.

14    Q.    So you do participate in some of the policy making?

15    A.    Yes, sir.

16    Q.    Okay.  At Mountain Park who has the authority to hire

17    or fire staff?

18    A.    Pastor Wills.

19    Q.    Is your wife involved in making policy at Mountain

20    Park?

21    A.    Not in a general sense, no, sir.

22    Q.    And do you and your wife have any kids?

23    A.    Yes, sir, we do.

24    Q.    Okay.  Is one of them Bo Gerhardt?

25    A.    My son is Bo Gerhardt.
```

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    Q.    And he's also a party to the lawsuit?

2    A.    Yes, he is, I'm afraid.

3    Q.    We've heard testimony in the course of this trial,

4    Pastor Gerhardt, about the students who are enrolled at

5    Mountain Park.  Who enrolls students at Mountain Park?

6    A.    The parents do.

7    Q.    And what particular traits do the students tend to

8    have?  Do they tend to come from trouble background?

9    A.    Typically, yes, sir, they do.

10   Q.    Okay.  What sort of history do the students generally

11   have when they come to Mountain Park?

12   A.    I often say that some of our kids, the parents send

13   their kids to us sometimes put a fence at the top of the hill

14   and other times put an ambulance at the bottom.  A parent

15   calls me on the phone and says, Brother Gerhardt, I have a

16   young person and they are, you know, I can't control them

17   anymore.  My daughter is slipping out at night or my son is

18   slipping out at night, and I don't know where they are going

19   or what they are doing.  They were great students until they

20   hit junior high school and something happened, they began to

21   run with the wrong crowd and began to smoke and fight with

22   mom and dad.  Kids have fought their parents and physically

23   abused their parents and all those things.  Those are the

24   kind of kids we get.

25            MR. STILLEY:  Objection.  I'll withdraw that

1    objection.

2    Q.    Based on the background you just testified about,

3    Pastor Gerhardt, I'd like to show you what was marked as

4    page 3 of Defendants' Exhibit A.  Sir, have you seen this

5    document before?

6    A.    Yes, sir, I have.

7    Q.    Okay.  It appears to be a form.  What kind of form is

8    it?

9    A.    We call it a preadmission statement.  It's used when

10   the parent calls on the telephone initially, get the

11   information about the student.

12   Q.    So this is a form that was prepared by you?

13   A.    I prepared part of this form, yes, sir.

14   Q.    All right.  And on this form do you ask the parents to

15   describe generally the behavior the children have?

16   A.    Yes, sir, we do.

17   Q.    And is there a space on the form where they can

18   identify the particular summary of behavior?

19        MR. STILLEY:  Objection, irrelevant.

20        MR. BRIGGS:  Your Honor, actually I think it's

21   entirety relevant in this case because it goes to the basis

22   why students would be enrolled in the first place and why

23   they need corrective behavior.

24        THE COURT:  Fine.  I'll overrule for the time being.

25   BY MR. BRIGGS:

1    Q.    So, Pastor Gerhardt, to an extent, the parents are

2    given an opportunity to describe generally the traits that

3    their children have or what they believe they have?

4    A.    Yes, sir.  We ask them to describe for us the problems

5    they are having at home that would cause them to call us in

6    the first place.

7    Q.    Okay.  Now, with respect to the third page of

8    Defendants' Exhibit A, this form has been completed.  And

9    does it, in fact, relate to the plaintiff, Jordan Blair?

10   A.    Yes, sir, it does.

11   Q.    Was this completed in connection with a communication

12   from his parent?

13   A.    Yes, sir, from his father.

14   Q.    When was the communicate made?

15   A.    The 19th of October in the year 2000.

16   Q.    After this communication or shortly thereafter was

17   Mr. Blair, actually Jordan, was he actually enrolled at

18   Mountain Park?

19   A.    It was a year later.

20   Q.    A year later, okay.  So you subsequently -- what

21   happens after you had a conversation around October 19th,

22   2000?  What was the decision at that time?

23   A.    At that particular time by the note that I have in the

24   upper left-hand corner, the parents indicated that they did

25   not have the resources financially, but they asked me to mail

1  them an application package, which I did.  I referred them to

2  some other ministries that I knew of that they could call and

3  check on for help for their son.

4  Q.    Okay.  At that time in October 2000, with whom did you

5  speak specifically?

6  A.    I talked to Mr. Ron Blair.

7  Q.    Okay.  And did he express a desire to enroll Jordan?

8  A.    Yes, sir, he wanted to be able to.

9  Q.    Okay.  And you said that you subsequently got a call

10  about a year later from the Blairs?

11  A.    Yes, sir, I believe it was.

12  Q.    Okay.  From whom specifically?

13  A.    Again, from Mr. Blair.

14  Q.    Okay.  Did he again express a desire to enroll Jordan?

15  A.    He certainly did.

16  Q.    Subsequently did it actually come about that the

17  parents did make a decision to enroll him at Mountain Park?

18  A.    Yes, sir, they did.

19  Q.    Okay, very good.  And, sir, now I'll show you what was

20  marked as Plaintiff's Exhibit 2.  Sir, have you seen that

21  before?

22  A.    Yes, sir, I have.

23  Q.    And what is that form?

24  A.    That is the basic application form to enroll a student

25  at Mountain Park.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    Q.    And is this form completed in relation to Jordan Blair?

2    A.    Yes, sir, it is.

3    Q.    And who would have completed this application?

4    A.    His parents.

5    Q.    Turning to the second page of Plaintiff's Exhibit 2, is

6    there a space for the parents to sign the application?

7    A.    Yes, sir, there is.

8    Q.    Okay.  And did the parents, in fact, sign the

9    application?

10   A.    Yes, sir, they did.

11   Q.    Okay.  And can you tell by looking at Plaintiff's

12   Exhibit 2 the date that Mr. Blair was enrolled?

13   A.    He was enrolled on the 20th of October in 2001

14   according to the signature and the date the parents put.

15   Q.    So that's when the parents actually completed the

16   application?

17   A.    Yes, sir, that's when they completed the application,

18   I'm sorry.  That's when they completed the application.

19   Q.    Okay.  And when did Mr. Blair arrive at Mountain Park?

20   A.    He arrived four days later, on the 24th.

21   Q.    Sir, I'd like to show you Defendants' Exhibit C and

22   represent that this is the sample schedule that's already

23   been identified --

24   A.    Yes, sir.

25   Q.    -- in the course of the trial.  Sir, did you actually

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1   prepare Exhibit C?

2   A.    I believe I did, yes, sir.

3   Q.    Okay.  And was it prepared in connection with this

4   lawsuit?

5   A.    Yes, sir, it was.

6   Q.    Okay.  But is the schedule maintained back at Mountain

7   Park?

8   A.    Yes, sir.

9   Q.    Okay.  I'd like to focus your attention, Pastor

10  Gerhardt, to one particular entry.  And just so we represent,

11  this is a sample schedule for a typical week at Mountain

12  Park; is that correct?

13  A.    That's correct.

14  Q.    Would this schedule have been the same back in 2001?

15  A.    Yes, sir.

16  Q.    Focusing your attention to the 2:30 time entry,

17  practical training, can you describe for the jury what

18  practical training is?

19  A.    Certainly.  It's that time and opportunity that the

20  young men have to -- again, to continue to learn, to apply in

21  a practical way the principles that are learning about living

22  life.  How to dig a fence post and set a fence post and do it

23  in such a way that the fence post won't come out of the

24  ground.  Just those kind of practical things.  How to mow a

25  yard and mow it correctly.  Those are the kind of things we

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    do.  As well as the ball playing and being a good sport on

2    the ball field and knowing how to run through first base.

3    Q.    So some days in the typical week the students will be

4    on work detail doing some of the tasks you assigned and other

5    days they would be doing games?

6    A.    Yes, sir, that's correct.

7    Q.    And the work detail that they do, how is that -- is

8    that an essential and important part of the overall

9    curriculum and what's offered by Mountain Park?

10   A.    Oh, yes, sir, it certainly is.  Again, we could not

11   have an opportunity to go out in a practical way and do the

12   work we do, how would we be able to instill that sense of

13   accomplishment and pride and self worth and accountability

14   and responsibility and discipline and all those things that

15   go with the job well done.

16   Q.    Okay.  You had mentioned mowing lawns.  When some

17   students arrive at Mountain Park, are there actually some

18   male students who never mowed the lawn before?

19   A.    That's for sure, yes, sir.  We have students who have

20   never mowed the yard before, don't have an idea how to mow,

21   and look back and see that you missed a strip of grass

22   three inches wide, and you need to go back and get it.  We

23   have to teach them how to wash a car from the top to the

24   bottom.

25   Q.    And productive adults in society typically know how to

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1    do that, would that be a fair statement?

2    A.    Yes, sir.

3    Q.    Sir, taking a look also on Exhibit C, we have some

4    academic training.  Can you describe for the Court and the

5    jury briefly the academic curriculum that's offered by

6    Mountain Park?

7    A.    The primary curriculum is an accelerated Christian

8    education curriculum out of Louisville, Texas.

9    Q.    And does that -- what does that -- does it integrate

10   any other aspects into the program?  What does the program

11   consist of?

12   A.    The ACE curriculum is a Christ centered bible based

13   individualized self based curriculum.  The students are to

14   take diagnostic tests to tell us where to place them in the

15   curriculum based on their own ability, their own performance.

16   It doesn't necessarily distinguish a grade level, but a level

17   of work and a level of ability to accomplish the work.

18        It's common for us to have a student come in and

19   they need to go back and review and learn again, if they ever

20   did learn basic math, how to add and subtract, multiply and

21   divide, those kind of things.

22        And also in the curriculum is the sense of the way

23   the system works on a day-to-day basis, the curriculum

24   procedures themselves instill responsibility, accountability,

25   and Christian character.

1  Q.    And is it hoped that through this program that some, if

2  not all, the students at Mountain Park will have the ability

3  to go on to college after they graduate?

4  A.    Yes, sir, it certainly is.  That's the goal.

5  Q.    In connection with this curriculum, are credits granted

6  once certain course levels are completed?

7  A.    Yes, sir, they are.

8  Q.    Okay.  And I'll show you page 65 of Plaintiff's

9  Exhibit 9.  And the top of this page, does this generally

10  show the courses and credits that are required at Mountain

11  Park?

12  A.    Yes, sir, it does, it shows the required credits in

13  each subject and how many have to be obtained in order to

14  graduate.

15  Q.    Now, taking a look on that list, there's a reference to

16  physical education and two credit hours.  Do you see that?

17  A.    Yes, sir, I do.

18  Q.    Okay.  Now, what does that physical education, those

19  two credit hours, what does that encompass?

20  A.    Okay, what that means, in order to graduate from our

21  school, they have to accomplish two years of PE.  They have

22  to earn a credit for two years worth of work.  In order to

23  earn that credit for us, the time that they spend in the

24  afternoon doing their -- whether it's playing ball or pulling

25  brush or building a fence, the physical activity they are

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    involved in, all those things are evaluated to give them a

2    physical education grade.

3    Q.    Okay.  So as you said, then all those physical

4    activities are incorporated in to give the physical education

5    credit?

6    A.    Yes, sir, that is correct.

7    Q.    Okay.  So then it -- also would it be fair to say then

8    the work that's done in the afternoons, that that also

9    relates into the academic programs?

10    A.    Yes, sir, it does.

11    Q.    Pastor Gerhardt, does Mountain Park maintain a no-touch

12    policy with respect to students?

13    A.    Yes, sir, it does.

14    Q.    So staff are generally not permitted to have physical

15    contact with students?

16    A.    That's correct.

17    Q.    All right.

18           MR. BRIGGS:  Your Honor, may I have just a moment to

19    confer?

20           THE COURT:  Sure.

21           MR. BRIGGS:  That's it at this time, Your Honor.

22    Thank you.

23           THE COURT:  Very well.

24                     CROSS-EXAMINATION

25    BY MR. STILLEY:

```
 1    Q.    Can you tell the jury the substance of the no-touch

 2    policy?

 3    A.    The substance of the no-touch policy would be simply

 4    that the staff should not manhandle the students.

 5    Q.    And does that include even senior staff such as

 6    yourself?

 7    A.    Correct, the staff should not manhandle students.

 8    Q.    Okay.  So it's fair to say then that slamming someone

 9    up against a wall would violate that no-touch policy; is that

10    correct?

11    A.    That would be correct.

12    Q.    Even for a person such as yourself, correct?

13    A.    Sure, yes, sir.

14    Q.    Within the past three -- have you ever violated that

15    policy?

16            MR. BRIGGS:  Your Honor, I'll object.

17            THE COURT:  Sustained.

18            MR. BRIGGS:  Outside the scope.

19    BY MR. STILLEY:

20    Q.    Is this no-touch policy written down anywhere?

21    A.    I'd have to go back and look in our handbook to see if

22    it's written there.  I don't recall, sir.

23    Q.    Did you have anything to do with the formulation of

24    this policy?

25    A.    This is a hard fast policy that Brother Wills has had
```

```
1    with us for many years.

2    Q.    I take it then you didn't have anything to do with the

3    formulation of the policy?

4    A.    That policy was in place when I came to work in the

5    ministry of Mountain Park.

6    Q.    Has it changed since that time?

7    A.    No, sir, it has not.

8    Q.    Now, you talked about physical education, correct?

9    A.    Yes, sir.

10   Q.    There is no formal lesson plan for physical education?

11   A.    There is no formal education plan for physical

12   education, no, sir.

13   Q.    There is nothing in writing from which a parent could

14   see that physical education might include tasks normally

15   associated with work, is there?

16   A.    No, I'm afraid there's not anything in writing.  It is

17   discussed with the parents during orientation.

18   Q.    And how do you know that?

19   A.    Because I conduct most of the orientation.

20   Q.    Do you have a checklist?

21   A.    Mental checklist.

22   Q.    So you check off in your mind what you told the

23   parents?

24   A.    I know what I talk to every parent about when they

25   enroll their students, yes, sir.
```

1   Q.    There is no agricultural program, agriculture

2   instruction program at Mountain Park or Palm Lane, is there?

3   A.    No, sir, not in a formal sense there is not.

4   Q.    You're involved in formulating policy, at least some

5   policies at Mountain Park and Palm Lane, correct?

6   A.    Yes.

7   Q.    And is it against --

8   A.    At Mountain Park?

9   Q.    At Mountain Park.

10  A.    Yes.

11  Q.    And at Mountain Park it is against the policy for the

12  students to have a copy of the handbook, correct?

13  A.    Against the policy for the students to have a copy of

14  the handbook?  I cannot say that.

15  Q.    What's the policy regarding students having a handbook?

16  A.    I don't recall a student ever asking for a handbook.

17  Q.    If they asked, would they get it?

18  A.    I'm not sure.  I guess I'd have to consider who, what,

19  why, and how.  There's a reason for that.

20  Q.    And do you mind telling us what the reason is?

21  A.    Certainly, yes, sir.  Part of the training program is

22  for the students to learn step by step, day by day.  And they

23  learn that in the day-to-day instruction and the day-to-day

24  process of being a part of the ministry between the lessons

25  being given in the school, between instructions given by

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1    orientation guides, other students, the peer pressure, the

2    instructions that they receive from the staff that work with

3    them right there hand to hand on the day-by-day basis.

4    Q.    Is it fair to say then that the student is expected to

5    just take staff's word on what the rules are?

6    A.    Yes, sir, that's correct.

7    Q.    And they have no way to rebut the staff's word on what

8    the rules are, correct?

9    A.    No, sir, that's incorrect.

10   Q.    What's the truth of the matter?

11   A.    The truth of the matter is my office is located in a

12   central location on the campus.  The students have easy

13   access to me.  All the students are fully aware that if they

14   had a question or problem with a staff member, whether it

15   was -- whoever it was, one of my family or whoever it might

16   be, all the students understand that they have a problem, a

17   question, they think they've been mistreated, they think

18   they've been done wrong by anybody, student or staff, they

19   can come see me wherever they feel a need to.  Oftentimes

20   they'll drop a little note.

21          I have a little box outside my door, they'll drop a

22   note, Brother Gerhardt, I need to see you, I have a problem.

23   Sometimes they'll walk in the office right, you know, just at

24   whatever time.  And all the students know.  For instance, a

25   new student who happened to be on orientation, if they said

1    to their guide, I want to see Brother Gerhardt and I want to

2    see him right now, then that guide would have the

3    responsibility to take them to whatever staff is there with

4    them out and about or in the school and they are to see that

5    they get to me as quickly as they can get them to me.

6    Q.    So you're telling the jury you have an open door

7    policy?

8    A.    Oh, yes, sir, I do.

9    Q.    And any student can come to speak to you without fear

10   of repercussion?

11   A.    That's true, yes, sir.

12   Q.    Has a student ever come and say I don't think a rule

13   requires a certain thing?

14         MR. BRIGGS:  Your Honor, I'm not quite sure where

15   this is leading.  I'm not sure it was given on direct, and it

16   relates to direct.  I'll object to relevance.

17         MR. STILLEY:  He talked about the --

18         THE COURT:  You know, how far do we go down the

19   road?  You know, we're going down a road, you know, the door

20   is kind of open there.  How far you going?  You know, how far

21   do we go?

22         MR. STILLEY:  I'm almost there.  I'm almost there.

23         THE COURT:  Where you might be going might be beyond

24   where we need to go.

25         MR. STILLEY:  I don't think it is.

```
 1              THE COURT:  Let's see.  Go ahead.
 2    BY MR. STILLEY:
 3    Q.     Okay.  Mr. Gerhardt, do you remember the question?
 4    A.     Please ask it again.
 5    Q.     Have you ever had a student come to your office and say
 6    I think I'm being required to do something that isn't called
 7    for by the rules?
 8    A.    I don't know that a student has ever come to my office
 9    and made a statement like you just stated.
10    Q.    Has a student ever come to your office and gotten into
11    a discussion such that it was necessary to show the student
12    the rules?
13    A.    To show the student the rules?  No, sir.
14    Q.    Now, on direct examination you spoke a little bit about
15    the document that was used to enroll Jordan Blair, did you
16    not?
17    A.    Yes, sir.
18    Q.    And do you see where I've marked at the bottom, it says
19    on top, date of enrollment, correct?
20    A.    Where you marked on the bottom of the page, the top
21    line?  I understand what you're asking now.  Yes, sir, it
22    says date of enrollment 10/24/01.
23    Q.    And on the bottom it says date of withdrawal, 11/10/01,
24    correct?
25    A.    Yes, sir, obviously a mistake on the date.  Oh, excuse
```

1    me, I'm sorry, 11/10/01, yes, sir, that's correct.  I'm

2    sorry.

3    Q.    And to your knowledge there are no documents signed by

4    plaintiff Jordan Blair's parents enrolling their son at Palm

5    Lane Academy, correct?

6              MR. BRIGGS:  Objection, Your Honor, relevance.  It's

7    outside the scope of direct.

8              MR. STILLEY:  The defendants are trying to say that

9    because they have permission, they can compel work without

10   having any liability to pay for the work.  And I'm trying to

11   demonstrate that there were no documents signed by the

12   patients enrolling Mr. Blair in Palm Lane.

13             THE COURT:  That don't have anything to do with

14   liability for work.  I mean, that's not part of the

15   definition of employee/employer.  That doesn't get into that.

16   Parental, that has nothing to do with the parents.

17             MR. STILLEY:  Okay.  Well, that's reasonable.  But I

18   would still --

19             THE COURT:  I know you still, you always still.  I

20   guess it got something to do with battery, huh?

21             MR. STILLEY:  The battery had already been committed

22   then.  I don't think I can stretch that far, Judge.

23             THE COURT:  Sustained.  Move on.

24             MR. STILLEY:  Thank you, Judge.

25   BY MR. STILLEY:

1    Q.    Now, you said you went to Caroline University; is that

2    correct?

3    A.    Yes, sir, I received my degree from Caroline University

4    of Theology.

5    Q.    And what city is that located in?

6    A.    They've changed their location a couple times.  And

7    honestly, it didn't come to the top of my head where they are

8    in Carolina.

9    Q.    Where were they at when you were there?

10   A.    As I say, I don't remember.  I don't remember the city

11   and state, it was a directed study course.

12   Q.    Was it a home study course?

13   A.    Yes.

14   Q.    How long did it take you from start to finish on this

15   program?

16   A.    I finished my master's in about a year.

17   Q.    You got your bachelor there, correct?

18   A.    I completed my bachelor's work there, yes, sir.

19   Q.    And how long did it take?

20   A.    It took me many years to accomplish my bachelor's

21   degree.  I started in 1972 and took courses.  And over the

22   course of the years it was -- whenever it was in the nineties

23   before I finally accomplished my bachelor's.

24   Q.    And you testified -- okay, thank you very much.  That's

25   good.  Now, you testified on direct the purpose of work was

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    to create a sense of accomplishment, accountability, and

2    responsibility?

3    A.    Yes.

4    Q.    Isn't it true that you could accomplish those same

5    goals with certified programs?

6    A.    Oh, I'm sure you could, but that's not what we're

7    about.  We're not interested in the certified program.  We

8    just want to provide a safe secure place and reach the kids

9    through Christ and teach them how to work hard.  And my daddy

10   didn't need it and his grandaddy didn't need it, and we don't

11   see why we needed a certification of some kind to teach a

12   young man how to work and the value of work.

13   Q.    Well, isn't it fair to say that you could teach the

14   same values if the boys were paid for their labors?

15           MR. BRIGGS:  Objection, Your Honor, that would call

16   for speculation.

17           THE COURT:  Sustained.

18   BY MR. STILLEY:

19   Q.    Isn't it true that those same values could be taught in

20   a program in which the instructors were certified?

21           MR. BRIGGS:  Same objection, Your Honor.

22           THE COURT:  Sustained.

23   Q.    Now, I believe you said that your father-in-law does

24   all the hiring and firing?

25   A.    He has the final say on all hiring and firing, yes,

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    sir.

2    Q.    Does he do all the hiring and firing?

3    A.    He may not physically do all the hiring firing himself

4    in person.  He may use me, but I do not do anything without

5    conversation with him.  So he is the authority.

6    Q.    Okay.  Is it possible that somebody -- for example,

7    junior staff, who hires the junior staff?

8    A.    No junior staff are hired or fired without the

9    authority and consent of Senior Pastor Wills.

10   Q.    Are you frequently the person that consults with Pastor

11   Wills about that?

12   A.    Yes, I am.

13   Q.    You told us also on direct about the type of kids that

14   come to your facilities, correct?

15   A.    Yes, sir.

16   Q.    Isn't it true that some of these kids are really pretty

17   good kids when they come in?

18   A.    The kids come to us because their parents have called

19   because there is some problem within the home that mother and

20   daddy feel like they are not reaching their child at home.

21   Most of the time when a parent calls us, whatever the

22   behavior is in that parents' mind, it's gone to a place that

23   they no longer have the ability to control.  And most often

24   after they've tried every other resource.  No parent calls us

25   and says will you take my child, enroll my child in your

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    school knowing that they are sending them miles, sometimes

2    states from home.  They don't do that lightly.  They've tried

3    often everything else.  When a parent calls us, whether the

4    kid's had lots of problems or a few problems, whatever those

5    problems are, the parent believes that those problems are

6    beyond their ability to care for and they leave their child,

7    they are losing control of the ability to raise and train

8    their child.

9          So, again, I said when we started that for some

10   folks we're a fence at the top of the hill.  For other folks

11   we're an ambulance at the bottom.  Some kids come in great

12   kids.  They just got, you know, wobbling on the axles.

13   Others come in and it's just a real tragic situation.

14   Q.    Well, isn't it true that some of these parents send

15   students to Mountain Park when there is really no problem

16   with the student?

17   A.    No, sir.

18          MR. BRIGGS:  Objection, Your Honor, calls for

19   speculation.

20          MR. STILLEY:  They've testified about --

21          THE COURT:  You've asked and answered that.  Let's

22   move on.

23          MR. STILLEY:  Okay.

24   BY MR. STILLEY:

25   Q.    Oh, can you tell us the approximate percentage of your

1    students that come from outside the state of Missouri from

2    Palm Lane -- for Mountain Park?

3    A.    To give you percentages, we're not that scientific.

4    Could I say the majority of our students come from outside

5    the state of Missouri, yes, sir, they do.

6    Q.    Is it fair to say that at least 80 percent of them come

7    from outside the state?

8    A.    That's probably a fair statement, sure.

9    Q.    And is the same true for Palm Lane in Florida?

10   A.    I'm not involved with their enrollment.

11   Q.    Now, you noted on one of these documents that you put

12   down, refer to others, no money.

13   A.    Yes, sir.

14   Q.    Was that simply because the Blair family couldn't

15   afford the tuition at that point in time?

16   A.    At that point in time they could not afford the

17   tuition, yes, sir.

18   Q.    Does Mountain Park ever take students kind of on a

19   scholarship basis where their parents don't have to pay?

20   A.    We have provided amounts of scholarship in times past,

21   yes, sir, we have.

22   Q.    Any particular reason that the Blair family wouldn't

23   qualify?

24   A.    I don't know of a particular reason or the

25   circumstances at the time, no, sir.

```
 1    Q.    Isn't it true that -- scratch that question.

 2          MR. STILLEY:  Your Honor, could I have just a moment

 3    with my client?  Thank you.  Pass the witness.

 4          THE COURT:  Very well.  You ready for your next

 5    witness?

 6          MR. BRIGGS:  We are.  We have nothing further of

 7    Pastor Gerhardt.  Thank you, sir.

 8          MR. OLIVER:  Your Honor, we have no further

 9    witnesses on the subject matter that's near and dear to your

10    heart.  We would renew our suggestions previously made.

11          THE COURT:  Okay.

12          MR. OLIVER:  We do have another witness on the

13    battery issue, but not on the Fair Labor Standards Act.

14          THE COURT:  Do you have any rebuttal on the Fair

15    Labor Standards?

16          MR. STILLEY:  Judge, if it please the Court, what

17    I'd like to do is get the defense case closed and then we can

18    address that at that point in time.

19          THE COURT:  I understand what you would like to do,

20    but, see, I'm the one with the robe on.

21          MR. STILLEY:  And I respect that highly, Judge, I

22    certainly do.

23          THE COURT:  Good.  And I keep telling you during the

24    recess what I want to do.  So I want to know, do you have any

25    rebuttal evidence on the testimony on this Fair Labor
```

1    Standards Act issue?

2         MR. STILLEY:  Am I going to be compelled to put on

3    their rebuttal case before they are complete with their case

4    in chief?

5         THE COURT:  In terms of Fair Labor Standards Act,

6    they said they have completed.  We discussed this and you

7    said you were agreeable to it.  I guess you're changing your

8    mind.  I told you we would look at doing this this way.  You

9    said you were agreeable to it.  They said they completed

10   theirs, I said do you have anything else on that issue?

11        MR. STILLEY:  Judge, I didn't hear them say we rest

12   our case with respect to the issue.

13        THE COURT:  Please.  I'm not talking about that.

14   Are you listening?

15        MR. STILLEY:  Judge, I'm listening very carefully.

16        THE COURT:  Fine.  Listen again.  They said they

17   have completed their evidence on the Fair Labor Standards Act

18   issue.  I said do you have any further evidence or rebuttal

19   evidence on that issue?  I'm not going to allow them to put

20   any more evidence on.  They said they've rested on it.  I'm

21   not going to allow them to put on any evidence.  We discussed

22   it this during recess and I said do you have any other

23   evidence you want to put on on that issue.

24        MR. STILLEY:  Yes, Your Honor, I do.

25        THE COURT:  Fine.  Let's put it on.

```
 1            MR. STILLEY:  Let me see if I make sure I understand

 2       the rules.

 3            THE COURT:  Well, I asked you, let's put it on.

 4            MR. STILLEY:  Let me understand so I don't violate

 5       the rules.  I'm not trying to violate the rules, Judge.  I

 6       want to know when I put on this witness, am I limited to if

 7       there's something that relates both to the fair labor and the

 8       battery?

 9            THE COURT:  You can call that witness later.  You

10       can call them back again on whatever other issues you have.

11       Right now we want to deal with the Fair Labor -- I want to

12       deal with the Fair Labor Standards Act issue.  If there's

13       something on another issue, then you can call the witness

14       back again.

15            MR. STILLEY:  Judge, there's overlap.  I'm not sure

16       that I can sort the two out.

17            THE COURT:  There is -- it's all overlap.

18            MR. STILLEY:  Well, now in the subsequent rebuttal

19       am I going to be limited to only the battery and only the

20       FLSA?

21            THE COURT:  Yes.  We're going to conclude that.

22       That's what we are doing.  They will not be allowed to put on

23       any other evidence.  I just told you that.  Now, let's listen

24       to this again.  They said they have completed their Fair

25       Labor Standards Act evidence.  I want to know if you have any
```

1    other, you can put that on now.  And then they are completed.

2    Then you can complete whatever you have on that issue.

3         MR. STILLEY:  If they don't mind me putting on

4    evidence that relates to the Fair Labor Standards Act even

5    though it may have some crossover effect into the battery

6    claim, I don't mind putting my witness on.

7         THE COURT:  Well, if there is just connection there

8    that overlaps, fine.  Otherwise you'll be given an

9    opportunity to put the other evidence on separately.

10        MR. STILLEY:  Okay.  I do want to reserve my

11   objection because I feel like their case in chief should be

12   completed before I have to start.  But subject to what the

13   Court has just said, I will call a witness for rebuttal.  You

14   ready to start?

15        THE COURT:  We're ready to go.  Call the witness.

16        MR. STILLEY:  Ray Palmer.

17        MR. OLIVER:  Your Honor, the original objection to

18   the witness as not being listed in interrogatory answers

19   No. 35 and No. 36.  No. 37 of the Palm Lane answers not being

20   listed.  I just don't want to lose it.

21        THE COURT:  Come on.

22        MR. OLIVER:  I didn't want to lose it.  That's all.

23        THE COURT:  I understand.

24        (The following proceedings were held at the bench

25   and outside the hearing of the jury:)

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

 1              THE COURT:  Now, what's the story on this witness?

 2              MR. OLIVER:  Ray Palmer is a former student, Your

 3      Honor, who was not listed in Rule 26(a) disclosures.

 4              THE COURT:  Was he just recently --

 5              MR. OLIVER:  In the pretrial and only in the

 6      pretrial.  His name -- Palm Lane specifically asked in

 7      Interrogatories 34, 35, and 36 of the name, address, and

 8      phone number of people who had knowledge about things

 9      relating to the business.

10              THE COURT:  I've ruled on this.  I've excluded that

11      witness.

12              MR. STILLEY:  Wait a minute.  This is rebuttal.  And

13      rebuttal is different than the case in chief.  I didn't try

14      to put him on in the case in chief.

15              THE COURT:  Tell me what he's going to rebut then.

16              MR. STILLEY:  Let me tell you what he's going to

17      testify to if he's allowed to testify.

18              THE COURT:  Well, fine.  If he's rebuttal, you say

19      he's rebuttal.

20              MR. STILLEY:  He's rebuttal.

21              THE COURT:  Don't tell me what he's going to testify

22      to, tell me what he's going to rebut.

23              MR. STILLEY:  He's going to rebut the assertion that

24      students are not put on extended forced labor, corrective

25      labor or whatever else you want to put it.

1          MR. OLIVER:  That's an issue he raised, not an issue

2     we raised.  He can't ask a question to set up a situation for

3     him to rebut.  He asked the question, we didn't.

4          THE COURT:  Let's stay calm.  What do you have to

5     say?  It seems to me, that seems to be my recollection that

6     you raised the issue.  Go ahead.

7          MR. STILLEY:  I didn't raise -- Judge, here's what

8     they did.  They said we just do a little bit, they might have

9     to do just a little bit of work.  This boy worked for seven

10    months and they made him haul wood for seven months.  And he

11    still wouldn't have gotten off of it except his grandpa found

12    out about it and he became so desperate that his desire to

13    communicate overwhelming fear.

14         THE COURT:  Fine, fine, fine.  I don't want to hear

15    about, you know, that the grandfather got mad, all this old

16    stuff you're talking about.  See, you want to throw in

17    everything but the kitchen sink.  Now, since he's rebuttal,

18    you can have him testify because Bo Gerhardt did say

19    something about they didn't -- it was never six months, it

20    may have been a couple months or something like that,

21    whatever he said.  But you bring him on, ask him who he is,

22    what his background is in terms of having knowledge, and you

23    get to this extended punishment or discipline detail and

24    that's it, okay.

25         MR. STILLEY:  Judge, I want to make a record on

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    this.

2          THE COURT:  You do that.  You make a record later on

3    on something else.  Now, you told me -- see, you asked for

4    rebuttal.  You're like, give me an inch, you know, and then

5    give me a mile.  You told me you had a rebuttal witness.  I'm

6    giving you that.  Now you're not happy.  What do you want me

7    to do?  As they say, please, what do you want?  Forget you.

8    You bring him on with that, and we'll deal with the other

9    later.

10          (The following proceedings continued within the

11    hearing of the jury:)

12                          RAY PALMER,

13    Having been first duly sworn, was examined and testified as

14    follows:

15                      DIRECT EXAMINATION

16    BY MR. STILLEY:

17    Q.    Please state your name for the record.

18    A.    Ray Palmer.

19    Q.    And where do you live?

20    A.    Schertz, Texas, S-c-h-e-r-t-z.

21    Q.    And what large town is that near?

22    A.    San Antonio.

23    Q.    And how old are you?

24    A.    Seventeen.

25    Q.    And who do you live with?

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

```
 1    A.     My grandpa.

 2    Q.     And is that because it's -- your parents are not

 3    available to take care of you?

 4    A.     Yeah, they are my guardian.

 5    Q.     And tell us about your education before -- scratch

 6    that.  Were you at a place called Mountain Park Boarding

 7    Academy for a period of time?

 8    A.     Yes, sir.

 9    Q.     And what was your starting date and stopping date?

10    A.     I wasn't really in school that much.  I mean, I was

11    like working.  I wasn't really in school.

12    Q.     I understand.  I just want to know the date of your

13    arrival at Mountain Park and the date of your departure from

14    Mountain Park, just those two dates.

15    A.     December 7th, and I left on August 15th of 2003.  And I

16    was there --

17    Q.     And can you tell us about your educational background

18    before you went to Mountain Park?

19           MR. OLIVER:  Your Honor, what does this have to do

20    with?

21           MR. STILLEY:  I just want to let the jury know what

22    kind of individual that they are getting testimony from.

23           THE COURT:  Briefly.

24           MR. STILLEY:  Briefly.

25           THE COURT:  Right.  Go ahead.
```

BY MR. STILLEY:

Q.    Can you tell us about what grade you were in and what school you were in before you went to Mountain Park?

A.    I was in 11th grade, and I went to Samuel Clemons High School.

Q.    And what kind of grades did you have?

A.    As and Bs.

Q.    And after you got out of Mountain Park, have you been in school?

A.    Yeah, I'm in school right now.

Q.    And where are you going to school at?

A.    Samuel Clemons High School.

Q.    What kind of grades are you making now?

A.    Cs and Bs.

Q.    Okay.  When you got to Mountain Park, what kind of activities were you put to doing?

A.    I was in like second grade PACE work and I was -- and they said I was supposed to be in -- I was in ninth grade, and I was supposed to be in 11th.

Q.    And did you do PACE work?

A.    Not really.  I wasn't really in school the whole time I was there.  I was either standing in the corner on the wall or I was stacking wood.

Q.    Okay.  And how many hours a day did you work stacking wood?

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    A.    Like eight hours or a long time, I don't know exact.

2    Q.    Was it the same amount of time every day?

3    A.    Yes, sir.

4    Q.    You didn't vary the amount of time you worked at any

5    time?

6    A.    No, sir.

7    Q.    What time did you get up in the morning?

8    A.    I got up once at 4:45 in the morning and I got up at

9    3:15 in the mornings stacking wood.

10   Q.    And now why would you get up at 3:15?

11   A.    I don't know.  I guess they are just being mean.

12   Q.    And what did you do after you got up at 3:15?  On that

13   day that you got up at 3:15, can you just tell the jury what

14   you did during that day?

15   A.    I got up and I stacked wood back and forth, just back

16   and forth.  And also, I don't know, I got a big gouge on my

17   leg when I wasn't hauling wood fast enough.

18   Q.    Now, can you tell us when you got up, what time did you

19   start hauling wood?

20   A.    They gave us 15 minutes to get ready, so I started

21   3:45 -- I don't know the exact time, about 3:45.

22   Q.    Okay.  And did you go to breakfast?

23   A.    Yes, sir, when everybody else went.

24   Q.    So when you went to breakfast, how long had you been

25   hauling wood?

1    A.    We went to breakfast at seven -- yeah, we went to

2    breakfast at seven, so three hours.

3    Q.    What did you do after breakfast?

4    A.    Went back and stacked wood.

5    Q.    How long did you get to eat breakfast?

6    A.    Twenty minutes.  And sometimes I had to stand in the

7    corner.

8          MR. OLIVER:  Your Honor, does this have something to

9    do with this case?  Objection, it's irrelevant, immaterial.

10   The specific acts not rebutting anything.

11         MR. STILLEY:  This is just what I told the Court was

12   going to come out.

13         THE COURT:  Well, fine.  Let's move on with it.

14         MR. STILLEY:  Certainly.

15         THE COURT:  Okay.  Because we're talking about hours

16   and so forth, that's what you indicated to me you were going

17   to talk about.

18   BY MR. STILLEY:

19   Q.    And how long did you haul wood after breakfast?

20   A.    Are you during school or --

21   Q.    Well, did you go to school that day?

22   A.    No, sir, I stacked wood during school.

23   Q.    You stacked wood during school hours?

24   A.    Yeah.  And they had people in school going from shifts

25   to watch me.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    Q.    And what did you call the people that watched you?

2    A.    They called them orientation guides.

3    Q.    And how long -- did you get a mid morning break?

4    A.    One break, yes, sir.

5    Q.    In the mid morning?

6    A.    Mid morning, like at 11 I got a break.

7    Q.    Okay.  How long was that break?

8    A.    Five minutes.

9    Q.    And what did you get to do at that break?

10   A.    Pee and use the rest room and wash my hands and stuff

11   and get a drink of water.

12   Q.    Did you get a lunch break?

13   A.    When everybody else went to lunch, I got a lunch break.

14   Q.    And how long was the lunch break?

15   A.    Thirty minutes.

16   Q.    And what did you do after lunch?

17   A.    Went back and stacked wood.

18   Q.    And how long did you stack wood?

19   A.    Till five o'clock.

20   Q.    Did you stop stacking wood at five o'clock?

21   A.    Well, sometimes I went in and got for showers at five

22   but then sometimes I stayed until dinner, and we left for

23   dinner at six.

24   Q.    On this day when you got up at 3:15, did you quit the

25   wood stacking at 5 p.m.?

```
 1    A.     The wood stacking in the morning?

 2    Q.     No, at five in the afternoon.

 3    A.     Sometimes, yes, sir.  Sometimes I would stay till

 4    shower.  I mean, sometimes I would stay till dinner.  I would

 5    go to dinner and then go back and take a shower.

 6    Q.     Were you ever forced to carry the wood faster than you

 7    were trying to carry the wood?

 8    A.     Yes, sir.

 9           MR. OLIVER:  Your Honor --

10           THE COURT:  I'll sustain this.  We're talking about

11    hours.  Now you're talking about fast.

12           MR. STILLEY:  I'm not what?

13           THE COURT:  You're talking about how fast.  We're

14    talking about hours.

15           MR. STILLEY:  I'm talking about --

16           THE COURT:  We understand that you're saying that

17    this is work.  Now you want to talk about how fast.

18           MR. STILLEY:  Well, actually --

19           THE COURT:  There is an objection.  I am sustaining

20    that.  Okay.

21           MR. STILLEY:  Judge, can I revisit that then after

22    the conclusion, total conclusion of the case?

23           THE COURT:  We'll talk about it.

24    BY MR. STILLEY:

25    Q.     Okay.  You told us about a specific day.  Was this a
```

```
 1    typical day?  Did you typically get up before 4 a.m.?

 2    A.    Yes, sir.  I was pretty much getting up at 4:45 a.m.

 3    On 4:45 a.m. Monday through Friday for like a month.

 4    Q.    Okay.  And did you haul wood each day, Monday through

 5    Friday?

 6    A.    Yes, sir.  And actually I hauled it Saturday too.

 7    Q.    And how many weeks did this go on?

 8    A.    For like three to four weeks.  And then if I did good

 9    hauling wood, they took me off.

10    Q.    All right.  Now, did you get taken off after three or

11    four weeks at Mountain Park?

12    A.    Yes, sir.  I was on the wood stacks off and on, off and

13    on.

14    Q.    And why did you get taken off the wood stacking?

15    A.    Because I guess I got good problems -- I didn't have

16    any problems.

17    Q.    And then did you get put back on wood stacking?

18    A.    Yes, sir.

19    Q.    Why did that happen?

20    A.    Because I wouldn't eat -- I don't know.

21    Q.    Because what?

22    A.    I guess -- why did I get put back on wood time the

23    second time?

24    Q.    Yes, the second time.

25    A.    The second time I was eating breakfast and Mr. Bo
```

1    Gerhardt told me to eat my --

2              MR. BRIGGS:  Objection.

3              MR. OLIVER:  This is the other example of --

4              MR. STILLEY:  Your Honor, I'm just trying to show

5    why he was put back.

6              THE COURT:  No, you aren't.  Please.  Talk about the

7    hours that he worked.  You want to show other things.  We're

8    talking about hours.

9              MR. STILLEY:  And nothing about the reason that he

10   went back on?  Because the defendant said that the

11   corrective --

12             MR. OLIVER:  Come on, Your Honor, he's making

13   speaking objections.  He's testifying to the jury.

14             MR. STILLEY:  I'm happy to come up.  I don't have a

15   problem.

16             THE COURT:  The hours.  The hours.

17             MR. STILLEY:  And nothing about anything else?

18             THE COURT:  Well, I don't want to get into the

19   details of it.

20             MR. STILLEY:  Okay.

21   BY MR. STILLEY:

22   Q.   From the time you were first taken off of the wood

23   carrying detail until the second time that you were on the

24   wood carrying detail, how long was that?

25   A.   Like eight to nine hours.  I had to wake up at 4:45 in

```
 1    the morning.  I stayed there till breakfast, which was seven.

 2    And then after that I went back and stacked wood till lunch,

 3    and went to lunch.  And then after that I stacked wood till

 4    five o'clock.

 5    Q.   But I'm trying to find out, it sounds like that you

 6    were actually off the wood cutting detail for several days?

 7    A.   Yeah.

 8    Q.   How many days were you off the wood cutting detail

 9    before you got put back on?

10    A.   Oh, two to three weeks.

11    Q.   All right.  And when you were put back on -- wait a

12    minute, scratch that.  For this two or three weeks, did you

13    go to class during that period of time?

14         MR. OLIVER:  Come on, Your Honor, objection.

15    A.   No, sir, I stood in the corner.  I was only

16    approximately in school for like a month the whole time I was

17    there.

18    Q.   Now, when got back to wood cutting duty, how long were

19    you --

20         THE COURT:  Why don't you try to summarize this.

21         MR. STILLEY:  I'm trying to summarize it to the

22    extent that I can.

23         THE COURT:  No, you are not.

24         MR. STILLEY:  We've got a young witness.

25         THE COURT:  Please.  Stop begging up here.  You're
```

```
 1    begging.  What I'm saying is hours.  You're trying to go

 2    through the minutiae.  Talk about hours.  You told me that

 3    you had a witness who could say something different about the

 4    hours of work, and that someone was on discipline for longer,

 5    for this six-month period or something.  So let's hear the

 6    substance of that, not every little point and stop on the

 7    road.  You want to tell me about every stop on the road from

 8    here to way someplace, you know, every little -- every little

 9    town.  Don't want to hear about that.  Give me the hours that

10    you told me you were going to give me and so forth.  Give me

11    what you told me you were going to give me.

12    BY MR. STILLEY:

13    Q.    Mr. Palmer, can you tell the jury, just explain to the

14    jury how many -- the start and stop times of your work as a

15    wood hauler, so that they'll have an understanding of how

16    many hours that you had to work at this job.

17    A.    I woke up at 4:45 in the morning.

18    Q.    Excuse me, I'm sorry.  I'm not asking you to go into

19    great detail because you've already told us about the

20    details.

21    A.    Oh, okay.

22    Q.    I'm just trying to get a summary so that the jury will

23    have an understanding.

24          THE COURT:  How many hours did he work a week?  How

25    many weeks did he work?  How many days of the week did he
```

1   work?  You know, that's what I'm talking about.

2          MR. STILLEY:  That's what I'm trying it get to.

3          THE COURT:  Then get on to that.  It's not

4   difficult.

5          MR. STILLEY:  Okay.

6   BY MR. STILLEY:

7   Q.    So about how many hours a week did you work at wood

8   hauling?

9   A.    I worked eight to nine hours a day.  I don't know.

10  Q.    Times six days?

11  A.    I worked Monday through Saturday and sometimes Sunday.

12  Q.    And how many weeks of work did you do while you were

13  there?

14  A.    The math you mean?  Eight times six.

15  Q.    I'm not asking about the math on that.  I'm just asking

16  approximately how many weeks that you actually worked there.

17  What I'm trying to do is get you to exclude the times when

18  you were allowed to go to class and the times that you were

19  forced to stand in the corner.  And just tell the jury about

20  how many weeks that you were on the wood hauling detail.

21  A.    I was on and off and on.  I was on like a month and

22  then I was on it for like three weeks.  And if I wasn't

23  stacking wood, I was standing in the corner.

24  Q.    Well, you told me about a month.  You told me about

25  three weeks.  Any other times?

1  A.    I don't know the exact time.

2  Q.    Well, how many other times were you on wood cut

3  carrying detail?

4  A.    I was on it five times.  I was --

5  Q.    Well, was it about a month each time or so?

6  A.    I was on it for three days one time and I was on it for

7  three weeks sometimes.  I didn't know the exact.

8  Q.    Did you ever volunteer to do this wood carrying?

9  A.    No, sir, I was forced to do it.

10       MR. STILLEY:  Your Honor, can I have just a moment

11  with my client?

12  Q.    How much weight did you lose while you were at Mountain

13  Park?

14       THE COURT:  Sustained.  I keep warning you.  I'm

15  going to talk to you in a minute.  Maybe I'm going to have to

16  try some other measures with you.

17       MR. STILLEY:  Your Honor, I'm very sorry.

18       THE COURT:  No, this is not about that.  You are

19  begging and you're asking for sympathy.  That's what you're

20  doing.  This is not about that, okay.  You need to quit it.

21  I'm tired of warning you, okay.  You are an officer of this

22  court, and you have to understand that.  I heard you over

23  there telling your client, I'm going to ask this question.

24  You know, you keep stepping over the line.  You are an

25  officer of this court first and foremost.  I understand you

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    have a duty to represent your client, but I've talked to you

2    enough.

3              MR. STILLEY:  I did not --

4              THE COURT:  Sit down.

5              MR. STILLEY:  I did not intentionally --

6              THE COURT:  Sit down.  Cross-examination.

7              MR. OLIVER:  May it please the Court.

8                        CROSS-EXAMINATION

9    BY MR. OLIVER:

10   Q.    Mr. Palmer, you arrived -- first of all, you were never

11   at Palm Lane, correct?

12   A.    Yes, sir, I was never there.

13   Q.    Second, you arrived at Mountain Park on December the

14   2nd -- I'm sorry, December the 7th, 2002, correct?

15   A.    Yes, sir.

16   Q.    So Mr. Jordan Blair was long gone before you arrived

17   there, correct?

18   A.    Yes, sir.

19   Q.    You don't know him, never met him; isn't that right?

20   A.    Yes, sir.

21   Q.    You said that you came up from Texas, from high school.

22   Isn't the truth you came up from the special education

23   department of your high school, son?

24   A.    Yes, sir.

25   Q.    You were in special ed, weren't you?

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    A.    Yes, sir.

2    Q.    You were sent to Mountain Park by your grandfather?

3    A.    Yes, sir.

4    Q.    While you were there you received multiple letters from

5    your grandfather, in each case encouraging you to behave.

6    You see on the screen where he wrote you and sing, doesn't it

7    feel good not having to stack wood, I know you could do it.

8    Didn't he say that?

9    A.    Yes, sir.

10   Q.    Didn't he also tell you Pastor Gerhardt and his staff

11   have the knowledge to make a man out of you, please listen to

12   them?

13   A.    Yes, sir, but that --

14   Q.    That was the advice that your grandfather who had legal

15   custody of you gave you, didn't he?

16   A.    Yes, sir, but that was before he even knew what they

17   did.

18          MR. OLIVER:  Thank you.  Nothing else, Your Honor.

19          THE COURT:  Anything else?

20          MR. STILLEY:  Not at this point in time.

21          THE COURT:  Very well.  You may step down.  You're

22   excused.

23          Ladies and gentlemen of the jury, why don't we

24   take -- maybe we'll get out of here by 5:30.  Does that

25   create a problem for anyone, 5:30?  Okay.  Let's try.  Why

1  don't we take a brief recess.  Why don't you all be prepared

2  to return at five minutes to five, okay.  Recall the

3  admonition.

4          (The following proceedings were held outside the

5  hearing of the jury:)

6          THE COURT:  Mr. Stilley, you are an officer of this

7  court.  There are rules.  If you don't like them then take

8  them someplace else, not here.

9          Now, you keep going, you know, there's a marshal

10  here, we got a jail here.  And maybe if you don't get the

11  message, I'm going to get in your pocket and lock you up,

12  okay.  I'm tired of talking to you, you know.  This is

13  failure to communicate here.  And maybe there's another way.

14  You don't seem to get it.  I can understand you being fervent

15  about your client, but don't you see, you are doing the same

16  thing that you want to think that these people are doing in

17  terms of going to extremes and being fervent.  You are doing

18  this.  So you need to step above this.  And you are an

19  officer of this court.  You see, you want to think that

20  somebody else is doing something fervently because of their

21  beliefs, but you then go in the other direction and you're an

22  officer of this court and you know better.  There are rules

23  in here, and I keep telling you about them.  If you don't

24  want to abide by them, then I will be in your pocket and you

25  will be locked up.  You got it?

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1          MR. STILLEY:  Yes, Your Honor.

2          THE COURT:  You better figure it out.  I'm getting

3     tired of this.

4          (Court in recess from 4:39 p.m. until 4:53 p.m.)

5          THE COURT:  I indicated that I would revisit this

6     motion for directed verdict on this Fair Labor Standards Act

7     claim, and that's why I wanted to get to this so we could

8     move ahead.  And the Court having heard further evidence on

9     it, the Court is going to grant that motion.

10         MR. STILLEY:  Judge, I'm not through presenting my

11    case.  I've got two more witnesses.

12         THE COURT:  No, you didn't tell -- what other

13    witness you got on Fair Labor Standards Act?

14         MR. STILLEY:  Angela Collier and Melissa Smith.

15         THE COURT:  What do they have to say?

16         MR. STILLEY:  They took PE, and they can testify to

17    what PE is.  And they will testify that PE did not consist of

18    anything about conventional PE just like in a public school.

19         MR. BRIGGS:  Your Honor, as the testimony has

20    consistently been in this case, both from Mr. Blair and from

21    our clients, the girls and the boys maintained separate

22    schedules and do not do things together.  Therefore, these

23    two women will not have testimony that will be relevant to

24    Mr. Blair's Fair Labor Standards Act claim.

25         MR. STILLEY:  They didn't make any distinction

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    between girls and boys, they just said PE consists of a lot

2    of other things besides things like running, games,

3    basketball, et cetera.

4         THE COURT:  There's been no showing that the

5    activities were the same between the girl -- between the

6    girls and the boys.  I mean, the testimony was exactly the

7    opposite.  They didn't -- the witnesses who had been on so

8    far have shown that they were completely separate, separate

9    dorms, separate activities, that they were separate.  All

10   activities were separate.

11        MR. STILLEY:  Well, am I going to be prohibited then

12   to testify about that?

13        THE COURT:  How is it relevant if they are separate?

14        MR. STILLEY:  I'm just asking for a ruling.

15        THE COURT:  You've heard my ruling.  I mean, you

16   understand English.  I'm saying how is it relevant?  I'm

17   asking you how is it relevant if they are separate?

18        MR. STILLEY:  Well, on one of these -- let me make

19   my best shot at showing that it's relevant.  On one of these

20   girls, she would testify that they tried to do some other

21   activities, I believe it was another sport, and was not

22   allowed to do that even though it was what would be

23   considered typically physical education type deal.  But it's

24   in the Court's judgment that the matters concerning the girls

25   does not have any bearing on matters concerning the boys then

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1    I don't have anything except these two young ladies.

2         THE COURT:  Fine.  Well, I'm going to exclude their

3    testimony relative to the physical education portion of it.

4    There's been no evidence that the activities were the same.

5    The evidence is that they were completely separate and

6    different and apart.  And assuming even if they were the same

7    as your client testified to, the Court is still going to find

8    that these activities were part of the educational program of

9    this institution for the benefit of the students and not to

10   the benefit of the defendants.  So that claim is gone.  The

11   Court is granting that directed verdict there.

12        So here we are now, we're going to continue on on

13   this battery claim.

14        MR. STILLEY:  Judge, I had a motion -- I mean, I had

15   a response that I wanted to make to the Court.  Would the

16   Court prefer I make this in writing?

17        THE COURT:  Relative to what?

18        MR. STILLEY:  Reference to the Fair Labor Standards

19   Act.  I wanted to preserve the record and show the argument

20   that I would make that that case should be submitted to the

21   jury.  Can I present that now or do you want me to just file

22   that through the ECF system?  I mean, I'm asking that I be

23   able to make my arguments now because that might persuade the

24   Court to change its mind.  But I certainly have not --

25        THE COURT:  You had asked to brief this whole issue.

```
 1    I have all the briefs I need, okay.  I made my ruling.

 2    That's that.  We're moving on.

 3              The defendants ready to continue with this battery

 4    portion of the case?

 5              MR. OLIVER:  Yes, we are, Your Honor.

 6              THE COURT:  Go ahead.  Call -- we'll bring the jury

 7    in and we'll call the next witness.

 8              MR. BRIGGS:  Your Honor, we would like to offer one

 9    exhibit that we already used in the case into evidence.  I

10    neglected to do that.

11              THE COURT:  What is that?

12              MR. BRIGGS:  Defendants' Exhibit A, Your Honor.

13              THE COURT:  Any objection to A?

14              MR. STILLEY:  No objection.  Does that make A, C,

15    and D in?

16              THE COURT:  Fine, they will be received then A, C,

17    and D.

18              (The following proceedings continued within the

19    hearing of the jury:)

20              MR. BRIGGS:  Your Honor, defendants call Drew

21    Parrish to the stand.

22                            DREW PARRISH,

23    Having been first duly sworn, was examined and testified as

24    follows:

25                         DIRECT EXAMINATION
```

```
 1   BY MR. BRIGGS:

 2   Q.    Sir, would you please state your full name for the

 3   record.

 4   A.    Drew Parrish.

 5   Q.    And, Mr. Parrish, why don't you spell the last name

 6   too.

 7   A.    P-a-r-r-i-s-h.

 8   Q.    Very good.  Thank you, sir.  Mr. Parrish, were you

 9   employed by Mountain Park Baptist Church and Boarding Academy

10   at one point in time?

11   A.    Yes, I was.

12   Q.    Okay.  Can you define the span that you were employed

13   at Mountain Park, those dates?

14   A.    It was after I graduated in 2001.  So maybe 2001 until

15   August of 2003.

16   Q.    Okay.  And during that time were you employed as a

17   staff member?

18   A.    Yes.

19   Q.    Since leaving Mountain Park, what have you done?  What

20   are you doing now?

21   A.    I'm currently enrolled in Crown College of the Bible in

22   Powell, Tennessee.

23   Q.    And you've come from Tennessee to testify in this case?

24   A.    Yes, I have.

25   Q.    When you were a staff member at Mountain Park, was one
```

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1   of your responsibilities to greet new students who arrived on

2   campus?

3   A.    Yes, it was.

4   Q.    And that was specifically male students?

5   A.    Yes.

6   Q.    Did you have -- in your responsibility as greeting new

7   male students, do you recall meeting Jordan Blair?

8   A.    Yes, I do.

9   Q.    Okay.  Is there a particular reason why you recall

10  meeting Mr. Blair?

11  A.    I remember meeting him because he came in and he was

12  escorted by an Arkansas police officer and he was in

13  handcuffs.

14          MR. STILLEY:  Objection, move to strike.

15          THE COURT:  The jury will disregard that.

16  Q.    Continue from there.

17  A.    And what else was the question?

18  Q.    What other part -- well, what other part of the meeting

19  do you recollect that you haven't said already?

20  A.    I remember taking him down to the dorm and getting him

21  in the shower and waiting with him for dinner.

22  Q.    Okay, very good.  And, Mr. Parrish, do you recall

23  meeting him, that when you met him that he was in handcuffs?

24          MR. STILLEY:  Objection.

25          THE COURT:  Overruled.

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

```
1    A.    Yes, I do.

2    Q.    And did Mountain Park put the handcuffs on him?

3    A.    No, they did not.

4    Q.    Okay.  After the handcuffs were removed, you said that

5    you took him down to the dorm.  Were you alone when you met

6    him?

7    A.    No, I was not.

8    Q.    Who was with you at the time?

9    A.    Matt Elmore.

10   Q.    So then you and Mr. Elmore walked with Mr. Blair down

11   to the dorm?

12   A.    Yes.

13   Q.    And then you say that you took him into the dorm area

14   to take a shower?

15   A.    Yes.

16   Q.    Okay.  And during that time frame did Mr. Bo Gerhardt

17   come on the scene and meet Mr. Blair?

18   A.    Yes, he did.

19   Q.    Mr. Parrish, do you recall during that meeting around

20   the shower area or in the bathroom area, do you recall seeing

21   whether Mr. Gerhardt ever pushed or shoved Mr. Blair into a

22   bathroom sink or wall?

23   A.    No, I do not.

24   Q.    You never saw that happen?

25   A.    No.
```

```
 1    Q.    Okay.  And if you had seen something like that happen,
 2    you would remember it; is that correct?
 3    A.    Yes.
 4    Q.    If you had seen that happen, would you have reported it
 5    to the staff at Mountain Park?
 6    A.    Yes, I would have.  I would have told Sam Gerhardt.
 7    Q.    Very good.
 8              MR. BRIGGS:  That's all I have.  Thank you.
 9              THE COURT:  Cross-examination.
10                             CROSS-EXAMINATION
11    BY MR. STILLEY:
12    Q.    You're no longer employed by Mountain Park; is that
13    correct?
14    A.    Yes.
15    Q.    When did you cease employment?
16    A.    I believe it was around August of 2003.
17    Q.    And how long were you at Mountain Park?
18    A.    As a staff member?
19    Q.    In any capacity.
20    A.    Approximately five years.
21    Q.    And how did you arrive at Mountain Park?  Did you come
22    as a student?
23    A.    Yes, I did.
24    Q.    And how long were you a student?
25    A.    For approximately three years.
```

```
 1    Q.    And what happened after the three years?

 2    A.    I graduated.

 3    Q.    And did you -- after you graduated you apparently then

 4    became a staff member?

 5    A.    Yes.

 6    Q.    Were you told anything about a no-touch policy or

 7    policy of that nature?

 8    A.    Yes.

 9    Q.    What were you told that that policy was?

10    A.    That under no circumstances any staff is to touch any

11    student in an aggressive manner.

12    Q.    All right.  During the five years that you were there,

13    did you ever see that policy violated?

14          MR. BRIGGS:  Objection, Your Honor, that's outside

15    the scope of direct.

16          THE COURT:  Sustained.

17 BY MR. STILLEY:

18    Q.    How much contact did you have with Jordan Blair?

19    A.    I don't know, a lot I guess.

20    Q.    Give us a time frame of your contact.

21    A.    His whole enrollment.

22    Q.    How did it come to be -- you were in contact with

23    him, okay, his whole enrollment at Mountain Park?

24    A.    I'm sorry?

25    Q.    Was it his whole enrollment at Mountain Park?
```

1    A.    Yes.

2    Q.    What about at Palm Lane, were you ever involved, did

3    you see him at Palm Lane?

4    A.    Yes.

5    Q.    And for how long did you see him at Palm Lane?

6    A.    Until he left Palm Lane.

7    Q.    You go to Palm Lane with him?

8    A.    Yes.

9    Q.    Has anybody told you what your testimony should be in

10   this case?

11   A.    No.

12          MR. STILLEY:  Your Honor, can I have just a moment?

13   Pass the witness.

14          MR. BRIGGS:  We have nothing further, Your Honor.

15          THE COURT:  Thank you, Mr. Parrish.  You may step

16   down.

17          MR. OLIVER:  The defendant rests, Your Honor.

18          MR. STILLEY:  Your Honor, we do have some rebuttal.

19   Can I have about 15 minutes?  I cannot?

20          THE COURT:  No.

21          MR. STILLEY:  Okay.

22          THE COURT:  Who do you have?  Call it.

23          MR. STILLEY:  Okay.  Ray Palmer.

24          MR. OLIVER:  He wasn't there during the relevant

25   period of time.  Anything he says is irrelevant.

1          THE COURT:  Has he got something to say about this

2    battery?

3          MR. STILLEY:  Judge, I don't want to say things I

4    shouldn't in front of the jury.  Can we please come up?  I

5    don't want to say anything I shouldn't say.

6          THE COURT:  Come up.

7          (The following proceedings were held at the bench

8    and outside the hearing of the jury:)

9          MR. STILLEY:  Let me explain what he can testify to

10   and let you rule if I can put this on or not.  I'm not

11   trying --

12         THE COURT:  Fine.  Tell me what he has got to say.

13   I don't need an explanation.

14         MR. STILLEY:  While he was carrying the wood there

15   was another kid and they told him he was not carrying the

16   wood fast enough and he said I can't carry it faster.  And

17   they shoved him and shoved him into the wheelbarrow that he

18   was using to carry the wood and put about an inch long gash

19   in his leg.  He asked for medical care on it and they didn't

20   give him any medical care, they just slapped a little salve

21   on it.  And he's got about an inch long scar on his leg from

22   being shoved into that.

23         THE COURT:  Fine.

24         MR. OLIVER:  Your Honor, it's irrelevant and not

25   relevant in time and place.  It doesn't have anything to do

1    with Bo Gerhardt.

2              MR. STILLEY:  It's the policy.

3              MR. OLIVER:  It's other acts.  He can't prove --

4              THE COURT:  I am excluding that.  That's excluded.

5              MR. STILLEY:  Let me see what else I've got here, if

6    anything.

7              THE COURT:  The pitching rotation.

8              MR. STILLEY:  I understand, Judge, but I'm just

9    about done here.

10             THE COURT:  Fine.

11             MR. STILLEY:  He said that Mr. Gerhardt -- and these

12   are his words from an e-mail.  He said one day he was

13   stacking wood and Mr. Gerhardt beat the crap out of me

14   several times.  And when this happens he takes me in a room

15   alone and starts hitting.  He did this to me once in the new

16   boys' dorm and another time out back near the school and also

17   when I first got there.  And then he says I never really been

18   away from home.  Can I put that on?

19             MR. OLIVER:  Same objection, Your Honor.

20             THE COURT:  You know, here we got a different act.

21             MR. STILLEY:  I'm trying to prove that their

22   no-touch policy is not true.  They say they have one.

23             THE COURT:  They may have a policy.  That doesn't

24   say that they still don't have the policy.  You're saying

25   that this witness said Mr. Bo Gerhardt took him in the room

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

1   so nobody could see, he didn't want anybody to see he was

2   violating the policy according to your proposed testimony.

3          MR. STILLEY:  Correct.  Correct.

4          THE COURT:  That doesn't change the fact that they

5   have a policy.  Well, you know, a lot of people got a policy.

6          MR. STILLEY:  They said they followed the policy.

7   I'm trying to show they didn't follow the policy.

8          THE COURT:  That's why we got courtrooms, police

9   officers and everything else because some people sometimes

10  don't follow the policy.  But we're talking about whether the

11  policy was followed with your client.

12         MR. STILLEY:  That's the testimony I've got.

13         THE COURT:  Okay, him.  That's him.  That's

14  Mr. Palmer.  Who else you got?

15         MR. STILLEY:  Well, I'm not even going to try the

16  rest.  I'm not going to get the rest in.

17         THE COURT:  You're a smart fellow.  Are we resting

18  completely then?

19         MR. OLIVER:  We're finished.

20         THE COURT:  Fine.  We'll do an instruction

21  conference shortly and have the jury come back tomorrow

22  morning at nine and argue this case.

23         MR. STILLEY:  Certainly, Judge.  Judge, I hope you

24  understand.  I appreciate the opportunity to --

25         THE COURT:  I understand.  You are a fervent

1    believer in what you're talking about.  That's all good.  But

2    can't you see the fervency in which they believe what they

3    are doing and then the fervency of you over here.  See, you

4    are an officer of the court.  You see what I'm saying?  It's

5    different.  Now, you want to bad mouth somebody else and talk

6    bad about them about them doing some things you fervently

7    believe aren't right that they are doing, but those things

8    are not part of this case.  And you're supposed to exercise

9    more control.  You are a lawyer and an officer of this court.

10    That's the difference, okay.  So then you are worse than

11    them, and you don't see that.  You don't see it.

12              (The following proceedings continued within the

13    hearing of the jury:)

14              THE COURT:  Both parties are resting, ladies and

15    gentlemen ladies of the jury.  We're going to adjourn for the

16    day and try to get some things together so this show can go

17    along smoothly tomorrow morning hopefully.

18              You all have a pleasant evening.  Recall the

19    admonition.  See you -- return to your jury rooms at 9 a.m.

20    in the morning, okay.

21              (The following proceedings were held outside the

22    hearing of the jury:)

23              THE COURT:  We're going to do this instruction

24    conference now so that we can get along smoothly here

25    tomorrow morning.

1          MR. OLIVER:  Your Honor, would it be easier for the

2    Court if I simply brought you an MAI battery package start to

3    finish rather than going through and fighting about it?

4          THE COURT:  No.

5          MR. OLIVER:  Okay.

6          THE COURT:  Because if we wait till tomorrow, there

7    will be problems.

8          MR. OLIVER:  All right.

9          THE COURT:  You know, it's like a song a guy sings

10   called Raindrops, LaVert says, "I got places to be and people

11   to see."  See, if I delay, it will get bad.  So I got to get

12   you all locked in now.

13         Now, this is what we need to do.  We need to put a

14   clean copy and a citated copy of instructions together.  And

15   we will have a stack of agreed and a little bitty stack of

16   disagreed.  You know, because there was another guy, he was a

17   great philosopher from California, his name was Rodney King,

18   he said, "Can't we all just get along, please?"

19         See, so we're going to try to get along and have

20   this small stack of instructions.  And, you know, of course

21   it's going to start with the instruction I gave at the

22   beginning of the trial will not be repeated here.  Do we have

23   all that stuff in here, these stacks?  Do we have those

24   instructions, the basic boilerplate?

25         MR. OLIVER:  Judge, I'd be glad to take all of those

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

1  and sort them out for you and get you when you we get them

2  sorted out.

3        THE COURT:  That's what I'm talking about, but

4  you'll need Mr. Stilley's stack so you have a very small

5  stack of disagreed, because we're going to make this record

6  today.

7        MR. OLIVER:  Judge, I don't have -- yes, sir.

8        THE COURT:  I'm going to give you all mine.  Now, do

9  you have those initials in there and the last one will be

10 giving the jury directions about unanimity and so forth.

11       MR. OLIVER:  I know the only thing that's not typed

12 that's good is a form of verdict.

13       THE COURT:  Well, we can figure out how that should

14 be and that will make it very simple tomorrow morning because

15 we will have agreed upon that.

16       You can join him over there, Mr. Stilley.

17       (Court in recess from 5:15 p.m. until 5:38 p.m.)

18       THE COURT:  I'm going to go through all those you

19 have agreed.  Proposed Instruction No. 1 is a Model Jury

20 Instruction 3.01, which starts with, "Members of the jury,

21 the instructions I gave at the beginning of the trial and

22 during the trial remain in effect, I'm now going to give you

23 some additional instructions."  That would be No. 1.  Any

24 objection to that?

25       MR. STILLEY:  No objection.

1            MR. OLIVER:  None, Your Honor.

2            THE COURT:  Proposed No. 2 is MAI -- Model Jury

3    Instruction 3.02, which begins with, "Neither in these

4    instructions nor in any ruling, action, or remark that I have

5    made during the course the trial have I intended to give any

6    opinion or suggestion as to what I think your verdict should

7    be."  Any objection to that?

8            MR. STILLEY:  None.

9            MR. OLIVER:  No, sir.

10           THE COURT:  No. 3 is the credibility instruction of

11   the Model Instructions 3.03.  It starts with, "In deciding

12   what the facts are, you have to decide what testimony you

13   believe and what testimony you do not believe."  Any

14   objection to that?

15           MR. STILLEY:  None.

16           MR. OLIVER:  No, Your Honor.

17           THE COURT:  Okay.  Proposed Instruction No. 4 is

18   3.04 of the Eighth Circuit Model Instructions, about burden

19   of proof.  It starts, "In these instructions you're told your

20   verdict depends on whether you find certain facts have been

21   proved," and then goes on to what the burden is, of greater

22   weight or preponderance of the evidence.

23           MR. STILLEY:  No objection.

24           THE COURT:  Okay, fine.  Proposed Instruction No. 5

25   is the verdict director relative to battery.  It's MAI then

1    23.02.  It says, "Your verdict must be for plaintiff if you

2    believe:  First, defendant intentionally pushed plaintiff;

3    and second, defendant thereby caused a contact with plaintiff

4    which was offensive to plaintiff; and third, such contact

5    would be offensive to a reasonable person."  Is that it?

6              MR. STILLEY:  That is correct.

7              THE COURT:  Okay.

8              MR. OLIVER:  Judge, we have no objection.  I'm

9    assuming that some time the Court is going to tell the jury

10   that Bo Gerhardt is the only defendant remaining.

11             THE COURT:  Yes.

12             MR. OLIVER:  Otherwise that would be confusing.

13             THE COURT:  And I don't have any problem with you

14   all indicating that also to remind them in any sense.  But I

15   need to remind -- tell them that the only claim remaining is

16   the battery claim against the remaining defendant Bo

17   Gerhardt.

18             So this proposed Instruction No. 6 is the damage

19   instruction.  "If you find in favor of Jordan Blair against

20   Defendant Bo Gerhardt, then you must award Jordan Blair how

21   much will fairly compensate him and so forth."  Any objection

22   to six?

23             MR. STILLEY:  No, objection.

24             MR. OLIVER:  None, Your Honor.

25             MR. STILLEY:  Actually, Judge, I'm going to need to

1    have -- I want a punitive instruction, so we might need to

2    put two blanks, a blank for punitive.

3              THE COURT:  What gives you the basis for me to even

4    give a punitive instruction?

5              MR. STILLEY:  Intentional tort.

6              MR. OLIVER:  There's no evidence of any intent.

7              THE COURT:  No, I will -- I'm ruling now that the

8    Court will not give a punitive damage instruction.  So that's

9    that.

10             Instruction No. 7 is 3.06 of the Eighth Circuit

11   Model Jury Instructions.  It directs them how to conduct

12   their deliberations.

13             Now, I'll tell you what.  Are we straight with all

14   the instructions so far?  Are there any others?

15             MR. OLIVER:  If you tell me how you want the form of

16   verdict, I'll bring you one typed in the morning.

17             THE COURT:  I don't know how I want it.  We're going

18   to discuss that now and figure it out.  Maybe you all can

19   draw something up and we can agree on it.  But what I'm going

20   to do, I'm going to give you this clean copy and maybe you

21   can just have them run off tomorrow without the caption up

22   here.

23             MR. OLIVER:  Yes, sir.

24             THE COURT:  Where it says the numbers and so forth.

25             MR. OLIVER:  Yes, sir, I'll take that out.

1          THE COURT:  So I'm going to give those to you and
2     I'll keep the other copies.  And you can just bring us all.
3     Because I don't want the jury to have any citations about
4     them about the title at all.
5          What about the form of verdict?
6          MR. OLIVER:  Your Honor, I'd be glad to type a
7     simple one right out of MAI, if you find the issues in favor
8     of -- we the undersigned jurors find the issues in favor of,
9     blank, insert the name.  Then, you know, the next paragraph,
10    if you find in favor of the plaintiff, then insert the amount
11    with eight signature blanks -- one signature blank.
12         THE COURT:  One signature blank, the foreperson, and
13    date.  Do you have any disagreement with that, Mr. Stilley?
14         MR. STILLEY:  Sounds good to me, Judge.
15         THE COURT:  Let's do that.  I'll see you all at nine
16    in the morning.
17         Now, how much time do you wish to argue your case,
18    Mr. Stilley?
19         MR. STILLEY:  Twenty minutes would be plenty.
20         THE COURT:  Twenty minutes would be more than
21    plenty.  How about 15 minutes?  You just got this -- and
22    that's five minutes too much.  All you got now is a battery
23    claim.
24         MR. STILLEY:  I understand, Judge.  And 15 minutes,
25    I agree with you.

1        THE COURT:  All we got is a battery claim.  You

2    think about what the testimony was relative to that, and 15

3    minutes is five too much.

4        MR. STILLEY:  I agree with you, Judge, I think

5    you're right in your analysis.

6        THE COURT:  Now, how do you want to divide that?

7    What do you want to reserve?

8        MR. STILLEY:  Five.

9        THE COURT:  Ten and five.  What kind of warnings do

10   you want on each?

11       MR. STILLEY:  Do you have a light that can come on?

12   Are you talking about -- oh, you're talking about warning?

13       THE COURT:  You know, it's either like the gong

14   show, they put a hook out, drag you off the stage or they

15   gong you.

16       MR. STILLEY:  I'd rather not get dragged off the

17   stage.

18       THE COURT:  What do you want, two minutes on the

19   first one and a minute on the second?

20       MR. STILLEY:  A minute is just right.

21       THE COURT:  A minute on both, on the first ten or

22   two minutes on the first ten?

23       MR. STILLEY:  Two minutes on the first ten, one

24   minute on the second.

25       THE COURT:  Okay.  What kind of warning you want,

PDF created with FinePrint pdfFactory trial version   www.pdffactory.com

```
1    Mr. Oliver?

2              MR. OLIVER:  Two minutes will be fine, Judge.

3              THE COURT:  As Tupac Shakur said, Mr. Stilley, but I

4    ain't mad at you.

5              MR. STILLEY:  Thank you, Judge.

6              THE COURT:  I don't take this personal.

7              MR. STILLEY:  I appreciate that, Judge.  And I feel

8    the same way about it.  And it's been a great pleasure

9    practicing in your court.  Thank you very much.

10             THE COURT:  It's good to be fervent.  And some folks

11   would clearly dislike the methods and manners with which they

12   undertake what they do.  And I don't know that this is

13   necessarily a proper forum unless you got the parents

14   cosigning on with saying that something different happened

15   than they proposed.

16             Now, maybe the proper forum are the state licensing

17   authorities or something, but, you know, the fervency has a

18   problem here where we have these rules and you have to

19   conduct yourself within the rules.  So in terms of presenting

20   your client's case and how fervently you feel, you keep

21   stepping over the line, and that's where the problem is.  And

22   as I told you, don't think that I'm going to keep calling you

23   up here to the bench and tell you about it.  I'm going to

24   bust you up in front of this jury so that they will know.

25   Because when you continue to do it, it does no good to have
```

1   you up here.  The jury has to know that you continually do

2   something.  So that's what I'm telling you, it's not going to

3   do any good with me.

4        Because it's like a friend of mine, he was swinging

5   his golf club in the house in the winter.  And he swung down

6   in his shag carpet and he took a divot out.  And his son was

7   eight or nine years old.  And he looked at him and said, "I'm

8   going to tell mama."  Because he was trying to stomp it back

9   in.  So, see, I will tell.

10       MR. STILLEY:  I will try real hard to not take a

11  divot out tomorrow.

12       THE COURT:  I know it's hard.  But this thing, this

13  case, when you don't have parents or whatever cosigning on

14  this deal saying that this isn't what they signed up for, you

15  got a problem with this case.  And sometimes if you want

16  results, you want -- you got to figure out how you can get

17  it.  And it didn't seem to me that this was the proper forum

18  for that.  So whatever.  I understand your fervency.

19       MR. STILLEY:  Thank you, Judge.  I appreciate it.

20       THE COURT:  I'll see you all tomorrow morning.

21       MR. OLIVER:  Nine o'clock.

22       (Court in recess at 5:47 p.m.)

23

24

25

1                    C E R T I F I C A T E

2           I, Susan R. Moran, Registered Merit Reporter, in

3    and for the United States District Court for the Eastern

4    District of Missouri, do hereby certify that I was present

5    at and reported in machine shorthand the proceedings in the

6    above-mentioned court; and that the foregoing transcript is

7    a true, correct, and complete transcript of my stenographic

8    notes.

9           I further certify that I am not attorney for, nor

10   employed by, nor related to any of the parties or attorneys

11   in this action, nor financially interested in the action.

12          I further certify that this transcript contains

13   pages 1 - 227 and that this reporter takes no responsibility

14   for missing or damaged pages of this transcript when same

15   transcript is copied by any party other than this reporter.

16          IN WITNESS WHEREOF, I have hereunto set my hand

17   at St. Louis, Missouri, this _____ day of

18   _____, 2004.

19

20                        _____

21                        /s/ Susan R. Moran
                          Registered Merit Reporter

22

23

24

25

PDF created with FinePrint pdfFactory trial version www.pdffactory.com